**EXHIBIT 1**

# DECLARATION OF MR. RICHARD YAMAMOTO

Ms. Parthenia Richardson

      v.

Agency Case No. 05-51-00166

U.S. Department of Commerce

I, Richard Yamamoto, pursuant to 28 U.S.C. § 1746, hereby declare:

I understand that this is the claim accepted for investigation:

Complainant, formerly the Assistant Director for Counter Espionage, GS-15, Office of Security, Office of the Secretary, Department Of Commerce alleges that she has been subjected to a continuous pattern of discrimination and harassment constituting a hostile work environment due to her race (Black) and sex (female). She cites the following:

1. During the period of May to June 2005, Richard Yamamoto did not support her as a supervisor and challenged her employment actions, despite her having obtained guidance from the Office of Human Resources and the Office of General Counsel.

2. In June 2005, Yamamoto took away her ability to make supervisory decisions, including hiring selections.

3. Since June 2005, Yamamoto requires her to meet him on a weekly basis for 30 minutes to discuss supervisory decisions and duties.

4. During the period of May to June 2005, Yamamoto failed to provide her any positive feedback, despite receiving positive feedback from two major clients, and also failed to openly acknowledge her contributions to the organization.

5. During the period of April to June 2005, Yamamoto undermined her authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining her rationale for employment decisions and actions.

6. In May 2005, Yamamoto allowed her Caucasian male counterparts and subordinate staff to communicate with her in a disrespectful and condescending manner.

7. During the period of April to May 2005, Yamamoto treated her with hostility and openly challenged any statements she made in staff meetings and other open forums.

EXHIBIT 7   1

8. On June 1, 2005, Yamamoto told her that he, his colleagues, and his staff did not have confidence in her ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about her coming on board, he now had doubts. At that time, Yamamoto also stated that he had no more "blue chips" available, and that he has used them all up.

Complainant also alleges retaliation for having engaged in the EEO complaint process when:

9. On July 11, 2005, she was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, she was being temporarily reassigned from her position as Assistant Director for the Counter Espionage Division for a period of 120 days. She also learned that Thomas deSeve, a Caucasian male counterpart, was assigned to assume her responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave her a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, she was informed that she was to move out of her office so that deSeve could occupy her space. She contends that deSeve already had adequate space, which would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. She further contends that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under her supervision on May 9, 2005, yet were not required to relocate.

12. She was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to her on her reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, she spoke to Bell and requested reasonable accommodation, as recommended by her physician for stress and Bell commented, "You are not under any stress, we just moved you from stress."

15. As a result of the refusal to comply with her request concerning the stress and to escape the hostile work environment, she "submitted an involuntary termination" (i.e., constructive discharge) on September 6, 2005.

For the purpose of this declaration I confirm that I am a Japanese-American male.

*When were you appointed to your position as Director, OSY?*

Response: August 12, 2002.

*Were you then employed by OSY?*

Response: No, I came from another agency.

*You are SES?*

Response: Yes.

*Why did you select Ms. Richardson for the position of Assistant Director of the Counterespionage Division?*

Response: Mr. Dave Bell was the selecting official. After he made the selection, he informed me of his selection.

*Were you aware when you concurred in the selection of her race?*

Response: I believe I was.

*How did you become aware?*

Response: To the best of my recollection, I learned of Ms. Richardson's race from unsolicited conversations with officials at the Department of Homeland Security who called me in support of Ms. Richardson and referenced her race in a positive manner.

*Did you speak with Mr. Nashid prior to concurring in the selection?*

Response: Yes. Mr. Nashid recommended Ms. Richardson to me and informed me that Ms. Richardson was his inside source of information at the Department of Homeland Security.

*Did you tell Ms. Richardson that you wanted her to clean up everything?*

Response: I am not sure what "clean up everything" means. When Ms. Richardson began with OSY, I briefed her on the goals of OSY (reduce the

EXHIBIT 7 Page 3

security risk, develop personnel to their fullest potential, and satisfy our customers and stakeholders) and asked her to provide firm and fair leadership in organizing the Counterespionage Division. Ms. Richardson was to ensure objective accountability via performance metrics and continue initiatives we had in place or initiated by her predecessor, Bob Page, while he was the Acting Assistant Director of her Division. I did not instruct her to "clean up everything." In fact, I informed her of several high performing employees in the Counterespionage Division that could help her in improving her Division. I asked her to review the performance metrics and determine what needed to be fixed. She demonstrated to me by her statements that she was not a big fan of performance metrics and systems. I emphasized to her that OSY was fully committed to performance metrics and the Management Application for Security (MAPS) system and she needed to be on board.

*Were there problems in the Counter Espionage Division that you brought to her attention?*

Response: The leadership and the overall performance of the Division did not meet my expected standards. When she began with OSY, I instructed Ms. Richardson to focus attention on the Declassification project because it was well behind schedule. Additionally, I told her I wanted to see improvement in providing accurate and timely information and assistance and increasing overall productivity. I emphasized that the essence of leadership was obtaining the willing cooperation of subordinates to meet high standards and that her subordinates should be treated as she would want to be treated. The employees

EXHIBIT 7    4

were receiving a minimum of 40 hours a year of formal training as required by their Individual Performance Plans and there were several high performers, but the Division did not appear to fulfill its potential.

*She states her employees complained about her because she was making them do their jobs and no one had made them do their jobs previously. Is that correct?*

Response: No.    The complaints were not about being held to task; rather they related to the unprofessional manner in which Ms. Richardson managed employees.  In fact, the high performers performed less effectively because of the way they were being treated. If she had been actually been making her employees "do their jobs," as she states, productivity should have increased rather than decrease as it did.  In fact, after Ms. Richardson was detailed to Special Projects Officer, productivity in the Counterespionage Division dramatically increased.

*Was Ms. Richardson harassed during her employment with the Office of Security?*

Response: No.  Both Mr. Bell and I wanted her to succeed and provided her numerous opportunities and assistance to do so.

*Did you or Mr. Bell discriminate based on Ms. Richardson's race and sex in actions you took affecting her?*

Response: No.  Race and/or sex were never considered in any of the actions taken that affected Ms. Richardson during her tenure with OSY.

*Did Mr. Bell provide Ms. Richardson an unfavorable mid-term counseling, reassign her and relocate her to force her to resign?*

EXHIBIT 7 page 5

Response:  Mr. Bell gave Ms. Richardson a fair and accurate mid-term review that reflected previous discussions with her.   Ms. Richardson was not reassigned but was detailed as Special Projects Officer and given GS-15 equivalent work to provide her an opportunity to succeed in another assignment with OSY.  Ms. Richardson was physically relocated because Acting Assistant Directors of the Counterespionage Division needed to occupy the Counterespionage Assistant Director's office where sensitive files specific to that position are kept in a safe and employees in that Division can have access to their supervisor.

*Did Mr. Bell take such actions in reprisal for her filing allegations of discrimination?*

Response:  Absolutely not.  Discussions on resolving the problems in the Counterespionage Division occurred well before her EEO complaint on June 20, 2005.  The attached June 17, 2005 e-mail from the Office of Human Resources verifies that Mr. Bell was concerned about Ms. Richardson's ability to lead the Counterespionage Division and was exploring detailing her before Ms. Richardson filed her allegations.  (Attachment 1)

*Did you fail to support Ms. Richardson* as a supervisor *and take away her ability to make supervisory decisions, including hiring selections?*

Response:  I gave Ms. Richardson full support and even placed OSY credibility on the line as I defended her for several months before it became clear that her management style and performance of her Division were not supportable.

I supported Ms. Richardson when she wanted to physically move three of her subordinates, Pettyjohn, Hilton, and Alston, from one location to another and when she selected Wanda Smith for an adjudication position. I supported Ms. Richardson in dealing with two of her subordinate supervisors, Ms. Guier and Ms. Powers, when she complained about them and indicated she needed assistance in dealing with the issue. I supported the reassignment of these two supervisors with Ms. Richardson's welcome concurrence. I supported Ms. Richardson's actions in suspending the clearance of one of her subordinates and when she asked to have that employee detailed outside of her Division. When Ms. Richardson was having difficulty finding senior members for one of her security panels, I helped by personally asking senior members to sit on the panel. A number of Ms. Richardson's employees complained to me about her and I supported her and defended her actions.

A selection of Alarie Shyllon for an Information Security vacancy was made prior to Ms. Richardson's arrival. Rather than have the then Acting Supervisor formally make that selection, I supported the recommendation of holding off on the formal selection until Ms. Richardson's arrival and gave Ms. Richardson the opportunity to make the formal selection decision. Ms. Richardson decided not to make the offer and I supported her decision. Mr. Fred Schwien, the Executive Secretary, received an anonymous complaint (Attachment 2) about Ms. Richardson and expressed his concern to me that this could be related to problems he had with his security paperwork. I defended Ms. Richardson to Mr. Schwien and later encouraged Ms. Richardson to establish some rapport with

Mr. Schwien since I knew they both had served in the same military Headquarters about the same time.

*Ms. Richardson stated there were three selections that were made while she was the Assistant Director. She got in trouble in the first because she did not have a panel interview. She states she had asked two people to serve on a panel but, when they did not appear, she went ahead and conducted the interview herself. She stated you did not allow her to make two subsequent selections.*

Response:   I never told Ms. Richardson she could not make selections. As background, there were three vacancies that were all posted and there were three certificates issued, one for each position. Ms. Richardson made the first selection and the only selection that was made during her tenure as Assistant Director for Counterespionage Division. The other two selections were not made until after Ms. Richardson was detailed to Special Projects Officer and therefore she was not involved in those two selections. Regarding the first selection, Ms. Richardson verbally told me she would be convening a selection panel and later mentioned it during the May 24 staff meeting (Attachment 3). After I asked Ms. Richardson who was on the panel, she informed me that she had asked Ms. Wanda Smith, Ms. Mary Isley, and Mr. Michael Bodin to develop questions and to sit on the panel but they never showed up. Later, the individuals involved informed me that Ms. Richardson had asked them to develop questions and to sit in on this panel. Before the appointed time, two of them went to her office and saw the interview already in progress with the door locked. Ms. Rachel Hughins, our human resources administrator, had also been asked to sit in on the panel.

Despite all these actions indicating Ms. Richardson understood the need for a selection panel, she later insisted that she was unaware of any such requirement.

*Would you give me the name and race of each of the people she asked to participate on the panel and those you spoke afterwards?*

Response: Wanda Smith, African-American female, could not attend. Mary Isley, African-American female, and Michael Bodin, Caucasian male, were also asked to attend and attempted to attend the meeting.

*What positions were Ms. Shyllon and Ms. Isley selected for?*

Response: Ms. Shyllon and Ms. Isley were selected as Team Leaders for the Information Security and Personnel Security Programs, respectively.

*Who made those selections?*

Response: Tom deSeve was the Acting Assistant Director for Counterespionage Division and he had one other person as a panel member.

*You have the person making the selection on the panel and have at least one other person with them?*

Response: Yes, that is OSY's internal practice.

*Is this policy in Writing?*

Response: No. This is the established practice which evolved to mitigate the allegations of favoritism.

*Does that policy pertain to positions at any grade level?*

Response: The practice involves all GS or equivalent positions in OSY.

*Did you require Ms. Richardson to meet with you on a weekly basis to discuss supervisory decisions and duties?*

Response: In early June 2005, Ms. Richardson informed me she was aware of the major problems in her Division, but she could not think of any solutions. Ms. Richardson stated she recognized that the Division had problems; that none of the problems were her fault; and that she didn't know how to solve them. I asked her to schedule meetings with me weekly so I could assist her in solving the problems in the Counterespionage Division. She agreed. There were no similar meetings prior to June 2005.

*Did Ms. Richardson meet with you weekly?*

Response: Ms. Richardson met with me on June 6 and 13 then failed to schedule any meeting for the weeks of June 20, 27, and July 5.

*Did you undermine her authority with staff by allowing them to come directly to you with their concerns and side with them on controversial matters without first obtaining her rationale for employment decisions and actions?*

Response: I did not undermine her authority. It is my practice to obtain both sides of the story. Based on my extensive experience in law enforcement, I don't rely only on the first account. I have an open door policy and I attempt to visit everyone in their offices to provide an opportunity for open communication. It is important to me that employees in OSY know they can communicate with any member of management.

*Did Ms. Richardson's Caucasian male counterparts and subordinate staff communicate with her in a disrespectful and condescending manner?*

7    10

Response: I do not tolerate disrespectful or condescending communication by anyone in this organization. The only person that Ms. Richardson accused of disrespectful communication with her was Ms. Janel Schuh. Ms. Richardson had missed several due dates for a report and Ms. Schuh went to her to obtain the data that was needed. When Ms. Schuh described what was said, I did not find it to be disrespectful. Ms. Schuh informed me she would ensure she did not appear to be disrespectful in the future.

*What is Ms. Schuh's position and race?*

Response: Ms. Schuh is a Caucasian Management Analyst Team Leader in the Strategic and Administrative Division in OSY.

*Did you treat Ms. Richardson with hostility and openly challenge statements she made in senior staff meetings and other open forums?*

Response: No. I am enclosing copies of all the minutes of staff meetings in which Ms. Richardson participated. There were only two instances in which I said something after she made a comment and in neither case was there anything that I considered or could be construed as hostility. It is my practice to question statements that I do not fully understand in an attempt to be well-informed. I do not believe I ever treated Ms. Richardson with hostility or openly challenged statements she made. The staff minutes reflect all topics that Ms. Richardson discussed (Attachment 4).

On April 5, the minutes reflect: "Rich suggested that Parthenia work with Ron [Martin—an African-American male] to set parameters for meeting the timelines." This is in regard to HSPD-12, which is an acronym for Homeland Security

Presidential Directive. The April 26 minutes reflect: "Rich suggested keeping minutes of the meetings" after she informed the staff that she was having a security contacts meeting.

*It would be helpful to have the documents you are referencing. You can provide them to me when you return your declaration. Do you recall any meetings during which she was embarrassed or made to look like she didn't know what she was talking about?*

Response: No. Again, it is my practice to ask questions any time I am not clear on a topic being discussed. Reviewing the staff meeting minutes, I do not see any topic for which I believe Ms. Richardson would be embarrassed. The only "open forums" both she and I attended were the Security Council, the Principal Human Relations Managers Council and the OSY Senior Management Conference.

*Was she embarrassed or challenged on any position she took during those meetings?*

Response: No. I can also include minutes of those meetings.

*I don't think that will be necessary. I don't recall Ms. Richardson making a specific allegation concerning that, but I will review her declaration. If she did make reference to a specific meeting, I'll allow you to address it. Did you tell her that you, your colleagues, and your staff did not have confidence in her ability to manage?*

Response: No, I did not tell Ms. Richardson that I did not have confidence in her ability to manage. Again, I supported her decisions until I came to realize that

Exhibit 7    12

she was continuing to make what I thought were poor management decisions. I told her that I was **losing** confidence in her as her division became less productive and as the morale spiraled downwards and that she needed to take action to correct the downward spiral. I don't believe I ever said "I, or others, had lost confidence in her abilities" since I personally had not totally lost confidence. Of all the Divisions in OSY, none were experiencing the problems evident in the Counterespionage Division.

*What exactly was the problem with her division, why was it "spiraling downward?*

Response: Productivity was down. Morale was the lowest I had ever seen. Multiple employees were seeing Mr. Bell and me to complain about Ms. Richardson's treatment of them. We had two of our high performers depart, one of whom told us he was leaving because of the way he was treated. When I attempted to change his decision, he said that it was past that point. An employee (African American female) that came from Census to help adjudicate cases asked to leave because she felt the Division was dysfunctional and that there was no central guidance and standard procedures. Ms. Richardson dismissed this complaint by saying that she told one of her employees to brief the employee from Census, but Ms. Richardson did not follow up to ensure her instructions were fulfilled and blamed the departed employee (Mr. Michael Bodin) for the lack of guidance and direction.

*Who were these two employees who left?*

Response: Katrina Herbert, an African-American female and Michael Bodin, a Caucasian male.

