**EXHIBIT 6**

PRINT | CLOSE

# PROBATIONARY AND TRIAL PERIODS

**Number:** DAO 202-315          **Effective Date:** 1987-07-10

## SECTION 1. PURPOSE.

.01 This Order provides Department policies and procedures regarding probationary and trial periods.

.02 This revision incorporates an amendment to the previous Order and modifies previous policy crediting temporary service preceding a probationary period toward completion of the period.

## SECTION 2. PROBATIONARY AND TRIAL PERIODS FOR INITIAL APPOINTMENTS.

.01 <u>Distinction between Probationary and Trial Period</u>. The term "probationary period" applies to career or career conditional appointments; the term "trial period" applies to term or excepted service appointments.

.02 <u>Coverage</u>. This Section applies to:

a. Employees subject to probationary periods by 5 CFR 315 and FPM Chapter 315, Subchapter 8-2;

b. Employees with term appointments, for whom the first year of service is a trial period under 5 CFR 316.304, and FPM Chapter 316, Subchapter 3-3;

c. Employees with excepted appointments, for whom the first year of service is a trial period required by DAO 202-302, "Employment in the Excepted Service."

.03 <u>Length</u>. All probationary and trial periods for initial appointments are for one year.

.04 <u>Evaluation by the Supervisor</u>. The supervisor of each employee serving a probationary or trial period must submit a signed statement certifying either that the employee's performance, conduct, and general character traits have been found to be satisfactory or to be unsatisfactory. The statement must also contain a specific recommendation about whether the employee should be retained after the probationary or trial period. This statement, provided to the supervisor by the personnel office, must be completed during the ninth or tenth month of the period on Form CD-35, "Probationary or Trial Period Report" (Exhibit 1). Supervisors who are considering recommending that an employee not be retained should promptly contact their servicing personnel office. The completed Form CD-35 with all required approvals must be filed in the Employee Performance File.

## SECTION 3. PROBATIONARY PERIODS FOR INITIAL APPOINTMENTS TO SUPERVISORY OR MANAGERIAL POSITIONS.

.01 <u>Definitions</u>. Supervisory position and managerial position have the meaning given them by the OPM Supervisory Grade Evaluation Guide for Position Classification. The definitions are reprinted in FPM Chapter 315, Subchapter 9-2.

.02 <u>Coverage</u>. The requirements of 5 CFR 315, Subpart 1; FPM Chapter 315, Subchapter 9; and this Section apply to:

a. All appointments and positions without time limitation in the competitive civil service; and

b. All term appointments and promotions.

.03 <u>Basic Requirements</u>.

a. An individual appointed for the first time on a non-temporary basis to a supervisory position must serve a supervisory probationary period. This requirement also applies to an individual previously appointed to a supervisory or managerial position requiring a probationary period that he or she did not complete successfully. A supervisory probationary period is

not required for temporary appointments or temporary promotions. Individuals having successfully completed a managerial probationary period or exempted by 5 CFR 315.904 (c) on the basis of prior service are not required to serve a supervisory probationary period.

b. An individual appointed for the first time on a non-temporary basis to a managerial position must serve a managerial probationary period. This requirements also applies to an individual previously appointed to a managerial position requiring a probationary period that he or she did not complete successfully. A managerial probationary period is not required for temporary appointments or temporary promotions, nor for individuals exempted by 5 CFR 315.904(c) on the basis of prior service.

c. Successful completion of a probationary period for a position that is both managerial and supervisory satisfies the requirements for both kinds of positions. Successful completion of a managerial probationary period satisfies the requirement for a supervisory probationary period.

d. Once an employee has successfully completed a supervisory probationary period, he or she may not be required to serve another supervisory probationary period. Once an employee has successfully completed a managerial probationary period, he or she may not be required to serve another managerial or supervisory probationary period.

e. An employee serving a supervisory or managerial probationary period for the first time must complete a core curriculum of supervisory/management training courses, as, provided in DAO 202-411, "Supervisory and Management Development."

f. The length of the probationary period for supervisory or managerial positions is one year, except as provided in paragraph .06d of this section.

.04 <u>Evaluation of Probationer's Performance</u>.

Performance requirements for probationary managers and supervisors should be set according to DAO 202-430, "Performance Appraisal," and documented on Form CD-396, "Performance Plan, Progress Review, and Appraisal Record." An evaluation of "Fully Successful" or higher on all critical elements of the performance plan is required for retention in the supervisory or managerial position beyond the probationary period.

.05 <u>Documentation</u>.

a. The supervisor of an employee who satisfactorily serves a probationary period must document its successful completion on Form CD-352, "Certification of Satisfactory

Completion of Probationary Period" (Exhibit 2). The supervisor of the probationer must receive the form from the personnel office as a reminder sixty days before the end of the probationary period. The form may not be completed until after the probationary period ends. The completed Form CD-352 must be filed on the right hand side of the employee's Official Personnel Folder.

b. Meeting the requirements for supervisory or managerial training is a necessary part of satisfactory completion of a probationary period. When an employee meets the training requirement, and has otherwise successfully completed the probationary period, the supervisor must so certify by signing the CD-352.

.06 Failure to Complete a Supervisory or Managerial Probationary Period Satisfactorily.

a. The decision to return a probationer to a non-supervisory or non-managerial position for reasons of supervisory or managerial performance is not grievable under the Department's administrative grievance system provided in DAO 202-771, "Employee Grievances."

b. The return of a probationer to a lower-graded non-managerial or non-supervisory position for reasons other than managerial or supervisory performance (i.e., for technical performance or misconduct) is subject to the procedural requirements of DAO 202-432, "Reduction in Grade and Removal Based on Unacceptable Performance," or DAO 202-752, "Adverse Actions."

c. If an employee is demoted into a supervisory or managerial position subject to probation and fails to complete the probationary period successfully, he or she is not entitled to repromotion to the original grade, but to a non-supervisory or non-managerial position at the same grade level as the managerial or supervisory position.

d. If an employee whose supervisory or managerial performance is otherwise satisfactory fails to complete the training requirement during the one year period, the probationary period is not satisfactorily completed. Within 15 calendar days of the end of the one-year period, the head of the operating unit employing the probationary must notify the Director of Personnel in writing of the reasons the training was not completed and the schedule for completing it. In such cases, the probationary period is extended until the requirements are met.

e. The placement of an employee who does not complete the supervisory or managerial probationary period successfully is the responsibility of the operating unit that made the appointment or promotion.

f. When an employee is promoted to a supervisory or managerial position and is then returned to his or her former grade, the employee's pay at the lower grade must be set at the level he or she would have attained but for the promotion.

.07 Crediting Service toward Completion of the Probationary Period.

a. Managerial Probationary Periods:

1. Satisfactory service in a managerial position during a probationary period that is interrupted is creditable toward completion of a subsequent supervisory or managerial probationary period that begins no later than two years after the end of the initial probationary period.

2. A temporary appointment, promotion, or detail to another managerial position during

a managerial probationary period is creditable toward completion of the probationary requirement. A temporary appointment, promotion, or detail to a supervisory or non-supervisory position during a managerial probationary period is not creditable toward completion of the managerial probationary period, and extends the probationary period by the length of the assignment.

b. Supervisory Probationary Periods:

1. Satisfactory service in a supervisory or managerial position during a probationary period that is interrupted is creditable toward completion of a subsequent supervisory probationary period (for the same or a different position) that begins no later than two years after the end of the initial probationary period.

2. A temporary appointment, promotion, or detail to another supervisory or managerial position during a supervisory probationary period is creditable toward completion of the probationary requirement.

3. A temporary appointment, promotion, or detail to a non-supervisory position during a supervisory probationary period is not creditable toward completion of the probationary requirement, and extends the probationary period by the length of the assignment.

## SECTION 4. EFFECT ON OTHER ORDERS.

This Order supersedes Department Administrative Order 202-315, dated October 1, 1982, as amended. This Order also supersedes all operating unit or regional policy directives on probationary and trial periods.

Signed - Director for Personnel and Civil Rights

Signed - Assistant Secretary for Administration

Office of Primary Interest.

Office of Personnel

USCOMM-DC -87-9001

For a copy of the Exhibits please call (202) 482-7873

**EXHIBIT 7**

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| RICHARDSON, PARTHENIA | | | 12/18/60 | 02/20/05 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| JO | TRANSFER | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| KTM | REG 315.501 LATERAL | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| VGL | 5 USC 4703 | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | SUPVY SECUR SPECLST |
| | OA          050040 |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ZA | 0080 | 05 | 01 | 103,947.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 103,947.00 | .00 | 103,947.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | OFFICE OF THE SECRETARY |
| | CHF FINCL OFCR AND A/S FOR ADM |
| | OFC OF SECURITY |
| | COUNTER-ESPIONAGE DIVISION |
| | CM 51110400020000000     PP 04 2005 |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 2 | 1-None  3-10 Point/Disability  5-10 Point/Other<br>2-5 Point  4-10 Point/Compensable  6-10 Point/Compensable/30% | 2 | 0-None  2-Conditional<br>1-Permanent  3-Indefinite | | X YES ☐ NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| B0 | WAIVED | 9 | NOT APPLICABLE | 0 |

| 30. Retirement Plan | | 31. Service Comp Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| K | FERS AND FICA | 12/15/03 | F | FULL TIME | |

## POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1-Competitive Service  3-SES General<br>2-Excepted Service  4-SES Career Reserved | E | E-Exempt<br>N-Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON     DIST OF COLUMBIA     DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

APPOINTMENT AFFIDAVIT EXECUTED 02/22/05.
CREDITABLE MILITARY SERVICE: 00 YRS. 00 MOS.
PREVIOUS RETIREMENT COVERAGE: PREVIOUSLY COVERED.
POSITION IS AT THE FULL PERFORMANCE LEVEL.
FROZEN SERVICE: 00 YRS. 00 MOS.
BASE PAY ADJUSTED - COMPETITIVE SELECTION.
SELECTED FROM OSY-2005-0054 DATED 12/01/04.
SERVICE COUNTING TOWARD CAREER TENURE FROM  12/15/03 .
SUBJECT TO COMPLETION OF ONE YEAR PROBATIONARY PERIOD FOR ASSIGNMENT TO
 SUPERVISORY OR MANAGERIAL POSITION BEGINNING 02/20/05.

