**EXHIBIT 26**

PRINT CLOSE

# REASONABLE ACCOMMODATION FOR DISABILITIES IN EMPLOYMENT

**Number:** DAO 215-10        **Effective Date:** 1996-06-07

## SECTION 1. PURPOSE.

This Order establishes Department of Commerce (the "Department") policy for providing reasonable accommodation for qualified individuals with disabilities who are employees or applicants for employment. It also designates responsibilities and describes procedures for submitting and responding to requests for reasonable accommodation.

## SECTION 2. AUTHORITY.

The Rehabilitation Act of 1973, as amended, requires Federal agencies to provide reasonable accommodation for qualified individuals with disabilities. 29 U.S.C. Section 791 eq seq.; 29 CFR Part 1614; see also 29 CFR Part 1630.

## SECTION 3. POLICY.

The Department shall provide reasonable accommodation for the known physical or mental limitations of qualified applicants and employees with disabilities, unless the Department can demonstrate that a particular accommodation would impose an undue hardship on the operation of its program.

## SECTION 4. DEFINITIONS.

.01 A reasonable accommodation is an adjustment to job requirements or to the work environment that assists an employee with a disability in performing the essential duties of his or her position, or a qualified applicant with a disability during the recruitment and selection process. Reasonable accommodation may include, but is not limited to:

a. making facilities readily accessible to, and usable by, people with disabilities;

b. job restructuring;

c. part time or modified work schedules;

d. acquiring or modifying equipment or devices;

e. appropriate adjustment or modification of examinations and training materials; and

f. providing readers, interpreters and other auxiliary aids.

.02 Reassignment as it relates to reasonable accommodation is the transfer of a nonprobationary employee, who becomes unable to perform the essential functions of a position even with reasonable accommodation, to another funded vacant position located in the same commuting area, at the same grade or level, the essential functions the employee would be able to perform with reasonable accommodation if necessary, unless it would impose an undue hardship on the agency.

.03 A qualified individual with a disability is one who:

a. has a physical or mental impairment which substantially limits one or more major life activities; or

b. has a record of such impairment; or is regarded as having such impairment; and

c. with respect to employment, i.e., is an employee or an applicant for employment, who can perform the essential functions of the position in question, with or without reasonable accommodation, without endangering the health and safety of the individual or others, and who, depending on the type of appointing authority being used meets the:

1. experience and/or education requirements of the position (which may include passing a written test); or

2. criteria for appointment under one of the special appointing authorities for people with disabilities.

.04 Major life activities include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

.05 A deciding official is a supervisor, manager, principal or servicing human resource manager who has the authority to determine whether a requested accommodation will be provided.

.06 A requestor is a qualified applicant or employee with a disability who requests reasonable accommodation.

.07 Undue hardship is significant difficulty or expense incurred should a particular accommodation be provided. The criteria to be considered in determining undue hardship include the:

a. nature and cost of the accommodation needed;

b. overall size of the organizational unit with respect to the number of employees, number and type of facilities and size of budget; and

c. type of operation, including composition and structure of the work force.

## SECTION 5. RESPONSIBILITIES.

.01 The Chief Financial Officer and Assistant Secretary for Administration shall:

a. Approve policies, directives and other materials outlining the Department's reasonable accommodation responsibilities; and

b. Fulfill, on behalf of the Secretary, the Secretary's responsibilities as head of an operating unit, i.e., the Office of the Secretary. These duties are outlined in paragraph .02 below.

.02 Heads of operating units shall:

a. Foster an environment that supports reasonable accommodation;

b. Provide funds for reasonable accommodation; and

c. Ensure compliance with provisions of this Order.

.03 The Director for Civil Rights shall:

a. Develop and issue Department policy and procedures for reasonable accommodation;

b. Advise Department officials regarding laws, regulations and Department policies pertaining to reasonable accommodation;

c. Consult with appropriate Human Resources Management and General Counsel representatives on providing reasonable accommodation and making undue hardship determinations;

d. Conduct periodic reviews of operating unit programs to ensure compliance with applicable laws, regulations and Departmental policy; and

e. Process EEO complaints filed under Section 7. of this Order.

.04 Equal Employment Opportunity (EEO) Officers shall:

a. Ensure that managers, supervisors and human resources managers understand the law and regulations regarding reasonable accommodation and advise them on:

1. reasonable accommodation issues;

2. the appropriateness of a request as determined by whether it relates to the work to be performed and/or the work place environment; whether the accommodation is used primarily at work, and is not primarily for personal use;

3. alternate methods of accommodations that would effectively meet the need; and

4. undue hardship.

b. Coordinate management and employee training on reasonable accommodation issues with human resources managers, as appropriate for each operating unit.

c. Consult with the Departmental Office of Civil Rights, appropriate Human Resources Management and General Counsel representatives on reasonable accommodation issues and undue hardship determinations.

.05 Immediate supervisors shall:

a. Acknowledge and respond immediately in writing to both oral and written accommodation requests;

b. Request medical documentation to support the accommodation request, as needed;

c. Share medical documentation only with individuals involved in responding to accommodation requests who have a valid need to know. This information is to be retained in a confidential manner:

1. until a decision is made on the accommodation request; and

2. for a reasonable period after the decision is made if:

(a) the request for the accommodation is denied; or

(b) the requestor indicates that the accommodation provided does not satisfy the need;

d. Determine if the:

1. requestor is a qualified individual with a disability as defined in paragraph 4.03 above; and

2. request is a reasonable accommodation as defined in paragraph 4.01 above;

e. Consult with the requestor regarding the kind of accommodation needed and determining an effective method of accommodation to address the need;

f. Determine if he or she has the authority to make a decision regarding the accommodation request; and refer the request to a higher-level official if the supervisor is not authorized to make the decision; and

g. Address the agency responsibility to accommodate known physical and mental disabilities by discussing the possible need of an accommodation with a qualified individual with a disability when it is observed that a disability may be limiting an employee's ability to perform the job at a fully successful level, or could otherwise improve a fully successful employee's job performance or an applicant's ability to participate in the selection process.

h. Seek guidance from and consult with the bureau EEO Officer on reasonable accommodation issues, and before determining that an undue hardship would occur if an accommodation were provided.

.06 Deciding Officials shall:

a. Respond promptly to accommodation requests referred by immediate supervisors or human resources managers;

b. Take necessary actions to ensure that accommodation requests are addressed promptly so as not to impede the employee's ability to perform the job or the applicant's ability to participate in the selection process;

c. Keep requestors, and immediate supervisors or human resources managers, as appropriate, apprised of progress in responding to accommodation requests;

d. Seek guidance from and consult with EEO Officers on reasonable accommodation issues and undue hardship determinations;

e. Monitor the processing of requests until decisions are made, and communicate these decisions in writing to requestors;

f. Provide written decisions on accommodation requests. When a request is denied, the decision must include an explanation for the denial.

g. Make every effort to reassign nonprobationary employees with disabilities who, with or without reasonable accommodation, are unable to perform the essential functions of their current position. As part of the affirmative action obligation, when a nonprobationary employee is unable to perform the essential functions of the position even with reasonable accommodation, an agency is required to reassign such qualified,

nonprobationary employees with disabilities to funded vacant available positions within the same commuting area that are serviced by the same authority, unless it would impose an undue hardship on the agency.

h. Provide appropriate training on reasonable accommodation for subordinate managers, supervisors and other employees.

.07 Human Resources Managers shall:

a. Ensure that all vacancy announcements:

1. Inform qualified individuals with disabilities that reasonable accommodations may be requested; and

2. Provide instructions for making such requests;

b. Identify opportunities to provide training on reasonable accommodation; and

c. Discharge responsibilities of managers and supervisors, as they apply to qualified applicants, listed in subparagraph 5.05.

.08 Employees with disabilities who desire accommodations shall:

a. Request an accommodation from the immediate supervisor;

b. Provide medical documentation of the disabling condition, if requested;

c. Provide a description of the accommodation requested, if known, and an explanation of how it would enable the employee to perform the job;

d. Acknowledge and respond to the immediate supervisor's offer to provide an accommodation when the employee has not requested an accommodation; and

e. Have the option to accept or reject an accommodation initiated by the immediate supervisor to improve the employee's job performance. However, an employee's decision to reject the accommodation could jeopardize the employee's employment status if (s)he is performing below a fully successful level, or if the disability is contributing to employee misconduct.

.09 Applicants with disabilities who desire accommodations shall:

a. Request an accommodation from servicing human resources managers;

b. Provide medical documentation of the disabling condition, if requested;

c. Provide a description of the accommodation requested, if known, and an explanation of how it would assist the applicant in the selection process;

d. Acknowledge and respond to a human resources manager's offer to provide an accommodation when the applicant has not requested accommodation; and

e. Have the option to accept or reject an accommodation initiated by a human resources management officer to improve the applicant's performance during the application process.

However, the applicant's decision to reject the accommodation may jeopardize competitiveness for the position in question should (s)he fail to successfully complete the application process.

## SECTION 6. PROCEDURES FOR REQUESTING REASONABLE ACCOMMODATION.

.01 Requests for reasonable accommodation may be submitted orally, but written requests are encouraged.

a. Employees with disabilities must submit requests to the immediate supervisor.

b. Qualified applicants with disabilities must submit requests to the servicing personnel office at a reasonable time prior to the occasion for which the accommodation is needed.

.02 Qualified individuals with disabilities must provide the following information:

a. if an employee, their name, daytime telephone number, position title and organization name;

b. if an applicant, their name, daytime telephone number, and home address;

c. a description of the disabling condition by an appropriate medical professional;

d. a description of the accommodation requested, if known, and an explanation of how it would enable an employee in performing the job, or how it would assist an applicant in the selection process; and

e. date of the request and signature of the requestor.

## SECTION 7. COMPLIANCE.

Two procedures are available to individuals who are dissatisfied with an Agency's response to a request for accommodation, and who wish to seek redress:

a. To file an EEO complaint, employees and applicants for employment must contact an EEO Counselor within 45 days after receiving a response to the request.

b. To file a grievance, employees and applicants for employment must contact the servicing human resources office promptly after receiving the decision, to find out the applicable procedures and time limits for filing a grievance under a negotiated grievance procedure or the administrative grievance system, as appropriate.

## SECTION 8. OTHER REFERENCES.

Department Administrative Orders 209-8, "Access for People with Disabilities to Meetings and Other Group Events;" 215-4, "Affirmative Action Plans, Programs and Related Activities;" 215-9, "Filing Discrimination Complaints;" and 202-705, "Acquired Immune Deficiency Syndrome (AIDS)."

## SECTION 9. ASSISTANCE.

Questions concerning this Order should be addressed to the Departmental Office of Civil Rights. This document will be made available in alternate format upon request by calling (202) 482-5691 (V/TDD/TTY).

_____(Signed)_____

Director for Civil Rights

Approved:

_____(signed)_____

Chief Financial Officer and Assistant

Secretary for Administration

Office of Primary Interest

Office of Civil Rights

Index Changes

Add

Accommodation for Disabilities in Employment, Reasonable 215-10

Reasonable Accommodation for Disabilities in Employment 215-10

**EXHIBIT 27**

Fo.... . IBB (February 1998)                                                    OMB Approval No. 06 0-0015

# Complaint of Employment Discrimination
## Against the U.S. Department of Commerce

For OCR Use
COMPLAINT NUMBER: 05-31-00166          Filing Date: 8/8/05 Hand Delivered

## INFORMATION ABOUT YOU

| | | | |
|---|---|---|---|
| Name | Parthenia Richardson | Social Security Number | |
| Address | 12604 Windbrook Drive | Home Phone (301) 292 2054 | |
| City/State | Clinton, MD | Zip Code 20735 | Work Phone (202) 482 1408 |

## INFORMATION ABOUT YOUR REPRESENTATIVE

Representative's Name    n/a          NOTE: You do not have to have a representative.

Address                                 Phone (    )

                                        Fax  (    )

City/State          Zip Code          Is your representative an attorney? ☐ Yes ☐ No

## INFORMATION ABOUT THE COMPLAINT

In which bureau did the alleged discrimination take place? Office of the Secretary

Did you work for the Department of Commerce at the time ? ☑ Yes ☐ No  If yes, what was your position (title/series/grade), office, and bureau?

Describe the action(s) or policy(ies) you believe was (were) discriminatory. Be specific and include dates. If you need more space, attach an extra page(s).

see attached pages

What do you believe was (were) the reason(s) for the alleged discrimination? Check the appropriate box(es) and write in specific details. For example: If it was because of your race, what is your race? If it was because of your age, what is your date of birth?

| | |
|---|---|
| ☑ Race | ☐ National Origin |
| ☐ Color | ☐ Age |
| ☐ Religion | ☐ Disability |
| ☑ Sex | ☑ Retaliation |

What remedy(ies) do you seek for the alleged discrimination? If you need more space, attach an extra page(s).

see attached pages

Did you discuss this(ese) issue(s) with an EEO Counselor? ☑ Yes ☐ No  Counselor's name? Bonnie Iverty

Did you file a grievance under a negotiated grievance procedure? ☐ Yes ☑ No  Filing date(s)?

Did you file a Merit Systems Protection Board (MSPB) appeal? ☐ Yes ☑ No  Filing date(s)?

_Parthenia Richardson_                          8/8/2005

SIGN HERE ( OR HAVE YOUR ATTORNEY SIGN FOR YOU)          DATE ( MONTH/DAY/YEAR)

Exhibit 1  Page 1

Parthenia Richardson, ▮▮▮▮▮▮▮▮

## EEO FORMAL COMPLAINT CONTINUATION PAGE:

Describe the actions or policies you believe were discriminatory. Be specific and include dates.

1. Mr. Richard Yamamoto has not supported me as a supervisor. Rather, he challenged all my employment actions, despite me obtaining guidance from the Office of Human Resources Management and the Office of General Counsel. (May - June 2005)

2. Mr. Yamamoto took away my ability to make supervisory decisions, including hiring selections. After I made a personnel security specialist selection, I was later informed that OSY policy required me to convene a panel. Prior to this, I received no guidance on filling a vacancy within my organization. (June 2005).

3. In a meeting with Mr. Yamamoto and Mr. Bell on at the beginning of June 2005, I was instructed to meet with Mr. Yamamoto every Monday afternoon for 30 minutes. I am the only GS-15 Assistant Director in the Office of Security required to meet with Mr. Yamamoto individually on a weekly basis for 30 minutes to discuss my supervisory decisions and duties. To my knowledge, none of my Caucasian male counterparts were required to be micro-managed in this manner.

4. Mr. Yamamoto failed to provide me with any positive feedback. He received positive feedback from two major clients, International Trade Administration and Bureau of Industry and Security. He neither passed that feedback on to me personally nor did he openly acknowledge my contributions to the organization. (May – June 2005)

5. Mr. Yamamoto undermined my authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining my rationale for employment decisions/actions. (April - June 2005)

6. Mr. Yamamoto allowed my Caucasian male counterparts and subordinate staff to communicate with me in a disrespectful and condescending manner. (May 2005)

7. Mr. Yamamoto regarded me with hostility and openly challenged any statements I made in staff meetings or other open forums. (April – May 2005)

8. On June 1, 2005, Mr. Yamamoto told me that he, my colleagues, and my staff did not have confidence in my ability to manage. He added that he had received outstanding recommendations from previous supervisors and was excited about me coming onboard but he now had doubts. He also stated he had no more "blue chips" available; he had used them all up.