EXHIBIT 7 PAGE 13

*What was Ms. Richardson doing to make these employees so miserable?*

Response: According to the employees, Ms. Richardson was not being fair; being dictatorial, treating them like a drill sergeant rather than treating them as professionals. Ms. Richardson reportedly came up with arbitrary times, and required them to do things just to show she had control over them. The attached e-mail reflects how she treated the highest performer, and the most overworked, in the Information Security program despite the fact that there were administrative support personnel available to accomplish the task (Attachment 5). The employees reported that Ms. Richardson made bad decisions and when employees brought to her attention that her decisions conflicted with policies, she would blame them for the inevitable problems that resulted.

*Do you have any reason to believe their complaints were not valid?*

Response: I was initially skeptical of the complaints but later found them to be valid. For example, employees complained that Ms. Richardson told them to stop security inspection programs because she didn't think they were appropriate. I checked and found the complaint to be valid—inspections had in fact been arbitrarily discontinued. Ms. Richardson faulted work on the Declassification Plan and COMSEC inventory as the reason this important requirement was not conducted for several months (Attachment 6). Neither projects consumed so much time as to justify discontinuing the inspection programs.

*Do you have any reason to believe their complaints were based on race and sex discrimination?*

7    14

Response: No. Race and sex were never mentioned or discussed.

*Was Ms. Herbert looking for another position before Ms. Richardson came on board?*

Response: She mentioned that she was considering moving out of the area.

*Did Ms. Herbert speak with you or Mr. Bell, did either of you have an exit interview with her?*

Response: I, personally, did not have an exit interview with her. I talked to her in one of my walk-by's, but she gave me the guarded answer that she thought it was time to leave. Ms. Herbert sent me an e-mail on July 13, 2005--three days after Ms. Richardson was detailed—to explore returning to OSY (Attachment 7). On November 21, 2005, I received a second inquiry from Ms. Herbert on returning to OSY through a third party.

*In Mr. Bell's mid-year counseling of Ms. Richardson, Mr. Bell noted several deficiencies in her performance. I believe we've already covered some of the matters he discussed: morale in the division at an all time low; he had lost, or was losing, confidence in her ability to manage; her communication skills were described as rude, harsh, and dictatorial; she unilaterally changed policy. He also told her complaints were received from field offices. Were there complaints from field offices?*

Response: Yes, for example, a string of e-mails from our Regional Security Officer in Norfolk, Virginia detail one of the complaints (Attachment 8). The e-mails dealt with her unilaterally changing Departmental policy regarding interim security clearances. OSY's policy was to grant interim security clearances in

certain situations and Ms. Richardson refused to follow that policy. Even after I emphasized that only I approve policy changes, she persisted.

*Had you seen letters acknowledging specific accomplishments by Ms. Richardson and, if so, was she recognized for these accomplishments? Ms. Richardson referenced two, specifically, one from the ITA.*

Response: There was an ITA letter (Attachment 9) and an e-mail from the Bureau of Industry and Security (Attachment 10), which I forwarded to her with a comment. I personally recognized her verbally as well regarding those comments. Her two accomplishments were clearly recognized in her mid-year evaluation (Attachment 11). Ms. Richardson alleges (Allegation #4) that I failed "to provide her any positive feedback." When warranted, I provided her verbal praises and sent her positive feedback e-mails (Attachment 12).

*Mr. Bell also said she failed to take responsibility for deficiencies in the division and attributed them to others. Were the deficiencies in her management skills or were functions in her division not being accomplished? You spoke to this briefly before.*

Response: It was primarily Ms. Richardson's management skills that resulted in functions in her division not being accomplished. Even after acknowledging problems in her division, she still refused to accept any responsibility. There are a number of examples of important functions that Ms. Richardson stopped such as security inspections, pre-appointment checks, and temporary clearances without coordinating with her supervisor.

*Minutes from an OSY Staff Meeting held on July 12, 2005 indicate the staff was advised Ms. Richardson would be focusing "on implementing several high-level departmental initiatives to include the declassification initiative and installation of SIPERNET connectivity. She was also supposed to support COOP, HSPD-12, Census Decennial and other [high] priority projects." Was Ms. Richardson actually assigned and working on any or all of these projects?*

Response: The projects were prioritized and Ms. Richardson's first and immediate concern in her position as Special Projects Officer was the Declassification project. The project was behind schedule and required the attention of a GS-15 level equivalent employee to manage it and implement it appropriately. That was her highest priority. The next priority was the Decennial security project for Census, again Gs-15 equivalent work, for which she received information from Harold Washington, the OSY Director at Census.

*Ms. Richardson alleges the work she was assigned was previously performed by Alarie Shyllon, a GS-12. Were the duties Ms. Richardson, a GS-15, was assigned the same as those performed by Ms. Shyllon, a GS-12 or was she to take some other approach?*

Response: The duties Ms. Richardson was assigned as Special Projects Officer were clearly senior level duties, commensurate with her grade level, and cleared by the Office of Human Resources Management. Most of the employees trained in the program were SES or GS-15. A GS-12 was not in a position to communicate directly with these individuals and the duties of a security specialist were not the same as my senior representative. Although some day to day

duties for the Declassification Project were performed by Ms. Shyllon, Ms.

Richardson was responsible for overseeing and executing the project. To bring

the project up to the required level, a senior official like Ms. Richardson was

needed to coordinate and implement the project and engage other senior

officials. Ms. Richardson was asked to develop an action plan, detailing how she

was going to accomplish the requirement including engaging senior officials.

*In May 2005, Ms. Powers and Ms. Guier were reassigned to special projects.*

Response: Ms. Powers was reassigned to the Emergency Management Division.

She moved to the Emergency Operations Center and occupied a temporary work

station until an open cubicle became available. Ms. Powers is supervised by Mr.

Bob Page, Assistant Director of the Emergency Management Division. Ms. Guier

was assigned to the Contract Guard Program in the Client Services Division,

working for Mr. Tom deSeve.

*Complaints were allegedly made to you and Mr. Bell concerning "bizarre*

*behavior" by an employee with "severe psychiatric problems." When a security*

*clearance wasn't approved i.e., the CIA refused to grant him access secret FBI*

*information, this individual was supposedly reassigned to the Bureau of Industry*

*and Security. Do you recall complaints about this individual and, if so, what*

*action was taken to deal with him?*

Response: There was an employee who had conflicts with some other

employees in the Anti-Terrorism Division. The individuals involved were

physically separated. The employee applied for a job with BIS, competed, and

was selected for the job. The employee was not reassigned by OSY and OSY

was not involved in any request for reassignment. The description of his clearance is incorrect: He had a top secret clearance and the CIA was adjudicating a higher level of clearance. There was no CIA refusal and the employee had direct access to FBI secret material.

*Did Mr. Bell make a statement in the presence of employees in the Anti-Terrorism Division to the effect that he "just had to fire Parthenia" and that she was going to be working on special projects in the back area of that division?*

Response: Not that I am aware of. I know he made it a point to ensure that the Counterespionage and Anti-Terrorism Divisions understood that Ms. Richardson was laterally transferred so that people would understand that Ms. Richardson was detailed to the Special Project Officer position with responsibilities for the Declassification project and the Decennial project. She was physically relocated to a private office located in the Anti-Terrorism Division because it was available private space and her previous office was needed by Acting Assistant Directors for the Counterespionage Division as it contained the safe with sensitive security files and also was accessible to the employees in that Division.

*The area to which Ms. Richardson was relocated has been described as a cubbyhole, an area no one else wanted to occupy; with partitions, not walls; and affording her no privacy. Is that accurate?*

Response: No, it is not accurate. The office was previously occupied by a GS-14 equivalent in charge of our intelligence. It was a private office composed of materials similar to her previous office. After Ms. Richardson departed, the newly hired Assistant Director for Anti-Terrorism, GS-15 equivalent, occupied the office.

In addition, the office was to be renovated and Ms. Richardson was aware that the office was being expanded. The work order, dated July 27, was submitted while she occupied the office (Attachment 13).

*Was this office space formerly occupied by Bob Repass?*

Response: That's correct.

*Ms. Richardson states she was told she was being relocated from her office so it could be occupied by Mr. deSeve, who was assigned responsibility for her division, as well as his own. Did Mr. deSeve actually assume responsibility for the Counter Espionage Division and did he move to her former office?*

Response: Mr. deSeve officially and fully assumed responsibility as the Acting Assistant Director for the Counterespionage Division, in addition to his assigned duties as Assistant Director for Client Services. Morale and productivity of the Counterespionage Division dramatically improved during the time he was Acting Assistant Director for the Counterespionage Division. The Counterespionage Assistant Director's office was needed to conduct any Counterespionage management business and, because the safe in that office had all of the sensitive security files for all the members of OSY, files which the Acting Assistant Director for the Counterespionage Division needed to be able to access. Mr. deSeve used his regular office as his principal location, but used the Counterespionage office close to the employees in that Division. His other office is a distance from the Counterespionage Division, on the other side of the main lobby. The current Acting Assistant Director for Counterespionage, Dane Woodard, African American male, is occupying Ms. Richardson's former office.

Pages 7    20

*While working in the area of the Anti-Terrorism Division, did Mr. Page monitor Ms. Richardson's attendance, i.e., when she came in and when she left for home?*

Response:  No.  Mr. Page is on the opposite side of the Division.

*The allegation was made by another witness, but not by Ms. Richardson.   Would Mr. Page have let everyone know he was "on her case"?*

Response:  This allegation is without merit.

*Were any of the actions taken so significant that Ms. Richardson would have been humiliated by them or forced to resign because of them?*

Response: From my perspective, there were no actions which would have humiliated Ms. Richardson or would have been so significant that she would be forced to resign. She did not inform me of any such instances perceived by her. I was surprised by her resignation and I know of no immediate, proximate cause that prompted her to abruptly submit her first e-mail of resignation and no action on Mr. Bell's part that precipitated her second e-mail of resignation.

*Was Ms. Richardson experiencing medical problems?*

Response: Not that I was aware of.  Ms. Richardson told me early on that she suffered from allergies.  She never communicated to me that she had any other medical problems.

*Did she request action to accommodate any medical problems?*

Response:  To my knowledge, Ms. Richardson indicated to Mr. Bell that she was suffering from stress, but did not provide any details.

7    21

*Did you consider her medical condition to constitute a disability, i.e., a condition substantially affecting any of her major life activities?*

Response: No, I never did.

*So the Information you have came from Mr. Bell?*

Response: Any medical information was communicated to Mr. Bell. Ms. Richardson did not communicate any medical problem to me.

*Did Mr. Bell act on his own initiative or at your direction in counseling Ms. Richardson, reassigning her, and relocating her?*

Response: Mr. Bell operates under his own initiative and had authority to make all of the decisions made. Mr. Bell was selected as the Deputy Director in part because of his initiative and independent assessments. Mr. Bell, who came from the Department of Justice, led the creation of the new Anti-Terrorism Division through tremendous personal initiative.

*Did you or Mr. Bell take the actions described based on reprisal for Ms. Richardson's EEO complaint?*

Response: Absolutely not.

*When and how did you become aware of Ms. Richardson's EEO complaint?*

Response: On June 20, I was notified by the EEO office. On July 5, 2005, Ms. Richardson was given the opportunity to resolve her complaint through informal mediation.

*Did you tell Mr. Bell about the EEO complaint?*

Response: Yes.

7    22

*Were there similar problems with Assistant Directors of other divisions, similar complaints by clients and subordinates?*

Response: No, the other Assistant Directors did not have similar problems and complaints about them—and certainly none in terms of quantity and severity. Actually OSY routinely receives dozens of compliments and very few complaints. Ms. Richardson received two kudos; however, the amount and level of complaints were unprecedented.

*Is there anything else you want to tell me?*

Response: I compliment you on your comprehensive questioning. Let me summarize the issues you raised: Ms. Richardson was not discriminated against based on her sex and/or race at anytime during her tenure with OSY. She demonstrated poor leadership, lack of technical competence, and a tendency to mischaracterize issues. Confidence in her ability to manage deteriorated over time. Mr. Bell and I attempted to assist her and provide her every opportunity to be successful. When confidence in her management skills became unsustainable, Ms. Richardson was detailed to another senior level position to provide her another opportunity to be successful. At no time did Mr. Bell or I discriminate against Ms. Richardson because of her race and/or sex or take any actions in retaliation for her engaging in protected activity.

I have read the above statement consisting of __23__ pages. I declare under the penalties of perjury that my statement is true, correct and complete to the best of

my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Richard Yamamoto

Executed on: _Dec 5, 2005_



**Jay Jamison/HCHB/Osnet**
06/17/2005 03:46 PM

To   Richard Yamamoto/HCHB/Osnet@osnet
cc
bcc
Subject   Probationary Period

Rich,

Parthenia's current appointment is subject to completion of a one year probationary period for assignment to a supervisory position beginning on February 20, 2005. This means the employee must serve a probationary period before initial assignment as a supervisor becomes final. Service on detail, temporary promotion, or reassignment to another supervisory position while serving a probationary period is creditable towards completion of probation. Service in a nonsupervisory position is not creditable. Satisfactory completion of the one year probationary period is a perquisite to continued service in the position. An employee who, for reasons of supervisory performance, does not satisfactorily complete the probationary period is entitled to be assigned to a position in the agency of no lower grade and pay than the one the employee left to accept the supervisory position. During the probationary period, second level supervisors/managers should provide guidance and training on supervisory skills and techniques and monitor and document performance. See also DAO 202-315 for a complete discussion of probationary and trial periods.

Maybe you and I should reconvene early next week to discuss this further. Your call as to whether you want to include the second line supervisor in our discussion. I would hold off on informing the employee that you are ~~dealing~~ *detailing* her to another position until after our discussion.

If you have any questions, let me know.

Jay

*attachment 2*

| Fred Schwien/HCHB/Osnet | To | Otto Wolff, Richard Yamamoto/HCHB/Osnet@osnet |
|---|---|---|
| 04/05/2005 05:33 PM | cc | |
| | bcc | |
| | Subject | Fw: Shenanigans at DOC |

FYI

Fred L. Schwien
Executive Secretary
United States Department of Commerce
Room 5838, 14th & Constitution Ave, NW,
Washington, DC 20230
Telephone: (202) 482-3035
Cell: (202) 550-9637
E-mail: fschwien@doc.gov
—— Forwarded by Fred Schwien/HCHB/Osnet on 04/05/2005 05:33 PM ——

| Matthew Healy/HCHB/Osnet | To | Fred Schwien/HCHB/Osnet@osnet |
|---|---|---|
| 04/05/2005 04:57 PM | cc | |
| | Subject | Fw: Shenanigans at DOC |

Admin? Seems kind of serious or at least looking into.

Matt Healy
Executive Secretariat
Office of the Secretary
U.S. Department of Commerce
Washington, D.C. 20230
phone: (202) 482-3660
fax: (202) 482-4090
—— Forwarded by Matthew Healy/HCHB/Osnet on 04/05/2005 04:56 PM ——



| Anonymous <nobody@paranoici.org> | To | CGutierrez@doc.gov;, devans@doc.gov;, DSampson@doc.gov |
|---|---|---|
| 04/04/2005 06:05 PM | cc | |
| | Subject | Shenanigans at DOC |

Dear Sir,

I would like to take a second of your time to bring to your attention a very bad situation that is happening right now--under your watch--at DOC.

Within you InfoSec division a new hire, Perthenia Richardson, has been brought on from DHS. This high level manager is abusing many of your best and award winning DOC employees. Many have complained to higher level management but these complaints are quickly calked up to "a new management style."

7    26

This "management style" includes daily harassment, daily threats to fire people,
positional demotions and many other things horrendous things that you have not been made privy to. Recently Ms. Richardson has taken to installing listening devices in public areas and berating her staff on some paranoid delusion of "rumor telling".

No one this far down the totem has the nerve to tell you that people are being made destroyed and I know you would not want this.

Please verify this for yourself and please don't be fooled by the cool and "friendly" demeanor of Ms. Richardson.