18     3

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF COMMERCE | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | MARY E. KING |
| CM 51 | 1702 | 02/20/05 | HUMAN RESOURCES OFFICER |

5-Part     50-315

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/31/93
NSN 7540-01-333-1237

CM 51110400020000000     PP 04 0*2005*BATCH 17025868 000-00 173-24 AG/EO 51-1702

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | | 2. Social Security Number | | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|---|---|
| RICHARDSON, PARTHENIA | | | | | | 12/18/60 | 02/20/05 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 02 | CORRECTION |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| | |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 130 | TRANSFER |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| KVM | REG 315.501 PROM |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| VGL | 5 USC 4703 |

**7. FROM: Position Title and Number**

**15. TO: Position Title and Number**
SUPVY SECUR SPECLST
0A           050040

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ZA | 0080 | 05 | 01 | 103,947.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 103,947.00 | .00 | 103,947.00 | .00 |

**14 Name and Location of Position's Organization**

**22. Name and Location of Position's Organization**
OFFICE OF THE SECRETARY
CHF FINCL OFCR AND A/S FOR ADM
OFC OF SECURITY
COUNTER-ESPIONAGE DIVISION

CM 511104000200000000        PP 09 2005

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference For RIF |
|---|---|---|---|
| 2  1-None  3-10 Point/Disability  5-10 Point/Other / 2-5 Point  4-10 Point/Compensable  6-10 Point/Compensable/30% | 2  0-None  2-Conditional / 1-Permanent  3-Indefinite | | X YES  ☐ NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| BO  WAIVED | 9  NOT APPLICABLE | 0 |

| Retirement Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33 Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1 FERS AND FICA | 12/15/03 | F  FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1-Competitive Service  3-SES General / 2-Excepted Service  4-SES Career Reserved | E  E-Exempt  N-Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON     DIST OF COLUMBIA     DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

**45. Remarks**
CORRECTS ITEM 5-C FROM KTM AND 5-D LATERAL.

18          4

| Employing Department or Agency | | | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| DEPARTMENT OF COMMERCE | | | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | MARY E. KING |
| CM 51 | 1702 | 02/20/05 | HUMAN RESOURCES OFFICER |

FORM CD-516
(1-94) L.F
OAO 202-430

U.S. DEPARTMENT OF COMMERCE

☐ NEW
☐ I/A: _____
MR#: _____
IP#: _____

# CLASSIFICATION AND
# PERFORMANCE MANAGEMENT RECORD

• Performance Plan    • Performance Appraisal    • Performance Recognition    • Progress Review    • Position Description

Employee's Name: RECRUIT

Social Security No.: _____

Position Title: Supervisory Security Specialist

Pay Plan, Series, Grade/Step: ZA-0080-V

Organization:  1. OFFICE OF THE SECRETARY          4. Counterespionage Division

2. OFFICE OF THE CFO/ASA          5. _____

3. OFFICE OF SECURITY             6. _____

Rating Period: 10/01/03-09/30/04

Covered By:  ☐ Senior Executive Service       ☐ Other _____

☑ General Workforce

## PART A—POSITION DESCRIPTION

**POSITION CERTIFICATION**—I certify that this is an accurate statement of the major duties and responsibilities of the position and its organization relationships and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds and that false or misleading statements may constitute violation of such statute or their implementing regulations.

| SUPERVISOR'S SIGNATURE Cheryl Stone | DATE 9-21-2004 | SECOND LEVEL SUPERVISOR Richard Yamamoto | DATE |
|---|---|---|---|

| CLASSIFICATION CERTIFICATION | OFFICIAL TITLE: | | | | |
|---|---|---|---|---|---|
| | PP: | SERIES: | FUNC: | GRADE: | I/A: ☐ YES ☐ NO |

I certify that this position has been classified as required by Title 5, US Code, in conformance with standards published by the OPM or, if no published standard applies directly, consistently with the most applicable published standards.

| NAME AND TITLE OF CLASSIFIER Richard Yamamoto, Director Security | SIGNATURE | DATE |
|---|---|---|

## PART B—PERFORMANCE PLAN

This plan is an accurate statement of the work that will be the basis of the employee's performance appraisal.

| NAME AND TITLE OF FIRST LINE SUPERVISOR/RATING OFFICIAL | SIGNATURE | DATE |
|---|---|---|

**APPROVAL**—I agree with the certification of the position description and approve the performance plan.

| NAME AND TITLE OF APPROVING OFFICIAL OR SES APPOINTING AUTHORITY | SIGNATURE | DATE |
|---|---|---|

**EMPLOYEE ACKNOWLEDGEMENT**—My signature acknowledges discussion of the position description and receipt of the ___, and does not necessarily signify agreement.

| | SIGNATURE | DATE |
|---|---|---|

**PRIVACY ACT STATEMENT**—Disclosure of your social security number on this form is voluntary. The number is linked with your name in the official personnel records system to ensure unique identification of your records. The social security number will be used solely to ensure accurate entry of your performance rating into the automated record system.

18     5

# MAST R RECORD/INDIVIDUAL POSIT N DATA

## A. KEY DATA

| 1. FUNCTION (1) A/C/D/R | 2. DEPT. CO/AGCY-BUR CD (4) | 3. SON (4) | 4. MR NO (6) | 5. GRADE (2) | 6. IP NO (8) |
|---|---|---|---|---|---|
| | | | | | |

## B. MASTER RECORD

| 1. PAY PLAN (2) | 2. OCC SER (4) | 3. OCC FUNC CD (2) | 4. OFF TLE-PF/CD/SF (6) PFIX / TITLE CD / SFIX | 5. OFF TITLE (38) (32 W/ PF OR SF) (26 W/ PF AND SF) |
|---|---|---|---|---|
| | | | | |

| 6. HQ/FLD CD (1) 1=HQ 2=FLD | 7. SUPV CD (1) 1=SUPV SGEG 2=SUPV GSSG 3=MGR SGEG 4=SUPV CSRA / 5=MGT CSRA 6=LDR LGEG 8=ALL OTHERS | 8. CLASS STD CD (1) X=NEW STD BLANK=N/A | 9. INTERDIS CD (1) N=NO Y=INTERDIS | 10. DATE CLASS (6) MO / DAY / YEAR |
|---|---|---|---|---|
| | | | | |

| 11. EARLY RET CD (1) 1=PRIMARY 2=SECONDARY / 3=FOREIGN SVC BLANK=N/A | 12. INACT/ACT (1) A=ACTIVE I = INACTIVE | 13. DT ABOL (6) MO / DAY / YEAR | 14. DT INACT/REACT (6) MO / DAY / YEAR | 15. AGCY USE (10) |
|---|---|---|---|---|
| | | | | |

| 16. INTERDIS SERIES (40) |
|---|
| (4)  (4)  (4)  (4)  (4)  (4)  (4)  (4)  (4)  (4) |

| 17. INTERDIS-PF/CD/SF (50) (32 W/ PF OR SF) (26 W/ PF AND SF) |
|---|
| (6)  (6)  (6)  (6)  (6)  (6)  (6)  (6)  (6)  (6) |

## C. INDIVIDUAL POSITION

| 1. FLSA (1) E E=EXEMPT N=NONEXEMPT | PAY TBL (6) 4 | 2. FIN DS (1) 0=NONE 3=SF-278 4=SF-450 | PROC INTG (1) N Y=YES N=NO | 3. POS SCHED (1) A=SCH A B=SCH B C=SCH C / 0=EXCEPTED BUT NOT A,B,C | 4. POS SENS (2) 3n 1=LOW RISK 2=NONCRIT/SENS 3=CRIT/SENS 4=SPECIAL SENS 5=MOD RISK 6=HIGH RISK / C=ADP N=NON-ADP | 4A. DRUG TS (1) yes |
|---|---|---|---|---|---|---|
| | | | | | | |

| WK TITLE CD (1) | 7. WK TITLE (38) | 5. COMP LVL (4) |
|---|---|---|
| | | |

| 8. ORG STR CD (18) | | | | | | | | 9. VAC REV CD (1) 0=POSN ACTION NO VACANCY A=NO CHANGE / B=LOWER GRADE C=HIGHER GRADE / D=DIFFERENT TITLE AND/OR SERIES E=NEW POSN/NEW FTE |
|---|---|---|---|---|---|---|---|---|
| (1st) 51 | (2nd) 11 | (3rd) 04 | (4th) 0003 | (5th) | (6th) | (7th) | (8th) | |

| 10. TARGET GRADE (2) V/5 | 11. LANG REQ (2) | 12. PROJ DUTY IND (1) BLANK=N/A Y=YES | 13. DUTY STATION (9) ST (2) 11 / CITY (4) 0010 / CNTY (3) 001 | 14. BUS CD (4) | 15. DT LST AUDIT (6) MO / DAY / YEAR | 16. PAS IND/LEO (1) BLANK=N/A 1=PAS A=LEO | 17. DATE-EST (6) MO / DAY / YEAR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 18. GRADE BASIS IND (1) 1=REV WHEN VACANT 2=IMPACT OF PERSON 3=SUP/GSSG / 4=SUP/PROGRAM 5=RGEG 6=POLICY ANAL GEG / 7=EQUIP DEV GUIDE | 19. DT REQUEST RECD (6) MO / DAY / YEAR | 20. NTE DATE (6) MO / DAY / YEAR | 21. POS ST BUD (1) Y=PERM N=OTHER |
|---|---|---|---|
| | | | |

| 22. MAINT REV/CLASS ACT CD (2) (1ST DIGIT=ACTIVITY AND 2ND DIGIT=RESULTS) |
|---|
| ACTIVITY 1=AUDIT (COUNTED TOWARDS MAINTENANCE REVIEW) 2=OTHER ACTIVITY / RESULTS 1=NO ACTION REQUIRED 2=MINOR PD CHANGE 3=NEW PD REQUIRED / 4=TITLE CHANGE 5=SERIES CHANGE 6=POSN UPGRADE / 7=POSN DOWNGRADE 8=NEW POSN 9=OTHER |

| 23. DATE EMP ASGN (6) MO / DAY / YEAR | 24. DATE ABOL (6) MO / DAY / YEAR | 25. INACT/ACT (1) A=ACTIVE I = INACTIVE | 26. DATE INACT/REACT (6) MO / DAY / YEAR | 27. ACCTG STAT (4) | 28. INTASGN SER (4) | 29. AGENCY USE (8) |
|---|---|---|---|---|---|---|
| | | | | | | |

| 30. PERSONNEL MANAGEMENT SPECIALIST'S SIGNATURE | 31. DATE |
|---|---|
| | |

| 32. REMARKS |
|---|
| |

FORM CD-516  (1-94) LF  DAO 202-430

18      6

# Position Description

**AC#**  511120040561

**Preparation date:**  2/12/2004

**Validate:**  NO

**Org:**  OFFICE OF THE SECRETARY

**Div:**  OFF ASST SEC FOR ADMIN

**Incumbent Name:**  Milne, Alan G

**Career Path:**  ZA  **Series:**  0080    **Band** 5

**Title:**  Supervisory Security Specialist

**Function:**

No specific function defined for this position.

**Principal Objective:**

To manage work on a variety of matters critical to security programs within the Counterespionage Division, providing senior-level supervisory skills, program development, and management capabilities. To provide strategies and recommendations for achieving long-term OSY performance initiatives, primarily risk mitigation.

**Series Definition:**

Performs analytical, planning or advisory work to develop and evaluate policies and procedures that protect personnel, property, and critical assets/information from loss including acts of espionage or terrorism.

**General Duties and Responsibilities:**

Manages an office with bureauwide responsibility, a major office of an extramural program, or major office through subordinate supervisors reporting directly to this position; or exercises principal responsibility for office or division level administrative management, formulating and implementing organizational goals and objectives, planning and evaluating programs, designing organizational structure, promoting economy of operations, planning and controlling an organizational budget; or carries out broad, unprecedented projects involving the substance of key bureau or department wide programs.

**Knowledge, Skills, and Abilities:**

Ability to (1) manage, through subordinate supervisors, a complex or large bureau-level office; or manage the administrative functions of a large line component, applying skill in establishing objectives and assessing progress and skill in coordinating activities of several units and making adjustments to meet changing requirements within available resources; or (2) working directly with top management of the bureau or Department to carry out broad, complex admininstrative assignments involving the substance of key bureau or department wide programs. Ability to represent immediate organizations and the bureau.

**Incumbent's Supervisory Responsibilties:**

Employee performs full range of supervision at least 25% of the time.

**Specialty Description:**

008010 Personnel Security
Safeguards information or material affecting the national defense and national security from unauthorized disclosure or sabotage primarily through the receipt and review of requests for investigations, the conduct of investigations, and the analysis and evaluation of completed investigative reports for the purpose of ensuring that access to classified information by personnel is consistent with national security.
008014 Information Security Specialist
Performs work concerned with identifying materials, processes, and information that require protection and recommending the level of security classification and other protections required. This work also includes the coordination necessary to identify items of information, technology, and materials that are restricted from transfer to foreign nations.

**Position-Specific Key Phrases:**

In the interest of supporting & promoting optimal org'l performance, critical resp focus on safeguarding NSI through strategic mgmt of info & pers'nel sec prgms in accordance w/ EO orders & DOC regs. Also coord's extensively regarding CI activ w/ OSY employees w/ intell resp. Duties incl completing cmplx, hi-level non-recurring assign'ts as tasked by sr mgmt. M'tains elig for TS-SCI clearance.