1


**Parthenia Richardson,**

## Additional concerns of workplace retaliation for bringing concerns to EEO process are:

9. On July 11, 2005, I was informed by Mr. Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005 that I was being temporarily reassigned from my position as Assistant Director for Counterespionage Division, for a period of 120 days. I was not given specific duties just a broad statement that I would assist him with overseeing programs (such as declassification program and upcoming decennial) that he had not been able to monitor in his role as the Acting Deputy Director. He also gave me a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

10. Effective July 12, 2005, Thomas de Seve, a Caucasian male counterpart, was assigned to assume my responsibilities while continuing his current responsibilities.

11. Mr. de Seve occupied an office of equal space near mine, which would have allowed him to effectively manage his position as the Assistant Director for Client Services and now in my role as the Assistant Director of Counterespionage. Yet on July 11, 2005 I was informed that I was to move out of my office so Mr. de Seve could occupy my space. Linda Guier and Susan Powers, two Caucasian female, GS-14 managers, were reassigned from under my supervision on May 9, 2005, and neither Mr. Yamamoto nor Mr. Bell required them to relocate. In fact, they remained in my area of responsibility despite the complaints they had lodged against me.

12. I believe I am the victim of retaliation as a result of my filing an EEO complaint against the Director of Security, Richard Yamamoto. A week after declining Mr. Yamamoto's proposed remedies (July 11, 2005) I was relieved from my position as Assistant Director of Counterespionage Division for a period of 120 days, told to vacate my office, and publicly humiliated by having had to move to a workspace where GS-14 employees had better accommodations. Since such time I have been cut off normal Office of Security email distribution, which make it impossible to carryout any assignments I maybe tasked.

13. In the process of retaliation I also encountered further discrimination as Mr. Yamamoto and Mr. Bell assigned my job and duties to Mr. de Seve a Caucasian male and gave me duties equal to a GS-11/12 to perform.

Parthenia Richardson, ███████

## Remedies Requested:

1. Request I be immediately detailed to another Department of Commerce Bureau outside of the Office of Security to duties commensurate to the abilities upon which I was initially hired. Request this detail continue until the formal process of filing EEO complaint is complete to lessen the chance for continued retaliation and to minimize the hostile work environment upon which I have been subjected to since the process began.

2. Compensatory damages for embarrassment and emotional distress. This includes demoralization as a result of the unwarranted removal from my position as Assistant Director and the relocation from my office to an area considered beneath that of someone in my position and grade.

3. Nondiscriminatory placement outside of the Office of Security in an equivalent position (GS-15) that would afford me the same career opportunities as that which I was hired to occupy given my professional background had discrimination not occurred.

4. Removal of the mid-year counseling from Mr. David Bell, Acting Deputy Director, dated July 11, 2005.

 Bernadette M
Worthy/HCHB/Osnet
09/07/2005 07:55 AM

To   Susan E Thomas/HCHB/Osnet@osnet
cc   partheniarichardson@verizon.net
bcc
Subject   Fw: Amendment to Formal EEO Complaint

Good morning Susan,

Please note and respond to the request to amend below.

BMW

—— Forwarded by Bernadette M Worthy/HCHB/Osnet on 09/07/2005 07:54 AM ——

 <partheniarichardson@veriz
on.net>
09/07/2005 07:20 AM

To   bworthy@doc.gov
cc
Subject   Amendment to Formal EEO Complaint

Good morning Bonnie ~

Please amend my formal EEO Complaint dated August 8, 2005 to add the following
2 statements under retaliation:

14.  I spoke to Dave Bell, August 17, 2005, and requested reasonable
accommodations as recommended by my physician for stress and was told "you are
not under any stress, we just moved you from stress.?

15.  I submitted an involuntary termination, September 6, 2005 for additional
retaliation the refusal to comply with my request concerning the stress and to
escape the hostile work environment.

Sincerely,

Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735
(301) 292-2059

1   5



&lt;partheniarichardson@veriz
on.net&gt;

09/07/2005 10:46 AM

To BWorthy@doc.gov, sthomas@doc.gov
cc  partheniarichardson@verizon.net
bcc
Subject  Re: Fw: Amendment to Formal EEO Complaint

Bonnie/Susan -

Here is my amended remedies as well:

Amended Remedies Requested:

1.  Reinstatement to an equivalent position (GS-15) to duties commensurate to
the abilities upon which I was initially hired.

2.  Reinstatement for annual leave that was used for stress related absences
as documented by my physician; and compensation for lost wages/benefits
incurred as a result of my involuntary termination.

3.  Compensatory damages for embarrassment and emotional distress.  This
includes demoralization as a result of the unwarranted removal from my
position as Assistant Director and the relocation from my office to an area
considered beneath that of someone in my position and grade.

3.  Nondiscriminatory placement outside of the Office of Security in an
equivalent position (GS-15) that would afford me the same career opportunities
as that which I was hired to occupy given my professional background had
discrimination not occurred.

4.  Removal of the mid-year counseling from Mr. David Bell, Acting Deputy
Director, dated July 11, 2005.

Sincerely,

Parthenia Richardson
12604 Windbrook Drive
Clinton, Maryland 20735
(301) 292-2059

&gt;From: BWorthy@doc.gov
&gt;Date: Wed Sep 07 06:55:52 CDT 2005
&gt;To: sthomas@doc.gov
&gt;Cc: partheniarichardson@verizon.net
&gt;Subject: Fw: Amendment to Formal EEO Complaint
&gt;
&gt;Good morning Susan,
&gt;
&gt;Please note and respond to the request to amend below.
&gt;
&gt;BMW
&gt;
&gt;
&gt;----- Forwarded by Bernadette M Worthy/HCHB/Osnet on 09/07/2005 07:54 AM
&gt;-----
&gt;
&gt;              &lt;partheniarichard
&gt;              son@verizon.net&gt;

*1*    *6*

Parthenia Richardson
12604 Windbrook Drive
Clinton MD 20735

## Facsimile Transmittal

05-51-00166

| To: | Bonnie Worthy, OHRM | Fax: | 202-482-5375 |
|---|---|---|---|
| From: | Parthenia Richardson | Date: | 9/16/2005 |
| Re: | Resignation Paperwork | Pages: | Header plus 8pgs |
| CC: | Susan Thomas, OCR | | |

☐ Urgent      ☐ For Review      ☐ Please Comment      ☐ Please Reply      ☐ Please Recycle

**Notes:**

Good morning Bonnie

Attached is a certified letter that was mailed to Mr. Dave Bell informing him for the record that I am aware he (OSY) did not submit the paperwork I provided outlining my reason for resignation. I was made aware of this action after speaking to an OSY human resources person. I am sending you a copy to ensure my official records are corrected and would appreciate it if you could also provide a copy to Susan Thomas I do not have his fax number. You will also note I am providing a copy to both Jay Jamison, OHRM and John Guenther, OGC.

Sincerely,

Parthenia

*Parthenia Richardson*
*12604 Windbrook Drive*
*Clinton, Maryland 20735*

September 15, 2005

Mr. David Bell
Deputy Director
Department of Commerce
Office of Security
1401 Constitution Avenue, NW
Room
Washington, DC 20230

Dear Mr. Bell:

This letter is to put on record the fact that the Standard Form 52 outlining my resignation
was not turned into the Office of Human Resource Management. I have attached what
was provided to the Office of Security as the reasons for my immediate resignation to
accurately document my personnel file.

You will also note that I have copied the appropriate management officials to ensure my
personnel file is accurately documented.

Sincerely,

Parthenia Richardson

2 Enclosures:
1. Standard Form 52 Request for Personnel Action (Resignation I submitted)
2. Standard Form 52 Request for Personnel Action (Paperwork that was submitted
Office of Security)

Copies furnished:
The Honorable Steny H. Hoyer, Congressman Maryland
Jay Jamison, Office of Human Resource Management
John Guenther, Office of General Counsel
Bernadette Worthy, Office of Civil Rights (re: 05-51-00166)
Susan E. Thomas, Office of Civil Rights (re: 05-51-00166)

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office *(Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| Resignation | OSY-05-088 |

| 3. For Additional Information Call *(Name and Telephone Number)* | 4. Proposed Effective Date |
|---|---|
| Rachel Hughins, x2-3008 | 09/17/2005 |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| Dave Bell, Dep Dir of Security   9/2/05 | Richard Yamamoto, Dir of Security   9/2/05 |

## PART B - For Preparation of SF 50 *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Richardson, Parthenia | | 12/18/60 | 09/17/2005 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| | |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| | |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | |

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Supervisory Security Specialist | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ZA | 0080 | V | 1 | $103,947.00 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $103,947.00 | $0.00 | $103,947.00 | $0.00 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE SECRETARY<br>OFFICE OF THE CFO/ASA<br>OFFICE OF SECURITY<br>COUNTERESPIONAGE DIVISION0 | |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|
| 2 | 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other<br>2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 2   0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | | X YES   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| WAIVED | 9   NOT APPLICAPBLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date *(Leave)* | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   FERS AND FICA | 12/15/03 | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career | E   E - Exempt<br>N - Nonexempt | 05/0127000/1101/1104 | 8888 |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|
| 11-0010-001 | WASHINGTON DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA   8 - Other | | |

## PART C - Reviews and Approvals *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| | | | F. | | |

-- Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature

Approval Date

CONTINUED ON REVERSE SIDE
52-118

Enclosure 1

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

**PART D - Remarks by Requesting Office**
(Note to Supervisors:  Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)     ☐ YES     ☒ NO

RESIGNATION EFFECTIVE SEPTEMBER 8, 2005

EMPLOYEE LEAVING FEDERAL SERVICE

**PART E  Employee Resignation/Retirement**

Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address.  Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits.  Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code.  Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving:  (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits.  Please be specific and avoid generalizations.  Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

SEE ATTACHED SHEET FOR DETAILED EXPLANATION OF SUDDEN RESIGNATION 9/6/05

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| 9/8/2005 | Trithema Richardson | 9/6/2005 | 12604 Windbrook Drive, Clinton, MD 20735 |

**PART F  Remarks for SF 50**

Enclosure 1                                        1    10

Parthenia Richardson, ▓▓▓▓▓▓▓
SF-52 Request for Personnel Action

## PART E – Employee Resignation/Retirement Explanation:

I hereby tender my resignation from the Department of Commerce. I do so in order to remove myself from a hostile work environment. I believe I am the victim of retaliation as a result of my filing an EEO complaint against the Director of Security, Richard Yamamoto. A week after declining Mr. Yamamoto's proposed remedies (July 11, 2005) I was detailed from my position as Assistant Director of Counterespionage Division and given the title of Special Projects Officer for a period of 120 days and told to vacate my office. The duties I was assigned were those of a GS 11/12 employee that failed to establish a Declassification Plan. This failure contributed to the report that was sent to the President of the United States on November 30, 2004 from ISOO, stating Commerce is "at significant risk" of failing to meet a mandated deadline of December 31, 2006. However, once these duties were assigned to me, the employee was promoted to a GS 13.

On August 17, 2005, I spoke to Dave Bell and requested reasonable accommodations as recommended by my physician and was told "you are not under any stress, we just moved you from stress. If we take this program from you and give it to someone else they will have stress and besides I don't know who would do it."

In short, being removed from my position and office, and assigned the failed duties of a subordinate are part of the hostile work environment coupled with the refusal to accept my physician's recommendation to remove me from the current work environment have contributed to my increased levels of stress and the necessity of my resignation.

*Parthenia Richardson* 9/6/05

Enclosure 1

1 of 11

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)*

1. Actions Requested

esignation

| | |
|---|---|
| | 2. Request Number |
| | OSY-05-088 |

3. For Additional Information Call (Name and Telephone Number):—

Rachel Hughins, x2-3008

4. Proposed Effective Date: 09/8 /2005

5. Action Requested By (Typed Name, Title, Signature, and Request Date)

Dave Bell, Dep Dir of Security   9/2/05

6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date)

Richard Yamamoto, Dir of Security   9/2/05

**PART B - For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1.  Show all dates in month-day-year order.)*

1. Name (Last, First, Middle)

Richardson, Parthenia

2. Social Security Number

3. Date of Birth: 12/18/60

4. Effective Date: 09/8/2005

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 5-C. Code | 5-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

7. FROM: Position Title and Number

Supervisory Security Specialist

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| ZA | 0080 | V | 1 | $103,947.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $103,947.00 | $0.00 | $103,947.00 | $0.00 |

14. Name and Location of Position's Organization

OFFICE OF THE SECRETARY
OFFICE OF THE CFO/ASA
OFFICE OF SECURITY
COUNTERESPIONAGE DIVISIONO

15. TO: Position Title and Number

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |

22. Name and Location of Position's Organization

**EMPLOYEE DATA**

23. Veterans Preference

| 2 | 1 - None   2 - 5-Point | 3 - 10-Point/Disability   4 - 10-Point/Compensable | 5 - 10-Point/Other   6 - 10-Point/Compensable/30% |
|---|---|---|---|

24. Tenure: 2   (0 - None, 1 - Permanent, 2 - Conditional, 3 - Indefinite)

25. Agency Use

26. Veterans Pref for RIF

27. FEGLI

WAIVED

28. Annuitant Indicator: 9   NOT APPLICAPBLE

29. Pay Rate Determinant: X YES  NO

30. Retirement Plan: K   FERS AND FICA

31. Service Comp. Date (Leave): 12/15/03

32. Work Schedule: F   FULL TIME

33. Part-Time Hours Per Biweekly Pay Period: 0

**POSITION DATA**

34. Position Occupied: 1   (1 - Competitive Service, 2 - Excepted Service, 3 - SES General, 4 - SES Career)

35. FLSA Category: E   (E - Exempt, N - Nonexempt)

36. Appropriation Code: 05/0127000/1101/1104

37. Bargaining Unit Status: 8888

38. Duty Station Code: 11-0010-001

39. Duty Station (City - County - State or Overseas Location): WASHINGTON DC

40. Agency Data | 41. | 42. | 43. | 44.

APPROVED OEB DD 9/8/05

45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship: 1 - USA  8 - Other | 50. Veterans Status | 51. Supervisory Status

**PART D - Reviews and Approvals** *(Not to be used by requesting office.)*

1. Office/Function

| | Initials/Signature | Date | | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|---|
| A. | Cindy Snyder | 9/8/05 | D. | | | |
| B. | | | E. | '05 SEP 12 AM 8:07 | | |
| C. | | | F. | | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature: OHR OPERATIONS RECEIVED

Approval Date

CONTINUED ON REVERSE SIDE

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

Enclosure 2

1          12

**PART D. Remarks by Requesting Office**

(Note to Supervisors:  Do you know of additional or conflicting reasons for the employee's resignation/retirement?
If "YES", please state these facts on a separate sheet and attach to SF 52.)     ☐ YES   ☐ NO

SIGNATION EFFECTIVE SEPTEMBER  8, 2005.

EMPLOYEE LEAVING FEDERAL SERVICE

**PART E. Employee Resignation/Retirement**

Privacy Act Statement

You are requested to furnish a specific reason for your resignation or
retirement and a forwarding address. Your reason may be considered in
any future decision regarding your re-employment in the Federal service
and may also be used to determine your eligibility for unemployment
compensation benefits. Your forwarding address will be used primarily
to mail you copies of any documents you should have or any pay or
compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and
8506  of title 5, U.S. Code. Sections 301 and 3301 authorize OPM

and agencies to issue regulations with regard to employment of
individuals in the Federal service and their records, while section 8506
requires agencies to furnish the specific reason for termination of
Federal service to the Secretary of Labor or a State agency in
connection with administration of unemployment compensation
programs.

The furnishing of this information is voluntary; however, failure to
provide it may result in your not receiving:  (1) your copies of those
documents you should have; (2) pay or other compensation due you; and
(3) any unemployment compensation benefits to which you may be
entitled.