Please help us.

Sincerely, Your Loyal and Hardworking DOC Employees



**Parthenia**
**Richardson/HCHB/Osnet**
04/07/2005 07:41 AM

To   Richard Yamamoto/HCHB/Osnet@osnet
cc
bcc
Subject   Re: Closing the Loop

History:        This message has been replied to

Rich -

I just saw him in the hallway and (he does remember me from SHAPE)  I explained that I would have the correct answer on which form he could have once the OPM Representative comes next week.

He seemed very satisfied with that answer and told he we would like to sit down with me and catch up on things since SHAPE.

Sincerely,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov


Richard Yamamoto/HCHB/Osnet

**Richard**
**Yamamoto/HCHB/Osnet**
04/07/2005 07:10 AM

To   Parthenia Richardson/HCHB/Osnet@osnet
cc
Subject   Closing the Loop


Parthenia:

Have you closed the loop with Fred Schwien yet?

Rich

NOTE: Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting May 24, 2005

*Present*
Richard Yamamoto
Tom deSeve
Bob Page
Dave Bell
Parthenia Richardson
Cindy Snyder
Patty Grasso
Vanessa Greer

*Absent*
Kevin Sadler

### Introduction.
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues.

### Emergency Management
- Bob mentioned a 3-day training exercise for COG.
- Homeland Security briefing with the Deputy Secretary is scheduled for 5/25.
- Bob commented that he had a good meeting 5/24 with Rich on PINNACLE and that it is moving along fine.
- The EOC conference room will not be available for meetings next week because of the final HVAC renovations.  Next Tuesday's staff meeting will be held in room 1528.
- The 435 and SOW for escape masks was submitted to OAM 5/23.  These masks will allow emergency personnel (i.e. EOC, EPT, ERT, and guards) to talk through the mask.

### Counterespionage
- Parthenia mentioned that Katrina Herbert's job announcement goes out today.
- The vice Silver position is in the review process.   The panel meets today on it.

### Project Management Office
- Patty mentioned that she met with Ron Martin and Chiara on HSPD-12 on 5/24.
- Patty also mentioned that the Security Council Meeting will be held on June 8 and the pre-meeting will be June 6.

### Strategic and Administrative Management
- Cindy mentioned that Kevin is in training at Suitland and will be back in the office on Thursday.  Jackie Jacobs is on travel to Seattle and Boulder and Greg Servant will be going to Jeffersonville this week to conduct a physical inventory and to discuss administrative issues.

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

## OSY Staff Meeting June 7, 2005

*Present*
Richard Yamamoto
Bob Page
Dave Bell
Kevin Sadler
Patty Grasso
Parthenia Richardson
Vanessa Greer

*Absent*
Tom deSeve

**Introduction**.
- Rich welcomed the staff. The meeting was then opened to personnel to discuss any issues.

**Emergency Management**
- Bob commented that PINNACLE continues to be the hot topic of the week.
- Bob mentioned that he had a good COOP meeting this morning (6/7/05), with the Bureaus. Bob brought them up to par with where we are going, & how we are going to do it. Personnel accountability seemed to be the biggest discussion topic.
- Bob has a Smithsonian Meeting @ 11 on June 8th.
- Chapter 7 is now in internal coordination with Pat before it goes out to the Admin. offices. Bob commented that they have a suspense date of June 30 to get it out for formal coordination.

**Project Management Office**
- Patty mentioned that they are continuing to work on the slides for the Security Council Meeting on 6/8/05.

**Counterespionage**
- Parthenia also mentioned that she received certs for the vice Herbert and vice Silver positions. Parthenia will be setting up interviews for all.
- On June 8th, Parthenia will be going to the Department of State to confer on a revoked clearance.
- Parthenia received from OPM a report that gives the error rate for submissions and will share with Tom deSeve.
- Parthenia asked Bob Page to review an instruction sheet created by Bob Deats for people with a STE and STU. This sheet will be given to all COMSEC holders.

**Strategic and Administrative Management**
- Kevin mentioned that the announcement has gone out for the Federal Employed Women Conference. He reminded staff that all conference requests have to go through the Training Panel for approval. The training panel deadline is June 14.
- Another training course is out for new Supervisors and new Supervisors in OS; it runs from June 27-30.
- Cindy is out of the office until Thursday, June 9, due to death in the family.
- Kevin will be out of the office next week.



Ramondia Kee/HCHB/Osnet
03/03/2005 11:34 AM

To Richard Yamamoto/HCHB/Osnet@osnet, David Bell/HCHB/Osnet@osnet, Robert Page/HCHB/Osnet@osnet, Thomas de
cc Kevin Sadler/HCHB/Osnet@osnet

bcc

Subject OSY Staff Meeting 3/1/05 (revised)

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

## OSY Staff Meeting March, 1, 2005

*Present*
Richard Yamamoto
Dave Bell
Kevin Sadler
Bob Page
Tom de Seve
Patty Grasso
Pat Billeter

**Absent**
Vanessa Greer

**Introduction**

Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

**Emergency Management**

▪ Bob noted that Tom Roston is currently attending the Master Exercise Practitioner Course.
▪ He also mentioned that there will be a COOP briefing on March 11th and the Pinnacle dates for the June    COOP exercise are June 22nd-23rd.
▪ Bob stated that there will be an EBS address March 2nd at 8:30 a.m.  The Secretary will be in the building    at that time.  Bob requested volunteers to monitor this activity.

**Counterespionage**

▪ Parthenia mentioned that during her first week at OSY she has met with Linda Kirton (OHRM) and will    review the suitability processing policy.
▪ She is processing paperwork to activate the PIPS terminal.

**Special Assistant**

**NOTE:** Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting March 8, 2005

*Present*
Richard Yamamoto
Kevin Sadler
Bob Page
Parthenia Richardson
Patty Grasso
Jason Blanton
Vanessa Greer

**Absent**
Dave Bell
Tom de Seve

**Introduction.**
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

**Emergency Management**
- Bob mentioned that all the communication lines in Hagerstown and CAMS should be up and running shortly.  Once this is ready to go, people will be dispersed to the site along with a COMSEC person to make the proper equipment connections.
- First official senior exercise is this Thursday, March 9.  The Deputy Secretary will participate and a briefing for Otto will be held on Friday.
- Bob also reiterated information Jim Van Brunt had distributed which related to a major exercise March 10 at Ft. Belvoir that could tie up traffic around the installation.

**Counterespionage**
- Parthenia made mentioned that Susan Powers has sent out the ISOO data call for Classification-related Cost Estimates -- feedback is needed by March 11.
- Alarie will be sending out the reminder of the second phase of the NSI Refresher briefing to those who haven't completed it.  Monday, March 14, Delores Pettyjohn will be assisting with this effort by providing responses to customer inquiries.
- Sherrie Phelps has a contractor coming in Monday, March 14, to look at relocating the card reader from the door on the PerSec side to the front door in rm. 1521.  The proposed setup will be similar to the AT division and will include a camera that will be installed to identify individuals needing access.
- Parthenia submitted a roster to Rich of personnel with SCI access and has recommended reducing the overall number.

7    32

NOTE: Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting March 15, 2005

*Present*
Richard Yamamoto
Kevin Sadler
Bob Page
Parthenia Richardson
Patty Grasso
Dave Bell
Tom deSeve
Vanessa Greer

## Introduction.
Rich welcomed the staff. The meeting was then opened to personnel to discuss any issues they had.

## Emergency Management
- Bob commented on the invitation for the TOPOFF3 meeting that Rich passed to him. He will respond to the RSVP accordingly.
- Bob also mentioned that he had a draft response on the Homeland Security Working Group webcims for Rich's signature.

## Counterespionage
- Parthenia made mentioned that she has heard there are issues with the time it takes to input data into MAPS when you don't have all of the information. Deena Richey is gathering this information and will pass it on to Patty for further investigation.
- Parthenia has a planned meeting with Linda Kirton, Jonathan Perez and others in reference to the rewriting of the Security Manual so it can be in accordance with the HSPD-12 requirements.

## Project Management Office
- Patty commented that there are still issues being identified with MAPS.
- All MAPS training is complete.
- A Security Council Meeting is scheduled for March 23rd, a practice session is scheduled for Monday, March 21st @ 3:00 p.m. with Rich.

## Strategic and Administrative Management

NOTE: Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting March 22, 2005

*Present*
Richard Yamamoto
Kevin Sadler
Bob Page
Parthenia Richardson
Patty Grasso
Dave Bell
Tom deSeve
Vanessa Greer

**Introduction.**
Rich welcomed the staff. The meeting was then opened to personnel to discuss any issues they had.

**Emergency Management**
- Bob mentioned that the ERT training started 3/22, 18 people showed up for a tabletop exercise.
- Tom Roston will be sending out an e-mail message to all A/D's and OSY personnel in HCHB relating to OSY refresher training in the EOC.
- Bob mentioned that he had a good meeting with the Secret Service re: Octagon. Our Secretary will have to play a part due to the secondary mission of Octagon.
- Tom is performing an SME review for a ZA-0080 position which recently closed.
- Bob received word that the Deputy Secretary will not be participating in the TOPOFF exercise.
- Carla Smith is out sick for the second week.
- Bob will be on vacation next week; Tom Roston will be acting in his stead.

**Counterespionage**
- Parthenia mentioned that work is progressing on the classification/declassification guide. InfoSec will have the guide back to her by March 31, with inserts, and addressing some of the issues that have been brought to her attention.
- Parthenia mentioned that an MOU was drafted between OSY/OHRM to take over the old SF 312's that were in PerSec's area. PerSec will be giving them to OHRM on a weekly basis.
- Parthenia also mentioned that OPM will be getting HR a PIP's terminal so HR can conduct appropriate checks.

**Project Management Office**
- Patty commented that herself and Ron met with Chiara Alsop 3/21, to discuss issues with MAPS concerning HSPD-12.
- First users group for MAPS is being planned for 4/5.

7    34

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

### OSY Staff Meeting March 29, 2005

*__Present__*
Richard Yamamoto
Parthenia Richardson
Tom deSeve
Tom Roston
Vanessa Greer

*__Absent__*
Dave Bell
Patty Grasso
Kevin Sadler

---

## Introduction
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

## Emergency Management
- 
- Tom mentioned that he performed the SME review for the new position in EOC.
- There will be an ERT functional exercise on March 30th in the EOC.
- Tom mentioned that with the OSY functional exercise on March 29th, the biggest problem was the radios.  An after action report is being put together for Rich's review.

## Counterespionage
- Parthenia made mentioned that she has InfoSec working on the classification/declassification guide.  By March 31 she should have this completed.
- Sharrieff Nashid called Parthenia to let her know the Secretary's name was on the no-fly list.  The Secretary was allowed through, however, his name is on the watch list. A memo is being prepared to take care of the problem.
- Parthenia has a meeting scheduled with OPM April 19th, in the future, these meetings will be held quarterly.
- Michael Boldin did an e-mail to the field offices on Datacomp, the responses received thus far are positive.
- PerSec is working on pre-check agreements for ITA.
- Parthenia also mentioned that she received a draft on the final adjudication guidelines that came from Linda Guier as part of a working group from which she was involved.  A lot of changes were made; so far the guide looks good.

## Project Management Office
- N/A

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

### OSY Staff Meeting April 5, 2005

**_Present_**
Richard Yamamoto
Parthenia Richardson
Tom deSeve
Bob Page
Kevin Sadler
Patty Grasso
Jason Blanton
Pat Billeter

**_Absent_**
Dave Bell
Vanessa Greer

**Introduction**.
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

**Emergency Management**
- Bob mentioned that he is extending the recruitment for the ZA-IV position in EOC.
- The EOC is preparing for a full-scale TOPOFF exercise and planning for the Pinnacle exercise in June.
- Bob mentioned that he will present the redesign of the COG team mission to FEMA on Thursday.

**Counterespionage**
- Parthenia mentioned that she had a meeting with Anthony Calza and on Clearance and HSPD-12 issues.
- She also met with Ron Martin regarding HSPD-12.  Rich suggested that Parthenia work with Ron to set parameters for meeting the timelines.

**Project Management Office**
- Patty noted that the MAPS user's group meeting that was held today went well. Further information is required to determine which outstanding issues are related to maintenance.
- The MAPS contractor will begin next to work on reports.
- The MAPS contractor should have a ball-park estimate for integrating HSPD-12 by Friday.

**Strategic and Administrative Management**
- Kevin mentioned that work continues on the FY06 adjusted and FY07 initial budgets.
- Revised FY05 performance plans have been drafted and will be distributed soon for appropriate signatures.

**Anti-Terrorism**
- Jason mentioned that he is working to review AT assessments and has been working to address with the various bureaus the proper persons to include for executive copies.
- A revised Top-10 will be calculated to take into consideration new assessments along with recently obtained information relative to countermeasure implementation.
- Jason also highlighted Ron Martin's role within OSY as it relates to HSPD-12.

NOTE: Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting April 12, 2005

**Present**

Richard Yamamoto
Kevin Sadler
Bob Page
Parthenia Richardson
Patty Grasso
Tom de Seve
Dave Bell
Pat Billeter

### Introduction

Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

### Emergency Management

- Bob mentioned that he is gearing up for the Pinnacle exercise to be held on June 23rd.
- Bob also mentioned that the Topoff exercise went well and a more formalized hot wash activity will occur later.

### Project Management

- Patty noted that there are no new issues with MAPS.  They have reached the maximum allowable funds to be on the Commits contract and will be exploring writing a new contract.
- Patty mentioned that she met with Ron Martin on the integration of HSPD-12 issues with MAPS for the control measure module.

### Counterespionage

- Parthenia mentioned that Delores Pettyjohn has been accepted into the Admin Certification Program.
- She mentioned that she and Bob Page would be working together to conduct mid-year performance evaluations for her staff.
- Parthenia noted that she is currently working COMSEC and BIS issues.
- Following discussion of suitability/pre-appointment determinations, Parthenia will create a matrix indicating who (OSY/Field/HR) is doing what to ensure consistency throughout OSY.

### Client Security Services/HCHB

- Tom mentioned that he should be completing mid-point reviews this week.
- He also noted that he is working vacancy issues at Gaithersburg, Norfolk, and Boulder.
- He mentioned that he would be on travel from this Thursday through next Tuesday.

### Strategic and Administrative Management

- Kevin provided an FTE update on the various positions being filled throughout OSY.  He also mentioned that several promising Presidential Management Fellows have applied for consideration with OSY.
- Kevin mentioned that he is working with Linda Curtain, Acting HR Director on filling vacancies.
- Kevin noted that HR representatives conducted briefings on T&A coding for OSY staff last week.
- Kevin mentioned that the Administration and Finance staff are finishing the March status of funds and will be soon requesting CD-435s for planned expenditures to occur throughout the remainder of the FY.

### Anti-Terrorism

- Dave mentioned that Treece has been accepted into the Admin Certification Program.
- Dave noted that several staff members would be returning from travel this week.

Exhibit 7    37

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

## OSY Staff Meeting April 19, 2005

*Present*
Richard Yamamoto
Parthenia Richardson
Tom deSeve
Bob Page
Kevin Sadler
Dave Bell
Patty Grasso
Vanessa Greer

**Introduction.**
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

**Emergency Management**
- Bob Page had nothing to report.

**Counterespionage**
- Parthenia made mentioned that she met with Rochelle Combs, the OIG Security point of contact to go through HSPD-12 on how its going to affect her contractors.
- Parthenia and Mike Boldin met with Tony Proctor last week.  Mike helped them get set-up with e-quip.

**Project Management Office**
- Patty mentioned that they are still working with CENTECH on modules.
- Patty also mentioned they had their second MAPS User Group Meeting on 4/19.

**Strategic and Administrative Management**
- Kevin mentioned that Pat Billeter would be coordinating rewrites & updates that will be necessary on the Security Manual chapters.
- OHRM has asked that we validate all of the questions in a question library they have put together on the old COOL system. Kevin mentioned that they would start with the 080's first.  This will be going on for the next two weeks.
- Finally, Kevin mentioned that they are still answering a couple of back & forth questions on the '07 Budget.  A meeting is set for this Thursday to discuss our '07 request with the budget analyst.