**Position Requirements:**

This position requires the submission of a Financial Disclosure Form, SF450.

**Position Sensitivity:**

This is a Special sensitive position.

Form CD-541 U.S. DEPARTMENT OF COMMERCE
(4-98) LF

# DEMONSTRATION PROJECT • PERFORMANCE MANAGEMENT RECORD

# PERFORMANCE APPRAISAL AND POSITION REVIEW

**Employee's Name**   Parthenia Richardson

**Position/Title**   Supervisory Security Specialist

**Career Path/Series/Band**   ZA-0080-V/1

**Organization**   Office of Security - Counterespionage Division   **Rating Period**   February 2005 - September 2005

## RATING OFFICIAL'S CERTIFICATION

I Certify That:

[X]   This plan is a complete and accurate statement of the performance elements, objectives, and major activities that will form the basis of the employee's performance appraisal.

[X]   The performance plan and position description reflect similar objectives, duties and responsibilities.

| Name and Title of Rating Official | Signature | Date |
|---|---|---|
| David Bell, Acting Deputy Director, Office of Security | | 4/28/05 |

## HIGHER LEVEL SUPERVISOR CONCURRENCE

*I agree with the certification of the position description and concur with the performance plan.*

| Name and Title of Higher Level Supervisor (if appropriate) | Signature | Date |
|---|---|---|
| Richard Y. Yamamoto, Director for Security | | MAY 06 2005 |

## PAY POOL MANAGER'S APPROVAL

*I agree with the certification of the position description and I approve the performance plan.*

| Name and Title of Pay Pool Manager | Signature | Date |
|---|---|---|
| David Bell, Acting Deputy Director, Office of Security | | 4/28/05 |

## REVIEWING OFFICIAL'S APPROVAL

*This review is appropriate when the pay pool manager is also the rating official.*

| Name and Title of Reviewing Official | Signature | Date |
|---|---|---|
| Richard Y. Yamamoto, Director for Security | | MAY 06 2005 |

## EMPLOYEE ACKNOWLEDGMENT

*My signature acknowledges discussion of the position description and receipt of the performance plan, but does not necessarily signify agreement with either document.*

| Employee's Signature | Date |
|---|---|
| Parthenia Richardson | 5/17/05 |

FORM CD-541 (4-98) LF

Tab K

WP v. 1.5 (10-7-98) AST

14

# SECTION 1 - PERFORMANCE PLAN

| Employee's Name | Rating Period | Element No. |
|---|---|---|
| Jarthenia Richardson | February 2005 - September 2005 | 1 of 3 |

## ITEM 1. Performance Element, Objective and Point Weight

Critical Element:

Reduce the security risk to DOC.

Objective:

Measurably Reduce the Threat Risk

Point Weight: 50

The weight must reflect the importance of the element or the time required to perform it, or both. Element weight must be in 5-point increments, with no element weight higher than 60 points, and all element weights must equal 100 points.

## ITEM 2. Major Activities or Required Results Related to the Above Element *(Maximum of 5)*

1- Contribute to reducing department wide risk indices.
2 - Individual output, which contributes to reducing risk indices, to include:
  Provide appropriate fiscal accountability for maximum return on investment in reducing the security risk, ensuring budget is managed properly and in line with OSY spending plan and expenditures are within limits of the appropriate allocation.
- Complete projects that significantly reduce the security threat, ensuring quality products and adhering to identified time-lines at least 95% of the time, to include developing office's strategy for reducing risk and presenting to immediate Supervisor, and meeting with each key stakeholder annually.
- Develop office's strategy for reducing risk and present to Deputy Director/supervisor by 7/1/05; specifically addressing efficiency improvements in PERSEC and arenas.
- Lead and document efforts in collaborating with Anti-Terrorism AD to achieve information risk index reduction goal.
- Ensure all security infraction/violation investigations/reports are completed in a thorough, timely and professional manner; providing completed reports to the Director for Security within 2 weeks of incident.
- Ensure the completion of accurate data uploads and downloads from OPM and the NFC occurs within required time limits; providing quarterly status reports to supervisor/others as appropriate.
- Identify and document OSY improvement with respect to ISOO defined INFOSEC programmatic output indicators.
- Identify and document OSY improvement with respect to OPM defined PERSEC programmatic output indicators.

## ITEM 3. Evaluation Criteria *(Benchmark performance standards must be used; add supplemental standards, if needed.)*

Activity 1 Source: Monthly Updates
| | |
|---|---|
| Highly Successful | Exceed annual risk reduction goal |
| Moderately Successful | Achieve between 80% and 100% movement toward risk reduction goal |
| Minimally Successful | Achieve between 1% and 79% movement toward risk reduction goal |
| Unsatisfactory | Achieve no positive movement toward risk reduction goal |

Activity 2 Source: Monthly Updates & Employee/Supervisor Documentation
| | |
|---|---|
| Highly Successful | Accomplish >100% of supervisor defined output goals achieving high standards |
| Moderately Successful | Accomplish between 75% - 100% of supervisor defined output goals |
| Minimally Successful | Accomplish between 50% - 74% of supervisor defined output goals |
| Unsatisfactory | Accomplish < 50% of supervisor defined output goals |

FORM CD-541 (4-98) LF

*TobK* WP v. 1.5 [10-7-98] AST

# SECTION 1 - PERFORMANCE PLAN

| Employee's Name<br>Parthenia Richardson | Rating Period<br>February 2005 - September 2005 | Element No.<br>1    of    3 |
|---|---|---|

**ITEM 1. Performance Element, Objective and Point Weight**

| Critical Element:    Reduce the Security Risk to DOC |
|---|

| Objective:    Measurable Reduce the Threat Risk |
|---|

**Major Activities:**    Additional individual outputs, which contribute to reducing risk indices

- When assigned, manage all COR/ACOR/POC/Bankcard holder and related responsibilities, to include meeting training requirements, providing direct tracking and monitoring of contract funds/resources; ensuring contract modifications occur within 5 days; and coordinating with OAM/OEB/AFMD and others as necessary to ensure contract amendments, invoicing, and closure are met.
- Lead and document efforts towards achieving Information risk Index reduction goal.

**ITEM 3. Evaluation Criteria** *(Benchmark performance standards must be used; add supplemental standards, if needed.)*

See Previous Page for Criteria

Tab K

15            (1)

# SECTION 1 - PERFORMANCE PLAN

| Employee's Name | Rating Period | Element No. |
|---|---|---|
| arthenia Richardson | February 2005 – September 2005 | 2 of 3 |

## ITEM 1. Performance Element, Objective and Point Weight

Critical Element:

Develop Personnel Potential

Objective:

Measurably achieve a highly skilled and cutting-edge workforce

Point Weight: 25

The weight must reflect the importance of the element or the time required to perform it, or both. Element weight must be in 5-point increments, with no element weight higher than 60 points, and all element weights must equal 100 points.

## ITEM 2. Major Activities or Required Results Related to the Above Element *(Maximum of 5)*

1 - Increase core professional competencies.

- Demonstrate leadership capabilities by being prepared to succeed supervisor and leading by example.
  - Manage all aspects of employee resources to include recruiting; guiding IDP development; assisting subordinates in developing solutions to problems; maintaining accountability; meeting with employees on at least a semi-annual basis; and taking appropriate performance actions.
  - Measurably contribute to employee engagement through actions to include articulating expectations to employees; ensuring employees have materials and equipment necessary for full job performance; providing appropriate recognition and praise; encouraging employee growth and development; and reinforcing the importance of OSY's goals and how each employee contributes to meeting those goals.
  - Promulgate the "team concept" within the CE Division.

## ITEM 3. Evaluation Criteria *(Benchmark performance standards must be used; add supplemental standards, if needed.)*

Activity 1 Source: Tracking of Core Professional Competency Training
Highly Successful — Complete >40 hours of position-related training that contributes to lowering security risks or increasing customer satisfaction
Moderately Successful — Complete between 26 and 40 hrs of position-related trng that contributes to lowering security risks or increasing customer sat.
Minimally Successful — Complete between 11 and 25 hrs of position-related trng that contributes to lowering security risks or increasing customer sat.
Unsatisfactory — Complete <11 hours of position-related training that contributes to lowering security risks or increasing customer satisfaction

Activity 2 Source: Supervisor's Evaluation
Highly Successful — Demonstrate ability to completely replace Director/immediate Supervisor
Moderately Successful — Demonstrate ability to adequately replace Director/immediate Supervisor
Minimally Successful — Demonstrate ability to represent Director/immediate Supervisor temporarily
Unsatisfactory — Demonstrate inability to adequately represent Director/immediate Supervisor

FORM CD-541 [4-98] LF

*Tab K*

WF v. 1.5 [10-7-98] ASI

18        12

# SECTION 1 - PERFORMANCE PLAN

| Employee's Name | Rating Period | Element No. |
|---|---|---|
| larthenia Richardson | February 2005 - September 2005 | 3 of 3 |

## ITEM 1. Performance Element, Objective and Point Weight

Critical Element:

Satisfy Customers/Stakeholders

Objective:

Measurably Satisfy Customer/Stakeholder Expectations

Point Weight:

25

The weight must reflect the importance of the element or the time required to perform it, or both. Element weight must be in 5-point increments, with no element weight higher than 60 points, and all element weights must equal 100 points.

## ITEM 2. Major Activities or Required Results Related to the Above Element (Maximum of 5)

1- Contribute to improving department wide customer satisfaction.

Contribute to improving overall customer satisfaction, through individual works that have a significant impact on customers ability to reduce their security risk.

- Develop coalitions within the Department that enables a high degree of communication and cooperation with all OSY customers.

## ITEM 3. Evaluation Criteria (Benchmark performance standards must be used; add supplemental standards, if needed.)

Activity 1  Source: Annual OSY Customer Satisfaction Survey
| | |
|---|---|
| Highly Successful | Overall Satisfaction > 90% |
| Moderately Successful | Overall Satisfaction between 80% - 90% |
| Minimally Successful | Overall Satisfaction between 50% - 79% |
| Unsatisfactory | Overall Satisfaction < 50% |

Activity 2  Source: Employee/Supervisor Documentation of Customer Feedback (Internal/External to OSY)
| | |
|---|---|
| Highly Successful | Performs position functions in manner that greatly promotes OSY reputation and satisfies customers |
| Moderately Successful | Performs position functions in manner that positively promotes OSY reputation and satisfies customers |
| Minimally Successful | Performs position functions in manner that neither promotes nor distracts from OSY reputation and satisfies customers |
| Unsatisfactory | Performs position functions in manner that distracts from OSY reputation and alienates customers |

FORM CD-541 (4-98) LF

Tab K

WP v. 1.5 (10-7-98) AST

18        13

**ITEM 5.** Rating Official's End-of-Year Appraisal *(Includes consideration of attached employee accomplishments)*

☐ 1. Review indicates performance is **Eligible.**

☐ 2. Review indicates performance is **Eligible;** however, there are performance deficiencies, as stated below.

☐ 3. Review indicates performance is **deficient** and a performance improvement plan is needed. Deficiencies are stated below. *(If this block is checked, supervisor must contact the servicing HR office.)*

☐ 4. Review indicates that a PIP has not been successfully completed and performance is rated **Unsatisfactory.**

**Key Achievements, Strengths:** Be specific and relate these to performance elements. List areas where work was done well, and identify the strengths exhibited by the employee during the rating period.

**Deficiencies, Areas of Concern:** *(Must be filled in if box 2 or box 3 above is checked):* Be specific and relate these to individual performance elements. Note deficiencies or areas where performance has declined during the rating period.

**Suggestions/Strategies for Improvement:** List areas in which the employee might enhance performance. Comments can also identify suggestions for career growth and development.