1.  Reasons for Resignation/Retirement (NOTE:  Your reasons are used in determining possible unemployment benefits.  Please be specific and
avoid generalizations.  Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| | | | |

**PART F. Remarks for SF 50**

Enclosure2

1    13

**Parthenia Richardson**
**12604 Windbrook Drive**
**Clinton, Maryland 20735**

August 30, 2005

Mr. David Bell
U.S. Department of Commerce
Office of Security
Washington, DC 20230

Dear Mr. Bell:

I hereby tender my resignation from Department of Commerce, Office of Security, with an effective date of September 17, 2005. At that time, I will return my government issued property.

Sincerely,

Parthenia Richardson

Enclosure 2



David Belli/r/CHB/O/snet@osnet,
Jay Jamison/r/CHB/O/snet@osnet,
John Quenther/r/CHB/O/snet@osnet,
Bernadette M Worthy/HO-HB/O/snet@osnet

Resignation

Dave -

After consultation with my physician it is best for my mental health to resign effective Thursday, September 8, 2005 versus September 17, 2005. I will complete all my outprocessing prior to departing today. Therefore I would like to take my remaining sick leave in the following manner and cash in the remaining annual leave balance:

1 hour today, Tuesday, September 6, 2005 from 3:00 -4:00pm
8 hours tomorrow, Wednesday, September 7, 2005 from 7:30am - 3:30pm.

Sincerely,

Parthenia Richardson

Enclosure 2

15

**EXHIBIT 28**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer and**
**Assistant Secretary for Administration**
Washington, D.C. 20230

Ms. Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735

SEP - 6 2005

Dear Ms. Richardson:

We received your complaint of discrimination on August 8, 2005. Hereafter, that date is the Filing Date.

The complaint has been given the following number: **05-51-00166**. To avoid delays in processing your complaint, it is very important that this number be used in all correspondence regarding this complaint, regardless of the person to whom your correspondence is sent.

If the complaint is accepted, the Department of Commerce will conduct a complete and fair investigation of your complaint within **180 calendar days** from the **filing date** unless you and the Department of Commerce agree in writing to extend that period, or the complaint is amended or consolidated with another active formal complaint. If the complaint is amended or consolidated, the investigation will be completed within no more than **360 days** from the first complaint filed. (29 C.F.R.§1614.106(d)(2)). In your case, the 180th day is February 6, 2006. We will need your cooperation in order to meet this deadline.

<u>Here are your rights</u>

If the 180th day arrives, and you have not received the Report of Investigation with the notice explaining the right to request a hearing, on the 181st day or thereafter, you may request a hearing by an Administrative Judge appointed by the Equal Employment Opportunity Commission (EEOC). (29 C.F.R §1614.108(f)). The request must be filed with the following District Office of the EEOC:

> District Director
> Washington Field Office
> Equal Employment Opportunity Commission
> 1801 L Street, Suite 100
> Washington, DC 20507

A copy of the hearing request must be sent to this office. If you fail to notify this office, that a hearing has been requested, a final agency decision could be issued in the interim.

Alternatively, you may file a civil action in an appropriate U.S. District Court. (29 C.F.R.§1614.408(b)).

Exhibit 3 Page 1

If this Office dismisses the complaint, or when we issue a Final Decision or Final Order on the merits of the complaint, you will have the right to appeal the Dismissal, the Final Decision or Final Order to:

> The Director
> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

You will be told how to file an appeal at the appropriate time.

Sincerely,

Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights

3    2

Certificate of Service

I attest that a copy of this Acknowledgment Notice has been sent to the parties listed below:

**By Certified Mail:**

Ms. Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735

**Other:**

Bernadette M. Worthy,  EEO Officer, OS

Subject Tab C

Compliance Chron File

Signature

SEP - 6

Date

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

9/6/05

7004 1160 0002 5024 1065

Ms. Parthena Richardson
12604 Windbrook Drive
Clinton, MD 207835

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )     C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered      ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7004 1160 0002 5024 1065

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

Ms. Parthena Richardson
12604 Windbrook Drive
Clinton, MD 207835

3          3

**EXHIBIT 29**



**UNITED STATES DEPARTMENT OF COMMERCE**
Chief Financial Officer and
  Assistant Secretary for Administration
Washington, D.C. 20230

DEC 2 2 2005

Ms. Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735

RE: **Parthenia Richardson**
Complaint No.: **05-51-00166**

Dear Ms. Richardson:

Please be advised that the investigation pertaining to complaint number 05-51-00166 has been completed. In accordance with Title 29, Code of Federal Regulations (C.F.R.), section (§) 1614.108(f), you are hereby provided a copy of the investigative file.

Since your case is a mixed case, *i.e.*, a discrimination complaint stemming from an action appealable to the Merit Systems Protection Board (MSPB), you are not entitled to a hearing before an Equal Employment Opportunity Commission administrative judge. The attached Final Agency Decision includes an explanation of your right to appeal to the MSPB or file a civil action in Federal Court.

Sincerely,

Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights

Enclosure

**Certificate of Service**

I attest that a copy of this Notice of Post-Investigative Options – Mixed Case has been sent to the parties below:

**Federal Express:**

Ms. Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735

**Other:**

Bernadette Worthy
EEO Officer, OS

Complaint File (Tab I)

OCR Chron File

_____
EEO ASSISTANT

DEC 2 2 2005
_____
DATE



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer**
**Assistant Secretary for Administration**
Washington, D.C. 20230

Parthenia Richardson,    )
Complainant              )
                         )
                         )
v.                       )        Complaint Number:  05-51-00166
                         )
Carlos M. Gutierrez, Secretary )
U.S. Department of Commerce )
                         )

## FINAL AGENCY DECISION – MIXED CASE COMPLAINT

This is the Department's final decision on complaint number 05-51-00166 filed by Parthenia Richardson (Complainant), a former Supervisory Security Specialist, ZA-0080-V (GS-0080-15) in the Office of Security (OSY (Agency), U.S. Department of Commerce (Department).

## I.    PROCEDURAL HISTORY

On June 20, 2005, Complainant contacted the Agency Equal Employment Opportunity (EEO) Office regarding her concerns of discrimination and requested alternative dispute resolution (ADR). On July 5, 2005, the Agency authorized the EEO Officer to offer Complainant an offer of resolution, which she declined the following day. Ex. 2. On July 22, 2005, the EEO Officer issued Complainant a Notice of Right to File [a formal complaint of discrimination] Within 15 Calendar Days via certified mail, return receipt requested. Ex. 2 at 19. The Domestic Return Receipt, PS Form 3811, shows Complainant received the notice on July 27, 2005. Ex. 2 at 21. In a formal equal employment opportunity (EEO) complaint dated August 8, 2005, Complainant alleged that Agency officials discriminated against her in connection with the matters referenced

05-51-00166

below. Ex. 1.[1]. After being amended on September 7, 2005, to include constructive discharge, the complaint was accepted for investigation as a mixed-case complaint on September 16, 2005. Ex. 6. Upon completion of the investigation, Complainant was sent a copy of the ROI and advised that since her case was a mixed-case complaint, she is only entitled to a final decision on the record by the Agency. Accordingly, this decision is being issued pursuant to Title 29, Code of Federal Regulations (C.F.R.) section (§) 1614.110(b).

## II.    STATEMENT OF CLAIMS

Complainant, formerly the Assistant Director for Counter Espionage, GS-15, in the Office of Security, Office of the Secretary, alleges that she has been subjected to a continuous pattern of discrimination and harassment constituting a hostile work environment due to her race (black) and sex (female).  She cites the following:

1.  During the period of May to June 2005, Richard Yamomoto did not support her as a supervisor and challenged her employment actions, despite her having obtained guidance from the Office of Human Resources and the Office of General Counsel.

2.  In June 2005, Yamomoto took away her ability to make supervisory decisions, including hiring selections.

3.  Since June 2005, Yamomoto requires her to meet him on a weekly basis for 30 minutes to discuss supervisory decisions and duties.

4.  During the period of May to June 2005, Yamomoto failed to provide her any positive feedback, despite receiving positive feedback from two major clients, and also failed to openly acknowledge her contributions to the organization.

---

[1] All of the Exhibits (Ex.) and Affidavits cited in this decision are matters of the record in the ROI.

05-51-00166

5.  During the period of April to June 2005, Yamomoto undermined her authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining her rationale for employment decisions and actions.

6.  In May 2005, Yamomoto allowed her Caucasian male counterparts and subordinate staff to communicate with her in a disrespectful and condescending manner.

7.  During the period of April to May 2005, Yamomoto treated her with hostility and openly challenged any statements she made in staff meetings or other open forums.

8.  On June 1, 2005, Yamomoto told her that he, his colleagues, and his staff did not have confidence in her ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about her coming on board he now had doubts.  At that time, Yamomoto also stated that he had no more "blue chips" available, and that he has used them all up.

In addition to discrimination and harassment constituting a hostile work environment due to her race and sex, Complainant also alleges retaliation for having engaged in the EEO complaints process when:

9.  On July 11, 2005, she was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, she was being temporarily reassigned from her position as Assistant Director for the Counterespionage Division for a period of 120 days. She also learned that Thomas de Seve, a Caucasian male counterpart, was assigned to assume her responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave Complainant a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, she was informed that she was to move out of her office so that de Seve could occupy her space. She contends that de Seve already had adequate space that would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. Complainant further contends that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under her supervision on May 9, 2005, yet were not required to relocate.

12. She was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to her on her reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, she spoke to Bell and requested reasonable accommodation, as recommended by her physician for stress and Bell commented, "You are not under any stress, we just moved you from stress." [2]

15. As a result of the refusal to comply with her request concerning the stress and to escape the hostile work environment, she "submitted an involuntary termination" (*i.e.*, constructive discharge) on September 6, 2005.

## III.    FACTUAL BACKGROUND

The U.S. Department of Commerce is an Agency in the Executive Branch of the Federal Government and is comprised of a number of bureaus and activities.  Under the auspices of the Office of the Secretary is the Office of the Chief Financial Officer/Assistant Secretary for Administration (CFO/ASA).  The CFO/ASA consists of ten directorates responsible for a wide range of administrative functions, which include budget and financial management,

---

[2] In her formal complaint, Complainant states that she suffered from stress as a result of harassment by her supervisors and co-workers and was denied accommodation.  The Department's Notice of Acceptance advised Complainant that although she had not specifically annotated "disability" as one of her bases, she could add the basis of disability during the investigative process.  There is no evidence showing she did so.  Therefore, the basis of disability and issue of denial of accommodation are not included for analysis in this decision.

05-51-00166

procurements, grants, outreach to small businesses, human resources management, civil rights, facilities and real estate management, and security. One of the directorates is the Office of Security (OSY), which provides policies, programs, and oversight as it collaborates with: (1) Facility managers to reduce the terrorism risks to DOC personnel and facilities; (2) Program managers to reduce the espionage risks to DOC personnel, information and facilities; and (3) Department and bureau leadership to increase emergency preparedness for DOC operations.

Richard Yamamoto (Japanese-American, male, no prior EEO activity), Senior Executive Service (SES), is the Director of Security. Ex. 7 and 16. David Bell (White, male, no prior EEO activity), is a Supervisory Security Specialist, ZA-0080-05, and at the time relevant to this complaint was serving as Assistant Director of the Anti-Terrorism Division and Acting Deputy Director of Security.[3] Ex. 8 and 16. Robert Page was the Supervisory Security Specialist and Assistant Director of the Emergency Management Team, and Thomas de Seve was the Supervisory Security Specialist and Assistant Director of the Client Security Services Division. Ex. 16.

On February 4, 2005, the Office of Human Resources (OHRM) issued a certificate to Complainant for selection of a Security Specialist, ZA-0080-IV (vice Silver). Ex. 21 at 1-3. [4]

On February 20, 2005, Complainant, formerly a Security Specialist, GS-0080-14, with the Department of Homeland Security, was laterally transferred into the position of Supervisory Security Specialist, ZA-0080-V (GS-0080-15) to serve as the Assistant Director of the Counterespionage Division, OSY, CFO/ASA. Exs. 6 and 18 at 3. Her tenure in this position was subject to completion of a one-year probationary period for assignment to a supervisory or managerial position beginning February 20, 2005. Ex. 18 at 3.

---

[3] In July 2005, Mr. Bell was promoted to Deputy Director.
[4] See Investigator's memorandum regarding inconsistencies and/or confusion regarding the selection certificates and action. Ex. 35.

05-51-00166

Complainant states that she was interviewed by Mr. Bell and Robert Page, Assistant Director for the Emergency Management Division and was told that Mr. Yamamoto would make the selection based upon their recommendation. Mr. Yamamoto and Mr. Bell both confirm that Complainant was selected for the position based upon Mr. Bell's recommendation. Exs. 7 and 8.

Complainant indicates that following her selection, Mr. Yamamoto met with her and told her that he wanted her to look into complaints, find out what her employees were doing, make them accountable, and "guide" the division back onto the right path.

Mr. Yamamoto confirms that he met with Complainant and briefed her on OSY goals, *i.e.,* "reduce the security risk; develop personnel to the fullest potential, and satisfy the customers and stakeholders," and asked her to provide "firm and fair leadership." He says that he identified several high performers in her division who could help her improve the division and asked her to focus attention on the Declassification Project because it was behind schedule. Mr. Yamamoto said he told Complainant that she was to ensure objective accountability via performance metrics and to continue initiatives that were already in place. He instructed Complainant to review the performance metrics and determine what needed to be fixed. Mr. Yamamoto said that by Complainant's statements, she demonstrated to him that she was not a "big fan" of performance metrics and systems. He emphasized to her that OSY was fully committed to performance metrics and the Management Application for Security (MAPS) system and that she "needed to on board." Ex. 7.

On March 13, 2005, Carla Fisher was detailed from the Counterespionage Division to the Emergency Management Division for a period not to exceed 90 days. Complainant was the authorizing official. Ex. 22 at 1.

On March 14, 2005, Security Specialist Starlene Hilton was reassigned from the Personnel Security Program to the National Security Information Program, both under the auspices of the Counterespionage Division. Complainant was the authorizing official. Ex. 22 at 7.

05-51-00166

On April 8, 2005, OHRM issued a certificate to Complainant for selection of a Security Specialist, ZA-0080-II/III (vice Kerrick). Ex. 21 at 7.

Mr. Yamamoto states that Fred Schwien, Executive Secretary, brought an anonymous complaint, dated April 4, 2005, to his attention and questioned whether it was related to problems he (Mr. Schwien) was having with his security paperwork. Mr. Yamamoto indicates the complaint charged Complainant with "abusing many of your best...employees...daily harassment, daily threats to fire people, positional demotions" and objected to "higher level management" characterizing her actions as simply "new management style." Ex. 7.

Effective May 14, 2005, Security Specialist Katrina Herbert transferred to another Agency (Department of Defense). Ex. 22 at 9.

Effective May 15, 2005, Linda Guier was laterally transferred from the Counterespionage Division to the Client Security Services Division. Ex. 19 at 1.

Effective May 15, 2005, Susan Powers was laterally transferred from the Counterespionage Division to the Emergency Management Division. Ex. 19 at 6.

On June 6, 2005, OHRM issued a certificate to the Agency for selection of a Security Specialist, ZA-0080-IV (vice Silver). Ex. 21 at 4.

On June 10, 2005, the detail for Security Specialist Carla Fisher was extended not to exceed 120 days. Complainant was the requesting official and Mr. Bell was the authorizing official. Ex. 22 at 3.

On June 21, 2005, Security Specialist Janice King was transferred from the Client Security Services Division (Census) to the Counterespionage Division. Complainant was the requesting official and Mr. Bell was the authorizing official. Ex. 22 at 13.

7

05-51-00166

On June 25, 2005, Michael Bodin transferred to another Agency (Department of Energy). Ex. 22 at 19.

On June 27, 2005, OHRM issued Complainant a corrected certificate for the position of Security Specialist, ZA-0080-III (vice Herbert). Ex. 21 at 8.