**Anti-Terrorism**
- Dave mentioned that Mike Allen let him know that the DAO was ready for Rich's signature.
- The Secretary will be traveling to Texas and New Mexico this week.

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

## OSY Staff Meeting April 26, 2005

*Present*
Richard Yamamoto
Parthenia Richardson
Tom deSeve
Bob Page
Dave Bell
Cindy Snyder
Vanessa Greer

### Introduction.
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues they had.

### Emergency Management
- Bob mentioned that his midpoints were done.
- Mike Sade had a couple of comments on the Mask paper.  This is being tracked down for response.
- A broadcast on the Eclipse ground sprinklers will be coming out this week.
- Bob also mentioned that he has coordinated the badges for CIO.

### Counterespionage
- Parthenia mentioned that today (4/26) they did their first integration of the CE Division briefing.
- A security contacts meeting will take place this Thursday (4/28) from 10-12noon; subjects covered will be:  HSPD-12 OMB guidance; changes in processing contractors; a newsletter that will begin in May; Michael Bodin will talk about E-Quip; clearance certs; and Bob Deats will provide an overview on information security and declassification.  Rich suggested keeping minutes of the meetings.
- Parthenia will meet with ISOO, Margaret Rose and her supervisor on Friday, April 29 @ 10am.
- Parthenia the GS-13 position (vice Silver) is ready for HR.
- Katrina Herbert will be leaving to return to DOD, no departure date yet.  Deena Richey's last day with Infosec will be Thursday, then she will start work with MAPS.
- Parthenia said CE will use ManTech for information verification, MAPS entry, and catch-up on suspense files.

### Project Management Office
- N/A

NOTE: Please be advised that all minutes are being recorded for accuracy.

## OSY Staff Meeting May 10, 2005

### *Present*
Richard Yamamoto
Tom deSeve
Bob Page
Dave Bell
Cindy Snyder
Patty Grasso
Vanessa Greer

### *Absent*
Kevin Sadler

### Introduction.
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues.

### Emergency Management
- Bob mentioned that on May 11 around 10:30 to 11:00 there would be testing of the biological case scenarios.

### Counterespionage
- Parthenia mentioned that she would be meeting with Rachel Hughins on May 11 regarding the new mid-year performance plans.
- Parthenia also mentioned that she signed off on top secret clearances for George Lee, Ron Martin and Rodney Miles.

### Project Management Office
- Patty commented that the next Security Council Meeting is scheduled for June 8 at 1:00pm in room 6029.
- The STG contract person, that was supposed to substitute for Chris Lukasiak during his time off, did not work out and neither did the second choice, so STG is working on getting a new person.

### Strategic and Administrative Management
- Cindy mentioned that Rachel Hughins is trying to get all the performance plans in and she will also be working on the NIST position.
- Greg Servant will be working intermittently on the inventory through June 30. He will be visiting offices to scan property and to obtain signatures on the hand receipts. Greg and Jackie will also be visiting the field offices to conduct a physical inventory and to discuss administrative issues.
- Cindy also mentioned that mid-year budget review meetings have been taking place with the different divisions.

Exhibit 7     40

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

## OSY Staff Meeting May 17, 2005

*Present*
Richard Yamamoto
Tom deSeve
Bob Page
Dave Bell
Parthenia Richardson
Kevin Sadler
Vanessa Greer

*Absent*
Patty Grasso

### Introduction.
Rich welcomed the staff.   The meeting was then opened to personnel to discuss any issues.

### Emergency Management
- Bob mentioned that the short (45-minute) COOP briefing he presented to the Anti-Terrorism Division this morning is available to the other Divisions.  This briefing is to enlighten staff on the process of COOP and the role of OSY.
- The OEP evacuation exercise scheduled for Thursday, May 19 is still on subject to weather concerns.
- Tom Roston, during his normal walk around discovered that all access to the North side of the Eclipse is now blocked crossing 15th street due to construction. Bob is planning on having a guide and dedicated person respond to this area to instruct people as to where to go on this side of the building, since this will most likely be a continuing issue.
- Tom received a call from BIS seeking a briefing on the upcoming COOP exercise - this meeting is tentatively scheduled for Monday, May 23rd.
- Tom also mentioned that a Homeland Security Working Group meeting is scheduled for next Wednesday, May 25.

### Counterespionage
- Parthenia mentioned that ISOO representatives came out today to discuss our plans on how we are going to meet the President's deadline on declassification. They gave suggestions and felt more confident that we were able to meet our deadline.  She will brief Rich on DOC efforts.
- CIA will be teaching a declassification/classification class for 25 DOC employees to inform them of the process of how to recognize a classified document, how it gets classified and how you review it for declassification.  Most of these attending the class are actual reviewers.
- Janel will be conducting a performance management meeting with the CE division on May 18.
- Parthenia mentioned that she and Dane have addressed the issues regarding the paperwork for the NIST political appointee.
- It was also mentioned that some staff moves have taken place in the CE division.

*1*      *41*

**NOTE: Please be advised that all minutes are being recorded for accuracy.**

### OSY Staff Meeting June 14, 2005

*Present*
Richard Yamamoto
Bob Page
Dave Bell
Tom deSeve
Cindy Snyder
Parthenia Richardson
Vanessa Greer

*Absent*
Patty Grasso
Kevin Sadler

**Introduction.**
- Rich welcomed the staff. The meeting was then opened to personnel to discuss any issues.

**Emergency Management**
- Bob mentioned that he has a PCC meeting on Friday afternoon 6/17.

**Project Management Office**
- N/A

**Counterespionage**
- Parthenia mentioned that Delores Pettyjohn met with Lois Anderson today (6/14), to discuss her buyout option.
- Parthenia also commented that she is still working with State Department on some cases, she included Francisco Ruben from OGC to review the ▇▇▇▇ case.

**Strategic and Administrative Management**
- Cindy commented that Kevin now has two daughters – Ainsley & Addison.
- Cindy mentioned that Rich and she attended a Renovation meeting the morning of 6/14 and will be meeting with the Budget people the afternoon of 6/14 to discuss HSPD-12 for FY07.
- Cindy also mentioned that she would be meeting with the Budget office on Friday, 6/17, to go over projections for the rest of this fiscal year.

**Anti-Terrorism**
- Dave mentioned that the Protection Team will be going to the weapons range on Tuesday, June 21.
- Jason will be going to Boulder the last week of June to do an Assessment.
- The Suburban that replaces the Tahoe for the Protection Team is in, arrangements are being made to have the emergency equipment installed.
- Dave also mentioned that Ronald Martin was deputized in a smooth 15 minutes of time today (6/14/05).

*attachment 8*



**Alarie Shyllon/HCHB/Osnet**
05/17/2005 08:41 AM

To   Parthenia Richardson/HCHB/Osnet@osnet
cc   Richard Yamamoto/HCHB/Osnet@osnet, David Bell/HCHB/Osnet@osnet
bcc
Subject   Re: Coversheets

Parthenia,

I will call the movers and have the boxes moved today.  Thank You.

Alarie Shyllon
Security Specialist
U.S. Department of Commerce
Office of Security
202-482-5026 Fax 202-501-6355
Parthenia Richardson/HCHB/Osnet



**Parthenia Richardson/HCHB/Osnet**
05/17/2005 07:34 AM

To   Alarie Shyllon/HCHB/Osnet@Osnet
cc   Parthenia Richardson/HCHB/Osnet@osnet
Subject   Coversheets

Alarie -

I see that the boxes of coversheets have not been moved, you did not complete the task given to you yesterday.  Greg gave you the information needed to get them moved yet they have not been moved yet. First thing this morning get the cart and move the boxes yourself I want this accomplished no later than 9:00am.

Sincerely,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov

7    43

 **Parthenia**
Richardson/HCHB/Osnet
06/17/2005 01:48 PM

To  Richard Yamamoto/HCHB/Osnet@osnet
cc  dbell1@doc.gov
bcc
Subject  Re: Inspections

Rich -

Alarie and Starr have been working very hard on correcting the Declassification Plan and Bob Deats was catching up on the COMSEC inventory that was noted as item not found/missing in the audit from NSA. Alarie, Starr, Bob Deats and either Becky or Delores are planning to start conducting them as soon as possible. Catching up and sorting out the declassification effort has really taken alot of time and was the hot issue for the last couple months.

I expect them to begin in July 2005 without fail.

Vr,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov

Richard Yamamoto/HCHB/Osnet

        **Richard**
        **Yamamoto/HCHB/Osnet**
        06/17/2005 01:29 PM

To  Parthenia Richardson/HCHB/Osnet@osnet
cc  dbell1@doc.gov
Subject  Inspections

Parthenia:

Why have the document and container inspections stopped?

Rich

7     44

*attachment 7*



**"Herbert, Katrina, CIV, WHS/HRD"**
<katrina.herbert@whs.mil>
07/13/2005 11:15 AM

To  "ryamamoto@doc.gov" <ryamamoto@doc.gov>
cc
bcc
Subject  Hello

History:    This message has been replied to and forwarded.

Hello Rich,

Just wanted to send a quick email to say thank you for everything, while I was there.  The position here is okay, but it's not what I imagined it would be and I do miss my Commerce family.  I really didn't want to leave but there were a lot of things and reasons, which I couldn't really explain, I felt it was best.  I just wanted to say I really enjoyed working under your management and look forward to maybe working for you again.  If any positions come available in Persec or at the Suitland location, please let me know.  I hope everything is well with you.

Katrina Herbert
Personnel Security Specialist
WHS/CAF
(703)699-1897

7    45

Richard
Yamamoto/HCHB/Osnet

05/31/2005 11:18 AM

To    Thomas de Seve/HCHB/Osnel@osnel

cc    Carroll Ward/HCHB/Osnet@osnet, David
      Bell/HCHB/Osnet@osnet, Parthenia
      Richardson/HCHB/Osnet@osnet, Patricia

bcc

Subject  Re: ITA Temporary "S" Clearance Request

The existing policy does not change until I approve a change.

Rich
Thomas de Seve/HCHB/Osnet



Thomas de
Seve/HCHB/Osnet

05/31/2005 11:16 AM

To    Parthenia Richardson/HCHB/Osnet@osnet

cc    Carroll Ward/HCHB/Osnet@osnet, David
      Bell/HCHB/Osnet@osnet, Patricia
      Keith/HCHB/Osnet@osnet

Subject  Re: ITA Temporary "S" Clearance Request

Folks:

- OPM does not make policy on granting access to NSI.
- National policy on granting access to NSI is E.O. 12968.
- Section 3.3, Special Circumstances, addresses the issue of temporary access and general conditions for such a grant.
- Section 6.1 directs that a senior agency head direct and administer the personnel security program.
- The DOC implementing directive is the Security Manual.
- Chapter 12, 1202B addresses granting temporary access.

The request by DOC employees traveling overseas for temporary access is common and is usually based on the DS requirement for access at least at the secret level to get into the CAA portion of the embassy. This area is where USG official business not requiring access to the ACR is conducted.

The ITA requests have been properly made according to USG and DOC policy and procedures and forwarded by ERSO.

OSY will be embarrassed if we do not properly evaluate the requests and respond to them in a timely fashion.

We may be revising persec policy, but the proposed revsion does not ipso facto replace existing policy.

Thomas de Seve, Jr
Assistant Director, Client Security Services
Office of Security
202-482-4361
Parthenia Richardson/HCHB/Osnet



Parthenia
Richardson/HCHB/Osnet

05/27/2005 04:35 PM

To    Carroll Ward/HCHB/Osnel@OSNET

cc    David Bell/HCHB/Osnet, Thomas de Seve/HCHB/Osnet,
      Patricia Keith/HCHB/Osnet

7    46



Subject  Re: ITA Temporary "S" Clearance Request

I can provide you the OPM liaison telephone number on Tuesday when I return to
work feel free to ask her to verify what I have stated to you.
Also the security manual is in revision.
Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
W: (202) 482-1408/C: (240) 476-5218


----- Original Message -----
From: Carroll Ward
Sent: 05/27/2005 04:23 PM
To: Parthenia Richardson
Cc: David Bell; Thomas DeSeve; Patricia Keith
Subject: Re: ITA Temporary "S" Clearance Request


Parthenia,

I have attached Eecutive Order 12968 - Access to Classified Information, Sec. 3.3. Special Circumstances
and DOC Security Manual, Chapter 12, Para. B. Temporary Eligibility for Access. This is the policy
regarding the granting of temporary clearances (access).  If you have something in writing from OPM that
over turns the Executive Order and DOC policy please let me know were I can find it.

Please let me know after you have had a chance to review these policies what you policy OSY is
operating from.


# Executive Order 12968 - Access to Classified Information

## August 2, 1995

### Sec. 3.3. *Special Circumstances:*

(a) In exceptional circumstances where official functions must be performed prior to the completion of the
investigative and adjudication process, temporary eligibility for access to classified information may be
granted to an employee while the initial investigation is underway. When such eligibility is granted, the
initial investigation shall be expedited.

    (1) Temporary eligibility for access under this section shall include a justification, and the
employee must be notified in writing that further access is expressly conditioned on the favorable
completion of the investigation and issuance of an access eligibility approval. Access will be
immediately terminated, along with any assignment requiring an access eligibility approval, if
such approval is not granted.

    (2) Temporary eligibility for access may be granted only by security personnel authorized by the
agency head to make access eligibility determinations and shall be based on minimum

7    47

investigative standards developed by the Security Policy Board not later than 180 days after the effective date of this order.

(3) Temporary eligibility for access may be granted only to particular, identified categories of classified information necessary to perform the lawful and authorized functions that are the basis for the granting of temporary access.

(b) Nothing in subsection (a) shall be construed as altering the authority of an agency head to waive requirements for granting access to classified information pursuant to statutory authority.

(c) Where access has been terminated under section 2.1(b)(4) of this order and a new need for access arises, access eligibility up to the same level shall be reapproved without further investigation as to employees who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years, provided they have remained employed by the same employer during the period in question, the employee certifies in writing that there has been no change in the relevant information provided by the employee for the last background investigation, and there is no information that would tend to indicate the employee may no longer satisfy the standards established by this order for access to classified information.

(d) Access eligibility shall be reapproved for individuals who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years and who have been retired or otherwise separated from United States Government employment for not more than 2 years; provided there is no indication the individual may no longer satisfy the standards of this order, the individual certifies in writing that there has been no change in the relevant information provided by the individual for the last background investigation, and an appropriate record check reveals no unfavorable information.

DOC Security Manual, Chapter 12

B. Temporary Eligibility for Access.

1. Based on a justified need meeting the requirements of E.O. 12968, temporary eligibility for access to classified information may be granted before investigations are complete and favorably adjudicated where official functions must be performed prior to completion of the investigation and adjudication process. The temporary eligibility will be valid until completion of the investigation and adjudication; however, the Department may revoke the access at any time based on unfavorable information developed in the course of the investigation.

2. Temporary eligibility for access must be requested by memorandum to the Office of Security. In addition, the justification for the access must be indicated on the CD-79, Request for Security Clearance. The Director for Security, or his/her designee, may grant temporary eligibility for access when an emergency need exists. Temporary eligibility allows access to classified information under controlled circumstances when the basis for granting a final security clearance has not been completed.

Thanks,

Carroll Ward, CPP
Department of Commerce
Eastern/Central Region Security Officer
Norfolk Federal Building
200 Granby Street, Room 407
Norfolk, VA.   23510
Com (757) 441-3431

7    48

Cell  (757) 449-9007
Fax  (757) 441-3422

----Parthenia Richardson/HCHB/Osnet wrote: ----

To: Carroll Ward/HCHB/Osnet@OSNET, "David Bell" <dbell1@doc.gov>, Nancy.Kripner@mail.doc.gov
From: Parthenia Richardson/HCHB/Osnet
Date: 05/27/2005 03:47PM
cc: Thomas de Seve/HCHB/Osnet, Patricia Keith/HCHB/Osnet
Subject: Re: ITA Temporary "S" Clearance Request

Per OPM a clearance can not be granted without the appropriate background investigation. I cannot speak about what was done before my time but that is the proper procedure.