## SECTION 2 - PERFORMANCE SUMMARY RATING

| Employee's Name | Rating Period |
|---|---|
| arthenia Richardson | February 2005 - September 2006 |

**Organization**

Office of Security - Counterespionage Division

### ITEM 1. Scoring

1. List each performance element and its weight.

2. Assign a score to each element. Enter "Unsatisfactory" if element performance does not warrant a score.

3. Complete total score by summing element scores. Total score can range from 40 to 100. If one or more elements are rated "Unsatisfactory," there is no total score and the overall rating is "Unsatisfactory."

| | Performance Element | Weight | Score |
|---|---|---|---|
| 1. | Reduce the security risk to DOC. | 50 | |
| 2. | Develop Personnel Potential | 25 | |
| 3. | Satisfy Customers/Stakeholders | 25 | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| | | TOTAL SCORE | |

### ITEM 2. Rating and Payouts

☐ **Eligible** *(All elements scored in the Eligible range)*

☐ **Unsatisfactory** *(At least one element rated Unsatisfactory)*

Performance Pay Increase Percentage _____  Dollar Amount _____  Bonus Amount _____

| Name and Title of Rating Official | Signature | Date |
|---|---|---|
| David Bell, Acting Deputy Director, Office for Security | | |
| Name and Title of Higher Level Supervisor *(If Appropriate)* | Signature | Date |
| Richard Y. Yamamoto, Director for Security | | |
| Name and Title of Pay Pool Manager | Signature | Date |
| David Bell, Acting Deputy Director, Office for Security | | |
| Name and Title of Reviewing Official | Signature | Date |
| Richard Y. Yamamoto, Director for Security | | |

| Employee's Signature *(Signifies evaluation feedback meeting held)* | Employee comments attached? ☐ YES ☐ NO | Date |
|---|---|---|

FORM CD-541 (4-98) LF

*Tab K*

WP v. 1.5 (10-7-98) AST

18    15

Form CD-541A
7(4-98) LF    U.S. DEPARTMENT OF COMMERCE

# ELEMENT POINT RANGES AND PERFORMANCE STANDARDS

This sheet must be used in conjunction with the performance plan. The benchmark performance standards are used to evaluate and score against the elements, objectives, and activities listed in the plan.

## ELEMENT POINT RANGES

## BENCHMARK PERFORMANCE STANDARDS

| 60 | 55 | 50 | 45 | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 |
|----|----|----|----|----|----|----|----|----|----|----|---|
| 59 | 54 | 49 | 44 | 39 | 34 | 29 |    |    |    |    |   |
| 58 | 53 | 48 | 43 |    |    |    | 24 |    |    |    |   |
| 57 | 52 | 47 |    | 38 | 33 |    |    | 19 |    |    |   |
| 56 | 51 | 46 | 42 | 37 | 32 | 28 | 23 |    | 14 |    |   |
| 55 | 50 |    | 41 |    |    |    |    |    |    |    |   |
| 54 | 49 | 45 |    | 36 |    | 27 |    | 18 |    | 9  |   |
| 53 |    | 44 | 40 |    | 31 |    | 22 |    |    |    |   |
| 52 | 48 | 43 | 39 | 35 |    | 26 |    |    | 13 |    |   |
| 51 | 47 |    |    |    | 30 |    |    |    |    |    |   |
| 50 | 46 | 42 | 38 | 34 |    | 25 | 21 | 17 |    |    |   |
| 49 | 45 | 41 | 37 | 33 | 29 |    |    |    |    |    |   |
| 48 | 44 | 40 | 36 |    | 28 | 24 | 20 | 16 | 12 | 8  | 4 |
| 47 | 43 | 39 | 35 | 32 | 27 | 23 |    |    |    |    |   |
| 46 |    |    |    | 31 |    |    | 19 |    |    |    |   |
| 45 | 42 | 38 | 34 | 30 | 26 |    |    | 15 |    |    |   |
| 44 | 41 | 37 | 33 |    |    | 22 |    |    | 11 |    |   |
| 43 | 40 | 36 | 32 | 29 | 25 | 18 |    |    |    |    |   |
| 42 | 39 | 35 | 31 | 28 | 24 |    | 17 |    |    |    |   |
| 41 | 38 | 34 | 30 | 27 |    |    |    |    |    |    |   |
|    | 37 | 33 |    | 26 | 23 | 20 |    | 10 |    |    |   |
| 40 | 36 | 32 | 29 |    |    |    | 16 | 13 |    |    |   |
| 39 | 35 | 31 | 28 | 25 | 22 | 19 |    |    |    |    |   |
| 38 | 34 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9  | 6  | 3 |
| 37 | 33 | 29 | 26 | 23 | 20 | 17 | 14 | 11 |    |    |   |
| 36 | 32 | 28 | 25 | 22 | 19 | 16 | 13 | 8  |    |    |   |
| 35 | 31 | 27 | 24 |    | 18 | 15 |    |    |    |    |   |
| 34 | 30 | 26 | 23 | 21 | 17 | 14 | 10 | 5  |    |    |   |
| 33 | 29 | 25 | 22 | 20 | 16 | 13 |    |    |    |    |   |
| 32 | 28 | 24 | 21 | 19 |    | 12 | 9  | 7  |    |    |   |
| 31 | 27 | 23 | 20 | 18 | 15 | 11 |    |    |    |    |   |
| 30 | 26 | 22 | 19 | 17 | 14 | 10 | 8  | 4  |    |    |   |
| 29 | 25 | 21 | 18 | 16 | 13 |    |    |    |    |    |   |
| 28 | 24 | 20 |    | 15 | 12 | 9  | 7  |    |    |    |   |
| 27 | 23 | 19 | 17 | 14 | 11 | 8  |    |    |    |    |   |
| 26 | 22 | 18 | 16 | 13 | 10 | 6  | 5  |    |    |    |   |
| 25 |    |    |    |    |    |    |    |    |    |    |   |
| 24 | 22 | 20 | 18 | 16 | 14 | 12 | 10 | 8  | 6  | 4  | 2 |

Element objectives were achieved with maximum impact through exemplary work that demonstrated exceptional originality, versatility, and creativity. Activities and related tasks were carried out to the utmost effectiveness and reliability, rarely leaving room for improvement. Products were of the highest quality; problems were solved with dedicated perseverance, penetrating insight, meticulous attention to detail, and unprecedented success. Potential sources of conflict were anticipated and avoided through creative alternatives. Cooperation and responsiveness were actively promoted wherever possible. Written and oral communications related to the performance of element activities maximized desired results, forged new cooperative relationships, and increased organizational prestige.

Element objectives were accomplished effectively and efficiently with consistently good quality and quantity of work. Activities and _____ related to _____ basic, cost-effective results. Products were above-average in quality and reliability. Accepted procedures were carried out efficiently and constructively, and problems were dealt with skillfully and resourcefully. Cooperative efforts were positive and productive. Written and oral communications related to the performance of element activities were clear and convincing.

Element objectives, activities, and related tasks were completed with adequate quality and quantity of work. Products were generally reliable and were delivered without unacceptable delays. Procedures were minimally correct and problems were dealt with satisfactorily. Work methods demonstrated a reasonable degree of cooperation with others. Written and oral communication related to the performance of element activities were generally understandable.

**UNSATISFACTORY:** Element objectives and activities were not successfully completed, because of failures in quality, quantity, completeness, or timeliness of work. Products were deficient, because they were contrary to directions or guidelines; did not meet minimum specifications; were inconsistent with proper procedures; were significantly flawed or substandard in quality; demonstrated insufficient technical knowledge or skill; were incomplete; were unacceptably late; or lacked essential cooperative involvement and support. Problems that arose during the performance of element activities were not satisfactorily resolved. (No score given for unsatisfactory performance).

| | ELEMENT #1 | ELEMENT #2 | ELEMENT #3 | ELEMENT #4 | ELEMENT #5 | ELEMENT #6 | TOTAL |
|---|---|---|---|---|---|---|---|
| WEIGHT | 50 | 25 | 25 | | | | = 100 |
| SCORE | | | | | | | 0.00 |

FORM CD-541 (4-98) LF        *TobK*      WP v. 1.5 (10-7-98) AST

18      16

# INSTRUCTIONS

**RESPONSIBLE OFFICIAL:** The Rating Official is responsible for all steps except C-6, which is the responsibility of the Pay Pool Manager.

**A.** **PERFORMANCE PLANNING (Section 1, Items 1-3):** Develop the performance plan in collaboration with the employee.

1. **Performance Element:** Establish the performance elements of the position (Item 1). Fill out a separate Section1 for each element.

2. **Objectives:** State the objective of each element.

3. **Point Weight:** Assign a weight to each element in terms of importance or time required, or both. The weight selected must be on the Element Point Range. The total weight of all elements must equal 100 points.

4. **Major Activities:** List the major activities or required results related to each element (Item 2).

5. **Evaluation Criteria:** If needed, enter a supplemental performance standard that defines at least the minimum level of "Eligible" performance to be applied along with the benchmark performance standards (Item3).

6. **Cover Sheet:** Fill out and sign the cover sheet; obtain the signatures of higher level supervisor, (if appropriate) the pay Pool Manager, Reviewing Official*, and employee in this order.

**B.** **PROGRESS REVIEW 1, Item 4):** Conduct at least one (mid-year) progress review with the employee.

1. **Discussion:** For each element, discuss with the employee and record: (a) progress toward accomplishing the element; (b) any need for changes in the plan; and (c) any performance deficiencies and how to correct them.

2. **Recording:** Check one of the blocks.

3. **Initiating:** Initial and date, and have the employee initial and date, attesting that the progress review took place. If changing the plan, Rating Official, Pay Pool Manager, Reviewing Official*, and the employee must initial the change.

**C.** **PERFORMANCE APPRAISAL (Section 1, Item 5: Section II):** Appraise the employee's performance in accordance with the performance elements, their objectives, activities, weighted values, the benchmark performance standards, and any supplemental standards.

1. **Notification:** Notify the employee of (a) the requirement to submit a list of accomplishments; and (b) the date and time of the Performance Review meeting.

2. **Performance Review Meeting:** Meet with the employee to discuss accomplishments. Ratings and other outcomes ARE NOT discussed att his meeting.

3. **End-of-Year Appraisal:** In item 5, describe the employee's performance, including consideration of employee's accomplishments and those accomplishments recognized by the Rating Official.

4. **Scoring:** Use the *Element Point Ranges and Performance Standards Table* to calculate a tentative total score: (a) measure the performance of each element against the *Benchmark Performance Standards* (and supplemental standards, if any); (b) from the column of scores headed my the weight of the element, select a score for the element that corresponds to the level of performance (e.g., if the weight of the element is 40 points and the performance on the element matched the highest benchmark, assign 40 points; if the performance matches the second highest benchmark, assign 28 points; if it matches the third highest benchmark, assign 16 points; if it falls between two benchmarks, assign an appropriate score); (c) sum the individual element scores to produce the total performance score.

5. **Recommendations:** Submit tentative overall scores and recommendations for pay increases and bonuses (through higher-level supervisor) to the Pay Pool Manager for approval.

6. **Pay Pool Manager:** Carry out the following steps using the automated performance payout system: (a) interleave peer groups: (b) make pay increase decisions; (c) make bonus decisions; (d) record decisions on Form CD-541; (e) sign the Summary Rating Sheet; (f) forward to Reviewing Official*, (g) return forms to Rating Official.

7. **Rating Official:** Signs the Summary Rating Sheet.

8. **Evaluation Feedback Meeting:** Rating Official meets with the employee to discuss the final decisions; rating any performance pay increase, and bonus. Obtains the employee's signature and gives the employee a copy of the completed appraisal.

---

* If the Pay Pool Manager is also the Rating Official for a position in the pay pool, the Reviewing Official (next higher level in management chain) must review and sign the performance plan and appraisal before feedback to the employee.