Mr. Yamamoto states that in early June, Complainant acknowledged to him that there were major problems in her division, although she did not admit any were her fault, and that she had no solutions. He avers he told Complainant that he "was losing" and not that he had lost confidence in her as she alleges. He asked Complainant to schedule weekly meetings with him so he could assist her in solving her division's problems, and she agreed to do so. He said that they met on June 6 and 13, but she did not schedule meetings with him during the weeks of June 20, 27 or July 5, 2005.

In June 2005, Mr. Yamamoto requested guidance from the Office of Human Resources Management (OHRM) regarding detailing Complainant to another position. In a memo dated June 17, 2005, Willie "Jay" Jamison, Human Resource Specialist, advised Mr. Yamamoto that Complainant was subject to completion of a one-year probationary period since she was a new supervisor. He advised that "during the probationary period, second level supervisors/managers should provide guidance and training on supervisory skills and techniques and monitor and document performance. Mr. Jamison asked that Mr. Yamamoto "hold off" on informing Complainant she was being detailed until they had the opportunity for further discussion. Ex. 7 at 25.

On or about July 11, 2005, Complainant was detailed to the position of Special Projects Officer. Ex. 29.

On or about July 11, 2005 Thomas de Seve was detailed to the position of Supervisory Security Specialist, ZA-0080-V, for a period not to exceed 120 days. Ex. 20.

05-51-00166

On August 30, 2005, Complainant tendered her resignation to be effective September 17, 2005. Ex. 1 at 9 and 14. Complainant then sent an email on September 7, 2005, making her resignation effective on September 8, 2005.

## IV.   LEGAL ANALYSIS

### a.    Applicable Law

This is a mixed case complaint.  The EEOC's regulations define a "mixed case" complaint as one in which the alleged discriminatory act is related to or stems from an action that is appealable to the Merit Systems Protection Board (MSPB or Board).  See 29 C.F.R. § 1614.302(a)(1).

Complainant brings this complaint under Title VII of the Civil Rights Act of 1964, as amended, Section 701 *et seq.*, Title 42, United States Code (U.S.C.) 2000e *et seq.*, ("Title VII").  A review of the statute itself, from which the Commission regulations are promulgated, reveals that section 2000e-3(a) of Title VII prohibits retaliation against a worker for engaging in protecting activity.[5] The Commission has interpreted the statutory retaliation clauses "to prohibit any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter [complainant] or others from engaging in protected activity," including threats and harassment in or out of the workplace.  See *EEOC Compliance Manual, Section 8 (Retaliation)* at 8-13 - 8-15 (May 20, 1998); see also *Quick v. Department of Air Force,* EEOC Appeal No. 01A00116 (August 13, 2002).

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII and the ADEA follows a three-step evidentiary analysis.  First, the burden is on the complainant to establish a *prima facie* case of discrimination by a preponderance of the evidence.  See *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 5 FEP Cases 965 (1973); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 18 FEP Cases 520 (1978); *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 17 FEP Cases 1062 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur.  See *Teamsters v. U.S.,*

---

[5] Protected activity is that activity which either opposes a practice made unlawful by one of the employment discrimination statutes (the "opposition clause"); or filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under the applicable statute (the "participation clause").  See EEOC Compliance Manual (Retaliation) at 8-1.

05-51-00166

431 U.S. 324, 14 FEP Cases 1514 (1977). A complainant raises an inference of discrimination by showing that the reasons most commonly given by management to justify a particular employment decision or action do not apply in the complainant's case.

Second, if the complainant meets the burden of presenting a *prima facie* case, then management has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 25 FEP Cases 113 (1981). The evidence presented by management need not establish management's actual motivation, but must be sufficient to raise a genuine issue of material fact as to whether management discriminated against the complainant. If management meets this burden of production, the presumption of discrimination raised by the *prima facie* case is rebutted and drops from the case altogether. See *Burdine*, 25 FEP Cases 116.

Third, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is a pretext for discrimination. See *Price Waterhouse v. Hopkins*, 490 U.S. 228, 49 FEP Cases 954 (1989); *Burdine*, 25 FEP Cases 116; *McDonnell Douglas*, *supra*. The complainant may show pretext by evidence that a discriminatory reason more likely than not motivated management, that management's articulated reasons are unworthy of belief, that management has a policy or practice disfavoring the complainant's protected class, that management has discriminated against the complainant in the past, or that management has traditionally reacted improperly to legitimate civil rights activities. See *McDonnell Douglas*, *supra*.

The ultimate burden of showing that management intentionally discriminated against the complainant remains at all times with the complainant. See *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 31 FEP Cases 609 (1983); *Burdine*, 25 FEP Cases 116. A finding of pretext, *i.e.*, a finding of sufficient evidence to disbelieve management's stated reason for its decision does not necessarily compel a finding of discrimination. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). Proof of pretext is simply one form of circumstantial evidence that is probative of intentional discrimination, and such proof may be quite persuasive. Thus, a complainant's *prima facie* case, when combined with sufficient evidence to find that

management's asserted justification is false, may permit a finding of discrimination. See *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097, 82 FEP Cases 1748 (2000). This is not to say that such a showing will always be adequate to find discrimination. As the Supreme Court noted in *Reeves*, there will certainly be instances where, despite such a showing, the record conclusively reveals some other nondiscriminatory reason for management's decision, or if the complainant presented only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred. Thus, for example, if the circumstances show that management gave a false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent. See *Reeves, supra* (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1338 (2nd Cir. 1997). Whether a finding of discrimination is appropriate in a particular case will depend on a number of factors, including the strength of the complainant's *prima facie* case, the probative value of the proof that management's explanation is false, and the strength of other evidence that discrimination did not occur. See *Reeves, supra.*

In cases involving harassment, the Courts and EEOC have somewhat modified the *McDonnell Douglas* analytical approach in order to achieve "a sensible, orderly way to evaluate the evidence." For harassment to be considered discriminatory, it must be severe or pervasive. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 63 FEP Cases 225 (1993). Actual psychological or emotional injury is not required. See *Harris*, p. 228. However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. See *e.g. Scott v. Sears Roebuck and Co.*, 798 F.2d 210, 41 FEP Cases 805 (7th Cir. 1986); *Hansen v. Rice*, EEOC Appeal No. 01920621 (September 10, 1992). "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress." See *Lin v. U.S. Postal Service*, EEOC Appeal No. 01932880 (December 23, 1993).

The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive: (1) whether the conduct in question is verbal or physical, or both; (2) whether the conduct was repeated, and, if so, how frequently; (3) whether the conduct was hostile or patently offensive; (4) whether the alleged harasser was a supervisor or a coworker; (5) whether more than one person joined in the harassment; and (6) whether the harassment was

directed at more than one individual. See *King v. Hillen*, 21 F.3d 1572, 64 FEP Cases 754 (Fed. Cir. 1994); *Crane*, EEOC Appeal No. 01924585 (April 22, 1993). Evidence of the general working-atmosphere involving employees other than the complainant is also relevant to the issue of whether a hostile work environment exists. See *Vinson v. Taylor*, 753 F.2d 141, 36 FEP Cases 1423 (D.C. Cir. 1985), affirmed in relevant part and reversed in part, *sub nom Meritor Federal Savings Bank v. Vinson*, 477 U.S. 57, 40 FEP Cases 1822 (1986); *Delgado v. Lehman*, 665 F. Supp. 460 (E.D. Va. 1987).

The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. See *Highlander v. K.F.C. National Management Co.*, 805 F.2d 804, 42 FEP Cases 654 (6th Cir. 1986). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. See *Harris*, p. 228. Furthermore, if the complainant does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of employment, and there is no Title VII violation. See *Harris*, pp. 227, 228.

Last, the analytical framework in *McDonnell Douglas* "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." See *Furnco*, 17 FEP Cases at 1066. Thus, whether or not a complainant has established a *prima facie* case, where management has provided a legitimate, nondiscriminatory explanation for its action, the factual inquiry must proceed to a decision on the ultimate factual issue in the case, *i.e.*, whether management's actions were discriminatory within the meaning of Title VII. See *Aikens, supra*.

b.    ***Prima Facie* Case**

The factual circumstances of the case and the bases of discrimination alleged determine the elements of a *prima facie* case of discrimination. See *McDonnell Douglas*, 5 FEP Cases 969 n.13. Here, Complainant has alleged that she resigned from her position due to race and sex-based and harassment.

05-51-00166

## Sex and Race-based Disparate Treatment

In order to establish a *prima facie* case of race and sex-based disparate treatment, a complainant must generally show: (1) membership in a protected class; (2) an employment situation comparable to that of other employees not of the same protected class; and (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment, or, in the alternative, that there is some other evidence raising an inference of prohibited discrimination. See *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 12 FEP Cases 1577 (1976); *Braganza v. U.S. Postal Service*, EEOC Appeal No. 01A20583 (June 20, 2002) (citing *Orr v. Tennessee Valley Authority*, EEOC Request No. 05930311 (March 11, 1994); *Scott v. Department of Defense*, EEOC Appeal No. 01902727 (September 24, 1990).

Employees are in comparable employment situations when it is reasonable to believe that they would receive the same treatment in the context of a particular employment decision. See Lindemann & Grossman, Employment Discrimination Law, 3rd Ed., Chapter 2, pp. 30-33 (1996). In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly identical to those of the comparative employees. See *O'Neal v. U.S. Postal Service*, EEOC Request No. 05910490 (July 23, 1991); *Powell v. U.S. Postal Service*, EEOC Appeal No. 01911979 (November 25, 1991). Thus, in order to be similarly situated, the comparative employees must have dealt with the same supervisor and have been subject to the same standards. See *Mitchell v. Toledo Hospital*, 964 F.2d 577, 59 FEP Cases 76 (6th Cir. 1992). The burden rests at all times with Complainant to produce facts establishing such similarly situated individuals. See *McDonnell Douglas*, 411 U.S. at 804.

Even in cases where there are no similarly situated employees, a complainant may be able to establish a *prima facie* case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of a causal relationship between membership in the protected class and the adverse action. See *Ward v. U.S. Postal Service*,

14

EEOC Request No. 05920219 (June 11, 1992), citing *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, FEP Cases (6th Cir. 1975) and *Leftwich v. United States Steel Corporation*, 470 F. Supp. 758 (W.D. Pa. 1979).

Complainant's *prima facie* case fails because she cannot meet prongs two and three of the *McDonnell Douglas* test required to establish a *prima facie* case under Title VII. Although Complainant generally asserts that she was treated differently than her White, male counterparts, she has not identified any specific White, male who was not meeting the legitimate expectations of the position and was treated more favorably under similar circumstances. Mr. Yamamoto maintains that the other Assistant Directors did not have similar problems and complaints against them and "certainly not in terms of quantity and severity" as Complainant had. Ex. 7 at 23. Moreover, Complainant has failed to provide any evidence from which an inference of sex or race discrimination can be drawn. Complainant thus fails to satisfy prongs two and three of the *McDonnell Douglas* test required to establish a *prima facie* case under Title VII. See *Millhouse v. U.S. Postal Service*, EEOC Appeal No. 01973269 (July 1, 1999).

## Sex and Race-based Harassment/Hostile Work Environment

In order to establish a *prima facie* case of hostile work environment, Complainant must show: (1) she belongs to a statutorily protected class; (2) she was subjected to unwelcome conduct related to her protected class; (3) the harassment complained of was based on her statutorily protected class(es); (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with her work performance and/or creating intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. See *Lee v. Department of the Army*, EEOC Appeal No. 01A13242 (January 2, 2003); *Betoni v. U.S. Postal Service*, EEOC Appeal No. 01A14690 (October 24, 2002). The conduct in question is evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. See *Mathis v. Department of the Air Force*, EEOC Appeal No. 01993920 (December 20, 2001).

The Supreme Court has held that a workplace is "hostile" when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment." See *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 81 (1993) (emphasis added). To determine whether a work environment is "hostile," the trier of fact should consider: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct unreasonably interferes with the employee's performance." See *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). As the Supreme Court emphasized, the standards for judging hostility are sufficiently demanding to ensure that anti-harassment laws do not become a "general civility code." See *Oncale,* 523 U.S. at 788. Poignantly, these standards are intended to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* Isolated comments do not rise to the level of conduct which is so severe and pervasive as to alter the conditions of employment and create a hostile work environment. See *Tuck v. Department of Treasury,* EEOC Appeal No. 01986481 (August 27, 2001); *Yake v. Department of the Navy,* EEOC Appeal No. 01951770 (January 5, 1998) (stating "there must be a steady barrage of opprobrious comments and not casual comment or accidental or sporadic conversation . . . .").

Finally, to sustain a hostile work environment claim, Complainant must produce evidence that she was discriminated against because of her protected classes. See *Bryant v. Brownlee,* 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (holding many bosses are harsh, unjust and rude . . . it is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack of linkage or correlation to the claimed ground of discrimination).

Complainant states that management only backed her for the first 30-45 days of her employment. She said that a pending selection action was suspended so she could take the action once she was hired. She says she did not want to select Alarie Shyloon[6] who was recommended by Susan Powers, then one of Complainant's two subordinate supervisors, because she did not believe Ms. Shyloon was best qualified. She indicates, at her request, no action was taken to fill

---

[6] The certificate reflects the candidate's name as Manunata Shyllon. Ex. 21 at 3.

the position at that time. She says prior to her first selection action, she elected to convene a panel to participate in interviews, even though guidance she obtained from HR indicated a panel was not required. The three panel members she designated did not participate in the interviews, and she went forward with her selection without their input. She believes Mr. Yamamoto was upset with her, explaining her action was not consistent with his policy requiring the use of panels, and says he queried her as to the specific action she had taken in making the selection. Because of her completion of a two-week leadership and management course (Ex 34) during the initial year of her GS-14 supervisory/probationary period at Department of Homeland Security, she believes she was fully capable of properly making selections. She indicates, however, Mr. Yamamoto took away her authority to make selections in June. Ex 21.

Complainant provides specific information on the selections she made for two positions. Documentation provided by HR reflects the certificate for the first, a Security Specialist, ZA-0080-04 (vice Kerrick), was issued to her on April 8, 2005. The certificate for the second, a Security Specialist, ZA-0080-03 position (vice Herbert), was issued to her on June 27, 2005. Ex 21. Complainant states she selected Black females for both positions. She says, although she considered Mary Isley least qualified for promotion to a GS-13 position, Messrs. Yamamoto or Bell selected Ms. Isley from a certificate issued to her on June 6, 2005. Ex 21. She believes Mr. Yamamoto also canceled a GS-13 Personnel Security Specialist position (vice Bodin) and opened a GS-13 Information Security Specialist position, specifically to promote Ms. Shyloon. Mr. Bodin transferred to another agency on June 25, 2005 (Ex 22), and there is no documentation showing a certificate for selection to his vacant position was issued to Complainant prior to her detail on July 11, 2005.

Complainant states her two subordinate supervisors, Linda Guier and Ms. Powers were aware Mr. Yamamoto had settled EEO complaints by moving employees who were White males and concludes they would be moved if they complained about her. She said they filed complaints with the Inspector General (IG) and sent letters to the Secretary of Commerce. She indicates that Mr. Bell repeatedly told them to give their new supervisor a chance and find a way to work with her. She says when she spoke with Mr. Yamamoto, he told her he believed there was some truth to their complaints based on the number of complaints they filed. She indicates, while she and

05-51-00166

Mr. Bell did not agree with his decision, Mr. Yamamoto reassigned both Ms. Powers and Ms. Guier to non-supervisory positions in other divisions, where they were to develop programs identified by the IG. She says Ms. Powers physically moved out of the division in late June or early July, but Ms. Guier was never relocated. She believes while in her division, both undermined her authority in an attempt to "get rid of" her. She says two subordinate employees, Ms. Shyloon and Geneva Alston also complained about her.