I have communicated this to Nancy Kripner and she understands.

Sincerely,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
W: (202) 482-1408/C: (240) 476-5218


----- Original Message -----
From: Carroll Ward
Sent: 05/27/2005 03:34 PM
To: Parthenia Richardson
Cc: Thomas DeSeve; Patricia Keith
Subject: ITA Temporary "S" Clearance Request


Parthenia,
I have been told there is a problem with getting ITA personnel temporary "S" clearances for those ITA folks that are going TDY overseas for a short period (Less than 90 days) and that you will not sign off on them. We are following established procedures set up by OSY years ago, what has changed, if anything?
Background: These specific ITA personnel are being required to go overseas to releif ITA personnel currently stationed oversea for leave purposes or training. They are being put in for an ANACI investigation, to include pre-appointment checks by our office. Once we have security package, we will send completed package plus a the ITA Supervisor's letter of justication for the temporary clearance to you....
Will you grant a temporary "S" clearance apon a favorable review of our package, even though the ANACI investigation is being processed by OPM and has not been completed?
Thanks,

Carroll Ward, CPP
Department of Commerce
Eastern/Central Region Security Officer
Norfolk Federal Building
200 Granby Street, Room 407
Norfolk, VA.  23510

49



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Office of Human Resources Management
Washington, D.C. 20230

JUN - 3 2005

To:        Richard Yamamoto
           Director for Security
           Office of the Secretary

           *By Parthenia happy*
           *Thank. Another happy*
           *customer*

From:      Doris W. Brown, Director    *Doris W. Brown*
           Office of Human Resources Management
           International Trade Administration

Subject:   Letter of Appreciation – **Ms. Parthenia Richardson**

I wanted to take a moment to tell you how much ITA's human resources office has come to appreciate Ms. Parthenia Richardson. Although relatively new to your staff, she has made her presence and effect known to us almost immediately. She is indeed a "breath of fresh air." Prior to her joining your staff, we had forwarded a number of security related issues to members of your staff for assistance in processing and adjudicating suitability and security clearances. Some of our employee relations cases remained open for months while we awaited a response from your staff.

We are extremely happy that we now have one person to go to who can always tell us the status of a case and who speaks with authority. In addition, we have found her technical knowledge to be top notch. She has a way of making sense of the seemingly impenetrable world of security processing, and my staff and I now have a much better understanding of your role in personnel security vis-à-vis ours in human resources management.

As a change agent, I can appreciate the position she's in as the "new kid on the block," having to work with and through a staff that has been in place for years. I can appreciate the position she's in trying to effect change while at the same time ensuring that processing of cases continues; and I can appreciate the organizational "whitewater" she must get through to impose new customer service and performance standards upon a staff. I believe she is on the right track, and my staff and I commend her for it.

Please convey to Parthenia our sincere appreciation for the lengths she has gone through to help us get an understanding of security implications associated with some of our joint cases. We look forward to working with her and others on your staff to help ensure a transparent process for the customers and cases we have in common.

7        5.0

*Attached PO*

Richard
Yamamoto/HCHB/Osnet          To  Parthenia Richardson/HCHB/Osnet
05/02/2005 08:13 AM          cc
                             bcc
                         Subject  Fw: Parthenia

Parthenia:

Thank you for your support to our customers as reflected by Mike Carroll.  Please keep up the good work.

Rich
—— Forwarded by Richard Yamamoto/HCHB/Osnet on 05/02/2005 08:11 AM ——



"MIKE CARROLL"
<MCARROLL@bis.doc.gov>          To  <RYamamoto@DOC.GOV>
04/29/2005 05:20 PM          cc
                         Subject  Parthenia


Rich:

I hope you have some idea of what a great decision you made to hire
Parthenia.  I'm sure she' giving me the same service she's giving all
your other clients, but having said that, it's bordering on unbelievable
how much she's been able to do in such a short.  I give you my
commitment that BIS will do everything it can do to support her as she
deals with some very difficult organizational culture issues.

Mike

*attachment 11*

**ITEM 4. Mid-Cycle/Progress Review** *(Check appropriate box)*

1. Review indicates performance is **Eligible**.

2. Review indicates performance is **Eligible**; however, there are performance deficiencies, as stated below.

3. Review indicates performance is **deficient** and a performance improvement plan is needed. Deficiencies are stated below. *(If this block is checked, supervisor must contact the servicing HR office.)*

**Key Achievements, Strengths:** Be specific and relate these to performance elements. List areas where work was done well and identify the strengths exhibited by the employee during the rating period.

- You received compliments from two customers for your support to them.

**Deficiencies, Areas of Concern:** *(Must be filled in if box 2 or box 3 above is checked)*: Be specific and relate these to individual performance elements. Note deficiencies or areas where performance has declined during the rating period.

- loss of key personnel within the CE Division, many others state they are aggressively in search of a position outside of the CE Division.
- morale of personnel in both sections within the Division has continued to decline during the entire period, despite providing you support by making significant personnel changes
- ... e CE Division, the working environment is at an all time low in that even a temporary employee on detail asked to be released at the end of the first week.
- ... s of confidence in you by myself and the Director
- failure to meet with the Director on a weekly basis per his guidance to you on 6/01/05
- complaints from most within the CE Division that your interpersonal communication skills with them are rude, harsh and dictatorial in nature
- complaints from our field offices
- you have on several occasions, decided to change the Director's or DOC policy without his knowledge or approval. Examples include ceasing Infosec inspections which impact the core mission of reducing the security risk and taking contentious actions without his prior approval.
- to date, you have not taken responsibility for the actions of the division and have repeatedly deflected the responsibility of shortcomings to others.

**Suggestions/Strategies for Improvement:** List areas in which the employee might enhance performance. Comments can also identify suggestions for career growth and development.

- develop and practice better intercommunication skills. As we discussed in our one on one meetings, deal with everyone as an individual based on their needs and motivations.
- take responsibility for outcomes within your areas of responsibility.
- enroll in and complete training for managers

| | Employee's Initials | Date | Rating Official's Initials | Date |
|---|---|---|---|---|
| Mid-Cycle Progress Review | | 7/11/05 | DKB | 7/11/05 |
| Progress Review | | | | |
| Progress Review: | | | | |

FORM CD-541 (4-98) LF

7   52

*attachment 12*

Richard
Yamamoto/HCHB/Osnet                    To    Parthenia Richardson/HCHB/Osnet
02/25/2005 01:32 PM                     cc
                                        bcc
                            Subject    Re: Fw: SCI Info 

Pathernia:

Good work.  Please close the loop with Mike Carroll.  Thanks.

Rich
Parthenia Richardson/HCHB/Osnet


Parthenia
Richardson/HCHB/Osnet                   To    Richard Yamamoto/HCHB/Osnet@osnet
02/25/2005 01:13 PM                      cc
                            Subject    Re: Fw: SCI Info for 

Rich:

I called the CIA point of contact for the status on the 2 names:

███████ She does not have a final TS clearance therefore she is not eligible to be nominated for SCI until the SSBI is completed favorably. (they did not have the request - our office should have responded back to Mike Carroll that until the background investigation is completed favorably for TS she is not eligible for nomination for SCI).

███████ - her paperwork was received January 24, 2005 and it was not indicated anywhere that it was a priority case.  They are awaiting TRACE results and it should be completed and finalized no later than the end of next week.  I asked them to move her to the top of the list.

Vr,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov


Richard Yamamoto/HCHB/Osnet

Richard
Yamamoto/HCHB/Osnet                    To    Parthenia Richardson/HCHB/Osnet@osnet
02/24/2005 08:55 AM                     cc
                            Subject    Fw: SCI Info for ███████

7    53

**Richard**
**Yamamoto/HCHB/Osnet**
03/31/2005 01:54 PM

To   Parthenia Richardson/HCHB/Osnet

cc

bcc

Subject   Re: Fw: New Pre-appointment process

Parthenia:

It was a fair question but OHRM is confused with their responsibilities, the suitability requirements, and the upcoming HSPD-12. The bureau HRs will push back at every perceived change. We need to discuss a game plan to overcome all this. Thanks. Hang in there.

Rich
Parthenia Richardson/HCHB/Osnet



**Parthenia**
**Richardson/HCHB/Osnet**
03/31/2005 01:47 PM

To   Richard Yamamoto/HCHB/Osnet@osnet

cc

Subject   Re: Fw: New Pre-appointment process

Rich -

This is a valid question to the HR specialist that announced the position. They should know if the position requires the person to come on board with SCI - the announcement will state that. So I do not understand why they do not understand the question.

I am very frustrated with the HR folks not knowing their jobs....as a matter of practice I would never know only the HR specialist and the hiring manager can make the determination.

Was this not a fair question to ask? How else would I have gotten the answer before saying yes and the person cannot perform their duties awaiting the SCI portion?

In my humble opinion the problem lies with Jonathan Perez and Linda Kirton they do not understand their job and have a hard time grasping how I am trying to assist.

Sincerely,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov

Richard Yamamoto/HCHB/Osnet

**Richard**
**Yamamoto/HCHB/Osnet**

To   Parthenia Richardson/HCHB/Osnet@osnet

7   54



| | |
|---|---|
| **Richard** Yamamoto/HCHB/Osnet 04/21/2005 05:04 PM | To  Parthenia Richardson/HCHB/Osnet cc bcc Subject  Re: Fw: e-QIP 85 P Project |

Parthenia:

Great. Thanks.

Rich
Parthenia Richardson/HCHB/Osnet



| | |
|---|---|
| **Parthenia** Richardson/HCHB/Osnet 04/21/2005 05:03 PM | To  Richard Yamamoto/HCHB/Osnet@osnet cc  David Bell/HCHB/Osnet@osnet Subject  Fw: e-QIP 85 P Project |

Rich -

I responded back to Karen Orange on this and will let you know once I get the approval for us to participate.

Vr,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov

----- Forwarded by Parthenia Richardson/HCHB/Osnet on 04/21/2005 05:01 PM -----



| | |
|---|---|
| **"Orange, Karen R."** <Karen.Orange@opm.gov> 04/21/2005 04:48 PM | To  "'PRichardson@doc.gov'" <PRichardson@doc.gov> cc Subject  e-QIP 85 P Project |

Parthenia,

Please send me an email that indicates DOC would like to participate in the 85P pilot project. I will forward the request to Ed McGuire.

Thanks for your cooperation.

7 · 55

Richard
Yamamoto/HCHB/Osnet
05/23/2005 03:48 PM

To    Parthenia Richardson/HCHB/Osnet
cc
bcc
Subject ████████████████████████

Parthenia:

Thanks for the speedy response.

Rich
Parthenia Richardson/HCHB/Osnet



Parthenia
Richardson/HCHB/Osnet
05/23/2005 03:18 PM

To    Richard Yamamoto/HCHB/Osnet@osnet
cc
Subject ████████████████████

Rich -

Please see Becky's note below none of the nominees had adverse information on file.

Vr,

Parthenia Richardson
Assistant Director
Counterespionage Division
Office of Security
U.S. Department of Commerce
Washington, DC 20230
V: (202) 482-1408/C: (240) 476-5218
Email: prichardson@doc.gov

---- Forwarded by Parthenia Richardson/HCHB/Osnet on 05/23/2005 03:16 PM ----



Becky Hall/HCHB/Osnet
05/23/2005 02:51 PM

To    Parthenia Richardson/HCHB/Osnet@osnet
cc
Subject ████████████████████

Hi,

I have checked all of the names, approximately 436, and found **no** adverse information. The only name that had any issue that could be outstanding was:

████████████
He has (or had) duel citizenship with Canada. The case was adjudicated favorably by Mary Isley on 8/5/03. The justification for the favorable adjudication was that a person has 5 years to become a citizen

2nd priority

*Debi or Peggy*

# BUILDING MANAGEMENT DIVISION (BMD) WORK REQUEST
## HERBERT C. HOOVER BUILDING

U.S. DEPARTMENT OF COMMERCE

JUL 27 REC'D

CONTROL NO: __CMD101950685__    RECEIPT DATE: ~~07/26/05~~ 8-1-05

**SECTION I:** REQUEST FOR SERVICES (To be completed by ordering Agency)    OSY #: 05-OSY-0127C-410-029

Requesting Office/Bureau: Office of Security

| Agency Contact: | Greg, Servant | 1524 | X6124 |
| | (Name) | (Room) | (Phone) |

Work Location: Rm. 1520
(Room)

Description of Work: Enlarge M-wall office in Rm. 1520.

↓ decide based on workload + who has worked on security

Charge To: 05/0127000/1104/2580    NTE Amount: 0.00
(Agency Accounting Data)

Ordering Agency Official: Kevin Sadler, AD S&AMD   /s/   7/26/05
(Signature)

**SECTION II:** ESTIMATE (To be completed by Building Management Division)

| Type | 7. Estimated Costs | 8. Total Cost |
|---|---|---|
| Construction: | $ 1400.00 | $ |
| Carpet: ☐ New ☐ Repair | $ | |
| Drapes: ☐ Clear ☐ Replace | $ | |
| Furniture: Systems/M.Wall labor | $ 1200.00 | |
| Signage: | $ | $ |
| Other: Contingency | $ 130.00 | $ |
| Operations and Maintenance: | $ | $ |
| Carp. Elec. HVAC Paint Plumb | $ | $ |
| Estimator: DEBORAH DAVIDSON | Total: $ 2730.00 | $ |
| (Name) | | |
| Estimator: Deborah Davidson | | 9/13/05 |
| (Signature) | | (Date Estimated) |

**SECTION III:** WORK PERFORMANCE AUTHORIZATION/FUNDS AVAILABLE (To be completed by ordering Agency)

Ordering Agency Official: /s/   9/13/05
(Signature)                 (Authorization Date)

**SECTION IV:** COMPLETION CERTIFICATION (To be completed by Building Management Division)

7. : 57

**EXHIBIT 2**

# Office of Security Organization Chart
(Revised 03/07/05)

Office of the Director
Vacant (ES-0080-00)

Deputy Director
Vacant (ES-0080-01)

**Strategic & Administrative Management**
K. Ssolar - Asst. Dir.

- Strategic Operations Program
  J. Sebura
- Administrative Program
  C. Snyder
  - R. Pigsley
  - V. Carter
  - P. Bower
  - M. Haber
  - F. Dyson
  - J. Jacobs

**Frequency Mgmt**
R. Page - Asst. Dir.

- M. Alles
- M. Alexander
- T. Kotson
- C. Schweitzer
- C. Weikart
- Vacant (ZA-0080-IV)

**Countermeasures**
P. Rothenstein - Asst. Dir.

- Personnel Security Program
  J. Ghent
  - C. Fisher
  - D. Haley
  - G. Pittman
  - W. Smith
  - B. Bodin
  - K. Herbert
  - R. Hall
- Information Security Program
  B. Powers
  - D. Chinn
  - W. Shelton
  - Vacant (ZA-0080-IV)
  - S. Hillen

**Anti-Terrorism**
D. Dart - Asst. Dir.

- Physical Security Program
  J. Reock
  - R. Marin
  - W. Page
  - Vacant (ZA-0130-IV)
- Executive Protection Program
  G. Garland
  - J. Jointer-Jernings
- Overseas Security Program
  D. Harper
  - C. Christino
  - G. Lee
  - V. Van Buren
  - R. Brorsen
  - K. Kancras
  - R. Miles
- Info. Countermeasures Program
  Vacant (ZA-0245-IV)

**Project Management Office**

- B. Glasse
- S. Speed
- C. Lew
- Vacant (ZA-0343-III)