FORM CD-541 (4-98) LF

*Tab K*

WP v. 1.5 (10-7-98) AST

**EXHIBIT 8**

## DECLARATION OF MS. PARTHENIA RICHARDSON

Ms. Parthenia Richardson

     v.

Agency Case No. 05-51-00166

U.S. Department of Commerce

I, Parthenia Richardson, pursuant to 28 U.S.C. § 1746, hereby declare:

I understand that this is the claim accepted for investigation:

I, Complainant, formerly the Assistant Director for Counter Espionage, GS-15, Office of Security, Office of the Secretary, Department Of Commerce allege that I have been subjected to a continuous pattern of discrimination and harassment constituting a hostile work environment due to my race (Black) and sex (female). I cite the following:

1. During the period of May to June 2005, Richard Yamamoto did not support me as a supervisor and challenged my employment actions, despite my having obtained guidance from the Office of Human Resources and the Office of General Counsel.

2. In June 2005, Yamamoto took away my ability to make supervisory decisions, including hiring selections.

3. Since June 2005, Yamamoto requires me to meet him on a weekly basis for 30 minutes to discuss supervisory decisions and duties.

4. During the period of May to June 2005, Yamamoto failed to provide me any positive feedback, despite receiving positive feedback from two major clients, and also failed to openly acknowledge my contributions to the organization.

5. During the period of April to June 2005, Yamamoto undermined my authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining my rationale for employment decisions and actions.

6. In May 2005, Yamamoto allowed my Caucasian male counterparts and subordinate staff to communicate with me in a disrespectful and condescending manner.

1 of 25



7. During the period of April to May 2005, Yamamoto treated me with hostility and openly challenged any statements I made in staff meetings and other open forums.

8. On June 1, 2005, Yamamoto told me that he, his colleagues, and his staff did not have confidence in my ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about my coming on board, he now had doubts. At that time, Yamamoto also stated that he had no more "blue chips" available, and that he has used them all up.

I, Complainant also allege retaliation for having engaged in the EEO complaint process when:

9. On July 11, 2005, I was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, I was being temporarily reassigned from my position as Assistant Director for the Counter Espionage Division for a period of 120 days. I also learned that Thomas de Seve, a Caucasian male counterpart, was assigned to assume my responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave me a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, I was informed that I was to move out of my office so that de Seve could occupy my space. I contend that de Seve already had adequate space, which would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. I further contend that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under my supervision on May 9, 2005, yet were not required to relocate.

12. I was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to me on my reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, I spoke to Bell and requested reasonable accommodation, as recommended by my physician for stress and Bell commented, "You are not under any stress, we just moved you from stress."

15. As a result of the refusal to comply with my request concerning the stress and to escape the hostile work environment, I "submitted an involuntary termination" (i.e., constructive discharge) on September 6, 2005.

For the purpose of this declaration I confirm that my race is Black.

Initials

*Why do you believe Management's treatment since April 2005 was based on discrimination due to your race and sex?*

Response: When I first got there, management seemed to support me and they told me what needed to be changed. They told me some of the things I might encounter. They asked if I thought I could handle it. They gave me a scenario for almost everything I would face. For the first 30-45 days, it appeared as though they backed me. When my employees started to complain because no one had ever made them do what they were supposed to do, management began to feel uncomfortable with all the complaints. The employees knew that by complaining they could get management to move them.

Mr. Yamamoto had told me to clean up everything. He gave me a promotion to come to do this job. Two months later, he called me in and said people believed I was making them look bad and I needed to make allies not enemies. He'd take the word of anyone over mine. All my GS-15 counterparts are White males. Tom de Seve and Bob Page two of my white male counterparts had supervised or been detailed over the employees in my former division at some point. When they told him anything, Mr. Yamamoto took their word and did not accept what I said, even when I gave him documentation to support it.

*Why do you believe Mr. Yamamoto's actions were based on discrimination due to your race and sex?*

Response: Because I was the only Black female ever in that position and to hold the grade of GS-15 and the obvious disparate treatment between myself and my white male counterparts. He even supported personnel actions of the former

Initials

6

3

white female Deputy Director (Cheryl Stone); whom left Commerce after 6

months due to frustration with all the personnel issues within the Office of

Security. Mr. Jay Jamison should be able to attest to this.

*Were you hired in February 2005?*

Response: Yes.

*What was your previous position?*

Response: GS-14 Security Specialist at Homeland Security.

*Was this position announced and did you apply?*

Response: Yes.

*Were you interviewed?*

Response: Yes, I was interviewed in person by Dave Bell and Bob Page, the

Assistant Director for Emergency Operations (or Services). He was detailed to

oversee the division I had before I got there. Bell was then the Acting Deputy; he

is now the Deputy. Both are White males.

I was told they would give their recommendation to Mr. Yamamoto and he would

make the final selection.

*Would Mr. Yamamoto have known your race and sex?*

Response: If they told him. Yes, he should have known because the Special

Agent in Charge in the Office of Security, Sharrieff Nashid, knew me personally

from before. Bell and Page asked him about me. Nashid told me they did and

they told me they were interviewing him. They also got a recommendation from

my then current assistant secretary and his deputy assistant secretary.

*You said for the first 30-45 days, Mr. Yamamoto supported you. What*

4 of 25

Initials 

6          4

*precipitated the problems in April?*

Response: My employees were not doing the work that they were being paid to do. Mr. Yamamoto met with me during my first days at Commerce for about an hour and a half and laid this out for me. I was to look into complaints and make employees accountable. As a new person, my job was to find out what they were doing. I was told things were not on the right path and I was to guide them. As I started meeting with people from OPM, ISOO and NSA, I asked them what was wrong so I could get us all on the right path. In my opinion, no one understood what the job entailed and what needed to be done. As a result of these meetings, I learned nothing had been done in two years in the development of and effective Commerce Declassification Program. A report was sent to the President of the United States stated "Commerce is at significant risk of failing" to meet the December 31, 2006 deadline for declassifying documents that were 25 years or older (this report was generated by ISOO). Mr. Yamamoto appeared to not like me meeting with agencies and told me to not air our dirty laundry.

*Had Ms. Powers and Ms. Guler applied for your GS-15 position?*

Response: That's the rumor I heard. I was told they had hated each other until I came and got the job. When I came, they banded together to get rid of me.

*Do you think they wanted to get rid of you to get your job?*

Response: They didn't like the fact that I was there, that I told them what to do, and gave them suspenses. They were two GS-14's making $90,000 or more a piece and I didn't understand why they didn't have the basic tools needed to

5 of 25

Initials

manage people and perform the duties to which they were assigned. They knew Mr. Yamamoto's style, i.e., if you complain about someone, you get moved or they get moved.

*Why would Mr. Yamamoto side with them against you when he could have selected them in the first place?*

Response: As I held them accountable, they filed complaints with the IG and sent letters to the Secretary and he stopped believing in me. He told me if they are making all these complaints, they have to be true.

I will send you two letters I received from clients thanking me for doing things and handling the staff.

Mr. Yamamoto had settled two or three EEO complaints out of court, so they knew how he was. Frank Silver filed a complaint based on age discrimination. He is a White male. Lee Ballard's is another person who filed a complaint was settled by letting him work out by Quantico Marine Base, near his house, just to get him out of the Office of the Security and I believe there was more to the settlement. He is a white male .

*What employment actions did Mr. Yamamoto challenge and how did he not support you as a supervisor in May to June 2005?*

Response: Basically, in the complaints from others who were not doing their jobs. He called me in and said, if you told me to do that I'd be upset too. They knew all they had to do was talk to him and they didn't have to do anything I said.

6                6

Initials

*What guidance did you obtain from the Office of Human Resources and the Office of General Counsel and who, specifically, did you speak with in those offices?*

Response: I talked to them about Carla Fisher. That was another thing I just walked in on. Mr. Yamamoto asked me if she was performing adjudications. I asked her supervisor, Linda Guier. She told me, yes. I told Rich. Ms. Fisher had had some legal problems in Baltimore. She told me about the problems herself. As a result, her security clearance had been suspended in October 2004. She said she never saw the letter suspending her clearance. I found that it had been put in her file and no other action taken. She was not restricted from doing adjudication on security clearances.

*Why did Mr. Yamamoto have a problem with your action?*

Response: He had asked me what should have been done. I said she should have been moved out of the office until the court proceedings were concluded. He didn't appear to want to do that but he did, and she filed a complaint against me. Her complaint was based on age and race. She is a Black female, over 40, just like me. Her complaint was dismissed.

This was the first time he mentioned people were upset with me. Bob Page was then Acting Division Director and he was the one who did not take action. HR and General Counsel said a personnel action, separate from the clearance, should have been done.

*You said Mr. Yamamoto prevented you from making supervisory decisions, including hiring selections, in June 2005. Had you made a selection?*

Initials 

6

7

Response: I had one employee who left and I had received the selection certificate. I talked to Jonathan Perez in HR and asked for information on making a selection. He said the procedures differed based on the grade level of the position. I attempted to get a panel even though this was a lower graded position because I wanted to get input from my employees who had experience in performing the duties the individual would perform and it would be valuable to obtain their input on selecting the right fit. I asked three adjudicators to sit in with me as I interviewed. I received no written guidance. The employees never did sit in with me, so I did it myself. I selected the best qualified. Mr. Yamamoto saw, on the office calendar, that I was having interviews and asked me who was on the panel. I sent an email to Office of Security HR specialist and was told there was no written policy. The latter was told by Mr. Bell that Rich's policy was to have a panel.

When I came to work on the first day, I was just thrown in the office and I started working. There was no book and no policy given to me. I got my hands slapped. *How did you get your hands slapped?*

Response: Mr. Yamamoto was upset with me for not using a panel. He called me in, he was upset, and he said you know I require a panel. He questioned my ability to make the selection. He asked me if I called their references and if I knew the person. I don't know how I'd be a GS-15 if I didn't know that stuff already, nor how I was selected to fill this position if they did not believe I could perform these duties. Also as indicated on my resume I had already taken a two

Initials

week senior leadership and management course while during my initial one year

probationary period as a GS-14 supervisory/managerial employee.

*During what period of time were you prevented from making these decisions?*

Response: There were two other selections from two other lists that he did not let

me do. Mary Isley, a Black female, was on a list for a GS-13 and was selected by

Mr. Yamamoto and Mr. Bell after they reassigned me. I thought she was the

least qualified among the other candidates, especially the 30-point veteran

preference candidates. After I was reassigned, he canceled a list. Mr.

Yamamoto wanted to give the position to Alanie Shyllon, a Black female, who

was responsible for the failed program that I was assigned to complete, because

he didn't want to lose her. I didn't find her the most qualified on an earlier list and

it is apparent she was not prepared for a GS-13 as she could not successfully

fulfill the duties as a GS-12. He canceled one list, which had opened for a

Personnel Security Specialist, and opened another announcement for an

Information Security Specialist, basically so he could select her. Both positions

were in my former division.

*You stated that since June 2005, Mr. Yamamoto requires you to meet him on a*

*weekly basis for 30 minutes to discuss supervisory decisions and duties. How*

*long did that requirement last?*

Response: I met with him twice, the first time was on June 6 and the second was

June 13. The third time I had to do it, I was preparing for an emergency

preparedness exercise and I had to go to Philadelphia. After that time period he

Initials

received notice of my informal EEO complaint and within the next 2 weeks I was reassigned from my position.

*Was there anything particularly burdensome for you in meeting with him?*

Response: It was burdensome and humiliating because I already attended senior staff meetings once a week with my white male counterparts in which the purpose was to discuss what had occurred since the last meeting and what you were working on within your division. His rationale was that he wanted me to sit with him and explain what I was doing and how I was doing it, so Tom de Seve wouldn't have to tell him what was going on in the division and it wouldn't be a surprise to him. This requirement also was disparate treatment.