Complainant states she met with representatives of other agencies concerning Commerce's Declassification Program and learned nothing had been done in two years to meet a Presidential mandate to declassify documents that were over 25 years old by December 31, 2006. She concludes no one in OSY understood what needed to be done. She says, within two months of her assignment, Mr. Yamamoto told her "people believed" she was "making them look bad," and that she needed to "make allies, not enemies."

She states Mr. de Seve who was Assistant Director for Client Security Services Division failed to reprimand his subordinate, Carroll Ward for "giving her orders and making judgment calls." She says Mr. Ward had advised her in an e-mail, dated May 31, 2005, that he needed a determination from her as soon as possible and that "it should not take more than 3-4 working days" for her to make it. She indicates that Mr. Bell told her he did not consider such action an attack or accusation that she had done something wrong. She further indicates that, while Mr. Ward and Richard Duncan refused to cooperate with her efforts, she did receive cooperation from Harold Washington and Dane Woodard. She relates that Mr. Yamamoto and Mr. Bell met with her on June 1 and told her that, based on the number of complaints they were receiving, she had to face up to the fact that people were not cooperating with her because she was doing something wrong. She contends she was doomed to fail, since Mr. Yamamoto and Mr. Bell did not support her, her subordinate supervisors were not qualified for their positions, and her division employees had received no formal training and did not know what they were doing.

She contends Mr. Yamamoto deferred to Messrs. Page and de Seve, both former supervisors of the Counterespionage Division, after they spoke with him about the actions she was taking and that he ignored what she said even when she offered documentation to support it. She makes

specific reference to the detail of Carla Fisher (Ex 22), which she proposed on the advice of OHRM and the Office of General Counsel. She states Mr. Page, as Acting Assistant Director of the Counterespionage Division, had failed to take this action and that Mr. Yamamoto still appeared reluctant to do so. She adds that Mr. Yamamoto also sided with employees who came to him complaining about the way she told them to do their jobs.

She believes Mr. de Seve was defensive of Ms. Powers because of their personal relationship and would discuss action Complainant took affecting her with Mr. Yamamoto. She indicates that, starting in June, Mr. Yamamoto required her to meet with him on a weekly basis to explain what she was doing and how she was doing it, so he would not be surprised at hearing about it from Mr. de Seve. Since information was exchanged during senior staff meetings, she found the weekly meetings with Mr. Yamamoto to be burdensome and humiliating. She states she did meet with Mr. Yamamoto twice, on June 6 and 13, 2005, that a third meeting was precluded by training she attended, and that no further meetings occurred subsequent to her detail.

She recalls that after she brought up a problem at a senior staff meeting concerning a discussion she had with the Office of Personnel Management (OPM) about OSY's failure to upload data to a database for over a year, Mr. Yamamoto became "mad" at her because he previously told her that she "didn't need to open a can of worms" and "expose [their] weaknesses."

She says, although she was notified by Mike Carroll, Director for Administration, Bureau of Industry and Security (BIS) and Doris Brown, Director of Human Resources, International Trade Administration (ITA) that they had each sent letters to Mr. Yamamoto in June 2005 recognizing her work, Mr. Yamamoto failed to acknowledge receiving them.

Complainant further states she did not receive performance standards until May 17, 2005. Ex 18. She indicates that, when Mr. Bell counseled her on July 11, 2005, he held her responsible for: loss of key individuals; individuals actively seeking other employment; low morale; failure to meet, as directed, with the Director in a weekly basis; poor communication, which he described as "rude, harsh and dictatorial"; complaints from field offices; and making changes to policy

without proper approval. She says he also stated he and the Director had lost of confidence in her and that she had attributed her deficiencies to others instead of taking responsibility for them herself.

Complainant said Mr. Bell told her to vacate her office so Mr. de Seve, who was designated Acting Assistant Director of the Counterespionage Division, could "sit in there." This notwithstanding, she believes Ms. Guier actually ran the division from July 12, and that neither Ms. Guier nor Mr. de Seve ever occupied her office. She states that shortly after she resigned, Mr. de Seve assigned her duties to Mr. Woodard, who moved from his office in Gaithersburg to occupy her office. She describes the space she was assigned as a "little hole-in-the-wall," a "cubbyhole hidden in the back" of the Anti-Terrorism Division "across the hall from the Counterespionage Division" and she maintains GS-14's occupied larger and nicer office space. She indicates that she was aware that plans were made, as she was leaving, to convert the space to a "full size office" for an incoming GS-15.

Complainant testifies that, although the Declassification Program was assigned to Ms. Shyloon, a GS-12, who worked under the direct supervision of Ms. Powers, a GS-14, she was now expected to accomplish what they had not. She says Mr. Bell wanted her to meet with him and Mr. Yamamoto weekly to discuss how the action plan she was to prepare was developing and if they would meet the program's December 2006 deadline. She states Mr. Yamamoto had promised the Director of the Information Security Oversight Office that he would develop the Declassification Program and an action plan for meeting the 2006 deadline. She indicates, based on this, the Director had agreed not to report, in a letter to the President, that '"Commerce was at significant risk of failing" for a second year and that what was actually reported was that "there was not enough information to make a determination if Commerce will make the deadline." She concludes this was based on a determination that Commerce did not have the correct format or confidence that anyone in Commerce had the competence needed to accomplish the project. She says she was on sick leave for surgery and mental health days but Mr. Bell sent her e-mail's every day asking for the status of the action plan, directing her to have it completed when she returned to work.

05-51-00166

She says, based on her physician's recommendation, she requested reasonable accommodation for stress on August 17, 2005, asking, specifically, to be moved to another Bureau. (Ex 28)  She indicates that Mr. Bell replied, "you are not under any stress, we just moved you from stress" and explained that he had no one else who would could accomplish the Declassification Program if she were moved.  While Complainant acknowledges there was no one else in her division who could have done it, she maintains Ms. Shyloon "should have been made to perform the duties she was assigned."  Complainant believes Mr. Yamamoto and Mr. Bell wanted her to resign because she "made things come to light that hadn't been done for years" by her "white male predecessors and white female subordinates."

Messrs. Yamamoto and Bell deny Complainant's mid-cycle review, detail, and relocation to other office space were effected in reprisal for protected EEO activity.  They also deny such actions were an attempt to humiliate Complainant or force her to resign.  Ex. 7 and 8.
Mr. Yamamoto states the mid-term review by Mr. Bell reflected previous discussions with Complainant and that an email from Mr. Jamison in OHRM, dated June 17, 2005 (Ex 7), indicates management action to effect Complainant's detail to another position predates her EEO activity. (Ex 2)

Mr. Yamamoto states Complainant had "demonstrated poor leadership, lack of technical competence, and a tendency to mischaracterize issues."  When attempts to assist her proved unsuccessful, Complainant was detailed to other work, equivalent to the GS-15 level, as Special Projects Officer.  The detail was intended to afford her an opportunity to succeed in another assignment within OSY.  He says she was relocated so the Acting Assistant Director of the Counterespionage Division could have access to files kept in a safe in that office and so division employees could have access to their supervisor.  He considers none of the actions taken by management humiliating and adds Complainant gave no indication she perceived any action as such at the time.  Neither does Mr. Yamamoto believe any of the actions taken should have precipitated or warranted her resignation.  He explains the actions taken were due to a loss of confidence in her ability to successfully manage her division, not reprisal for protected EEO activity.

He states Ms. Shyloon continued to perform the day-to-day duties of the Declassification Project and Complainant was responsible for overseeing and executing the project, to include coordination and implementation; engaging other senior officials; and developing an action plan.

He explains that on Ms. Powers' reassignment to the Emergency Management Division, she moved to the Emergency Operations Center where she occupied a temporary workstation until an open cubicle became available. Ms. Guier was reassigned to the Client Services Division, managed by Mr. de Seve [who was later assigned duties as Acting Assistant Director of the Counterespionage Division in addition to those of his own position]. Mr. Bell explains that Ms. Guier was not relocated because space, equivalent to her grade, was not available. Mr. Yamamoto states the area to which Complainant was assigned was previously occupied by a GS-14 and was similar to Complainant's office. He says the Assistant Director for the Anti-Terrorism Division occupied it after Complainant left and plans to enlarge it had been made while she occupied the office. (Ex 7)

He states morale and productivity in the Counterespionage Division dramatically improved with Mr. de Seve's assignment as Acting Assistant Director of the division. Although Mr. de Seve used his own office as his principal location, it was some distance from the Counterespionage Division and he did make use of Complainant's office as needed. He says Mr. Woodard, currently Acting Assistant Director of the Counterespionage Division, now occupies Complainant's former office.

Mr. Yamamoto states Complainant advised Mr. Bell she was suffering from stress, but provided no details. He did not consider her stress condition a disability.

Addressing the mid-cycle review (Ex 7) he issued Complainant, Mr. Bell states members of Complainant's staff were leaving and based on actions she had taken, her employees were filing EEO and IG complaints. He says employees told him they were miserable, that Complainant would not allow them to do their jobs and provided them no guidance, and that communication with her was virtually nonexistent. He indicates they described her as rude, harsh and dictatorial. Several wanted to leave and so many people did leave that a temporary employee was assigned

05-51-00166

to her from the Suitland office. He says, after two days, the employee stated she had never worked in so demeaning an environment and that she wanted to return to her office in Suitland. He believes clients were not receiving the level of service expected. He states the senior person in their Silver Spring office told his supervisor that Complainant would not communicate with his office, gave him incorrect information, or provided him information that was not supported by documentation. He says Complainant had failed to follow guidance in the OSY Security Manual and had a contractor escorted out of the building without review and approval by Mr. Yamamoto. Mr. Bell states, in his meetings with Complainant and Mr. Yamamoto, Complainant would not acknowledge problems in her division even though he and Mr. Yamamoto were dealing with problems there almost every day.

Mr. Bell says, following her reassignment as Special Projects Officer, Complainant was initially assigned the Declassification Project, which required review by 14 Bureaus of thousands of documents and was to be completed by December 2006 under a Presidential Directive. He says, since 50% of the primary personnel involved in the project were at the GS-15 or SES level, Ms. Shyloon, as a GS-12, was not commanding their attention and the project was not going well. He hoped for better cooperation with Complainant's involvement. He testifies Complainant was to develop an Action Plan for the project but after several months, never managed to do so. He had planned to assign Complainant the Decennial Project next and she would have assisted a GS-15 and performed GS-14/GS-15 level work. He states, after Complainant left, the Declassification Project was assigned to the Acting Assistant Director of the Counterespionage Division and is explicitly listed in his FY06 performance plan. Mr. Bell states he has been more involved with it himself, and Ms. Shyloon, now a GS-13, continues her duties with the project.

Mr. Bell denies Complainant's assertion that he sent her e-mail's every day she was on leave. Based on a review of his records, he finds he sent her four e-mail's, one of which merely wished her a speedy recovery, during the 13 days she was absent in July and three e-mail's during the 15 days she was absent in August. He adds that the last of these was a reply to an e-mail she had

sent him that same day. (Ex 27) He indicates he expected her to tell him when she planned to return to work and how soon she would complete the action plan that had been [assigned to her on July 18. Ex 23.

Mr. Bell says counseling was kept private, since only he and Mr. Yamamoto met with Complainant, but she did mention to him once that she felt humiliated. He says he made clear to Complainant and her subordinates that the "reassignment" was a lateral reassignment and he believes anyone would have understood that the Acting Assistant Director of the Counterespionage Division should have access to her office.

Mr. Bell says, although Complainant was absent for several days through July and August, she failed to schedule meetings with Mr. Yamamoto when she was at work. He is aware Complainant took leave for surgery, but he does not know the reason for her surgery. He admits she requested accommodation for stress in August, but provided him only a prescription note with some scribbling on it that was almost illegible. Ex 28. He states HR was reviewing her request when she resigned. He reiterates that while he was aware Complainant had no previous supervisory experience, she was selected because she had responded well to the interview questions. He asserts that, when major problems developed, she was offered assistance and eventually assigned other duties in which, it was hoped, she would succeed. Like Mr. Yamamoto, he states he was surprised by Complainant's resignation.

We find that under a theory of hostile work environment, Complainant fails to establish a *prima facie* case of harassment since there is no absolutely no evidence that the Agency's actions were based on either her race or sex. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17; EEOC Notice No. 915.002 (March 8, 1994), Enforcement Guidance on *Harris v. Forklift Systems, Inc.* at 3, 6. Rather, the evidence clearly establishes that Complainant was simply not meeting management's expectations. Taken as a whole, we find that Complainant has not shown that the actions alleged were sufficiently severe or pervasive as to constitute hostile work environment harassment.

## **Retaliation**

EEOC regulation 29 C.F.R. § 1614.101(b) provides in pertinent part that no person shall be subject to retaliation for opposing any practice made unlawful by Title VII, the Age Discrimination in Employment Act, the Rehabilitation Act, the Equal Pay Act.

In the instant case, Complainant has not offered any direct evidence of retaliation beyond her own subjective belief that actions taken by the Agency were in retaliation for her participation in prior EEO activity.  When a complainant lacks direct evidence on a claim of retaliation, the burden-shifting analysis articulated in *McDonnell Douglas* and its progeny is applied.  See *Jordan v. Department of Education*, EEOC Appeal No. 01A44365 (October 18, 2004).

Specifically, in a reprisal claim, Complainant must establish a *prima facie* case by showing that: (1) she engaged in a protected activity; (2) the Agency was aware of the protected activity; (3) she was subsequently subjected to adverse treatment by the Agency; and (4) a nexus exists between the protected activity and the adverse action. See *Burbey v. Department of Homeland Security*, EEOC Appeal No. 01A43103 (Sept. 14, 2004).  The EEOC has stated that regarding a claim of retaliatory harassment, the harassment must be sufficiently severe or pervasive that it rises to the level "reasonably likely to deter protected activity" by an individual. See EEOC Compliance Manual, § 8, 8-15 (1998).

If Complainant establishes a *prima facie* case of retaliation, the burden shifts to the Agency to communicate a legitimate, non-discriminatory reason for the challenged action; Complainant must then establish by a preponderance of the evidence that the reason proffered by the Agency was not its true reason, but acted merely as a pretext for retaliation. See *Grayson v. Department of the Interior*, EEOC Appeal No. 01A42321 (October 20, 2004) (citing *Hochstadt v. Worcester Found. for Experimental Biology*, 425 F. Supp. 318, 324 (D. Mass), *aff'd*, 545 F.2d 22 (1st Cir. 1976)) (extending application of the disparate treatment framework described in *McDonnell Douglas* to cases of retaliation).

05-51-00166

In the case at hand, Complainant fails to fulfill prong four in the four-prong *prima facie* test enumerated above as she cannot demonstrate a nexus between her protected activity and her detail and voluntary resignation. There is no evidence that the responding management officials ever made any direct statement regarding the EEO claim. Furthermore, the decision to reassign or detail was based on documented deficiencies in her work performance and was in the works well before Complainant contacted the Agency EEO Office.

OHRM Specialist Jamison states Mr. Yamamoto and Mr. Bell initially supported Complainant, but after several months they became concerned with how she was managing her division. He says both advised him that morale was low, employees were looking for other positions, and that an anonymous complaint about her had been made to the Commerce Secretary and the IG. He says they did not expressed similar concerns about other Assistant Directors. He indicates that both spoke with him in early June about detailing Complainant to Special Project Officer duties for a period of time. He believes they considered this to be in the best interest of the organization since Complainant was not performing effectively as an Assistant Director. He believes management intended to assess Complainant's performance during the detail and then make a decision concerning her future placement.