**Client Security Services**
T. de Neyn - Asst. Dir.

- HQ/IB Program
  - T. Bayon
  - T. Smith
  - D. McClanahan
  - R. Pride
  - Vacant (ZA-0080-IV)
- Cisco Program
  C. Ward
  - P. Kahn
  - P. Mann
  - F. Rothen
  - Vacant (ZA-0080-III)
- NHO Program
  G. Weaver
  - V. McCann
  - J. Lyda
  - K. Kelley

**Mid-Shoulder Program**
W. Monroe

- M. Glebb
- M. Walker
- R. Santas
- W. Hennessen
- Vtzzi (ZB-0063-09)
- K. McClean
- K. McGough
- A. Strauss
- K. Siegfried
- M. Robinson
- D. Geiler
- B. Clark
- L. Howard
- E. Kelly
- J. Lynch
- J. Chovey
- W. Preach
- J. Pierce
- Vacant (GS-0083-09)
- Vacant (GS-0083-09)
- Vacant (GS-0083-09)

**MHCO**
- K. Tunik
- A. Halpert
- J. Thiff

**NRD Program**
D. Woodard
- M. Jones
- C. Birger
- D. Herr
- C. Keene
- T. Nelson
- W. Maxfield
- T. Dress
- M. Rogers
- Vacant (ZA-0130-III)

**NFSA Program**
H. Dumont
- V. Jackson
- K. King
- G. Frankford
- V. Davis

**Census - Washington Section**

- R. Evans
- V. Dingess
- K. Shelton
- J. Hyatt
- K. Kalkagen
- R. Moore
- B. Crew
- Vacant (ZA-0080-III)
- R. Hoveen
- K. Asbmann
- E. Slaby
- K. Benevenes
- A. King
- W. Washington
- B. Cumnim

**Census - PKIN Section**

- B. Glasse
- F. Fraher
- D. Rochier
- D. Palermo
- R. Brown
- R. Smith
- R. Spley

## Organizational Relationship of Witnesses Interviewed

### Office of Security

- Richard Yamamoto, Director, SES: Asian, male, no prior protected EEO activity

- David Bell, Supervisory Security Specialist, ZA-0080-05, Anti-Terrorism Division and Acting Deputy Director for Security; appointed Deputy Director, SES in July 2005): White, male, no prior protected EEO activity

- Kari Reid, Intelligence Operations Specialist, ZA-0132-04, Anti-Terrorism Division: White, female, no prior protected EEO activity

- Sharrieff Nashid, Security Specialist, ZA-0080-04, Secretary's Protection and Investigation Unit, Anti-Terrorism Division: Black, male, no prior protected EEO activity,

- Delores PettyJohn, Security Assistant, ZS-0086-03, Counterespionage Division: Black, female, no prior protected EEO activity,

- Robert Deats, Security Specialist, ZA-0086-03, Counterespionage Division: Hispanic, male, no prior protected EEO activity.

- Harold Washington, Jr., Supervisory Security Specialist, ZA-0080-05, Census Program, Client Security Services Division: Black; male, no prior protected EEO activity.

### Office of Human Resources Management

- Willie "Jay" Jamison, Human Resources Specialist: Black, male, prior protected EEO activity unknown.

*16*

2

**EXHIBIT 3**

# DECLARATION OF MR. DAVID BELL

Ms. Parthenia Richardson

v.

Agency Case No. 05-51-00166

U.S. Department of Commerce

I, David Bell, pursuant to 28 U.S.C. § 1746, hereby declare:

I understand that this is the claim accepted for investigation:

Complainant, formerly the Assistant Director for Counter Espionage, GS-15, Office of Security, Office of the Secretary, Department Of Commerce alleges that she has been subjected to a continuous pattern of discrimination and harassment constituting a hostile work environment due to her race (Black) and sex (female). She cites the following:

1.  During the period of May to June 2005, Richard Yamamoto did not support her as a supervisor and challenged her employment actions, despite her having obtained guidance from the Office of Human Resources and the Office of General Counsel.

2.  In June 2005, Yamamoto took away her ability to make supervisory decisions, including hiring selections.

3.  Since June 2005, Yamamoto requires her to meet him on a weekly basis for 30 minutes to discuss supervisory decisions and duties.

4.  During the period of May to June 2005, Yamamoto failed to provide her any positive feedback, despite receiving positive feedback from two major clients, and also failed to openly acknowledge her contributions to the organization.

5.  During the period of April to June 2005, Yamamoto undermined her authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining her rationale for employment decisions and actions.

6.  In May 2005, Yamamoto allowed her Caucasian male counterparts and subordinate staff to communicate with her in a disrespectful and condescending manner.

7.  During the period of April to May 2005, Yamamoto treated her with hostility and openly challenged any statements she made in staff meetings and other open forums.

1 of 25

Initials _____

8. On June 1, 2005, Yamamoto told her that he, his colleagues, and his staff did not have confidence in her ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about her coming on board, he now had doubts. At that time, Yamamoto also stated that he had no more "blue chips" available, and that he has used them all up.

Complainant also alleges retaliation for having engaged in the EEO complaint process when:

9. On July 11, 2005, she was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, she was being temporarily reassigned from her position as Assistant Director for the Counter Espionage Division for a period of 120 days. She also learned that Thomas de Seve, a Caucasian male counterpart, was assigned to assume her responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave her a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, she was informed that she was to move out of her office so that de Seve could occupy her space. She contends that de Seve already had adequate space, which would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. She further contends that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under her supervision on May 9, 2005, yet were not required to relocate.

12. She was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to her on her reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, she spoke to Bell and requested reasonable accommodation, as recommended by her physician for stress and Bell commented, "You are not under any stress, we just moved you from stress."

15. As a result of the refusal to comply with her request concerning the stress and to escape the hostile work environment, she "submitted an involuntary termination" (i.e., constructive discharge) on September 8, 2005.

For the purpose of this declaration I confirm that I am a Caucasian male.

*What was your position in February 2005?*

Initials _____

Response: Acting Deputy Director, OSY and Assistant Director for the Anti-Terrorism Division.

*When were you appointed to the Deputy Director position?*

Response: July 2005.

*What was your grade and series as Assistant Director and what is your current grade and series?*

Response: GS-15 equivalent, we changed to a different series and grade. I am now SES.

*How long have you worked in the Office of Security?*

Response: Since March 2003.

*Did you and Mr. Page interview Ms. Richardson for the position of Assistant Director of the Counter Espionage Division? If so, was the interview conducted in person?*

Response: Yes to both questions. Mr. Page, the Assistant Director for Emergency Management Division participated in Ms. Richardson's interview.

*Did you speak with Mr. Nashid prior to making a recommendation for selection? If so, what was the basis for your inquiry and what information did he provide?*

Response: Mr. Nashid is an employee in the Office of Security, he is the Special Agent in Charge of the Secretary's Protection Detail and he worked for me when I was Assistant Director for Anti-Terrorism. Mr. Nashid provided a recommendation about Ms. Richardson. He sought me out to tell me about her. It was back almost a year ago but as I recall, he had known her - I don't recall

Initials

where, and was favorably impressed with the way she was doing whatever she did in another job. He never worked with or for her directly, as I recall.

*Did you recommend Ms. Richardson for the position?*

Response: Yes. We were the selecting panel. I was the selecting official. Mr. Page and I interviewed Ms. Richardson. Based on the interview, I informed the Director, Mr. Yamamoto, that I was selecting Ms. Richardson.

*Did you interview anyone else?*

Response: No. We looked at all of the packets and resumes, and she was the one we elected to interview.

*Was Mr. Yamamoto aware of Ms. Richardson's race when he selected her?*

Response: Mr. Yamamoto was not the selecting official. I don't know if he was aware of Ms. Richardson's race when I informed him of my selection. I don't remember him asking about her race or making any comment relating to her race. He was not involved in the interview process and did not meet Ms. Richardson until she began with the Office of Security.

*Was Ms. Richardson harassed during her employment with the Office of Security?*

Response: No.

*Did Mr. Yamamoto discriminate based on Ms. Richardson's race and sex in actions he took affecting her?*

Response: No, he didn't, absolutely not.

*Were actions you or others took affecting Ms. Richardson based on race and sex discrimination?*

4 of 25

Initials

Response: No.

*Did you provide Ms. Richardson an unfavorable mid-term counseling, reassign her and relocate her to force Ms. Richardson to resign in reprisal for her filing allegations of discrimination?*

Response: That's a two-part question. To the first part, yes I did give her a mid-cycle review, which was not good, and she was reassigned and relocated. Those actions were strictly based on well-documented performance and were not in any way based on reprisal, sex, or race.

*Is the mid-year counseling still in her records or was it destroyed when she resigned?*

Response: I don't think anything's been destroyed since this case is ongoing.

*Did Mr. Yamamoto fail to support Ms. Richardson as a supervisor and take away her ability to make supervisory decisions, including hiring selections?*

Response: No.

*I believe there were three selections that were made while she was the Assistant Director. She got in trouble in the first and Mr. Yamamoto did not allow her to make two later selections.*

Response: In the first selection she made, and the only selection I recall her being involved in while she was the Assistant Director for Counter Espionage, she did not follow the guidelines that all of us here are required to follow regarding conducting a panel interview. She unilaterally made the selection without a panel. To Mr. Yamamoto's credit, he allowed the selection to stand.

5 of 25

Initials

The person she selected was brought on board even though she didn't follow the guidelines and use a panel, as all the Assistant Directors are required to do. *Are you aware that two other selections for positions in her division were subsequently made by Mr. Yamamoto?*

Response: That doesn't ring any bells and I would have known about it. Mr. Yamamoto did not make the subsequent selections. The other two were selected based on panel interviews. In OSY, it is the practice that all selections require a panel interview be conducted.

*Was this policy from HR or from OSY?*

Response: It is an internal OSY practice.

*How and when would Ms. Richardson have become aware of this policy?*

Response: I told her. I don't know when, but it was prior to her conducting the first interview for the first and only vacancy I am aware she was involved in filling. She selected two others to be on the panel but when they arrived, she had locked the door and conducted the interview by herself.

*Do you know why she did not allow them to participate in the interview?*

Response: No, I don't know why.

*How did you learn that they had been excluded from the interview?*

Response: When I asked them if the panel interviews were completed, they told me, no. I asked the two why not and they said they had been locked out.

*Did Mr. Yamamoto require Ms. Richardson to meet with him on a weekly basis to discuss supervisory decisions and duties?*

Initials _JB_

Response: Yes. After he received numerous indicators that her performance was not meeting his expectations, he did require her to come in and explain what was going on in her division. It is one of four major divisions in his office. It is my understanding that he wanted her to bounce her ideas off him and to mentor her since she was a new civilian supervisor. She was not previously a supervisor with Homeland Security. He looked at the meetings as a chance to mentor her.

*Did he undermine her authority with staff by allowing them to come directly to him with their concerns?*

Response: He supports and participates in an open door policy, as do I. If an employee wants to speak with him, or me, or anyone in the chain of command, they are free to do that. He also walks around and talks to people; he does not just sit in his office. People approach him during the normal business day. Does that undermine anyone? No, not if you're doing what you should be doing. I have no problem with my employees going directly to Mr. Yamamoto.

*Did Mr. Yamamoto side with the employees on controversial matters without first obtaining Ms. Richardson's rationale for her employment decisions and actions?*

Response: No, absolutely not. He's very fair and always wants to hear both sides of the story. In Ms. Richardson's case, he bent over backwards to support her. Mr. Yamamoto supported her requests and the way she wanted to do things in that division.

*Did Ms. Richardson's Caucasian male counterparts and subordinate staff communicate with her in a disrespectful and condescending manner?*

7 of 25

Initials *DB*

Response: No, not in my presence. We have staff meetings where some folks have expressed differences of opinion. If some action in an office impacts on another office, an Assistant Director may speak up and address the impact of the actions by another office on their office. These disagreements are not personal, and they happen infrequently.

*Did Mr. Yamamoto treat Ms. Richardson with hostility and openly challenge statements she made in senior staff meetings and other open forums?*

Response: No, on hostility, absolutely not. As far as openly challenging statements she made, not any more than he does with anyone else if he has a question about something they are briefing. If it's the first time he hears about something, he will ask questions. I do not consider that a challenge. If Mr. Yamamoto was not fully briefed and if he still has questions, Mr. Yamamoto will ask them.

*Did Mr. Yamamoto tell Ms. Richardson that he, his colleagues, and his staff did not have confidence in her ability to manage?*

Response: In a meeting with Mr. Yamamoto, myself, and Ms. Richardson, he did tell her he was beginning to lose confidence in her abilities. That was well into her tenure here. He was being frank, based on comments that were made about her actions. It was getting to the point of being a crisis.

*What was wrong with what she doing; why was it almost a crisis?*

Response: Staff elected to leave. She had at least one or two EEO complaints against her from her staff and IG complaints against her by her staff. Performance indicators from clients showed they were not receiving the same

Initials

11/30/05  18:17  FAX 202 501 6355          OFFICE OF DAS SECURITY                     ☒009

level of service as they had in the past. After she left, several issues surfaced that were very wrong. She had not shared these with us. It was these types of things, personnel security (parsec) issues or omissions; she was not accomplishing what she should have. These issues were coming in all the time and Ms. Richardson was unable to effectively perform her job duties and employee morale was very low.

*She said she was told, during her interview, that there were problems within her division and that you wanted her to take a firm hand in dealing with them?*
Response: The position of Assistant Director of Counter Espionage had been vacant for some time. When you have a long delay in filling a position, there are some issues that are not handled as appropriately as they would have been had someone been at the helm. I wanted her to take a strong, not firm, hand in dealing with the division. I believed she had the capability to get her arms around the division and get it working as efficiently as possible as soon as possible.

*Was she removed from the office e-mail or was her e-mail restricted in some way that would have prevented her from doing duties assigned to her?*
Response: Not that I'm aware of. I never heard of that, absolutely not.
*With regard to these incidents, do you have any reason to believe Mr. Yamamoto's actions were based on race and sex discrimination; were your motives or those of Ms. Richardson's coworkers and subordinates based on discrimination due to her race and sex?*

9 of 25

Initials _DB_

Response: No, absolutely not. Again, Mr. Page and I hired her for this position. We knew she was an African-American female from the interview. That did not matter. We were looking for someone who could come in and do the job. Mr. Yamamoto, as a minority himself, believes in equal employment opportunity and giving everyone a chance. He tried meeting with Ms. Richardson, so he could counsel and mentor her in order to help her succeed. I wanted her to succeed. If she failed, it would have reflected poorly on me since I had selected her. There is no way Mr. Yamamoto or I would have failed to show her respect due to her race and/or sex.

*In your mid-year counseling of Ms. Richardson, you noted several deficiencies in her performance. Would you give me specific information on how she was responsible for the loss of key individuals, what employees were actively seeking other employment, and who was the temporary employee that had asked for release?*

Response: We had one employee, in particular, who was very good. He left strictly because of her. Several other employees approached me about leaving. They said they were miserable, that everything had changed and all for the worse. The employees said Ms. Richardson would not let them do their jobs, that communication was nonexistent. The employees said that Ms. Richardson provided them no guidance, that she would just give them a suspense date, but would not give them guidance on how to accomplish the work. Ms. Richardson had problems with two subordinate supervisors and was complaining about them regularly. She said they were working against her, behind the scenes, and were

10 of 25

Initials _PB_

not supporting the mission. Mr. Yamamoto supported her by asking if it would help her if the two employees were removed from under her supervision. He said they could be removed, but only with the understanding that Ms. Richardson would not be able to replace them. Ms. Richardson said, absolutely, as soon as possible remove the employees from her supervision. We found other jobs for those employees in order to support her and help her succeed. We had another employee who left. I didn't speak to her myself so this is second hand information, but I understand she said she didn't like the way Ms. Richardson was managing. At least four other employees said they wanted to leave because of Ms. Richardson's management style. Morale was as low as I think it could be.

*Was there a temporary employee who also wanted to leave?*

Response: I forgot about her. Since Ms. Richardson came, we lost so many employees so we brought one in from Suitland. After two days, she said she never worked in such a demeaning environment and that morale was so bad that she wanted to go back to Suitland. It shows how bad the morale was. These issues were limited to that division. We did not have these issues in the other divisions.