*Why would Mr. de Seve be telling him what was going on in your division?*

Response:  Tom and Susan Powers were, allegedly, romantically involved and Tom was defensive of any actions I would take involving her.  Mr. Yamamoto and Mr. Bell told me of the allegations concerning the two of them.  Tom takes personally what is done to her, he's like her guardian angel.  She worked for him and had to be removed because of the allegations.  Both were married.

*When and how did you learn you received positive feedback from two major clients?*

Response: I received telephone calls from Mike Carroll, Director for Administration at Bureau of Industry and Security and Doris Brown, Director Human Resources at International Trade Administration informing me that they had sent letters to Mr. Yamamoto in the month of June 2005.  They asked me if I

Initials

had received their letters when I said no they gave me copies. I can provide copies to you.

*What staff members went directly to Mr. Yamamoto during the period of April to June 2005 and how did this undermine your authority?*

Response: Susan Powers, Linda Guier (white females), Allarie Shyllon, and Geneva Alston, (black females).

There was a controversial issue involving Geneva. Mr. Yamamoto explained to me that she had been out on Worker's Compensation after falling in the building. After speaking to HR, I wanted to see if she needed reasonable accommodation for her injury. She took it as handicap discrimination. Her disability was not documented as such. When she would be angry because of deadlines or requests for her to perform her assigned dutiesshe often obtained a doctor's note and did not come to work for a couple days. She was out of work more than she was in. I suggested we needed to find a solution and that there was work she could do at home since her injury was preventing her from coming in. When she was out one time, she sent in a doctor's note. She was out of sick leave. The note specified that she was disabled for a specific period. She came in on the last day of that period and I told her supervisor Linda Guier that she had to go home since she came in one day early. I checked with HR and I told her I could not take the risk if she were to become injured. Geneva went home and on April 20, sent an e-mail to Mr. Yamamoto and his boss, Otto Wolff.

*Who communicated with you in a disrespectful and condescending manner and how was their manner disrespectful and condescending?*

11 of 25

Initials

Response: I had e-mails from Tom de Seve's subordinate (Carroll Ward, white male) challenging something I said to him in an earlier e-mail. Ward sent me an email on 31 May 2005 specifically giving me orders and making judgment calls, clearly second guessing the policy that I had outlined per official guidelines with regard to cases. As an example he stated, "We need to know ASAP what your determination is, it should not take more than 3-4 working days to turn around our completed packages to make a determination!" There was a pattern with the way that de Seve ran his division in comparison to mine. My subordinates knew that they could speak with other division heads if they had issues, so long as they were respectful. However, de Seve would not allow me to speak directly to his subordinates on any issue and did not reprimand them for lack of respect. I told Dave Bell and he said, "being challenged is not being attacked or accused of guilt of any kind."

*How did Mr. Yamamoto allow this; was he aware of it?*

Response: He was aware of the problems I had in getting cooperation. He thought it was my fault. I only received cooperation from Harold Washington and Dane Woodard (black males), Richard Duncan and Carroll Ward (white males) refused to cooperate with any of my efforts. They are the 4 field managers assigned to Tom de Seve. He and Mr. Bell said, at first, we thought it was just people not being cooperative but when so many complain, you have to face up to it being your problem and what you are doing is wrong. They said this at the meeting on June 1.



Initials

6

12

*What statements of yours did Mr. Yamamoto challenge in staff meetings and other forums during April to May 2005?*

Response: These were senior staff meetings. That was another reason why I didn't understand why I had to meet with Mr. Yamamoto, since we had these meetings. At these meetings, I would bring up OPM's problem with us not having uploaded any data to the database for over a year. He'd get mad. I don't know why. He mentioned to me before that I didn't need to open a can of worms and didn't need to expose our weaknesses. As I met with them, i.e., officials from different agencies, they would contact me and ask me why something was not done. They knew I would try to fix it.

*You stated on June 1, 2005, Mr. Yamamoto told you that he, his colleagues, and his staff did not have confidence in your ability to manage. Did he say what, specifically, caused him and them to loose confidence in your abilitty to manage?*

Response: The complaints being made against me. He and Mr. Bell asked me what I thought was the problem. I said, I was doomed to fail. Things were so bad when I got here that they needed to fail so I could fix them. I said, because he was not supporting me, I had to fail. I told him the employees in my division had no formal training. They were only doing what others told them to do. If you reassign someone to a job and they don't know what they are doing, you need to send them to school. The supervisors, Guier and Powers, were not qualified to do what they were doing either.

*You also said that Mr. Yamamoto added that while he had received outstanding recommendations from previous supervisors and was excited about you coming*

Initials

6

13

*on board, he now had doubts and that he had no more "blue chips" available,*

*and that he has used them all up. What was he referring to?*

Response: He said, I know you're used to working for powerful people, i.e.,

generals, and they can back anything you do. Here, I don't have those kind of

blue chips. I assumed he meant with Otto Wolff.

*To your knowledge, had any other subordinates of Mr. Yamamoto had their hiring*

*or other employment decisions challenged by employees or had complaints or*

*grievances filed based on actions they had taken?*

Response: I know there were a lot of complaints against Mr. Bell prior to him

becoming deputy director. Kari Reid filed a grievance or an EEO complaint.

Another guy, James Van Brunt, volunteered to go on active duty to get out of the

office. Sharrieff Nashid also had a lot of issues with Mr. Bell as well.

I was told the IG received an anonymous complaint about my personal credit

information having been discussed throughout the office. Mr. Yamamoto told me

about it. I think he thought I made the complaint, but I was just as shocked as he

was. I don't know who called it in. Mr. Yamamoto had me do a credit release for

Harold Washington so he could investigate it. Susan and Linda had access to

the information from a credit report and released it before I got there. It was

discussed by the whole office. I was told this during my interview, so I'd be

aware of the kind of people I'd have working for me.

*Do you believe the reason given by Mr. Yamamoto for his actions, i.e., that he*

*was receiving too many complaints about you and that led him to conclude the*

*way you were doing things was the problem, was not valid or was not his true*

Initials

6            14

reason and that he was really discriminating based on your race and sex because Mr. Bell also had a lot of complaints and he didn't take the same attitude with Mr. Bell?

Response: Yes I believe that, because of the disparate treatment of the complaints against Mr. Bell, in comparison with those against me, that Mr. Yamamoto's actions were based upon my race and sex.

*Did he select Mr. Bell for promotion?*

Response: Yes.

*You allege reprisal in actions taken by Mr. Bell. Do you believe he was acting at Mr. Yamamoto's direction?*

At first, I felt he was doing what he was told. The actions he tried to take after I left showed me he was involved.

*What were these actions?*

Response: He altered my resignation documents and because I felt this might happen I had provided an advance copy to Jay Jamison, Bonnie Worthy prior to my resignation. I also sent an email the day I resigned to these same individuals which also outlined my reasons for resignation.

*Do you know when and how Mr. Yamamoto and Mr. Bell became aware you alleged discrimination in your treatment by Mr. Yamamoto?*

Response: I believe it was on June 26. The EEO Counselor told me she forwarded my concerns to management.

*Why did Mr. Bell tell you that you were being temporarily reassigned?*

15 of 25

Initials

6

15

Response: Mr. Bell stated it was so I could assist him with some programs/projects that he did not have time to focus on in his role as the Acting Deputy Director, as he then gave me a mid-term counseling and he addressed issues listed in the counseling: loss of key individuals and others stating they were actively seeking other employment, a decline in personnel during the entire period; the working environment in the division was at an all time low with even a temporary employee asking for release; loss of confidence; failure to meet with director on a weekly basis; rude, harsh, and dictatorial communication skills; field office complaints; changing policy without approval; to date that I had not taken responsibility for deficiencies in the division and attributed them to others. The counseling was done on July 11, 2005 exactly one week after I declined an offer of resolution during the informal EEO process. I didn't receive my performance standards until May 17, 2005 although I began working at Commerce on February 20, 2005, some 90 days later.

*Why would Mr. de Seve been reassigned to your division if there were problems in his relationship with Ms. Powers? ~~Are there dates for the meetings?~~*

Response: On May 9, 2005, Susan Powers and Linda Guier were reassigned from my division by Mr. Yamamoto to develop programs identified by the Commerce Inspector General. . I did not agree with the rationale for their reassignment (to escape my leadership) but did state that I felt I could manage the division better if they were not in the way. Even Mr. Bell said he did not agree and he stated to both of them in various meetings with me present during March and April 2005 they needed to find a way to work with their new supervisor. He

16 of 25

Initials

also explained he did not feel they were being fair to me because they had not given me a chance.

*When they were reassigned, were you directly supervising their subordinates?*

Response: Yes. They were, not functioning in the division as Personnel Security Manager (Guier) and Information Security Manager (Powers), but Guier never moved. Powers moved the sometime between the last week in June 2005 and the first week in July 2005 right before I was reassigned. They were allowed to remain in my workspace and disrupt my work force, and I discussed this with Mr. Bell and Yamamoto several times.

*Where was Mr. de Seve located before he was assigned your workspace?*

Response: In an office in the same building, just down the hall. I asked the reason for the move and was told they wanted him to sit in there. He never actually moved into my office at all. Guier was allowed to run the division from July 12, 2005 until right after I resigned. No one moved into my office until a month ago.

*Who moved in?*

Someone from the DOC Office of Security, a person who works for Tom de Seve. He was told to come up and do the job by Tom because Tom said he didn't have time to do it. He is from an office in Gaithersburg. His name is Dane Woodard. He's a Black male. He is sitting, physically, in the office. He's a GS-14.

*Where was your new workspace located and why was it less favorable than that of GS-14's?*

17 of 25

Initials

6

17

Response: The space they gave me was a little hole-in-the-wall near where Dave Bell's people sit. It was a little cubbyhole hidden in the back of the section, across the hall from my old division. There were GS-14's with larger and nicer office space, and right before I departed they were making plans to take the space I was sitting in and knock down a wall to make a full size office for a new GS-15.

*Why do you believe the duties you were assigned were GS-11 and GS-12 level duties?*

Response: They were the duties of the failed Declassification program Alarie Shyllon, a GS-12 Information Security Specialist, and Susan Powers, a GS-14 Information Security Manager, were responsible for. Mr. Yamamoto had a meeting with the director in charge of ISOO and said we would get things done. In this meeting Mr. Yamamoto and Mr. Leonard agreed if Commerce got the program up and running then Mr. Leonard would not report that we were still at significant risk of failing. Rather the current status was reported as not enough information available at this time. They did not have the skills to do it and the agency said we did not have the right format and they had no confidence we know what to do. Mr. Yamamoto got hostile when I brought it up, that we were not meeting the mandate. I was expected to accomplish what Alarie and Susan should have done, I was not doing management and oversight of the program.

*Minutes from an OSY Staff Meeting held on July 12, 2005 indicate the staff was advised you would be focusing "on implementing several high-level departmental initiatives to include the declassification initiative and installation of SIPERNET*

18 of 25

Initials

6     18

connectivity. You were also supposed to support COOP, HSPD-12, Census Decennial and other highly priority projects." Were you actually assigned and working on any or all of these other projects?

Response: No and I was never provided any written duty description. I was also removed from email distribution and senior staff meetings that my white male counterparts attended.

When did you advise management that stress was a medical concern?

Response: On August 17, 2005, I spoke to Mr. Bell and requested reasonable accommodations as recommended by my physician and was told "you are not under any stress, we just moved you from stress. If we take this program from you and give it to someone else they will have stress and besides I don't know who would do it." My request for reasonable accommodation was processed through the health unit and the EAP. A copy was also sent to Mr. Bell, HR, GC, and EEO. Previously, when Mr. Bell spoke with me on July 11, 2005 Mr. Bell said he knew I had trouble sleeping and thought the move would alleviate stress.

What accommodation had you requested?