Mr. Jamison states he did not discuss Complainant's reassignment to a position outside OSY with Mr. Bell since Mr. Bell had no authority to make such an assignment. He says Complainant contacted him to request a reassignment outside OSY because she was "dissatisfied," but he explained that management could not direct her reassignment for this reason and that her only recourse was to apply for another position.

Additionally, nowhere in her EEO complaint or her signed declaration does Complainant identify any other incidents which occurred during this time period where she was retaliated against for engaging in protected activity. Complainant offers nothing to substantiate her claims, and indeed cannot offer anything more than her subjective belief that management's actions were of a retaliatory nature, nor can she prove that these actions originated due to her race, sex or participation in EEO activity. Thus, her *prima facie* case of retaliation fails.

26

## **Constructive Discharge**

The test for involuntariness of a resignation action requires that a complainant show that: (1) she involuntarily accepted the terms of the agency; (2) the circumstances permitted no other alternative; and (3) the circumstances were the result of the coercive acts of the agency. See *Henriksen v. Department of Energy*, 79 M.S.P.R. 213, 216 (1998); *West v. U.S. Postal Service*, 44 M.S.P.R. 551, 562 (1990). An involuntary resignation is tantamount to a removal action and is appealable to the Board. See *Camp v. Department of the Army*, 63 M.S.P.R. 1, 3 (1994). The Board has found that where an employee's working conditions are so intolerable that the employee is forced to resign, the employee's resignation is involuntary and constitutes a constructive removal; the ultimate question to be determined is whether the employee's working conditions were so difficult that a reasonable person in the employee's position would have felt compelled to resign. See *Bates v. Department of Justice*, 70 M.S.P.R. 659, 662 (1996); *Jones v. Department of the Navy*, 66 M.S.P.R. 421, 423-24 (1995).

Thus, a complainant who alleges that his/her resignation was involuntary may show "whether the totality of the circumstances supported the conclusion that [he] was effectively deprived of free choice in the matter." See *Heining v. General Services Administration*, 68 M.S.P.R. 513, 519-20 (1995). A complainant's claims that his/her resignation was coerced by harassment, including prohibited discrimination and reprisal for whistleblowing, are appropriate issues for consideration in determining whether the complainant's resignation was involuntary. See *Collins v. Defense Logistics Agency*, 55 M.S.P.R. 185, 188-90 (1992), modified on other grounds by *Ferdon v. U.S. Postal Service*, 60 M.S.P.R. 325, 329-30 (1994); see also *Markon v. Department of State*, 71, M.S.P.R. 574, 580 (1996). Further, to establish involuntariness, it is not necessary for the complainant to prove prohibited discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 or reprisal under the Whistleblower Protection Act of 1989 (WPA), 5 U.S.C. § 2302(b)(8). "Rather ... [he] need only show that 'working conditions were so difficult that a reasonable person in the employee's position would have felt compelled to resign.'" See *Hernandez v. U.S. Postal Service*, 74 M.S.P.R. 412, 417 (1997) (citing *Bates*, 70 M.S.P.R. at 663 (quoting *Hurwitz v. Department of the Army*, 61 M.S.P.R. at 436, 439 (1994)).

It is undisputed in this case that Complainant resigned from her position because she was faced with what *she* perceived to be an unpleasant situation. However, this is far, far short of the kind of conduct the Commission, the MSPB and the Courts have found to constitute coercion. Contrary to Complainant's assertions, the evidence shows that Complainant had choices other than to resign. Primarily, she could have continued working. Although Complainant was detailed to another position for 120 days, that alone would not make a decision to resign involuntary. As the MSPB has made clear, to prove a constructive discharge an employee has an obligation to act reasonably, not assume the worst, and not jump to conclusions too quickly. See *Burton v. Department of the Army*, MSPB Docket No. SF-0752-03-0203-I-2 (October 21, 2004), citing *Miller v. Department of Defense*, 85 M.S.P.R. 310, 321 (2000).

While the evidence suggests some unpleasantries existed in the workplace, even if proven, do not individually, in combination, or in totality show that she was subjected to a hostile or discriminatory work environment such that a reasonable person in her position would have been compelled to resign. The MSPB and the Courts have consistently held that no employee is guaranteed a working environment free of stress, and that dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are generally not so intolerable as to compel a reasonable person to resign. See *Burton v. Department of the Army*, MSPB Docket No. SF-0752-03-0203-I-2 (October 21, 2004), citing *Miller v. Department of Defense*, 85 M.S.P.R. 310, 321 (2000). Moreover, Complainant has not proven her affirmative defense of race and sex discrimination because she has not alleged facts sufficient to make out a *prima facie* case of discrimination or retaliation on any basis. Rather, most of Complainant's arguments in this regard focus on her defense of her work performance and her "belief" that her subordinates and supervisors had orchestrated a campaign of harassment against her. At the very least, Complainant contributed to her own situation by failing to follow established Agency policies. Complainant admits that she was aware that the Agency routinely convened panels when making selections, yet she disregarded this policy and made selections based on her belief that she was sufficiently experienced to do so. Agency employees are expected to respect authority and follow the orders and instructions of supervisory officials. See *Redfern v. Department of Labor*, 58 M.S.P.R. 307, 316 (1993). Further, employees do not have an unfettered right to disregard supervisory instructions; rather an employee must obey the

05-51-00166

agency order, even if she believes it to be improper, and protest the propriety of the order later. See *Howarth v. U.S. Postal Service,* 77 M.S.P.R. 1, 7 (1997). Thus, any loss of confidence or trust by Agency officials was warranted.

As to the second criterion, Complainant failed to show that she was presented with no alternative other than resignation. When she was served with the notice of reassignment, she could have challenged the reassignment rather than submit her resignation. There is no evidence in the record showing that Complainant sought advice or assistance as to her rights to challenge the reassignment or that the Agency was aware that she believed that she was involuntarily submitting her resignation. The fact that Complainant was faced with unpleasant alternatives does not obviate her resignation from being voluntary. Moreover, the record does not support Complainant's contention that she established that her resignation was caused by harassment and coercion. Most of Complainant's arguments in this regard focus on her defense of her work performance.

In sum, we find that Complainant has failed to establish that she was forced to resign from her position and that she was the victim of any prohibited discrimination, harassment and/or reprisal. Although Complainant failed to establish a *prima facie* case of sex and race-based discrimination, retaliation or harassment, we recognize that Complainant's burden to establish a *prima facie* case is not onerous. Thus, we continue our analysis despite the deficiencies in Complainant's *prima facie* evidence.

c.    **The Agency Response**

In order to meet its burden, the Agency need only show that it based its decision on a legitimate consideration and not on an illegitimate one. See *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 (1978). The Supreme Court stated in *Board of Trustees v. Sweeney,* 439 U.S. 24, 25 (1978), that the defendant need not "prove absence of discriminatory motive." Rather, the defendant need only "articulate some legitimate, nondiscriminatory reason for its action." *Id.* In *Texas Department of Community Affairs v. Burdine,* the Supreme Court held that the burden on

29

05-51-00166

the employer is to "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." See *Burdine*, 450 U.S. 257 (1981).

Even if, *assuming arguendo*, Complainant could make out a *prima facie* case of sex and race-based discrimination, harassment or retaliation, the Agency has articulated legitimate, nondiscriminatory reasons for its actions. All of the responding management officials deny that their actions were based on Complainant's race, sex and EEO activity or as a means to discriminate, retaliate or harass her. Through their testimony and production of documentation, Messrs. Yamamoto and Bell address and clearly refute every issue raised by Complainant. Exs. 7 and 8.

Mr. Yamamoto testifies that the morale in Complainant's division had "spiraled downward" and her division became less productive. He said that two higher performers, Katrina Herbert and Michael Bodin, left. He said Mr. Bodin stated that he left because of the way he was being treated. He said Ms. Herbert sent him an email after she left in which she told him that she did not want to leave but thought it best to do so. He said that he perceived her email as a veiled indication of her dissatisfaction with Complainant's supervision. Mr. Yamamoto said that another employee who was assigned to Complainant's office to assist with adjudications asked to return to her own office because she felt the division was dysfunctional and no central guidance or standard procedures were provided. He said Complainant dismissed this complaint and blamed Mr. Bodin for failing to provide her with guidance and direction. Mr. Yamamoto avers that several employees came to him and Mr. Bell complaining of unprofessional treatment by Complainant. He said the employees reported that Complainant was unfair and dictatorial, treating employees like a drill sergeant rather than professional. Employees reported to him that Complainant established arbitrary timeliness; made bad decisions; made decisions despite being informed they conflicted with established procedures; and then blamed them problems resulted.

Mr. Yamamoto avers that despite his and Mr. Bell's efforts, Complainant failed to meet their performance expectations. He said that both he and Mr. Bell wanted her to succeed and provided her with numerous opportunities and assistance to do so. He said Complainant was detailed to

05-51-00166

the assignment of Project Officer in hopes she would succeed. Mr. Yamamoto said that he gave Complainant his full support and even placed OSY credibility on the line as he defended her for several months until it became clear that her management style and performance of her division were not supportable. He said he supported Complainant when she wanted to move three of her subordinates, PettyJohn, Hilton and Alston, and her selection of Wanda Smith for an adjudication position. He said that he supported Complainant in dealing with two of her subordinate supervisors, Guier and Powers, when she complained about them and indicated she needed assistance is dealing with the issue. He said he supported the reassignment of these two supervisors with Complainant's "welcome concurrence." Mr. Yamamoto said that when Complainant was having difficulty finding senior members for one of her security panels, he helped by asking senior members to sit on the panel. He said that when several of her employees complained to him about her, he supported her and her actions.

Mr. Yamamoto further discussed Complainant's selection actions. He said that a selection of Alarie Shyllon for an Information Security vacancy was made prior to Complainant's arrival. Rather than have the Acting Supervisor make the selection, he supported the recommendation of holding off on the formal selection until Complainant arrived in order to give her the opportunity to make the formal selection. He said that Complainant disagreed with the selection of Ms. Shyllon and he supported her decision. Mr. Yamamoto denies that he prevented Complainant from making other selections. He said that she made one selection and the other two selections were made after she was detailed. Mr. Yamamoto further recounts that the two individuals Complainant asked to serve on the panel did, in fact, show up at the time Complainant designated but found she had the door locked and an interview in progress. Ex. 7

Mr. Bell essentially corroborates the testimony of Mr. Yamamoto. Ex. 8.

We find the reasons cited by Messrs. Yamamoto and Bell represent legitimate, non-discriminatory reasons for their actions.

### d.    Pretext

At this point, the burden returns to Complainant to show that the Agency's articulated reasons are a mere pretext for discrimination. Complainant can do this either directly, by showing that a discriminatory reason more likely motivated the agency, or indirectly, by showing that the Agency's proffered explanation is unworthy of credence.

Complainant argues, in effect, that her resignation was involuntary. She asserts that she resigned to remove herself from a hostile work environment. Ex. 1 at 11.because she no longer could

The record contains statements from several individuals who, in their opinion, believe Complainant was subjected to race and sex discrimination and was forced to resign. Exs. 9-13. Yet none of these witnesses testified to actually witnessing, first hand, Messrs. Yamamoto or Bell engage in any discriminatory or harassing behavior toward Complainant. Their respective testimonies are based upon nothing more than pure speculation and hearsay. Kari Reid (White, female, no prior EEO activity, Intelligence Operations Specialist, ZA-0132-IV, and Delores PettyJohn (Black, female, no prior EEO activity), Security Assistant, ZS-0086-III, opine that Messrs. Yamamoto and Bell did discriminate against and harass Complainant. However, both admit they have no direct knowledge of Complainant's treatment and only became aware through Complainant confiding in them. Ex. 9 and 10. We also find Ms. Reid's testimony self-serving and biased because it appears to stem from her own discontent rather than any actual first-hand knowledge of Complainant's alleged mistreatment. The same holds true of the testimony provided by Robert Deats (Hispanic, male, no prior EEO activity), Security Specialist, ZA-0086-III, and Sharrief Nashid (Black, male, no prior EEO activity), Security Specialist, ZA-0080-IV. Exs. 11 and 12. Mr. Nashid, who admits to having no direct knowledge of Complainant's alleged treatment, infers Agency officials discriminate against Blacks and females but also indicates that two White males (Ballard and Silver) were previously "forced out" of their positions by Agency management. More important, however, is that none of the witnesses were in a position to evaluate Complainant's overall performance or have direct knowledge of management's expectations of Complainant's performance.

05-51-00166

While the evidence suggests that "problems" exist within the Counterespionage Division, the evidence simply does not support that the problems are the result of prohibited discrimination. Rather, the problems appear to stem from personality conflicts between Complainant and her staff. Harold Washington (Black, male, no prior EEO activity), Supervisory Security Specialist, ZA-0080-V, in charge of the Census Program within the Client Security Services Division, denies witnessing any inappropriate behavior by Messrs. Yamamoto or Bell. He said he conducted an investigation into an allegation that information regarding Complainant's personal credit was released outside the division. His investigation could not corroborate such an incident occurred, but Complainant did inform him of her perception of the situation. Mr. Washington said that through his interviews of staff within the Counterespionage Division he became aware that there were many "problems" within that division. He did not believe that any of the problems were instituted or initiated by Messrs. Yamamoto or Bell. He said that the problems appeared to between Complainant and her staff. Mr. Washington describes the climate in the Counterespionage Division as a "negative environment" filled with "distrust and confusion." Ex. 13.

Both Messrs. Yamamoto and Bell acknowledge that problems existed within Complainant's division but aver that many of the problems were the result of Complainant's leadership. Both state that the staff complaints were not about being held to task but the "unprofessional manner" in which Complainant managed the employees. Mr. Yamamoto avers that productivity decreased under Complainant's leadership and that after her detail, productivity increased. Ex. 7 at 5. Mr. Yamamoto further avers that Complainant failed to follow Agency policy to hold a panel when making selections, stopped important security functions such as security inspections, pre-appointment checks and temporary clearances without coordinating with her supervisor, demonstrated poor leadership and lack of technical competence, and had a tendency to mischaracterize priorities. He said that despite his and Mr. Bell's efforts to support and assist Complainant to be successful as the Assistant Director for the Counterespionage Division, she was not. He said that since he and Mr. Bell had lost confidence in Complainant, she was detailed

to as a Special Project Officer with the Declassification project as her highest priority. He avers that these duties were "clearly senior level duties, commensurate with her grade level and cleared by OHRM. Ex. 23 at 7 and 17.

After a careful and thorough review of the evidence, we find Complainant has failed to show, by a preponderance of the evidence that any of the Agency's articulated reasons for its actions were pretextual, or were motivated by discriminatory or retaliatory animus. In reaching this conclusion, we are not persuaded that the management actions which formed the basis for the complaint were motivated by other than normal supervisory responsibilities nor are we persuaded that management's actions were so inappropriate under the circumstances that pretext is established. See *Baba v. Department of Veterans Affairs*, EEOC Appeal No. 01985316 (March 30, 2001). Complainant has simply failed to rebut the Agency's assertion that she was not meeting the requirements of her position or management's expectations. Employers generally have broad discretion to set policies and carry out personnel decisions, and should not be second-guessed by reviewing authorities absent evidence of an unlawful motivation. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Complainant's subjective belief that she was being discriminated against or harassed is insufficient as a matter of law to establish that the Agency's explanation for its decision is a mere pretext. The Courts and the Commission have consistently held that a trier of fact cannot find discrimination merely because an employee or adjudicator would have preferred that the employer conduct its business differently. See *Mosby v. General Services Administration*, EEOC Appeal No. 01970179 (October 15, 1999), citing *Bruno v. City of Crown Point, Indiana*, 950 F.2d, 355, 364 (7th Cir. 1991); *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 580 (1978). Moreover, it is not the job of the trier of fact to second-guess the Agency's business decisions and the fairness of those decisions, as long as the Agency's business is conducted in a nondiscriminatory manner. See *Sanchez v. Phillip Morris, Inc.*, 992 F.2d 244 (10th Cir. 1993), *Burdine, supra*.