*What had she done to cause morale in the division to be at an all time low?*

Response: The primary thing was the lack of communication. From what I was hearing from her employees, Ms. Richardson was not providing them with feedback and was not telling them what she expected. They said she set unrealistic deadlines and when they met the deadline, she would kick the work back as not acceptable. There were no guidelines given, so they were frustrated

11 of 25

Initials *DB*

because they didn't know what she wanted. When employees turned work in, they felt the way Ms. Richardson gave it back was demeaning; she said they failed, but she had not given them what her expectations were. She was telling virtually everyone in that division, over and over, that they were failing and not living up to her standards.

*When and why did she fail to meet with the director?*

Response: She was told to meet with Mr. Yamamoto on a weekly basis beginning sometime in June. She had absences throughout July and August for periods of several days. If she was not at work on a Monday, for example, and was to meet with the Director on Monday at 10:00, it was incumbent on her to get on his calendar sometime that week. She failed to do that.

*How were her communication skills rude, harsh, and dictatorial?*

Response: That's what the employees told me. I heard that from virtually all Ms. Richardson's employees. When there was communication, that's the way it came across, rude, harsh and dictatorial. The problem was there wasn't much communication.

*What complaints were received from field offices, which offices, and when were they received?*

Response: One that comes immediately to mind is our Silver Spring office. The senior person there passed on to his supervisor that Ms. Richardson would not communicate with them, gave them incorrect information, or gave information she couldn't back up with documentation. It got to the point that Mr. Yamamoto became concerned about it. Assistant Directors don't have the authority to

12 of 25

Initials

change policy. On a couple of occasions, she changed OSY policy. She took it upon herself to do so. Ms. Richardson did not follow existing OSY policy, essentially changing the policy and advising the Silver Spring field office to take incorrect actions.

*Had Ms. Richardson received letters acknowledging specific accomplishments she made and was she recognized for these accomplishments?*

Response: As I recall, she did receive one letter from one of the Bureaus thanking her for her work. Mr. Yamamoto, as I recall, mentioned it at one of our staff meetings. This is a large organization. We have about 130 folks. We receive these kinds of letters on a weekly basis. We don't have a ceremony when we get them. We pass them on to the supervisor and employee. Mr. Yamamoto and I were aware of it and it was passed on to her. The three main people who should have been advised of it were.

*What policy had she changed without approval?*

Response: As I recall, one was involved here in our building. It had to do with contractor clearances. She did not follow the OSY Security Manual Guidance when she withdrew/denied a contractor's clearance and had the contractor escorted out of the building without Mr. Yamamoto's approval or even review.

*How had she failed to take responsibility for deficiencies in the division and attributed them to others?*

Response: When we met with Ms. Richardson, Mr. Yamamoto and myself, she would not even acknowledge, to our surprise, that there was a problem in her division. We had been dealing with problems on almost a daily basis. You can't

Initials *JB*

begin to solve a problem until you acknowledge it exists. She didn't seem to want to even acknowledge the problems existed.

*Minutes from an OSY Staff Meeting held on July 12, 2005 indicate the staff was advised Ms. Richardson would be focusing "on implementing several high-level departmental initiatives to include the declassification initiative and installation of SIPERNET connectivity. She was also supposed to support COOP, HSPD-12, Census Decennial and other [high] priority projects." Was Ms. Richardson actually assigned and working on any or all of these projects?*

Response: Ms. Richardson had been involved with one, the declassification project. That was the primary one and it was to be the initial one she was to take on. As a Department, we were behind on it. It required thousands and thousands of documents to be reviewed by 14 Bureaus of Commerce. Some Bureaus were doing well and some were not. It was a Presidential Directive and was to be completed by December 2006. We had Ms. Richardson work on that initially to get us back on track because we were behind. A lot of senior people in the Bureaus, SES and GS-15 managers, needed to be involved in getting that accomplished, in fact over 50% of the primary personnel on that project throughout DOC were GS-15 and SES Sometimes, when a GS-12 or GS-13 tries to nudge them to get on track, they aren't paid much attention. Therefore, we determined it was necessary to have someone of Ms. Richardson's level, a GS-15 equivalent, working on this very important project. We thought if we got a higher-ranking person to get on that, they would get them to cooperate and get the work completed.

14 of 25

Initials _____

*Is the declassification project Ms Richardson was assigned as Special Projects Officer and the HSPD-12 project one and the same or are they two distinct projects?*

Response:  Two distinct projects.

*Were duties she was assigned previously assigned to Alarie Shyllon, a GS- 12?*

Response: Were we asking them to do essentially the same duties? No. It appeared to be too big a project for a GS-12 or GS-13 to do. That's why we were so far behind. We needed a senior person to deal with other senior people. We should have been much further along and we thought we needed a senior person to devote time and attention to it. We wanted Ms. Richardson to produce an action plan for December 2006 but, after several months, she was never able to give us one. The difficulties Ms. Richardson exhibited further confirmed the need to have a senior person on the project. The decennial project was to be her next project. Census felt they needed someone to assist that Field Office Manager for Security Services, a GS-15 equivalent, at Census. The project would take Ms. Richardson's full time and attention.

Did you say GS-14 or GS-15 level?

Response:  I felt that the work with Census was at the GS-14/15 equivalent level.

*Was Ms. Shyllon again assigned responsibility for the declassification project? If not, please provide the name and grade of the person who was assigned the project and explain, if the employee is not a GS-15 equivalent, why the project no longer had to be assigned to someone at that grade level.*

15 of 25

Initials

Response: The project is now assigned to Ms. Richardson's replacement, the Acting Counterespionage Division Assistant Director. In fact, it is explicitly listed in his FY 06 performance plan. While Ms. Shyllon ( GS-13 equivalent), a member of that division, is performing many of the day to day duties, appropriate for a GS-13, it is the responsibility of the Acting Assistant Director to ensure the project is managed and completed on schedule. I, as the Deputy Director, have also become much more involved since Ms. Richardson's departure, meeting on many occasions with the OSY staff and personally meeting with one of the customers to assist them in getting their declassification project on track. Finally, the Director, Mr. Yamamoto, completed the training required by ISOO to directly participate in this project, training that Ms. Richardson never scheduled for herself as the Assistant Director or Special Project Officer with responsibility for this project.

*Did you send Ms. Richardson e-mails every day while she was on sick leave and expect her to have an action plan prepared for presentation the same day she was to return to work?*

Response: No, that's not correct. I was not even here every day while she was out. A check of her leave dates indicates she was on leave 30 full days on the following dates: July 8,12-14 and 19-29, and August 1-5 and 11-29. My archive email sent mail folder has a record of emails sent to her from me in July on the 19th, 20th (wishing her a fast recovery), 21st and 27th. My emails in August to Ms. Richardson on dates she was on leave were August 1st, 16th, and 26th. The August 26th email was a reply to her email on that same day, leaving only four

Initials

emails I initiated the 30 days Ms. Richardson was on leave that concerned work related responsibilities.

What I expected her to tell me was, I'll be back on a certain date and, although I'm not where I can work on it now, I can have it to you on that date. I just wanted her to tell me a date when she would have the action plan finished. If she was incapacitated, of course I don't expect her to do the action plan while she was incapacitated. I wanted Ms. Richardson to tell me when she expected to have it done, then I could have negotiated and adjusted the date. That's what I expected.

*Complaints were said to be made to you and Mr. Yamamoto concerning "bizarre behavior" by an employee with "severe psychiatric problems."*

Response: Do you know who that was?

*No, I don't have a name. When a security clearance wasn't approved, i.e., the CIA refused to grant him access to secret FBI information, this individual was reassigned to the Bureau of Industry and Security.*

Response: This has nothing to do with her division and had nothing to do with a psychiatric problem. I never saw any official documentation on a psychiatric condition. This person was not reassigned. He applied for, was interviewed and selected for a position he saw announced and was hired by another Bureau within DOC. There was no reassignment or ever a discussion of reassignment of this individual.

*Can you reassign someone to a different Bureau?*

Initials *DB*

Response: No. In the case above, he went on the OPM web site and saw a job announced. This person was not in the security field. He was interviewed for it, selected, and he accepted. It had nothing to do with us reassigning him. Even though the other office is in the Department of Commerce, we had nothing to do with moving him over there. Would we have gone out and asked another Bureau, would you take a GS-15 who does security work? Probably not. There isn't another Bureau with GS-15's doing security work, that why we're all here. About the only way another Bureau would have considered a transfer of any GS-15 from our office is if they got the employee for free, meaning that this office would continue to pay that employee's salary, and would not have been able to back fill that position.

*Did you make an announcement in the Anti-Terrorism Division to the effect that you "just had to fire Parthenia" and that she was going to be working on special projects in the back area of that division?*

Response: Absolutely not. I never considered removing Ms. Richardson and never contemplated her resignation. What I said to her people - I called them together the day of the action and said it was a lateral move. I advised the Anti-Terrorism section chiefs about the detail as they would need to know why her office would be in their area.

*The area to which Ms. Richardson was relocated has been described as a cubbyhole, an area no one else wanted to occupy; with partitions, not walls; and affording her no privacy. Is that accurate?*

18 of 25

Initials _DB_

Response: No, not at all. It was an office and previously occupied by a GS-14 and later (after Ms. Richardson's departure) by the Assistant Director for the Anti-Terrorism Division, a GS-15 equivalent. It had a door that closed. It was certainly not a cubbyhole. She had privacy. In fact, we moved another GS-15 supervisor into that space after Ms. Richardson resigned.

*Ms. Richardson states she was told she was being relocated from her office so it could be occupied by Mr. deSeve, who was assigned responsibility for her division, as well as his own. Did Mr. deSeve actually assume responsibility for the Counter Espionage Division and did he move to her former office?*

Response: He did assume responsibility temporarily because I needed an Acting Director to make GS-15 decisions on a daily basis. He had an office on the other side of the building and he needed access to that office because the safe with the security files is located there. Mr. deSeve needed access to the security files kept in the safe in order to review them there, and to speak with employees in that area. In addition, the employees temporarily supervised by Mr. deSeve needed access to him as not all employees in OSY have access to all divisions in OSY. Mr. deSeve would use the office periodically, not continually. Once I changed her to Special Projects Officer, Ms. Richardson did not have any reason to have access to that safe or that office anymore. By moving her, Ms. Richardson would not be interrupted by someone who needed access to the safe or by employees who needed access to Mr. deSeve as their Acting Assistant Director.

*Who finally moved into her office and when?*

19 of 25

Initials

Response: We've got an Acting Assistant Director for Counter Espionage in there now. Mr. deSeve was there until October 1 and then we moved in an African-American male from a field office to be Acting Assistant Director. He will be acting until a permanent selection is made.

*While working in the area of the Anti-Terrorism Division, did Mr. Page monitor Ms. Richardson's attendance, i.e., when she came in and when she left for home?*

Response: I can't speak for him, but he was not given that assignment. I was Ms. Richardson's supervisor and that was not a concern of mine, I was not concerned that she was not putting in an eight-hour a day. Mr. Page never reported that to me, nor did we ever have a discussion about that. Ms. Richardson never reported to me that Mr. Page was doing that. If she had, I would have stepped in immediately. That was not his concern.

*Did Mr. Page let everyone know he was "on her case"?*

Response: Again, he was not her supervisor; they were peers. No, I never heard that comment or anything related to that. The only time he had any supervisory responsibility was when I was on leave, in July or August, for a couple of days. I have one of my Assistant Directors act for me in my absence.

*Was Ms. Richardson humiliated by the actions taken?*

Response: I cannot speculate as to how Ms. Richardson felt, but she did mention once that she was feeling humiliated. I kept our counseling sessions private. The only people I knew who were aware of the situation were myself, Ms. Richardson, and Mr. Yamamoto. The counseling sessions were usually just

Initials *DB*

myself and Ms. Richardson. In the weekly sessions, it was just Mr. Yamamoto, Ms. Richardson and me. In the reassignment, it was made clear to her and her subordinates that it was a lateral reassignment. In the relocation, it would have been understood by anyone that if she was not the Assistant Director, she would not be in that office and that the Acting Assistant Director or new Assistant Director would be in that office.

*Why were Ms. Powers and Ms. Guier not required to move when they were reassigned?*

Response: Ms. Powers was physically relocated to the Emergency Operations Center. Ms. Guier was not physically relocated because we did not have space equivalent to her grade available.

*What medical problems was Ms. Richardson experiencing?*

Response: She took quite a bit of leave for surgery. She never shared with me what the surgeries were for. I don't know the specifics of her medical condition, if there is any.

*Did Ms. Richardson request accommodation for stress?*

Response: Yes, sometime in mid-August.

*Did she provide you any medical documentation to support her request?*

Response: No. I remember working with HR on the accommodation issue. As I recall, the only thing she provided was a paper that looked like a prescription note pad. It had some scribbling on it, the address was marked out and the scribbling was almost illegible. I don't know if I have this confused with another action because I also spoke with folks about workers' compensation.

21 of 25

Initials _____

*Did you speak with Jane Ovedovitz in the Health Unit?*

Response: No. I spoke with Adrienne Ross in the Safety Office upstairs. I worked with her. I may be confusing this. When we got the request for reassignment, I was working with HR and they were reviewing all that needs to be done for that type of request. Ms. Richardson's resignation came up, so her request for reassignment was never fully processed by HR. I had several meetings with HR about Ms. Richardson's request and I didn't disregard or disapprove it.

*Did you consider her medical condition to constitute a disability, i.e., a condition substantially affecting any of her major life activities?*

Response: I was not aware of her medical condition. She never provided any documentation or the details of her medical condition to me, nor did she ever discuss her medical condition with me. The only thing I had was a letter from her doctor saying she needed time off to recover from surgery. She had sick leave saved up and she requested sick leave and I approved it. The stress was something she said, but she never provided me with any documentation on it or discussed the details of her stress with me.

*Did you act on your own initiative or at Mr. Yamamoto's direction in counseling Ms. Richardson, reassigning her, and relocating her?*

Response: I acted in concert with the Director, but I was her supervisor and it was ultimately my decision, as it was my decision to bring her on board. I had the ultimate responsibility.

22 of 25

Initials

*Was the counseling Ms. Richardson received, her reassignment from her position to lower graded duties, and her relocation intended to force her to resign?*

Response: No, absolutely not. The reassignment was intended to give her a chance to be successful. If she had been able to turn the project around and get it on track, it would be a success story and a chance for her to gain confidence in herself. Her resignation was not in the cards. We were looking for a long-term solution with these projects. It would have helped me because we had lost confidence in her abilities as a manager. The reassignment was meant to help Ms. Richardson succeed and give me a way to continue to support her as a senior employee. We wanted her to contribute to mission accomplishment and this was another way for her to do so, appropriate with her grade level and skills.

*When and how did you become aware of Ms. Richardson's EEO complaint?*

Response: I guess through official channels. It would have come down to Mr. Yamamoto. I don't recall a date.

*Did you or Mr. Yamamoto take the actions described based on reprisal for Ms. Richardson's EEO complaint?*

Response: No, again, we wanted her to be a success. We brought her on board, she was a key member of the staff and we wanted to provide her assistance. Mentoring was intended to help her. We understood she had no supervisory experience. In the interview, she said all the right things. When major problems occurred, rather than let things spiral downward, we tried to give her some help

23 of 25

Initials *[signature]*

and mentor her. She would not even acknowledge there were problems. The weekly sessions were to help her and had nothing to do with reprisals.

*Who is Fred Schwein?*

Response: He worked upstairs. He's gone now. He was not part of OSY. He was part of the Secretary of Commerce's staff. He relocated to the Department of Homeland Security in the last two or three weeks.

*Did he intervene in Ms. Richardson's behalf?*

Response: He never intervened, at least not with me or to my knowledge. In the two to two and a half years I've been here, I've only spoken with him about five times total and not about her.