Response: I asked to be moved to another bureau, per my doctor's note dated 8-16-05 "Parthenia Richardson is in medical need of being removed from the current emotionally stressful work environment where she is presently placed."

Would they have had the authority to do that?

Response: After the request goes through the health unit, management has input and agrees to release me. Management would have to work with HR and

19 of 25

Initials

6

19

the health unit to find reasonable accommodation and agree to it and offer it to me. If they (management) didn't say yes, it couldn't happen.

*Was the statement you cited Mr. Bell made, i.e., about believing the move had relieved you of stress, his only response?*

Response: When I went to see him on August 17, 2005, he wasn't in and I left the doctors note with is secretary. Later that morning, I asked him if he received it and he said he had, but that he didn't look at it yet. I asked him to do so because it was in my best interest medically to be moved. He said, if I move you it would cause stress to someone else because I don't know who else could do the declassification program.

*Was there anyone else that could do it?*

Response: Within my office, no. In other offices, I don't know. I was not privy to their qualifications. The program was failing for two to three years. Susan and Alarie were both given performance awards/bonuses for work on the program by management prior to my assignment to Commerce. In my opinion, Alarie should have been made to perform the duties to which she was assigned; not be allowed to pass them on to me her previous supervisor to accomplish.

*If the program was failing to meet a mandate, why would they receive kudos?*

Response: Because no one really understood what was involved and no one met with the people I did. Susan Powers and Bob Page (and previously Alan Milne the person I replaced) signed everything that went out and Mr. Yamamoto alleged he was not aware of the issues until I brought them to his attention.

Initials

6                    2.0

*Did you discuss you treatment with anyone other than Mr. Bell and Mr.*

*Yamamoto, i.e., HR or a higher level management official?*

Response: I requested to see Mr. Wolff by e-mail, but got no response. I did

speak with Fred Schwien, a White male, who I knew from the Army while on

active duty. He is the Executive Secretariat for DOC and works directly for the

Deputy Director for Commerce. He knew my character and work ethic. He said, if

it gets to the point where you think you're going to lose, find a new job. He also

had issues with Guier and some employees concerning his security paperwork. I

had to help him straighten it out during my first weeks at Commerce.

*Why did he not intervene?*

Response: I told him I was coming to him unofficially. I just wanted him to listen

and tell me what he thought, personally. I never asked him to intervene.

*Do you believe Mr. Bell and Mr. Yamamoto wanted you to resign?*

Response: Yes. Mr. Yamamoto and Mr. Bell wanted me to meet with them

weekly and tell them what was going on, how the action plan was developing in

meeting the deadline. I was out for surgery and personal mental health days, on

approved sick leave, and while I was out Mr. Bell sent me e-mails asking me the

status. Every day I received e-mails and I was told that when I come back I was

to have an action plan. How was I to do that if I had to present it on the same day

I came back?

*Why was accomplishing this program suddenly so important?*

Response: It finally came on their radar. It was going to the President again, for

the second time. The ISOO Presidential deadline was coming up in December

21 of 25

Initials

6        2 1

31, 2006 and there was no program developed to accomplish this goal. There

was also a promise made to Mr. Bill Leonard, ISOO by Mr. Yamamoto that

Commerce would develop declassification program and an action plan on how

the department would meet the deadline. In exchange for this promise the letter

to the President did not state for the second year that "Commerce is at significant

risk of failing." Instead Mr. Leonard reported there was not enough information to

make a determination if Commerce will make the deadline."

*Why do you believe management's actions were due to reprisal and not*

*management's previously expressed dissatisfaction with your actions as a*

*manager?*

Response: I believe it was reprisal because I declined the offer of informal

resolution one week before my detail which included the following: a. Detail

Counselee to the position of Special Projects Officer, ZA-0080-V/1, for a period

of ninety (90) calendar days effective July 10, 2005. Counselee's duty station

during her detail will be Bureau of the Census headquarters in Suitland,

Maryland. Counselee's first level supervisor will be Harold Washington (a

subordinate who worked for Tom de Seve). b. Provide Counselee a statement of

work performed for the Office of Security for the period from February 22, 2005 to

the effective date of this Agreement. This statement of work will be prepared by

Richard Yamamoto or his designee and will be provided to Counselee within

twenty-one (21) calendar days of the effective date of this Agreement. c. Inquiries

from potential future employers regarding Counselee's employment with the

Agency will be directed to the Human Resources Manager or his/her designee,

Initials

6

2. 2

who will provide the following information only in response to such inquiries: Counselee's title, series, grade, salary, and dates of service. Failure by any Agency employee unfamiliar with the terms of this Agreement to abide by the requirements of this paragraph will not constitute a breach of this Agreement. d. Process Counselee's resignation effective October 10, 2005, unless Counselee leaves the Agency prior to that date.

Coupled with management not presenting me with the letters of appreciation from two major bureaus (dated in May and June 2005) expressing their gratitude for my outstanding support, which also noting they understood the difficult task I had because I inherited a division in turmoil. .

*Who is John Guenther?*

Response: Employment Law Chief, Office of General Counsel.

*Do you believe Mr. Bell and/or Mr. Yamamoto wanted you to resign?*

Response: Yes, I believe they created an environment to make me leave or find a new job.

*Why?*

Response: It was also offered in the offer of resolution during the informal phase, see above offer. Also, I believe because I made things come to light that hadn't been done. I feel they took it personally because I did the job they told me to do and in the process uncovered things that had not been done for years. My white male predecessors and white female subordinates had not accomplished these tasks and assisted Mr. Yamamoto and Mr. Bell in doubting my discoveries, thus making it very difficult for me when addressing these issues.

Initials

23

*What are you now seeking as relief?*

Response: 1.  Reinstatement to an equivalent position (GS-15) to duties commensurate to the abilities upon which I was initially hired.

2.  Reinstatement for annual leave and sick leave that was used for stress related absences as documented by my physician; and compensation for lost wages/benefits incurred as a result of my involuntary termination.

3.  Compensatory damages for embarrassment and emotional distress.  This includes demoralization as a result of the unwarranted removal from my position as Assistant Director and the relocation from my office to an area considered beneath that of someone in my position and grade.

4.  Nondiscriminatory placement outside of the Office of Security in an equivalent position (GS-15) that would afford me the same career opportunities as that which I was hired to occupy given my professional background had discrimination not occurred.

5.  Removal of the mid-year counseling from Mr. David Bell, Acting Deputy Director, dated July 11, 2005.

*Do you have a job now?*

Response: No.

*What amount are you requesting for compensatory damages?*

Response: I have not thought of that

*If you have any documentation to support your request you should submit it with your signed declaration.*

Initials

6        24

I have read the above statement consisting of 25 pages. I declare under the penalties of perjury that my statement is true, correct and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Parthenia Richardson

Executed on: 11/16/05

6        25

Supplemental Declaration of Ms. Parthenia Richardson

*I have four certificate lists that were sent to you by Mr. Perez. Would you please advise me if you or someone else made selections for the following positions and who was selected:*

*Security Specialist, ZA-0080-IV (vice Silver) dated February 24 and June 6.*
Response: That cert was already done just as I got there and Susan Powers had recommended Alarie Shyllon. They waited until I arrived to allow me to make the selection. Alarie Shyllon was on the list, but I didn't think she was the most qualified. I asked them to wait a while to let me see what I wanted to do. That cert was cancelled and June 6 cert is the one Mr. Bell or Mr. Yamamoto used to select Mary Isley for that position.

*Security Specialist, ZA-0080-IV (vice Kerrick) dated April 8.*
Response: That was a non-issue. There was a Security Assistant already working there. She was leaving and was a valuable employee. They agreed with me and allowed me to select her for the Security Specialist position.

*Who was selected and what is her race?*
Response: Wanda Smith. She is a Black female.

*Security Specialist, ZA-0080-III (vice Herbert) dated June 27.*
Response: That was a selection I made. Kendra Mathews, a Black female.

*What were the two positions you said management did not allow you to make the selections for?*
Response: One was vice Bodin. I have no idea who was selected. The other was the vice Silver position. I believe they cancelled vice Bodin and reopened it changing the position from a Personnel Security Specialist to an Information Specialist position. Alarie Shyllon was selected.

*Ms. Shyllon's first name isn't really Alarie, is it?*
Response: No, it's something else. Mam something.

*I also received six Personnel Actions Mr. Jamison indicates were initiated by you prior to July 2005. These include three which were addressed in prior testimony: Ms. Herbert's Transfer, to be effective May 14; Mr. Bodin's Transfer, to be effective June 25; and Ms. Fisher's detail, to be effective March 13 and extended on June 10. I believe two others may also have been referenced but I don't want to make a false assumption. Would you provide clarification on:*

Initials

6      26

*The reassignment of Ms. Starlene Hilton, Security Specialist, ZS-0080-III from the Personnel Security Program to the Security Information Program in your division effective March 14, 2005;*
Response: She was not doing well in the program she had and we needed help in Information Security Branch. I asked that she be trained for that since we needed help in there.

*The detail of Ms. Janice King, Security Specialist, ZS-0080-III from Client Security Services Division-Census to Counterespionage Division effective June 21, 2005.*
Response: When Mr. Bodin was leaving, I didn't want to let him leave without two weeks notice. Mr. Bell overruled me. I asked Mr. Washington if he had anyone I could use so there'd be at least one-week overlap, for continuity. That was why Ms. King was detailed.

*One of the documents you sent me was an email Ms. PettyJohn sent you on July 21 informing you "Linda happily announced that Carla is 'coming home' ... stating Tom wants it to happen ASAP.... Taking over already. You replied to her that same day and stated "I expected it they are playing right into my hands." Who did you believe was "taking over" and how were they "playing into [your] hands"?*
Response: When Mr. Bell reassigned me, he told me it wasn't due to anything I had done, he needed me for these important projects, it was not a demotion, I would be going back after 120 days. I felt it was a lie. When they started putting everyone back as they were before I came, that proved to me that it was a lie.

Initials

6    27

I have read the above statement consisting of __3__ pages. I declare under the penalties of perjury that my statement is true, correct and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Parthenia Richardson

Executed on: 12/5/05

3 of 3

6          28

**EXHIBIT 9**

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| Detail NTE 90 days (6/10/2005) | OSY-05-044 |

| 3. For Additional Information Call *(Name and Telephone Number)* | 4. Proposed Effective Date |
|---|---|
| Rachel M Hughins, X23008 | 03/13/2005 |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| LINDA GUIER, PERSEC PROGRAM MNGR. | PARTHENIA RICHARDSON, AD CE DIV |

**PART B - For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1.) Show all dates in month-day-year order.*

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FISHER, CARLA S | | | |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| | | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| | | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SECURITY SPECIALIST | SECURITY SPECIALIST |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ZA | 0080 | III | 2 | | | ZA | 0080 | III | 2 | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE SECRETARY<br>OFFICE OF ASST SEC FOR ADMIN<br>OFFICE OF SECURITY<br>COUNTER-ESPIONAGE DIVISION | OFFICE OF THE SECRETARY<br>OFFICE ASST SEC FOR ADMIN<br>OFFICE OF SECURITY<br>EMERGENCY MANAGEMENT DIVISION |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|
| 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite  1 | | YES  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| | 07/23/79 | F   FULL TIME | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career  1 | E - Exempt<br>N - Nonexempt  E | 05/0127000/1104/1101 | 7777 |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|
| 11-0010-001 | WASHINGTON DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART C - Reviews and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. APPROVED | Cindy Snyder | 3/11/05 | D. | | |
| B. APPROVED | Sharon Smith dunn | 3/14/05 | E. | | |
| C. | | | F. | | |

2. **Approval:** I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

| Signature | Approval Data |
|---|---|
| | |

CONTINUED ON REVERSE SIDE
52-118

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

Exhibit 12  Page 1

**PART D. Remarks by Requesting Office**
(Note to Supervisors:  Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)    ☐ YES    ☐ NO