In sum, the substance of Complainant's allegations concern actions to which she presents no conclusive evidence that any of the claimed actions were objectively offensive, abusive or hostile, and otherwise taken in order to harass her because of her race, sex or EEO activity. The majority of the actions complained of are common workplace occurrences, and unless it is reasonably established that the actions were somehow abusive or offensive, and were taken in order to harass Complainant on the basis of her protected class, such everyday events are not sufficiently severe or pervasive so as to offend the general sensibility of an individual experiencing such occurrences in the workplace. See, in pertinent part, *Kelly v. Social Services Administration Agency*, EEOC Appeal No. 01A14037 and 01A14867 (December 12, 2002), citing *Wolf v. U.S. Postal Service*, EEOC Appeal No. 01961559 (July 23, 1998) and *Long v. Veterans Administration*, EEOC Appeal No. 01950169 (August 14, 1997); *Bennett v. Department of the Navy*, EEOC Request No. 05980746 (September 19, 2000). Accordingly, Complainant failed to establish that she was subjected to prohibited discrimination or harassment.

## V.    DECISION

We find no violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to the matters alleged.

## VI.    ATTORNEY'S FEES

An attorney did not represent Complainant during the processing of her complaint but she is not a prevailing party. Therefore, an award of attorney's fees is not appropriate. See 29 C.F.R. §§ 1614.110 and 1614.501(e).

05-51-00166

## VII.   RIGHT TO APPEAL

The record reflects that the claim in this complaint, alleged constructive discharge, is an action appealable to the MSPB. Consequently, Complainant's appeal rights in connection with this decision are properly under the jurisdiction of the MSPB in accordance with 29 CFR, Part 1614.302, *et. seq.,* and are as follows:

1. If the Complainant is dissatisfied with this decision, she has the right to appeal the matter to the MSPB (not the EEOC) within **30 calendar days** of receipt of this correspondence. Any appeal should be forwarded to the MSPB, Washington DC Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, VA 22314-2840, with a copy provided to Susan E. Thomas, Acting Chief, Program Implementation Division, Office of Civil Rights, Room 6012, U.S. Department of Commerce, Washington, D.C. 20230.  Any statement or brief submitted in support of the appeal must be submitted to both the MSPB and the Department at the addresses provided within **30 calendar days** of filing the Notice of Appeal; or

2. Complainant may file a civil action within 30 days of receipt of notice of the final decision or action taken by the MSPB if she does not file a petition for consideration with the EEOC.  If Complainant does not file an appeal with the MSPB, she has the right to file a civil action in Federal district court within **30 calendar days** of receipt of this correspondence; and as further described at 29 C.F.R § 1614.310(a).

3. Complainant is further notified that if she files a civil action, she must name the appropriate Department or Agency head as the defendant and provide his or her official title. **DO NOT NAME JUST THE AGENCY OR DEPARTMENT**.  Failure to name the head of the Department or Agency or to state his or her official title may result in the dismissal of the case. The appropriate Agency is the Department of Commerce. The head of the Department of Commerce is **Carlos M. Gutierrez**, who is the Secretary of Commerce.

05-51-00166

4. The complaint number identified in the first paragraph of page 1 of this letter should be used on all correspondence.

*Susan E. Thomas*

Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights

*December 21, 2005*

Date Issued

Enclosure

05-51-00166

### Certificate of Service

I attest that a copy of this Final Agency Decision has been sent to the parties below:

**<u>By Certified Mail:</u>**

Ms. Parthenia Richardson
12604 Windbrook Drive
Clinton, MD 20735

**<u>Other:</u>**

Bernadette M. Worthy
EEO Officer, OSY

Complaint File (Tab Mc)

OCR Chron File

_____
Signature

DEC 2 2 20__
_____
Date

OMB No. 3124-0009

# MERIT SYSTEMS PROTECTION BOARD
# APPEAL FORM (MSPB FORM 185)

## INSTRUCTIONS FOR COMPLETING YOUR APPEAL

**GENERAL:** This form is intended to help you provide the Board with the information we need to process your appeal. We need this information to help us determine whether the Board has jurisdiction over your appeal, whether it has been filed within the applicable time limit, and what claims you are raising. You do not have to use this form to file an appeal with the Board. However, if you do not, your appeal must still comply with the Board's regulations. See 5 C.F.R. Parts 1201, 1208 and 1209. The Board will expect you to become familiar with these regulations, which are available on the MSPB website—www.mspb.gov—and in MSPB offices, agency personnel offices, agency libraries, and most public libraries. The Board's website also contains an electronic version of this form, addresses and telephone numbers of the MSPB regional and field offices, and additional information that explains the Board's practices and procedures.

**WHAT PARTS TO COMPLETE:** You may use this form for any of the following matters over which the Board has jurisdiction:

☐ An appeal of a Federal agency personnel action or decision that is appealable to the Board under a law, rule, or regulation;

☐ An appeal of an administrative decision or action by the Office of Personnel Management (OPM) or a Federal agency affecting your retirement rights or benefits;

☐ An Individual Right of Action (IRA) appeal under the Whistleblower Protection Act (WPA);

☐ An appeal under the Uniformed Services Employment and Reemployment Rights Act (USERRA); or

☐ An appeal under the redress procedure of the Veterans Employment Opportunities Act (VEOA).

Complete **Part 1** of this form regardless of which type of appeal you are filing. **Your appeal must contain your signature, or the signature of your representative, in question 12 of Part 1. If it does not, your appeal will be rejected and returned to you.**

Complete **Part 2** if you are appealing a Federal agency personnel action or decision. See 5 C.F.R. 1201.24(a).

Complete **Part 3** if you are appealing an administrative decision or action affecting your retirement rights or benefits. See 5 C.F.R. 1201.24(a).

You may raise certain other claims in connection with an appeal of an agency personnel or retirement action or decision. If you wish to raise any of these claims at this time, check the appropriate box (or boxes) in **Part 4** and provide supporting information as an attachment to this form. You may raise such claims and provide the information later—but no later than the close of the conference(s) held to define the issues in your appeal. See 5 C.F.R. 1201.24(b).

Complete **Part 5** ONLY if you are filing one of the following types of appeals:

☐ An IRA appeal under the WPA. See 5 C.F.R. 1209.6;

☐ A USERRA appeal. See 5 C.F.R. 1208.13; or

☐ A VEOA appeal. See 5 C.F.R. 1208.23.

If you complete Part 5, you **must** provide the additional information required by the Board's regulations for the particular type of appeal as an attachment to this form. The Board may consider ONLY the claim that the agency violated the particular law involved and may NOT consider the merits of the underlying action or decision.

If you wish to designate someone to represent you in this appeal, also complete and **sign Part 6, Designation of Representative.** See 5 C.F.R. 1201.31.

**If you prefer to file your appeal electronically, please visit the MSPB website—www.mspb.gov—and follow the link to e-Appeal.**

MSPB Form 185, Page 1 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

## PART 1 – Appellant and Agency Information

Complete this part of the form which applies to your appeal. If you are filing, then proceed to Part 2 if you are appealing an agency personnel action or decision; to Part 3 if you are appealing an administrative decision or action affecting your retirement rights or benefits; or to Part 5 if you are filing an IRA appeal, USERRA appeal, or VEOA appeal.

*Please type or print legibly.*

**1. Name** *(last, first, middle initial)*

**2. Present address** *(number and street, city, State, and Zip code)*
**You must notify the Board in writing of any change in your mailing address while your appeal is pending.**

Address:

City, State, Zip code:

**3. Telephone Numbers** *(include area code)* **and E-Mail Address**
**You must notify the Board in writing of any change in your telephone number(s) or e-mail address while your appeal is pending.**

Home: ( )          Work: ( )          FAX: ( )          Other: ( )

E-mail Address:

**4. Name and address of the agency that took the action or made the decision you are appealing** *(include bureau or division, street address, city, State and Zip code)*

Agency Name:

Bureau:

Address:

City, State, Zip code:

**5. Your Federal employment status at the time of the action or decision you are appealing:**

[ ] Permanent          [ ] Temporary          [ ] Term

[ ] Seasonal          [ ] Applicant          [ ] Retired

[ ] None

**6. Type of appointment (if applicable):**

[ ] Competitive          [ ] Excepted

[ ] Postal Service          [ ] SES

[ ] Other *(describe):*

**7. Your position, title, grade, and duty station at the time of the action or decision you are appealing (if applicable):**

Occupational Series:          Position Title:

Grade:          Duty Station:

**8. Are you entitled to veterans' preference?**
**See 5 U.S.C. 2108.**

[ ] Yes          [ ] No

**9. Length of Government service (if applicable):**

**10. Were you serving a probationary or trial period at the time of the action or decision you are appealing?**

[ ] Yes          [ ] No

MSPB Form 185, Page 3 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

## PART 2 – Agency Personnel Action or Decision (non-retirement) (continued)

18. Explain briefly why you think the agency was wrong in taking this action or making this decision.

19. What action would you like the Board to take in this case (i.e., what remedy are you asking for)?

20. **With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a** grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

[ ] Yes                    [ ] No

If "Yes," **attach a copy of the grievance**, enter the date it was filed *(month, day, year)*, and enter the place where it was filed **if different from your answer to question 4 in Part 1:**

Agency Name:                              Date Filed:

Bureau:

Address:

City, State, Zip code:

If a decision on the grievance has been issued, **attach a copy of the decision** and enter the date it was issued *(month, day, year)*:

## PART 3 – OPM or Agency Retirement Decision or Action
Complete this part if you are appealing an administrative decision or action by the Office of Personnel Management (OPM) or a federal agency affecting your rights or benefits under the Civil Service Retirement System (CSRS) or the Federal Employees' Retirement System (FERS). See 5 C.F.R. 1201.3(a)(6). If the decision or action is appealable to the Board, you should have received a final decision from OPM or the agency that informs you of your right to file an appeal with the Board.

21. In which retirement system are you enrolled?

[ ] CSRS         [ ] CSRS Offset         [ ] FERS

[ ] Other, *describe*:

22. Are you a:

[ ] Current Employee                    [ ] Annuitant

[ ] Surviving Spouse

[ ] Other, *describe*:

MSPB Form 185, Page 5 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

# PART 4—Other Claims
## (continued)

30. Check the appropriate box (or boxes) for any claim(s) that you wish to raise at this time **in connection with the action or decision you are appealing in Part 2 or Part 3**, and provide supporting information as an attachment to this form:

[ ] A claim that the agency made errors in applying required procedures (harmful error), that the agency action or decision was the result of a prohibited personnel practice, or that the agency action or decision was not in accordance with law. See <u>5 C.F.R. 1201.56</u>(b) **and (c)(3).** For prohibited personnel practice claims, also **see 5 U.S.C. 2302(b).**

[ ] A claim that the agency action or decision was the result of prohibited discrimination (race, color, religion, sex, national origin, disability, age). See <u>5 C.F.R. 1201.151 and 1201.153</u>. If you previously filed a **formal discrimination** complaint concerning the action or decision you are appealing, **attach a copy of the complaint.** If the agency has issued a final decision on your discrimination complaint, **attach a copy of the decision.**

[ ] A claim that the agency action or decision was based on whistleblowing. See 5 U.S.C. 2302(b)(8), <u>5 C.F.R. 1209.2</u>(b)(2), and <u>5 C.F.R. 1209.6</u>(a). If you previously sought corrective action from the Office of Special Counsel (OSC) and the same agency action or decision you are appealing, attach a copy of your **request to OSC** for corrective action. If you have received written notice from OSC of your right to appeal to the Board, **attach a copy of the OSC notice.** Also **see** <u>5 C.F.R. 1209.8</u> and <u>1209.9</u> if you wish to request a stay of the agency action or decision.

[ ] A claim that the agency violated your rights under the Uniformed Services Employment or Reemployment Rights Act (USERRA) (other than rights related to the Thrift Savings Plan for Federal employees) in taking the action or making the decision. **See 38 U.S.C. 4322 and <u>4324</u>, <u>5 C.F.R. 1208.11</u>, and <u>5 C.F.R. 1208.13</u>.** If you previously filed a USERRA complaint with the Department of Labor (DOL) on this matter, **attach a copy of the complaint.** If you have received written notice from DOL that your USERRA complaint could not be resolved, **attach a copy of the DOL notice.**

[ ] A claim that the agency violated a law or regulation relating to veterans' preference in taking the action or making the decision. **IMPORTANT:** If you choose to make your veterans' preference claim in connection with this appeal of an agency action or decision, you may NOT also file a complaint under the redress procedure of the Veterans Employment Opportunities Act (VEOA) with DOL. See <u>5 U.S.C. 3330a</u>(e) and <u>5 C.F.R. 1208.26</u>.

# PART 5—IRA Appeal, USERRA Appeal, or VEOA Appeal

Complete the applicable question in this part ONLY if you are filing an Individual Right of Action (IRA) appeal under the Whistleblower Protection Act, a Uniformed Services Employment and Reemployment Rights Act (USERRA) appeal, or a Veterans Employment Opportunities Act (VEOA) appeal.

Before you may file an IRA appeal with the Board, you must first file a whistleblower complaint with the Office of Special Counsel (OSC) and exhaust the procedures of that office. See 5 C.F.R. 1209.2(b)(1). To pursue redress for a USERRA violation, you may either file a USERRA complaint with the Department of Labor (DOL) or file an appeal with the Board. However, if you filed a USERRA complaint with DOL, you must exhaust DOL procedures before you may file an appeal with the Board. See 5 C.F.R. 1208.11. Before you may file a VEOA appeal with the Board, you must first file a VEOA complaint with DOL and allow DOL at least 60 days to try to resolve the matter. See 5 C.F.R. 1208.21.

## Answer Question 31 ONLY if you are filing an IRA appeal.

31. Have you exhausted OSC procedures with respect to your whistleblower complaint, i.e., with respect to the same disclosure(s) and the same agency action or decision underlying your IRA appeal?

[ ] Yes          [ ] No

If "Yes," **attach a copy of your complaint to OSC**, provide the information required by the Board's regulations at <u>5 C.F.R. 1209.6(a)</u> as an attachment to this form, and explain what action you would like the Board to take in this case. If you have received written notice from OSC of your right to file an IRA appeal with the Board, **attach a copy of the OSC notice.** Also **see** <u>5 C.F.R. 1209.9</u> if you wish to request a **stay** of the agency action or decision.

COPY

## FedEx Express — US Airbill

FedEx Tracking Number: **8526 6295 5288**

SPH1
Sender's Copy

Sender's FedEx Account Number: **1505-3924-7**

Sender's Name: **ALICIA J. DAVIS**   Phone ( **202** ) **482-2835**

Company: **OFFICE OF SECRETARY**

Address: **1401 CONSTITUTION AVE NW**

City: **WASHINGTON**   State **DC**   ZIP **20230-0001**   Dept./Floor/Suite/Room

Your Internal Billing Reference: **551053200001M 2240**

To: **Ms. Parthena Richardson**   Phone

Address: **12604 Wintbrook Drive**

City: **Clinton**   State **MD**   ZIP **20735**

**4a Express Package Service**   *Packages up to 150 lbs.*
- [ ] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service**   *Packages over 150 lbs.*
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**
- [ ] FedEx Envelope
- [ ] FedEx Pak
- [x] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling**
- SATURDAY Delivery
- HOLD Weekday at FedEx Location
- HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?
- [ ] No
- [ ] Yes — Shipper's Declaration not required
- [ ] Yes — As per attached Shipper's Declaration
- [ ] Dry Ice

Cargo Aircraft Only

**7 Payment** *Bill to:*
- [ ] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight    Total Declared Value  $ .00

**8 Sign to Authorize Delivery Without a Signature**

**466**

0311247903

Try online shipping at fedex.com
By using this Airbill you agree to the service conditions on the back of this Airbill
and on our current Service Guide, including terms that limit our liability.
Questions? Visit our Web site at fedex.com
or call 1.800.GoFedEx 1.800.463.3339.