*Is there anything else you want to tell me?*

Response: I just want to point out that I was the selecting officer. I thought she'd do well. I thought she had the potential and that I could get her on the road to success using her as the Special Projects Officer. I was genuinely surprised when she voluntarily resigned.

24 of 25

Initials

I have read the above statement consisting of _24_ pages. I declare under the penalties of perjury that my statement is true, correct and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

David Bell

Executed on: _11/30/05_

11/30/05  18:24 FAX 202 501 6355    OFFICE OF DAS SECURITY    ☒026

**EXHIBIT 4**

Jonathan Perez/HCHB/Osnet        To   Parthenia Richardson/HCHB/Osnet@osnet
02/24/2005 07:57 AM               cc   Kevin Sadler/HCHB/Osnet@osnet, Rachel
                                       Hughins/HCHB/Osnet@osnet
                                 bcc
                             Subject   Fw: Security Specialist, ZA-0080-IV (vice Silver) certificates

Per the request of OSY, please find attached the certificate lists for vice Silver, ZA-0080-IV. Please
let me know if you have any questions.
JP

Security Specialist, ZA-0080-IV (vice Silver)
Please see the link below to view your certificates of eligibles from vacancy announcements
OSY-2005-0064 (the DEU cert) and OSY-2005-0069 (the Merit/MAP cert).  **Regarding the merit
promotion list, applicants should be prepared to verify their claim of status as per the
instructions in vacancy.**  I remain available, as always for any questions you might have in this
regard.  Special thanks to Michael Allen for his review of the Merit/MAP applicants.

Instructions:

https://jobs1.quickhire.com/scripts/doc.exe/admin
1. Go to this URL

2.  Enter OSY-2005-0064 or OSY-2005-0069 in the field entitled "Userid" for your certificates.

3. Enter 1qwertyu into the field entitled "password"

Please alert me by email when your selection process is complete.

Exhibit 21 Page 1

DELEGATED EXAMINING CERTIFICATE

U.S. Department of Commerce
51 Office of Security

Certificate Number: OSY-2005-0064-DEU ZAIV
Issued on: 02/18/2005
Expires on: 05/19/2005
ZA-0080-04
Duty Location: Washington DC Metro Area, DC
Random Number: 1

**Grade: 04**

      107  CP   DAVIS, PAULA

      102.8  CPS   SANTOS, JOSE

              Phone:

      104.4  TP   STRATE, SEAN

              Phone:

This certificate is valid only for the position, grade and duty location shown on this
certificate.
Selection must be made within the top 3 available candidates.
You may not pass over a veteran preference eligible to select a lower ranking non-prefe
rence eligible
unless the veteran has declined the position (please provide documentation)or an object
ion has been
sustained by this office this office.

**Exhibit** 21 **Page** 2

Selecting Official Signature: _____

For questions regarding this certificate, please contact your servicing Human Resources
Specialist.

Merit Promotion Certificate
U.S. Department of Commerce
51 Office of Security
Issued on: 02/18/2005

Certificate Number: OSY-2005-0069-MAP ZAIV
ZA-0080-04
Location: Washington DC Metro Area, DC
Random Number: 1

Please return certificate by: 05/19/2005

**Grade: 04**

MCELROY, JAMES
███████████████████████
███████████████████████████
Phone: ████████████████

SHYLLON, MAMUNATA
██████████████████████
████████████████████████
Phone: ████████████████

BURNS, JAMES
██████████████████████
██████████████
████████████████████████
Phone: ████████████

I hereby certify that the selections(s) indicated above is (are)
based solely on merit, fitness and qualification with due weight
given to performance and awards and does (do) not involve
discrimination based on race, color, religion, sex, national origin,
age, physical or mental disability, sexual orientation, political
affiliation, employee organization affiliation, or favoritism.

Exhibit 21 Page 3

Selecting Offical Signature: _____

For questions regarding this certificate, please contact your servicing HR Specialist.

Jonathan Perez/HCHB/Osnet       To  Parthenia Richardson/HCHB/Osnet@osnet
06/06/2005 02:42 PM             cc  Rachel Hughins/HCHB/Osnet@osnet
                                bcc
                            Subject  Security Specialist, ZA-0080-IV (vice Silver) certificates of
                                     eligibles

Security Specialist, ZA-0080-IV (vice Silver)
Please see the link below to view your certificates of eligibles from vacancy announcements
OS-OSY-2005-0037 (the DEU cert) and OS-OSY-2005-0038 (the Merit/MAP cert).  **Regarding the
merit promotion list, applicants should be prepared to verify their claim of status as per the
instructions in vacancy.** I remain available, as always for any questions you might have in this
regard.

Instructions:

https://jobs1.quickhire.com/scripts/doc.exe/admin
1. Go to this URL

   2. Enter OS-OSY-2005-0037 or OS-OSY-2005-0038 in the field entitled "Userid" for your
certificates.

   3. Enter 1qwertyu into the field entitled "password"

Please alert me by email when your selection process is complete.

OS-OSY-2005-0037 DEU Band IV.pdf   OS-OSY-2005-0038 MAP Band IV.pdf

Exhibit 21 Page 4

DELEGATED EXAMINING CERTIFICATE
U.S. Department of Commerce
51 Office of Security

Certificate Number: OS-OSY-2005-0037-DEU Band IV
Issued on:  06/06/2005
Expires on:  09/04/2005
ZA-0080-04
Duty Location:  Washington DC Metro Area, DC
Random Number:  3


**Grade: 04**


     100.38  CP    BURNS, JAMES
     <span>████████████</span>
     <span>██████</span>
     Phone: ████████████


     96.13  CPS   SANTOS, JOSE
     <span>█████████████</span>
     <span>█████████████</span>
     Phone: ████████████


     93.02  CPS   DEWALD, DAVID
     <span>████████████</span>
     <span>████████████</span>
     Phone: ████████████


This certificate is valid only for the position, grade and duty location shown on this
certificate.
Selection must be made within the top 3 available candidates.
You may not pass over a veteran preference eligible to select a lower ranking non-prefe
rence eligible
unless the veteran has declined the position (please provide documentation)or an object
ion has been
sustained by this office this office.


Selecting Official Signature: _____

For questions regarding this certificate, please contact your servicing Human Resources
 Specialist.

Merit Promotion Certificate
U.S. Department of Commerce
51 Office of Security
Issued on: 06/06/2005

Certificate Number: OS-OSY-2005-0038-MAP IV
ZA-0080-04
Location: Washington DC Metro Area, DC
Random Number: 3

Please return certificate by: 09/04/2005

**Grade: 04**

BARBEE, JUDITH

Phone:

BLUM, HOWARD

Phone:

BURNS, JAMES

Phone:

ISLEY, MARY

Phone:

SCHOCH, DANIEL

Exhibit 21 Page 6

Selecting Offical Signature: _____

For questions regarding this certificate, please contact your servicing HR Specialist.

**Jonathan Perez/HCHB/Osnet**
04/08/2005 03:47 PM

To   Parthenia Richardson/HCHB/Osnet@osnet

cc   Kevin Sadler/HCHB/Osnet@osnet, Rachel Hughins/HCHB/Osnet@osnet

bcc

Subject   Security Specialist, ZA-0080-II/III (vice Kerrick) certificates of eligibles

Security Specialist, ZA-0080-II/III (vice Kerrick)
Please see the link below to view your certificates of eligibles from vacancy announcements OS-OSY-2005-0016 (the DEU cert) and OS-OSY-2005-0021 (the Merit/MAP cert). **Regarding the merit promotion list, applicants should be prepared to verify their claim of status as per the instructions in vacancy.** I remain available, as always for any questions you might have in this regard.

Instructions:

https://jobs1.quickhire.com/scripts/doc.exe/admin
1. Go to this URL

2. Enter OS-OSY-2005-0016 or OS-OSY-2005-0021 in the field entitled "Userid" for your certificates.

3. Enter 1qwertyu into the field entitled "password"

Please alert me by email when your selection process is complete. For your conveneince, the certificates are attahced. Also, here's the list of codes one should use in making designations on the certs. We ask that no other notations, etc., aside from these codes be made on the certs.

OS-OSY-2005-0016-DEU II amend.pdf   OS-OSY-2005-0016-DEU III.pdf   OS-OSY-2005-0021 MAP III.pdf

certificate action codes.pdf

OS-OSY-2005-0021 MAP II.pdf

Exhibit 21  Page 7

Jonathan Perez/HCHB/Osnet

06/27/2005 12:03 PM

To   Parthenia Richardson/HCHB/Osnet@osnet

cc   Rachel Hughins/HCHB/Osnet@osnet

bcc

Subject   Revised: Security Specialist, ZA-0080-III, (vice Herbert) certificates of eligibles

Please diesregard the earlier email on this subject; the vacancy ID numbers were from then old advertsiement:       This one is the corrected version.

Thanks,

JP

Security Specialist, ZA-0080-III, (vice Herbert)

Please see the link below to view your certificates of eligibles from vacancy announcements OS-OSY-2005-0043 (the DEU cert) and OS-OSY-2005-0044 (the Merit/MAP cert). **Regarding the merit promotion list, applicants should be prepared to verify their claim of status as per the instructions in vacancy.** I remain available, as always for any questions you might have in this regard.

Instructions:

https://jobs1.quickhire.com/scripts/doc.exe/admin

1. Go to this URL

2. Enter OS-OSY-2005-0043 or OS-OSY-2005-0044 in the field entitled "Userid" for your certificates.

3. Enter 1qwertyu into the field entitled "password"

Please alert me by email when your selection process is complete.

Exhibit 21 Page 8

DELEGATED EXAMINING CERTIFICATE
U.S. Department of Commerce
51 Office of Security

Certificate Number:  OS-OSY-2005-0043-DEU III
Issued on:  06/27/2005
Expires on:  09/25/2005
ZA-0080-03
Duty Location:  Washington DC Metro Area, DC
Random Number:  7

**Grade: 03**

|         |    |                 |
|---------|----|-----------------|
| 94.25   | TP | BLAKEY, THOMAS  |

Phone: ████████

|         |    |                 |
|---------|----|-----------------|
| 93.28   | NV | MCCOWAN, JOEL   |

Phone: ████████

|         |    |                 |
|---------|----|-----------------|
| 90.6    | NV | ROWE, SHARRON   |

Phone: ████████

This certificate is valid only for the position, grade and duty location shown on this
certificate.
Selection must be made within the top 3 available candidates.
You may not pass over a veteran preference eligible to select a lower ranking non-prefe
rence eligible
unless the veteran has declined the position (please provide documentation)or an object
ion has been
sustained by this office this office.

**Exhibit 21 Page 9**

Selecting Official Signature: _____

For questions regarding this certificate, please contact your servicing Human Resources
Specialist.

Merit Promotion Certificate
U.S. Department of Commerce
51 Office of Security
Issued on: 06/27/2005

Certificate Number: OS-OSY-2005-0044-MAP III
ZA-0080-03
Location: Washington DC Metro Area, DC
Random Number: 7

Please return certificate by: 09/25/2005

**Grade: 03**

TAYLOR, PAUL

Phone:

THOMPSON, DIANE

Phone:

WARE, GEORGE

Phone:

WASHINGTON, VALERIE

Phone:

I hereby certify that the selections(s) indicated above is (are)
based solely on merit, fitness and qualification with due weight
given to performance and awards and does (do) not involve
discrimination based on race, color, religion, sex, national origin,
age, physical or mental disability, sexual orientation, political
affiliation, employee organization affiliation, or favoritism.

Exhibit 21 Page 10

Selecting Offical Signature: _____

For questions regarding this certificate, please contact your servicing HR Specialist.

**EXHIBIT 5**

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp - 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)**

| 1. Actions Requested | | |
|---|---|---|
| Resignation | **2. Request Number** OSY-05-088 | |
| 3. For Additional Information Call (Name and Telephone Number) Rachel Hughins, x2-3008 | **4. Proposed Effective Date** 09/17/2005 | |

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized by (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| Dave Bell, Dep Dir of Security  9/2/05 | Richard Yamamoto, Dir of Security  9/2/05 |

**PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)**

| 1. Name (Last, First, Middle) Richardson, Parthenia | 2. Social Security Number | 3. Date of Birth 12/18/60 | 4. Effective Date 09/17/2005 |
|---|---|---|---|

| **FIRST ACTION** | **SECOND ACTION** |
|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Supervisory Security Specialist | |

| 8. Pay Plan ZA | 9.Occ. Code 0080 | 10.Grade or Level V | 11.Step or Rate 1 | 12. Total Salary $103,947.00 | 13.Pay Basis PA | 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12A. Basic Pay $103,947.00 | 12B. Locality Adj. $0.00 | 12C. Adj. Basic Pay $103,947.00 | 12D. Other Pay $0.00 | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE SECRETARY OFFICE OF THE CFO/ASA OFFICE OF SECURITY COUNTERESPIONAGE DIVISION0 | |

## EMPLOYEE DATA

| 23. Veterans Preference 2<br>1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 24. Tenure 2<br>0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | 25. Agency Use | 26. Veterans Pref for RIF  X YES  NO |
|---|---|---|---|
| 27. FEGLI WAIVED | 28. Annuitant Indicator 9  NOT APPLICABLE | | 29. Pay Rate Determinant 0 |
| 30. Retirement Plan K  FERS AND FICA | 31. Service Comp. Date (Leave) 12/15/03 | 32. Work Schedule F  FULL TIME | 33. Part-Time Hours Per Biweekly Pay Period |

## POSITION DATA

| 34. Position Occupied 1<br>1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career | 35. FLSA Category E<br>E - Exempt  N - Nonexempt | 36. Appropriation Code 05/0127000/1101/1104 | 37. Bargaining Unit Status 8888 |
|---|---|---|---|
| 38. Duty Station Code 11-0010-001 | 39. Duty Station (City - County - State or Overseas Location) WASHINGTON DC | | |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship  1 - USA  8 - Other | 50. Veterans Status | 51. Supervisory Status |

**PART C - Reviews and Approvals (Not to be used by requesting office.)**

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

| Signature | Approval Date |
|---|---|

CONTINUED ON REVERSE SIDE
52-118

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

18    18

**PART D – Remarks by Requesting Office**
(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)

☐ YES   ☒ NO

GNATION EFFECTIVE SEPTEMBER 8, 2005

EMPLOYEE LEAVING FEDERAL SERVICE

**PART E – Employee Resignation/Retirement**

Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

SEE ATTACHED SHEET FOR DETAILED EXPLANATION OF SUDDEN RESIGNATION    9/6/05

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| 9/8/2005 | *Anthena Richardson* | 9/6/2005 | 12604 Windbrook Drive, Clinton, MD 20735 |

**PART F – Remarks for SF 50**

18    19

**Parthenia Richardson, ▇▇▇▇▇**
**SF-52 Request for Personnel Action**

## PART E – Employee Resignation/Retirement Explanation:

I hereby tender my resignation from the Department of Commerce. I do so in order to remove myself from a hostile work environment. I believe I am the victim of retaliation as a result of my filing an EEO complaint against the Director of Security, Richard Yamamoto. A week after declining Mr. Yamamoto's proposed remedies (July 11, 2005) I was detailed from my position as Assistant Director of Counterespionage Division and given the title of Special Projects Officer for a period of 120 days and told to vacate my office. The duties I was assigned were those of a GS 11/12 employee that failed to establish a Declassification Plan. This failure contributed to the report that was sent to the President of the United States on November 30, 2004 from ISOO, stating Commerce is "at significant risk" of failing to meet a mandated deadline of December 31, 2006. However, once these duties were assigned to me, the employee was promoted to a GS 13.

On August 17, 2005, I spoke to Dave Bell and requested reasonable accommodations as recommended by my physician and was told "you are not under any stress, we just moved you from stress. If we take this program from you and give it to someone else they will have stress and besides I don't know who would do it."

In short, being removed from my position and office, and assigned the failed duties of a subordinate are part of the hostile work environment coupled with the refusal to accept my physician's recommendation to remove me from the current work environment have contributed to my increased levels of stress and the necessity of my resignation.

*Parthenia Richardson* — 9/6/05

18    20