E 0 6/10/05

No pay change during detail

**PART E. Employee Resignation/Retirement**

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address.  Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits.  Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code.  Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving:  (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE:  Your reasons are used in determining possible unemployment benefits.  Please be specific and avoid generalizations.  Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| | | | |

**PART F. Remarks or SF 50**

Exhibit 22 Page 2

**EXHIBIT 10**

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

## REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)

| ...ions Requested | | 2. Request Number |
|---|---|---|
| ...ail Extension NTE 120 days (10/07/2005) | | OSY-05-064 |

3. For Additional Information Call *(Name and Telephone Number)*

Rachel M Hughins, x23008

| | 4. Proposed Effective Date |
|---|---|
| | 06/10/2005 |

5. Action Requested By *(Typed Name, Title, Signature, and Request Date)*

*Parthenia Richardson*

PARTHENIA RICHARDSON, AD CE DIV

6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)*

Dave Bell, Acting Dep Dir OSY      6/9/05

**PART B - For Preparation of SF 50** (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FISHER, CARLA S | | | 06/10/2005 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 5-C. Code | 5-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

7. FROM: Position Title and Number

SECURITY SPECIALIST

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| ZA | 0080 | III | 2 | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|

14. Name and Location of Position's Organization

...FICE OF THE SECRETARY
...ICE OF ASST SEC FOR ADMIN
OFFICE OF SECURITY
COUNTER-ESPIONAGE DIVISION

15. TO: Position Title and Number

SECURITY SPECIALIST

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| ZA | 0080 | III | 2 | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|

22. Name and Location of Position's Organization

OFFICE OF THE SECRETARY
OFFICE ASST SEC FOR ADMIN
OFFICE OF SECURITY
EMERGENCY MANAGEMENT DIVISION

**PART C - Employee Data**

23. Veterans Preference

| 1 - None | 3 - 10-Point/Disability | 5 - 10-Point/Other |
|---|---|---|
| 2 - 5-Point | 4 - 10-Point/Compensable | 6 - 10-Point/Compensable/30% |

27. FEGLI

| 24. Tenure | | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|
| 0 - None | 2 - Conditional | | |
| 1 - Permanent | 3 - Indefinite | | ☐ YES ☒ NO |
| 1 | | | |

| 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|
| 9   NOT APPLICABLE | 0 |

**APPROVED OEB**

30. Retirement Plan

| 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|
| 07/23/79 | F   FULL TIME | |

**PART D - Position Data**

34. Position Occupied

| 1 - Competitive Service | 3 - SES General |
|---|---|
| 2 - Excepted Service | 4 - SES Career |
| 1 | |

| 35. FLSA Category | 36. Appropriation Code |
|---|---|
| E   E - Exempt   N - Nonexempt | 05/0127000/1104/1101 |

| 37. Bargaining Unit Status |
|---|
| 7777 |

38. Duty Station Code

11-0010-001

39. Duty Station *(City - County - State or Overseas Location)*

WASHINGTON DC

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART E - Review and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | *Cindy Snyder* | 6/10/05 | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered ... is accurate and that the proposed action is in compliance with ... requirements.

| Signature | | Approval Date |
|---|---|---|

CONTINUED ON REVERSE SIDE
52-118

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

PART D. Internal Agency Requesting Office

(Note to Supervisors:   Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)

☐ YES     ☐ NO

01/07/05

No pay change during detail

PART E. Employee Resignation/Retirement

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1.   Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
|  |  |  |  |

PART F. Remarks for SF 50

Exhibit 22  Page 4

FORM C D-516
(1-94) LF
DAO 202—43)

U.S. DEPARTMENT    COMMERCE

☐ NEW

☐ I/A: _____

MR#: _____

IP#: _____

# CLASSIFICATION AND
# PERFORMANCE MANAGEMENT RECORD

• Performance Plan    • Performance Appraisal    • Performance Recognition    • Progress Review    • Position Description

Employee's Name: Carla S. Fisher

Social Security No.: ▓▓▓▓▓▓

Position Title: Supervisory Security Specialist

Pay Plan, Series, Grade/Step: ZA-0080-III/1

Organization:
1. OFFICE OF THE SECRETARY
2. OFF OF THE CFO/ASA
3. OFFICE OF SECURITY
4. Emergency Management Div
5. _____
6. _____

Rating Period: 10/01/04-09/30/05

Covered By: ☐ Senior Executive Service    ☐ Other _____
☑ General Workforce

## PART A—POSITION DESCRIPTION

**POSITION CERTIFICATION**—I certify that this is an accurate statement of the major duties and responsibilities of the position and its organization relationships and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds and that false or misleading statements may constitute violation of such statute or their implementing regulations.

SUPERVISOR'S SIGNATURE
Parthenia Richardson

DATE

SECOND LEVEL SUPERVISOR
Dave Bell

DATE
6/9/05

| CLASSIFICATION CERTIFICATION | OFFICIAL TITLE: | | | | | |
|---|---|---|---|---|---|---|
| | PP: | SERIES: | FUNC: | GRADE: | I/A: ☐ YES ☐ NO | |

I certify that this position has been classified as required by Title 5, US Code, in conformance with standards published by the OPM or, if no published standard applies directly, consistently with the most applicable published standards.

| NAME AND TITLE OF CLASSIFIER | SIGNATURE | DATE |
|---|---|---|
| Dave Bell, Acting Deputy Director. of Security | | |

## PART B—PERFORMANCE PLAN

This plan is an accurate statement of the work that will be the basis of the employee's performance appraisal.

| NAME AND TITLE OF FIRST LINE SUPERVISOR/RATING OFFICIAL | SIGNATURE | DATE |
|---|---|---|
| | | |

**APPROVAL**—I agree with the certification of the position description and approve the performance plan.

| NAME AND TITLE OF APPROVING OFFICIAL OR SES APPOINTING AUTHORITY | SIGNATURE | DATE |
|---|---|---|
| | | |

**EMPLOYEE ACKNOWLEDGEMENT**—My signature acknowledges discussion of the position description and receipt of the , and does not necessarily signify agreement.

| SIGNATURE | DATE |
|---|---|
| | |

**PRIVACY ACT STATEMENT**—Disclosure of your social security number on this form is voluntary. The number is linked with your name in the official personnel records system to ensure unique identification of your records. The social security number will be used solely to ensure accurate entry of your performance rating into the automated record system.

Exhibit 21, Page 5

# MASTER RECORD/INDIVIDUAL POSITION DATA

## A. KEY DATA

| 1. FUNCTION (1) | 2. DEPT. CD/AGCY-BUR CD (4) | 3. SON (4) | 4. MR NO (6) | 5. GRADE (2) | 6. IP NO (8) |
|---|---|---|---|---|---|
| A/C/D/I/R | | | | | |

## B. MASTER RECORD

| 1. PAY PLAN (2) | 2. OCC SER (4) | 3. OCC FUNC CD (2) | 4. OFF TLE-PF/CD/SF (6) PFIX / TITLE CD / SFFX | 5. OFF TITLE (38) (32 W/ PF OR SF) (26 W/ PF AND SF) |
|---|---|---|---|---|
| | | | | |

| 6. HQ/FLD CD (1) | 7. SUPV CD (1) | 8. CLASS STD CD (1) | 9. INTERDIS CD (1) | 10. DATE CLASS (6) |
|---|---|---|---|---|
| 1=HQ 2=FLD | 1=SUPV SGEG 2=SUPV GSSG 3=MGR SGEG 4=SUPV CSRA  5=MGT CSRA 6=LDR LGEG 8=ALL OTHERS | X=NEW STD BLANK=N/A | N=NO Y=INTERDIS | MO  DAY  YEAR |

| 11. EARLY RET CD (1) | 12. INACT/ACT (1) | 13. DT ABOL (6) MO DAY YEAR | 14. DT INACT/REACT (6) MO DAY YEAR | 15. AGCY USE (10) |
|---|---|---|---|---|
| 1=PRIMARY 2=SECONDARY  3=FOREIGN SVC BLANK=N/A | A=ACTIVE I = INACTIVE | | | |

**16. INTERDIS SERIES (40)**

| (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**17. INTERDIS-PF/CD/SF (50) (32 W/ PF OR SF) (26 W/ PF AND SF)**

| (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## C. INDIVIDUAL POSITION

| 1. FLSA (1) | PAY TBL (6) | 2. FIN DS (1) | PROC INTG (1) | POS SCHED (1) | 4. POS SENS (2) | 4A. DRUG TS (1) |
|---|---|---|---|---|---|---|
| E E=EXEMPT N=NONEXEMPT | | 4  0=NONE 3=SF-278 4=SF-450 | n  Y=YES N=NO | A=SCH A B=SCH B C=SCH C  0=EXCEPTED BUT NOT A,B,C | 3  1=LOW RISK 2=NONCRIT/SENS 3=CRIT/SENS 4=SPECIAL SENS 5=MOD RISK 6=HIGH RISK  C=ADP N=NON-ADP | yes |

| 6. WK TITLE CD (4) | 7. WK TITLE (38) | | 5. COMP LVL (4) |
|---|---|---|---|
| | | | |

| 8. ORG STR CD (18) | | | | | | | | 9. VAC REV CD (1) |
|---|---|---|---|---|---|---|---|---|
| (1st) 51 | (2nd) 11 | (3rd) 04 | (4th) 0003 | (5th) | (6th) | (7th) | (8th) | 0=POSN ACTION NO VACANCY A=NO CHANGE   B=LOWER GRADE C=HIGHER GRADE   D=DIFFERENT TITLE AND/OR SERIES E=NEW POSN/NEW FTE |

| 10. TARGET GRADE (2) | 11. LANG REQ (2) | 12. PROJ DUTY IND (1) BLANK=N/A Y=YES | 13. DUTY STATION (9) ST (2) CITY (4) CNTY (3) | 14. BUS CD (4) | 15. DT LST AUDIT (6) MO DAY YEAR | 16. PAS IND/LEO (1) BLANK=N/A 1=PAS 2=LEO | 17. DATE-EST (6) MO DAY YEAR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 18. GRADE BASIS IND (1) | 19. DT REQUEST RECD (6) MO DAY YEAR | 20. NTE DATE (6) MO DAY YEAR | 21. POS ST BUD (1) |
|---|---|---|---|
| 1=REV WHEN VACANT 2=IMPACT OF PERSON 3=SUP/GSSG  4=SUP/PROGRAM 5=RGEG 6=POLICY ANAL GEG  7=EQUIP DEV GUIDE | | | Y=PERM N=OTHER |

**22. MAINT REV/CLASS ACT CD (2) (1ST DIGIT=ACTIVITY AND 2ND DIGIT=RESULTS)**

| ACTIVITY 1=AUDIT (COUNTED TOWARDS MAINTENANCE REVIEW) 2=OTHER ACTIVITY | RESULTS 1=NO ACTION REQUIRED 2=MINOR PD CHANGE 3=NEW PD REQUIRED  4=TITLE CHANGE 5=SERIES CHANGE 6=POSN UPGRADE  7=POSN DOWNGRADE 8=NEW POSN 9=OTHER |
|---|---|

| 23. DATE EMP ASGN (6) MO DAY YEAR | 24. DATE ABOL (6) MO DAY YEAR | 25. INACT/ACT (1) A=ACTIVE I = INACTIVE | 26. DATE INACT/REACT (6) MO DAY YEAR | 27. ACCTG STAT (4) | 28. INTASGN SER (4) | 29. AGENCY USE (8) |
|---|---|---|---|---|---|---|
| | | | | | | |

| 30. PERSONNEL MANAGEMENT SPECIALIST'S SIGNATURE | 31. DATE |
|---|---|
| | |

**32. REMARKS**

FORM CD-516 (1-94) LF  DAO 202-430

Exhibit 22 Page 6