**EXHIBIT 30**

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| BERRY, TRACEY P | | | 01/22/06 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 101 | CAREER COND APPT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| BWA | SEE BELOW | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

**7. FROM: Position Title and Number**

**15. TO: Position Title and Number**
SUPVY SECUR SPECLST
OA          060012

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ZA | 0080 | 05 | 01 | 107,521.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 107,521.00 | .00 | 107,521.00 | .00 |

**14. Name and Location of Position's Organization**

**22. Name and Location of Position's Organization**
OFFICE OF THE SECRETARY
CHF FINCL OFCR AND A/S FOR ADM
OFC OF SECURITY
COUNTER-ESPIONAGE DIVISION

CM 511104000200000000    PP 02 2006

| EMPLOYEE DATA | | | |
|---|---|---|---|
| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
| 1  1-None  2-5 Point  3-10 Point/Disability  4-10 Point/Compensable  5-10 Point/Other  6-10 Point/Compensable/30% | 2  0-None  1-Permanent  2-Conditional  3-Indefinite | | YES  X NO |
| 27. FEGLI | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| Z5 | 9  NOT APPLICABLE | | 0 |
| 30. Retirement Plan | 31. Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| K | | F  FULL TIME | |

| POSITION DATA | | | |
|---|---|---|---|
| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
| 1  1-Competitive Service  2-Excepted Service  3-SES General  4-SES Career Reserved | E  E-Exempt  N-Nonexempt | | 8888 |
| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) | | |
| 11-0010-001 | WASHINGTON    DIST OF COLUMBIA    DC | | |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

APPOINTMENT AFFIDAVIT EXECUTED
SELECTED FROM                    DATED

POSITION IS AT THE FULL PERFORMANCE LEVEL.
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.
HEALTH BENEFITS COVERAGE CONTINUES.
CREDITABLE MILITARY SERVICE:  00 YRS.  00 MOS.
ANNUAL AND SICK LEAVE BALANCES TO BE TRANSFERRED.
APPOINTMENT IS SUBJECT TO COMPLETION OF ONE YEAR INITIAL PROBATIONARY
PERIOD BEGINNING  01/22/06 .
SERVICE COUNTING TOWARD CAREER TENURE FROM  01/22/06 .

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF COMMERCE | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | MARY E. King |
| CM 51 | 1702 | 01/20/06 | HUMAN RESOURCES OFFICER |

TURN OVER FOR IMPORTANT INFORMATION
3-Part    50-315

1 - Employee Copy - Keep for Future Reference

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

**EXHIBIT 31**

**UNITED STATES DEPARTMENT OF COMMERCE**
Chief Financial Officer
**Assistant Secretary for Administration**
Washington, D.C. 20230

Parthenia Richardson
12604 Windbrook Avenue
Clinton, MD 20735

SEP 1 6 2005

Complaint Number: 05-51-00166

Dear Ms. Richardson:

This is in reference to the mixed case complaint[1] filed by you on August 8, 2005.  The
Department of Commerce has decided to accept the following bases and claims for investigation.

Complainant, formerly the Assistant Director for Counter Espionage, GS-15, Office of
Security, Office of the Secretary, alleges that she has been subjected to a continuous pattern
of discrimination and harassment constituting a hostile work environment due to her race
(black) and sex (female).  She cites the following:

1.  During the period of May to June 2005, Richard Yamomoto did not support her as a
    supervisor and challenged her employment actions, despite her having obtained guidance
    from the Office of Human Resources and the Office of General Counsel.

2.  In June 2005, Yamomoto took away her ability to make supervisory decisions, including
    hiring selections.

3.  Since June 2005, Yamomoto requires her to meet him on a weekly basis for 30 minutes to
    discuss supervisory decisions and duties.

4.  During the period of May to June 2005, Yamomoto failed to provide her any positive
    feedback, despite receiving positive feedback from two major clients, and also failed to
    openly acknowledge her contributions to the organization.

5.  During the period of April to June 2005, Yamomoto undermined her authority with staff
    by allowing them to come directly to him with their concerns and siding with them on
    controversial matters without first obtaining her rationale for employment decisions and
    actions.

6.  In May 2005, Yamomoto allowed her Caucasian male counterparts and subordinate staff
    to communicate with her in a disrespectful and condescending manner.

7.  During the period of April to May 2005, Yamomoto treated her with hostility and openly
    challenged any statements she made in staff meetings or other open forums.

---

[1] The Equal Employment Opportunity Commission regulations define a "mixed case" complaint as one in which the
alleged discriminatory act is related to or stems from an action that is appealable to the Merit Systems Protection Board.
See Title 29, Code of Federal Regulations, section 1614.302(a)(1).

4                    1

8. On June 1, 2005, Yamomoto told her that he, his colleagues, and his staff did not have confidence in her ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about her coming on board he now had doubts. At that time, Yamomoto also stated that he had no more "blue chips" available, and that he has used them all up.

In addition to discrimination and harassment constituting a hostile work environment due to her race and sex, Complainant also alleges retaliation for having engaged in the EEO complaints process when:

9. On July 11, 2005, she was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, she was being temporarily reassigned from her position as Assistant Director for the Counterespionage Division for a period of 120 days. She also learned that Thomas de Seve, a Caucasian male counterpart, was assigned to assume her responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave Complainant a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, she was informed that she was to move out of her office so that de Seve could occupy her space. She contends that de Seve already had adequate space which would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. Complainant further contends that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under her supervision on May 9, 2005, yet were not required to relocate.

12. She was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to her on her reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, she spoke to Bell and requested reasonable accommodation, as recommended by her physician for stress and Bell commented, "You are not under any stress, we just moved you from stress." [2]

15. As a result of the refusal to comply with her request concerning the stress and to escape the hostile work environment, she "submitted an involuntary termination" (i.e. constructive discharge) on September 6, 2005.

---

[2] While the Complainant has not specifically added the basis of disability (stress) to her complaint, she may raise this basis with the Investigator during the course of the investigation.

<u>Rights and Responsibilities</u>

- If you believe that the issue(s) in your complaint has/have not been correctly identified, the Chief, Compliance Division must be notified at the address shown below, in writing, within 15 calendar days after receipt of this Notice, specifying why you believe that the issue(s) has/have not been correctly identified.

- An investigator will soon contact you to receive your sworn or affirmed statement and the evidence you possess. You and your representative, if represented, will receive a copy of the final Report of Investigation upon its completion.

- The investigation must be completed within 120 days from the filing of the mixed case complaint, unless you and the Department agree on an extension. *See* Title 29, Code of Federal Regulations (C.F.R.) section (§) 1614.108(e) Therefore, it is essential that when the investigator asks you for the information to support your complaint, you or designated representative promptly provide it.

- You may amend your formal complaint at any time before the investigation is complete. *See* 29 C.F.R. § 1614.106(d). New claims must be like or related to the claims raised in the original complaint. For example, if the original complaint concerns a Performance Improvement Plan, a new claim concerning his/her subsequent performance rating would be "like or related." A new claim concerning his/her time and attendance would not.

- Inasmuch as this is a mixed case, you are not entitled to a hearing. You will receive a Final Agency Decision within 45 days of the date the investigation is completed.

- If a final decision is not issued within 120 days of filing of the mixed case complaint, you may appeal the matter to the MSPB at any time thereafter as specified in 5 C.F.R. § 1201.154(b)(2) or you may file a civil action as specified at 1614.310(g), but not both. *See* 29 C.F.R. § 1614.302(d)(1)(i).

- We may dismiss the complaint if you fail to cooperate with the investigation.

- If the EEO Officer/Counselor informed you or your designated representative that Alternative Dispute Resolution, through mediation, is an appropriate option in this complaint, you and/or your designated representative, have a right to choose mediation at any time during the processing of your formal complaint, including during the investigation. *(The DOC EEO Alternative Dispute Resolution: Mediation Guide* identifies the following cases where mediation is inappropriate: cases involving applicants for employment, former employees, alleged violence, egregious harassment, adverse actions, class actions, when authoritative resolution of a matter is required in precedent-setting cases, when the matter in dispute has significant government policy implications, or when it is important to produce a full public record of the proceedings.)

3

4    3

For your information, I have enclosed an information sheet on EEO Complaint Investigations and EEO mediation.

Amendments to formal complaints, copies of hearing requests, and requests for corrections to the statement of claims should be sent to:

Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights, Room 6012
U.S. Department of Commerce
Washington, D.C. 20230

Requests for mediation and a copy of the ADR Program Guide should be addressed to the servicing EEO Officer or:

Bernadette M. Worthy
Chief, Client Services and Resolution Division
Office of Civil Rights, Room 6012
U.S. Department of Commerce
Washington, DC 20230

Sincerely,

Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights

Enclosures

## CERTIFICATE OF SERVICE

I attest that a copy of this Notice of Acceptance of a Mixed Case Complaint for Investigation has
been sent to the parties listed below:

By Certified Mail:

Parthenia Richardson
12604 Windbrook Avenue
Clinton, MD 20735

Other:

Bernadette M. Worthy
Chief, Client Services and Resolution Division, Office of Civil Rights

Investigation Team

Subject Tab (Tab F)

OCR Chron File


Signature

SEP 16

Date



# Complaint Investigations

The Office of Civil Rights (OCR) manages the Department of Commerce's Equal Employment Opportunity (EEO) and Sexual Orientation Discrimination complaint processes. This fact sheet includes basic information about complaint investigations.

**OCR Quick Facts**

**Q. Who conducts complaint investigations?**

A. OCR assigns Investigators to collect information on all EEO and Sexual Orientation Discrimination complaints that are accepted for processing.

**Q. What is the role of the investigator?**

A. Investigators develop evidence related to the complaint by interviewing complainants, management officials, and other witnesses and collecting documents. They do not determine whether a law has been violated, or give advice to the complainant or other witnesses.

**Q. What happens during the investigation ?**

A. During each interview, investigators should:
- introduce themselves;
- show a letter of authority and explain the purpose of the interview;
- answer questions about the rights and obligations of witnesses;
- state the desire of the Department to process the complaint as promptly as possible;
- take testimony by asking questions; and
- collect documentary evidence and statistical data.

**Q. How is testimony taken during the investigation?**

A. Testimony is usually summarized in signed statements, also called declarations. Other methods may be used, including:
- sending interrogatories, or questions to be answered in writing; and
- gathering evidence through a fact-finding conference, in which testimony is recorded by a court reporter.

Whatever method is used, witnesses swear to the truth of their testimony under penalty of perjury.

OCR determines the method of investigation.

**Q. What is the deadline for completing investigations?**

A. OCR must complete its investigation within 180 calendar days after the date a complaint is filed.

In some cases, the deadline may be extended.

- **If the complainant and OCR agree that more time is needed**, it may be extended for up to 90 days.

- **If a complaint is amended,** i.e., the complainant adds new allegations that are accepted for processing, the deadline is adjusted so that the agency must complete its investigation within the earlier of 180 days after the last amendment to the complaint or 360 days after the filing the original complaint.

- **When a complaint has been consolidated with an earlier filed complaint,** the agency must complete its investigations within the earlier of 180 days after the filing of the last complaint or 360 days after the filing of the original complaint.

*Office of Civil Rights, US Department of Commerce, Room 6012, Washington, DC 20230*
*www.osec.doc.gov/ocr | 202/482-4993 (V) TTY Users: Call via the Federal Relay Service at 1-800-877-8339.*

4    6

**Q. Is Alternative Dispute Resolution (ADR) available in the formal EEO complaint process?**

**A.** Yes. It is available if the Departmental EEO ADR Manager has determined the conflict is suitable for ADR. Complainants are informed through a Notice of Investigation memorandum of the possibility of ADR. If the employee elects ADR and management agrees to participate, arrangements will be made for a mediator and the mediation session.

**Q. What if resolution if not reached through mediation?**

**A.** If resolution is not reached through mediation, the complaint will be returned to the stage in the complaint process where it originated for further processing.

**Q. Are Commerce employees required to participate in investigations?**

**A.** Yes. All Department employees are required to cooperate with EEO Investigators.

An employee may have do the following:

• meet with the Investigator and answer questions;
• sign a sworn statement summarizing answers provided during the interview;
• give the Investigator the names of other people with information about the complaint; and/or
• provide documentary evidence related to the complaint.

**Q. Does the investigator file a report of investigation?**

**A.** Yes. The Report of Investigation (ROI) includes the Investigator's summary of the evidence, procedural correspondence, documents and statistics collected by the Investigator and declarations.

The ROI is sent by certified mail to the complainant and the complainant's representative, if any, unless other arrangements have been made with OCR.

*Unauthorized disclosure by anyone of personal information containing in the ROI is prohibited.*

**Q. What happens after the investigation?**

**A.** In most EEO complaints, complainants may choose to:
• have the Equal Employment Opportunity Commission (EEOC) conduct a hearing; or
• request a final decision by the Department of Commerce without a hearing.

In a Sexual Orientation Discrimination Complaint, the Department will issue a final decision within 60 days after the ROI is issued.

With the ROI, complainants are also sent a letter that outlines their rights and the next steps in the complaint process.

---

**Reasonable Accommodations:** Individuals who need an accommodation to participate in the EEO or Sexual Orientation Discrimination Complaint processes (e.g., sign language interpreter, print materials in accessible format) should inform the bureau EEO Office or OCR so appropriate arrangements can be made.

---

*Published January 2003*

*This document is intended as a general overview and does not carry the force of legal opinion.*

4    7

# EEO Mediation



*The Department of Commerce offers EEO Mediation as an alternative to the EEO and Sexual Orientation Discrimination Complaint Processes for current employees.*

*To find out if your case is appropriate for mediation, contact Bonnie Worthy, Chief of the Client Services and Resolution Division at 202/482-8121. (TTY Users, call via the Federal Relay Service at 1-800-877-8339.)*

EEO Mediation is a fair and efficient process that helps employees and managers resolve employment disputes. A trained mediator assists the parties in reaching a voluntary negotiated agreement. Choosing mediation does not suspend the EEO complaint in process. Your complaint continues to be processed during mediation. Complaint processes are not discontinued until a settlement agreement is finalized. To learn more about the EEO Mediation, see the OCR website at www.osec.doc.gov/ocr.

## CHOOSE EEO MEDIATION TO RESOLVE EMPLOYMENT DISCRIMINATION CLAIMS:

**Issues are Resolved Faster and More Efficiently -** Most Mediation is completed in one or two sessions with less financial and emotional cost to both parties.

**Mediation Offers More Flexibility and Control -** The process is informal and flexible: parties may bring attorneys or other representatives, but there are no rules of evidence and no witnesses. Parties negotiate their own settlement and have more control over the outcome of their dispute.

**Participants can Create Win-Win Solutions That Meet Both Parties' Needs –** Mediation settlements are mutually agreed upon and address the concerns of both parties.

**Mediation is a Confidential Process –** No records of discussions are kept and parties agree to keep the proceedings confidential.

**Preservation of Relationships –** The cooperative forum of mediation often preserves relationships in ways that would not be possible in traditional adversarial decision-making processes.

U.S. Department of Commerce - Office of Civil Rights
February 2005



4    8