# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| PARTHENIA RICHARDSON | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 06-00517 (ESH) |
| v. | ) |
| | ) |
| CARLOS M. GUTIERREZ, | ) |
| SECRETARY | ) |
| U.S. DEPARTMENT OF COMMERCE | ) |
| | ) |
| Defendant. | ) |

_____

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Plaintiff Parthenia Richardson, by and through her undersigned counsel, hereby respectfully opposes and responds to Defendant's Motion to Dismiss and for Summary Judgment. As set forth in Plaintiff's accompanying Memorandum of Points and Authorities, Plaintiff states a claim upon which relief can be granted. In support thereof, Plaintiff submits the attached Opposition.

Dated: December 11, 2006                    Respectfully submitted,


_____/s_____
Camilla C. McKinney, Esq.
Law Offices of Camilla C McKinney, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C. 20005
(202) 861-2934/(202) 514-9111 (fax)
Attorney for Plaintiff Parthenia Richardson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**PARTHENIA RICHARDSON**

                         Plaintiff,

           v.

**CARLOS M. GUTIERREZ, SECRETARY U.S. DEPARTMENT OF COMMERCE**

                     Defendant.

_____

)
)
)
)
)
)
)   Civil Action No. 06-00517 (ESH)
)
)
)
)
)
)
)
)

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

        Plaintiff, Parthenia Richardson ("Plaintiff Richardson" or "Ms. Richardson"), by and through her undersigned attorney, hereby opposes Defendant's Motion to Dismiss and for Summary Judgment. As set forth in her Amended Complaint, Ms. Richardson brings this action against the U.S. Department of Commerce ("DOC" or "the Agency") for damages based on the denial of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e, *et seq*. (hereafter "Title VII"). The Agency retaliated against Ms. Richardson by reassigning her and treating her differently than other similarly situated managers when she engaged in activities protected by Title VII. In support thereof, Plaintiff Richardson submits this Memorandum.[1]

---

[1] Ms. Richardson also alleged that the Agency interfered with, restrained and denied her the exercise of her rights under the Family and Medical Leave Act of 1993 ("FMLA"). While Ms. Richardson believes that she can establish this claim, these allegations are not central to a full recovery in this case. Accordingly, Ms. Richardson will not pursue her FMLA claim.

## I.    INTRODUCTION

On February 20, 2005, the Agency selected Ms. Richardson to serve as a Supervisory Security Specialist, ZA-0080-V (GS-0080-15 equivalent), Assistant Director of the Counter Espionage Division, Office of Security (hereafter "OSY"), Office of the Secretary, United States Department of Commerce (hereafter "DOC"), in Washington, DC.  Prior to this appointment, which was a promotion, Ms. Richardson served as a Security Specialist, GS-0080-14, in the Department of Homeland Security (DHS).

Ms. Richardson was the only African-American female to ever hold the Assistant Director for Counter Espionage position in OSY.

When Ms. Richardson assumed her new position, she met with Richard Yamamoto, her second-line supervisor of record and the Director of OSY, to discuss his expectations of her in her new position.  Mr. Yamamoto made it clear that a number of things in the office needed to change, and he specifically told Ms. Richardson that her subordinates were not completing their work and, as their new manager, she was to take full accountability for their performance.  He also indicated that he wanted her to be able to work autonomously.

Unbeknownst to Ms. Richardson, the problems within OSY were much more severe and long-standing than she was lead to believe by Mr. Yamamoto.  There were significant work-related issues which had been inadequately addressed, endangering the mission of OSY, as well as serious morale problems which had resulted in numerous employees filing complaints.

When Ms. Richardson attempted to address these outstanding issues, and to take control of personnel matters, Mr. Yamamoto suddenly changed course.  Instead of

providing Ms. Richardson with management's support, time and time again, Mr. Yamamoto went out of his way to hinder and encumber Ms. Richardson's efforts to succeed as a supervisor. For example, Mr. Yamamoto allowed her subordinates to speak to her in a condescending manner, openly challenged her supervisory decisions in front of her subordinates, and took other steps to wrongly criticize her decision-making. Indeed, although he accused Ms. Richardson of not carrying out her duties as the Assistant Director of Counter Espionage, he nonetheless failed to offer any concrete or specific instances of when she did not effectively manage her office. In short, Mr. Yamamoto disparaged her and made unfounded allegations as a pretext to undermine her authority.

These incidents are significant because they highlight the disparate treatment which Ms. Richardson was subjected to during her tenure with OSY and provide indirect evidence of Mr. Yamamoto's retaliatory motive. Unlike her Caucasian and male counterparts, Ms. Richardson was erroneously held to a higher standard than others, failed to receive the support and mentorship necessary to carry out her duties, and made the scapegoat for deep-seated problems in OSY which predated her appointment.

When Ms. Richardson stood up to this disparate treatment and pointed out the unfair discrepancies in how she was treated in comparison to her Caucasian and male colleagues, Mr. Yamamoto quickly and swiftly reassigned her, an action which amounted to a demotion because he stripped her of her supervisory duties and responsibilities and gave her office and job to a Caucasian male, Thomas deSeve. Faced with this humiliation and embarrassment, as well as the fact that she was no longer assigned duties commensurate with her position and was forced to work in an undesirable and belittling environment, Ms. Richardson resigned her position.

Significant to this case, and Ms. Richardson's burden of proof, is evidence of Mr. Yamamoto's preferential treatment of comparators, such as Tom deSeve and Robert Page, among others, as well as the treatment her predecessors. In particular, testimony of co-workers and other evidence shows that Ms. Richardson was treated disparately. As such, this differing treatment demonstrates that the Agency's reasons for demoting or reassigning her after she complained to the EEO are pretext and that others were not punished for similar alleged transgressions. For these reasons, as will be set forth in greater detail below, Ms. Richardson should be allowed to obtain the discovery which would be necessary to prove her claims. This is particularly the case where, as here, there has been little, if no opportunity, for Plaintiff to seek comparator information.

## II.    FACTS

### a.    Evidence of Disparate Treatment Compared to Other Similarly Situated Management-Level Colleagues.

As the first and only African-American female to serve as the Assistant Director of the Counter Espionage Division (Am. Complaint at ¶ 9), Ms. Richardson came to the appointment with high expectations and, as she then believed, a mandate to turn things around in an Office which had many systemic problems and personnel issues. Indeed, when she first started, management appeared to support her. Mr. Yamamoto met with Ms. Richardson and advised her that things were not on the right path and she needed to change things. Employees needed to be made accountable, and she was encouraged to find out what was wrong so that the office could get back on the right track. Declaration of Parthenia Richardson, EEO Report of Investigation, Dated November 16, 2005, p. 5, (Hereinafter "Richardson Decl."), attached hereto as Exhibit 1.

Toward that end, Ms. Richardson, eager to live up to Mr. Yamamoto expectations and to perform her job to the utmost of her ability, began to analyze her work group. She also met with several officials and quickly discovered that nothing had been done in two years to develop the DOC's Declassification Program. Richardson Decl. at p. 5. As a result of her discovery, the Information Security Oversight Office ("ISOO") generated a report which was sent to the President of the United States indicating that Commerce was at significant risk of failing to met the December 31, 2006 deadline to declassify documents that were twenty-five years or older. Id. Instead of praising Ms. Richardson for her initiative in unearthing a task that needed to be completed expeditiously, Mr. Yamamoto chastised her for bringing the issue to the forefront of the Agency. Id. Indeed Mr. Yamamoto told her not to "air our dirty laundry." Id. Mr. Yamamoto's reaction surprised Ms. Richardson as he himself had indicated that she was to get her department on the right path. Thus, she was baffled by his unfounded criticism, as it was completely inconsistent with what he had previously instructed her to do.

Shortly thereafter, Ms. Richardson again encountered antagonism from Mr. Yamamoto when she undertook the task of hiring new staff to support her work and to assist in making necessary changes to OSY. To fill the positions within her division, Ms. Richardson consulted with Jonathan Perez in Human Resources. Richardson Decl. at p. 8. Although HR informed her that a panel was not necessary for the lower graded position she was filling, Ms. Richardson nevertheless formed a panel of individuals who had experience in performing the duties the selectee would perform because she thought it would be valuable to get their input. Id. See also Am. Complaint at ¶ 12.

However, when the three individuals on the panel were unable to participate in the interviews of the applicants, Ms. Richardson was forced to select a candidate based solely on her own input.  Richardson Decl. at p. 8; Am. Complaint at ¶ 12.  Although this was well within Human Resources policy, Mr. Yamamoto unfairly and inappropriately chastised her for making the decision without consulting him.  Richardson Decl. at p. 8-9; Am. Complaint at ¶ 13.  Ms. Richardson explained to Mr. Yamamoto that the panel she selected was unable to convene to interview the candidates and she made a selection because she could no longer delay filling the position.  Id.  Despite the fact that she had done nothing wrong, and simply was doing her job, he nonetheless informed her that she would no longer be allowed to select new hires.  Id.   This demonstrates the different treatment she was subjected to, as she was fully qualified, as a GS-15 level manager, to make hiring decisions, but unlike her male and Caucasian counterparts, Mr. Yamamoto unjustly prevented her from making such important supervisory decisions.

During  the next several months, Mr.  Yamamoto continued  to take steps and actions which undermined her decision-making, weakened her authority and diminished her capacity to carry out the changes she needed to make in OSY.  Am. Complaint at ¶ 14.  Mr. Yamamoto accused her of not carrying out her duties as the Assistant Director of Counter Espionage, but failed to offer any concrete or specific instances of when she did not effectively manage her office.  Id.  Mr. Yamamoto also openly challenged her managerial decisions in front of subordinates and counterparts.  Am. Complaint at ¶ 16.  He went out of his way to humiliate her and discredit her in front of the staff.  Mr. Yamamoto disparaged her and made unfounded allegations as a pretext to undermine her authority.  Id.

Conversely, Ms. Richardson's Caucasian male counterparts, Thomas deSeve and Robert Page, were not subjected to such disparate treatment. For example, only Ms. Richardson was singled out to attend an extra weekly meeting with Mr. Yamamoto that others were not required to do. Richardson Decl. at p. 9-10; Am. Complaint at ¶ 18. And, when issues or concerns were raised within the department, Mr. Yamamoto consistently believed Ms. Richardson's subordinates, or Mr. deSeve and Mr. Page, even when she provided documentation and proof to support her position. Am. Complaint at ¶ 17. This demonstrates that, unlike the treatment she received, Ms. Richardson's colleagues were allowed to make managerial decisions autonomously.

Moreover, when Mr. DeSeve and Mr. Page began treating her with disrespect and were condescending to her, Mr. Yamamoto did nothing to halt the inappropriate behavior. Am. Complaint at ¶ 15. This was, no doubt, because Mr. Yamamoto had the preconceived notion that an African-American female, like Ms. Richardson, was not capable of performing the job duties and responsibilities of a GS-15 level managerial position. Mr. Yamamoto's discriminatory perceptions of Ms. Richardson demonstrate that his rationale for reassigning or demoting her was pretextual and that he was motivated by retaliatory bias when she reported the differing standards which she was subjected to in contrast to her Caucasian and male colleagues.

Ms. Richardson was not alone in her perception of discriminatory bias within OSY. In particular, Kari Reid, a Caucasian female, noted that "the climate in the Office of Security is the worst [she has] seen in [her] nearly 20 years of US Government employment in terms of racial and gender discrimination." Declaration of Kari Reid, EEO Report of Investigation, Dated November 17, 2005, p. 4, (Hereinafter "Reid Decl."),

attached hereto as Exhibit 2.    She also testified that all women in OSY are routinely treated with a condescending attitude and Ms. Richardson was he only female in a top leadership position.  Id.  Furthermore, Mr. Yamamoto was demeaning to her and spoke to her "as if [she] were the lowest form of life on earth."  Id. at p. 10.  In contrast, males in the organization, regardless of experience or paygrade, will be spoken to by Mr. Yamamoto in a much more professional manner than any woman in the office.  Id.

Echoing Ms. Reid's sentiments, Delores PettyJohn, an African-American female, also noticed that Ms. Richardson was "set up" from the first day she began work at OSY because management was not ready for the changes she made and would not support her. Declaration  of Delores PettyJohn, EEO Report  of Investigation, Dated  November 26, 2005, p. 3, (Hereinafter "PettyJohn Decl."), attached hereto as Exhibit 3.   Based on her observations, Ms. Richardson was harassed and her authority was questioned.  Id. at p. 5. Ms. Richardson was the first Black female and Ms. PettyJohn did not see other managers treated that way.  Id.

Sharrieff Nashid, an African-American male, also noted disparate treatment and that Ms. Richardson was treated differently than her predecessor, Alan Miline, in that he was allowed to carry out his duties "without having to go through such great approval" from Mr. Yamamoto.  Declaration  of Sharrieff Nashid, EEO Report  of Investigation, Dated December 2, 2005, p. 4, (Hereinafter "Nashid Decl."), attached hereto as Exhibit 4. Ms. Richardson's position had never been previously held by a Black or a woman, and Mr. Nashid also experienced that he had to go through harder justifications than others do for his actions.  Id.   Based on his observations, most Blacks don't get the opportunity to be promoted to the position of Ms. Richardson, there are not any minority woman beyond

the GS-13 level, and, throughout OSY, woman have not been promoted beyond GS-14. Id. at 6.

      **b.**    **Mr. Yamamoto Retaliated Against Ms. Richardson When She Filed An EEO Complaint Concerning Disparate Treatment.**

On June 6, 2005, Ms. Richardson made her first contact with the Equal Employment Opportunity Office to discuss her concerns regarding Mr. Yamamoto's discriminatory behavior and disparate treatment. See EEO Memorandum dated August 31, 2005, attached hereto as Exhibit 5, p.1. Ms. Richardson spoke to Bernadette M. Worthy, an Equal Opportunity Officer, who reports directly to Mr. Otto Wolf, Chief Financial Officer and Assistant Secretary for Administration and Management. Sometime between June 6 and June 20, 2005, Mr. Yamamoto was notified that Ms. Richardson had filed a discrimination complaint against him and had requested ADR. Am. Complaint at ¶ 19.

On July 5, 2005, during mediation of the informal EEO complaint, OSY authorized Ms. Worthy to offer a proposed resolution to Ms. Richardson. See EEO Memorandum dated August 31, 2005, attached hereto as Exhibit 5, p. 2. These efforts at conciliation failed and on July 6, 2005, Ms. Richardson informed Ms. Worthy, who in turn informed OSY, of her intent to move forward with her formal EEO complaint. Id.

Shockingly, within days of the termination of her informal EEO complaint, on July 11, 1005, in retaliation for pursuing a formal complaint, Mr. Bell informed Ms. Richardson that Mr. Yamamoto had decided to temporarily reassign or demote her from her position to a "Special Projects" position for a period of 120 days. Am. Complaint at ¶ 22. Mr. Bell also informed her that Mr. DeSeve would assume her responsibilities and instructed her to vacate her office immediately so that Mr. DeSeve could occupy it, even

though Mr. DeSeve had adequate work space where he was currently located. Id. That same day, also in retaliation for exercising her civil rights, Mr. Bell gave Ms. Richardson a mid-year evaluation and cited performance issues that were completely inaccurate. Id.

Ms. Richardson was demoted in that she was stripped of her management and supervisory authority. Am. Complaint at ¶ 24. Mr. Yamamoto assigned her to work in an area that was far more inferior and substandard in comparison to the office she previously occupied. Am. Complaint at ¶ 25. Specifically, the space assigned to Ms. Richardson consisted of a little cubbyhole in the back of the offices occupied by Mr. Bell's section. Richardson Decl. at p. 18. Several of the lower level GS-14 employees had larger office space. Id. Furthermore, Mr. Yamamoto assigned Ms. Richardson duties relating to the Declassification Program, an assignment which had been handled by GS-12 and GS-14 employees, both of whom had been unsuccessful in completing the project. Id. Additionally, she was not provided with a written duty description and she was removed from e-mail distribution and senior staff meetings that her Caucasian male colleagues received and attended. Id. at p. 19.

Thereafter, on July 19, 2005, Ms. Richardson had surgery and through August 2005, due to complications arising from the surgery, was intermittently on sick leave. Am. Complaint at ¶ 28 & 30. Yet, during this time period, while she was recuperating, management harassed Ms. Richardson and continued to retaliate against her for filing the EEO complaint.

As a point of fact, on the same day she was scheduled for surgery, Mr. Bell harassed Ms. Richardson by e-mailing her to request that she call him about a certain file. Am. Complaint at ¶ 28. Shortly thereafter, on July 21, 2005, Mr. Bell, once again, e-

mailed her.  Id. at ¶ 29.  He requested that she have the Declassification Action Plan completed immediately upon her return, implying that she would have to work while out on sick leave.  Id.  Ms. Richardson suffered from stress and anxiety as a result and feared that she would not be able to complete the task while she was recovering from surgery.

On July 27, 2005, Ms. Richardson learned from her physician that she had developed complications from the surgery and that she could not go back to work as originally planned.  Am. Complaint at ¶ 30.  Once again, Mr. Bell harassed and retaliated against Ms. Richardson by e-mailing her on August 1st about work related issues during her sick leave, causing her an enormous amount of stress.  Id. at 31.

On August 17, 2005, Ms. Richardson requested a reasonable accommodation due to the high level of stress and anxiety caused by the harassment and the fact that she lost her job duties and responsibilities in retaliation for filing her EEO complaint.  Am. Complaint at ¶ 39.  Mr. Bell denied her request and informed her, that in his opinion, she was not under any stress because she was no longer responsible for her GS-15 position. Id.

Unable to endure any further retaliation by Mr. Bell and Mr. Yamamoto, on August 30, 2005, Ms. Richardson tendered her resignation, effective September 17, 2005. Am. Complaint at ¶ 41.

It is evident that the Agency harassed, humiliated and retaliated against Ms. Richardson when she filed her EEO discrimination complaint.  Indeed, management went out of its way to harm Ms. Richardson's professional reputation and to destroy her career by reassigning or demoting her and harassing her about leave issues.  This in turned has

caused Ms. Richardson significant anxiety and emotional distress, resulting in insomnia and other stress-related medical conditions.

## III.    STANDARD OF REVIEW

### a.    Motion for Summary Judgment.[2]

A Motion for summary judgment should only be granted when "there is no genuine issue as to any material fact". Rule 56(c). A genuine issue is one which could establish a claim or a defense and thus effect the outcome of the action. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "material" facts in a civil action are determined by the substantive law of the claims presented. Id., at 248.

Further, in considering the summary judgment issue, the court must view all evidence in the light most favorable to the non-movant. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(citations omitted); Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999). Summary judgment should not be sustained unless the record, when considered as a whole, precludes a rational trier-of-fact from a finding for the non-moving party. Liberty Lobby, Inc., 477 U.S. at 248-249. The role of the trial court at the summary judgment stage is limited to discerning whether there are genuine issues of fact, not to deciding those issues. Lafond v. General Physics Corp., 50 F.3d 165, 172 (2d Cir. 1995)("district court erred by resolving a disputed issue of fact and [drawing] inferences in favor of the movant."); Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir. 1986), cert. denied, 480 U.S. 947, 94 L. Ed. 2d 791, 107 S. Ct. 1605 (1987)(A summary judgment motion does not empower a court to

---

[2]    It appears that Defendant does not seek dismissal of Plaintiff's Title VII claims pursuant to Rule 12(b)(6).  Accordingly, only the standards for Rule 56(c) are set forth herein.

act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.)

Recognizing its "drastic nature," the Courts of Appeal have consistently cautioned against granting summary judgment "unless it is perfectly clear that there are no genuine issues of material fact in the case" and, especially in employment discrimination cases, as here, when the "state of mind is a decisive element of a claim... " Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004-05 (4th Cir. 1987) (internal citations omitted).  Accord Young In Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1261 (7th Cir. 1993)(Summary judgment is "often an inappropriate method of resolving Title VII claims in which the issue of intent . . . is the central issue."); Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir. 1995)("Summary judgments should only be used sparingly in employment discrimination cases."); Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223-24 (2d Cir. 1994)("A trial court must be cautious about granting summary judgment [in a discrimination case] when . . . the central issue is intent . . .").  Moreover, where there are a number of discrepancies in the facts asserted by the parties, as here, summary judgment should not be used at all.  Reeves v. Jackson Plumbing Co., 530 U.S. 133 (2000).

By virtue of the fact that well-established case law supports Ms. Richardson's case, and the numerous material facts in genuine dispute, as set forth *infra*, it is clear that the  Agency's motion for summary disposition should be denied and that this matter should  proceed so that Ms. Richardson has a fair opportunity to engage in discovery to support the allegations in the Amended Complaint.

**b.      Summary Judgment Should Be Denied Where There Has Been Insufficient Opportunity to Take Discovery.[3]**

In the present case, the Court should permit Ms. Richardson to develop facts supportive of her claims of pretext by allowing her to propound discovery. Indeed, courts have routinely denied motions for summary judgment outright so that the parties could properly take discovery. The general rule is that summary judgment is improper if the non-movant has not had an adequate opportunity for discovery. See Plott v. Gen. Motors Corp., 71 F.3d 1190, 1195 (6th Cir. 1995).

Summary disposition is especially disfavored where, like here, Plaintiff's ability to prove pretext is heavily dependent upon witness testimony, credibility issues and other evidence requiring discovery. Indeed, the significance of discovery is a well accepted concept by the courts. For example, in San Filippo v. Bongiovanni, 30 F.3d 424, 432 (3d Cir. 1994), the appellate court noted that the plaintiff submitted a Rule 56(f) affidavit seeking to take additional discovery in order to rebut the defendant's claim that the plaintiff would have been dismissed even in the absence of his protected activities. In overturning the district court's ruling, the Third Circuit acknowledged that the district court has discretion on making decisions on Rule 56(f) motions. Nonetheless, the

---

[3]   In the present case, Defendant seeks dismissal of Plaintiff's Title VII claims pursuant to Rule 56. For the reasons set forth in greater detail below, such a motion is premature as no discovery has been taken. Defendant will likely claim in its Reply that sufficient "discovery" was taken during the administrative processing of the case. However, the filing of a civil complaint in U.S. District Court is *de novo*. See Chandler v. Roudebush, 425 U.S. 840, 845-846 (1976)(acknowledging that since the civil action provided in § 706 is a trial *de novo*, federal-sector employees are entitled to a trial *de novo* of their employment discrimination claims). See also Farrell v. Principi, 366 F.3d 1066, 1067 (9th Cir. 2004) (confirming that the claimant may seek *de novo* review of the disposition of his administrative complaint by filing a civil action in district court); Doe v. United States, 821 F.2d 694, 697-98 (D.C.Cir. 1987) (holding that "[d]e novo means here, as it ordinarily does, a fresh, independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion.")    As such, any facts relevant to Ms. Richardson's complaint arising from the administrative case should be considered anew and Ms. Richardson should have the opportunity to pursue, as well as introduce, new evidence and legal theories to support her claims. See also Rule 56(f) Affidavit in Support of Plaintiff's Opposition to Defendant's Summary Judgment Motion, attached hereto.

appellate court emphasized that where relevant information sought is in the hands of the moving party, "a district court should grant a Rule 56(f) motion almost as a matter of course . . ." <u>Id</u>.

The same applies here.  Ms. Richardson's case should not be dismissed without allowing her to seek information concerning the disparate treatment which Ms. Richardson was subjected to during her tenure with OSY.  Such discovery will allow Ms. Richardson to show that she was first unfairly prevented from exercising her supervisory authority, and held to higher standards than her comparators, and then stripped of her authority when she exercised her EEO rights.   Evidence of Mr. Yamamoto's preferential treatment of comparators will  support the  fact that Mr. Yamamoto's reasons for her reassignment or demotion were pretext to hide his retaliatory intent.  This is pivotal information that only the Agency maintains. <u>See also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 n.5 (1986)(explaining that Rule 56(f) provides that summary judgment must be denied where the nonmoving party has not had the opportunity to discover information that is essential to his opposition); <u>Reed v. Lawrence Chevrolet, Inc.</u>, 2001 WL 838404 (7th Cir. 2001)(denying Rule 56(f) motion where employee reasonably could not be expected to challenge the sincerity of the defendant's proffered reasons (i.e., lack of experience, no long-term interest in sales, gaps in Reed's employment record) without having, at least, the opportunity to conduct discovery regarding whether the selecting official applied the same standards to Caucasian applicants); <u>Hellstrom v. U.S. Dep't of Veterans Affairs</u>, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary  judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."); <u>Sutera v. Schering</u>, 73 F.3d 13, 18 (2d Cir.

1995)(summary judgment was entered before any discovery had taken place. In these circumstances, it cannot be said that plaintiff had a full and fair opportunity to show that defendant's articulated reason for his dismissal was pretextual); <u>Messina v. Local</u>, 205 F. Supp. 2d 111, 127 (S.D.N.Y. 2002)(granting plaintiff's cross-motion for relief under Rule 56(f) and, accordingly, denying defendants' motion for summary judgment); <u>Niagara Mohawk Power Corporation v. Consolidated Rail Corporation</u>, 97 F. Supp. 2d 454, 458 (N.D.N.Y. 2000)(premature to grant employer summary judgment, as no formal discovery has taken place yet).

Clearly, to dismiss the Complaint at this early stage, without the benefit of any discovery on Ms. Richardson's allegations, would deprive her of the opportunity to prove her case.  On the other hand, permitting time for discovery will not substantially prejudice defendant.  In sum, it is in the interest of justice, and to assist the Court with a more developed record, to allow Plaintiff to take discovery before reaching an ultimate decision on the merits.

## IV.    ARGUMENT

### a.    Ms. Richardson Can Establish A Prima Facie Case Of Retaliation.

To state a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) that a reasonable employee would have found the challenged action so materially adverse that she would have been dissuaded from engaging in the protected activity, and (3) that there was a causal connection between the protected activity and the challenged retaliatory act.  <u>Pegues v. Mineta</u>, 2006 WL 2434936 (D.D.C. August 22, 2006); <u>Rochon v. Gonzalez</u>, 438 F.3d

1211, 1219-20 (D.C. Cir. 2006); Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000) (a *prima facie* case of retaliation is established by the employee showing that the "employer took an adverse employment action against him, and that the adverse action was causally related to the exercise of his rights."); Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002); Brown v. Brody,  199 F.3d 446, 452-53 (D.C. Cir. 1999).

Whereas the anti-discrimination provisions of the statute seeks a workplace where individuals are not discriminated against, the "anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees."  Burlington  Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006).

For this reason, retaliation does not have to be the primary cause for the challenged employment decision; rather, it must merely play a role or be a *motivating factor* for the adverse action and plaintiff need only demonstrate that an employer used a forbidden consideration with respect to any employment practice.  See Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)(a plaintiff may prove a defendant violated Title VII by demonstrating that discrimination was a *motivating factor* in the employment action at issue)(emphasis  added); Arthur Young & Co. v. Sutherland, 631 A.2d 354, 370 (D.C.App. 1993)(Plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that Defendant's adverse actions were improperly motivated, i.e*.,* that, more likely than not, a desire to penalize the assertion of protected rights was a *substantial contributing factor* in Defendant's decision to engage in the challenged acts)(emphasis added); Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986) ("Title

VII is violated *if a retaliatory motive played a part* in the adverse employment actions, even if it was not the sole cause.")

The Court in McDonnell Douglas v. Green, 411 U.S. 792, 805, (1973) cautioned against strict interpretation of the standards, stating that "the facts necessarily will vary in [employment discrimination], and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13.  See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 253, n.6; Alvarado v. Board of Trustees, 928 F.2d 118 (4th Cir. 1991)(acknowledging that it was permissible to modify the McDonnell Douglas test in recognition of the Supreme Court's statement that the test should vary with differing applications of Title VII).

Thus, Ms. Richardson's burden of establishing a *prima facie* case "is not onerous." Burdine, 450 U.S. at 253 (1981).  See also Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000)("of particular significance to this case, the burden of establishing *prima facie* case is "not onerous"); Fernandes v. Costa Brothers Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999)(described *prima facie* case as a "modest hurdle"); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000)(stating that burden of establishing a *prima facie* case is "minimal"); Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000)(burden of establishing *prima facie* case is "de minimis"); Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000)(reversing lower court's grant of summary judgment to the Title VII defendant because it had "applied an unduly inflexible standard" in evaluating plaintiff's *prima facie* case); Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 1999)(*prima facie* requirement is "not onerous" and poses a "burden

easily met"); <u>Bellaver v. Quanex Corp.</u>, 200 F.3d 485, 493 (7th Cir. 2000)(reversing grant of summary judgment to the Title VII defendant because plaintiff's evidence on the *prima facie* case need not be overwhelming or even destined to prevail . . . plaintiff's burden is a "low burden"). In sum, the importance of the prima facie case is to "point toward illegal discrimination." <u>Holmes v. Bevilacqua,</u> 794 F.2d 142, 147 (4th Cir. 1986).

Given the flexibility of the *prima facie* case, Ms. Richardson undoubtedly fulfills her *prima facie* burden. Ms. Richardson first contacted the EEO office on June 6, 2005. Within weeks, on July 11, 1005, in retaliation for pursuing her rights, Mr. Bell informed Ms. Richardson that Mr. Yamamoto had decided to remove her from her supervisory position, an action that amounted to a demotion. In its Motion, Defendant appears to attack Ms. Richardson's *prima facie* case based on its unfounded contention that Mr. Yamamoto's reassignment of Ms. Richardson was not a materially adverse action and/or that there is not the requisite causal link. Def. Mot. Summ. Jud. at 22. Accordingly, Plaintiff will focus on showing that she has met this burden.

      i.        **Mr. Yamamoto's Demotion of Ms. Richardson on July 11th Constitutes an Adverse Action.**

Consistent with the D.C. Circuit holdings, and the Supreme Court's decision in <u>Burlington Northern</u>, an expansive definition of adverse employment action is applicable here. The statute itself proscribes "discrimination" against those who invoke the Act's protections; the statute does not limit its reach only to acts of retaliation that take the form of a cognizable employment actions.

    . . . . . To establish a prima facie case under section 704(a) [ *42 U.S.C. § 2000e-3*(a)], a plaintiff must show: 1) that he or she engaged in activity protected by the statute; 2) that *the employer . . . engaged in conduct having*

*an adverse impact on the plaintiff*; and 3) that the adverse action was causally related to the plaintiff's exercise of protected rights.

Passer v. American Chemical Soc., 935 F.2d 322, 331 (D.C. Cir. 1991) (emphasis in original)(citing Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1423 (D.C. Cir.)(per curiam), supplemented on other grounds on reh'g, 852 F.2d 619 (D.C. Cir. 1988)).  Consequently, "less flagrant reprisals" by employers may indeed be adverse in nature.  Wanamaker  v. Columbia Rope Company, 108 F.3d 462 (2d Cir. 1997).    See  also  Forkkio, 306 F.3d at 1130-1131 (although purely subjective injuries….are not adverse actions, the threshold is met when an employee experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.)

In Burlington Northern, the U.S. Supreme Court specifically rejected Defendant's contention that an adverse action is limited to a loss of grade, salary or benefits.  Def. Mot. Summ. Jud. at 23.  Indeed, "[a] provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." [citations omitted.]  Thus, purpose reinforces what language already indicates, namely, that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.  Burlington Northern, 126 S.Ct. at 2412-13.

Similarly, in Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006), the D.C. Court of Appeals found that the district court had erred when it held that the plaintiff had

not suffered an adverse employment action. Although the plaintiff did not have a reduction in grade, pay, or benefits, the defendant, nonetheless, subjected the plaintiff to a drastic reduction in her work responsibilities. In that case, the Court held that adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents. So long as a plaintiff meets the statutory requirements of being "aggrieved" by an employer's action, we do not categorically reject a personnel action as nonadverse simply because it does not fall into a cognizable type. Id. The Court also expressly recognized that "reassignment with significantly different responsibilities … generally indicates an adverse action." Id., citing Forkkio, 306 F.3d at 1131. See also Howard v. Gutierrez, 237 F.R.D. 310 (D.D.C. 2006)(where the plaintiff received a poor evaluation, was denied the opportunity to telework from home and learned that the employer wanted to force her out, the Court held that the issue of whether a particular employment action was 'materially adverse' is fact-intensive and "depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances.'"); Stewart v. Ashcroft, 352 F.3d 422, 477 (D.C. Cir. 2003)("while generally lateral transfers, or the denial of them, [will] not be considered adverse employment actions, there are circumstanced where they [may] be."

This rationale was also followed by this Court in Kalonski v. Gutierrez, 435 F.Supp.2d 55 (D.D.C. 2006), a case strikingly similar to Ms. Richardson's. In Kalonski, the plaintiff was a federal employee who served in a managerial position. Shortly after she filed an EEO complaint, her supervisor informed her that she would be reassigned to a newly created position at the same pay grade. Kalonski at 61. He also informed the

plaintiff that she would report to a new manager. <u>Id</u>. As a result of these retaliatory actions, the plaintiff began to suffer from anxiety and depression and subsequently went on medical leave. <u>Id</u>. During her absence, management posted her former position and although the plaintiff applied for it and achieved a perfect score, management instead hired the individual who had replaced the plaintiff. <u>Id</u>.

Similar to the case at hand, there was no dispute that the plaintiff had engaged in protected activity. Also similar to the case at bar is defendant's feeble attempt at downplaying the plaintiff's reassignment under the auspices that a reassignment alone, without a decrease in pay, did not constitute a materially adverse action. <u>Kalonski</u> at 62. The plaintiff in <u>Kalonski</u> argued that the reassignment constituted an adverse employment action for three principal reasons: (a) the plaintiff was stripped of her supervisory duties; (2) she suffered a loss of advancement potential and; (3) she was effectively moved down within the agency hierarchy because she no longer reported directly to a Presidential appointed and Senate-confirmed official. <u>Kalonski</u> at 65.

The Court agreed with the plaintiff and stated that the latter two points, when combined with the first point, lent credence to the argument that plaintiff suffered materially adverse consequences as a result of the reassignment. <u>Kalonski</u> at 65. Moreover, the Court also indicated that the plaintiff's argument, that the Agency's reassignment caused her reputation to suffer harm, was not entirely immaterial to her claim. <u>Id</u>. As for the plaintiff's change-in-reporting argument, the Court stated that it was undeniable that one's influence and authority within the hierarchy of a government agency may be affected by the identity of one's immediate supervisor and that there may

be circumstances where the identity of one's supervisor is relevant to determining whether a change in job description constitutes an objectively tangible harm.  Id.

In weighing all the arguments, the Court in Kalonski held in favor of the plaintiff and ruled that the job actions which she was subjected to were adverse.  Kalonski at 66. Because the "the prima facie burden should not be onerous and […] all reasonable factual inferences must be drawn in favor of the non-moving party, the Court concludes that there is a genuine issue of material fact as to whether plaintiff suffered an adverse employment action.  Although a jury may ultimately conclude that the position was not meaningfully different, the evidence now before the court fails to support a finding as a matter of law that the reassignment did not entail objectively tangible harm".  Id. at 68.

With these precepts in mind, it is clear that Ms. Richardson was subject to an adverse action when she was removed from her position and essentially demoted.

Prior to the actions of Mr. Bell and Mr. Yamamoto, Ms. Richardson was a management level, GS-15 level employee with a staff that she supervised.

As a direct result of her June 6th complaint, she was reassigned to a non-existent "Special Projects" position.  Am. Complaint at ¶ 22.   She was stripped of her management and supervisory authority and was not provided with a written duty description.  Moreover, when Mr. Bell and Mr. Yamamoto eventually assigned duties to Ms. Richardson, they were those of a GS-11 or 12.   Am. Complaint at ¶ 24; Richardson Decl. at p. 18-19.

She was forced to leave her office and work in a little cubbyhole in the back of the offices occupied by Mr. Bell's section.  Richardson Decl. at p. 18-19.  Her work space was substandard in comparison to the office she previously occupied and several of

the lower level GS-14 employees had larger office space.  Am. Complaint at ¶ 25; Richardson Decl. at p. 18-19.

She was also removed from e-mail distribution and no longer invited to senior staff meetings.  Richardson Decl. at p. 18-19.  And, her former job duties and responsibilities were given to a similarly situated male, Mr. DeSeve.  Am. Complaint at ¶ 22.

Of equal significance and importance is the fact that Ms. Richardson was still in her one year probationary period when Mr. Yamamoto demoted or reassigned her.  Under Federal personnel policy, Ms. Richardson's detail would not count towards completion of her one year probationary period.  Thus, when Mr. Yamamoto ultimately decided to detail Ms. Richardson by stripping her of her supervisory duties, he caused her to career to come to a complete standstill.

Finally, when she took leave for surgery and complications arising from the surgery, she was further retaliated against by management during her recuperating period and constantly harassed about unfounded work related issues.  Am. Complaint at ¶ 28, 29 30, 31, 39.  Unable to tolerate further retaliation, Ms. Richardson resigned.  Am. Complaint at ¶ 41.  Plainly, these are the types of "workplace-related or employment-related retaliatory acts and harm" contemplated by Kalonski and Burlington Northern.  These actions easily meet the threshold of dissuading a reasonable employee from making a charge of discrimination.  Taken in totality, management's actions were, no doubt, adverse and unlawful under Title VII.

ii.    Ms. Richardson's Demotion on July 11th Within Weeks of Instituting Her EEO Complaint Establishes a Causal Connection.

In order to establish the requisite "causal link," a plaintiff need only establish that the protected activity and the adverse action were not wholly unrelated. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). This showing may include presenting direct or circumstantial evidence establishing that the employer was aware of the protected activity at the time that it took the adverse employment action. Goldsmith, 996 F.2d 1155, 1163. As such, a prima facie showing of causation does not require a large quantum of proof. See, e.g., Karpel v. Inova Health System Services, 134 F.3d 1222, 1229 (4th Cir. 1998) (finding that fact of adverse employment actions following filing of EEOC claim met the prima facie burden for causation); McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991) (plaintiff stated a prima facie case even though there was no evidence of causal connection other than the fact that plaintiff was fired after bringing a lawsuit).

Evidence establishing a close temporal proximity between the employer's knowledge of protected activity and the adverse employment action has long been regarded as particularly probative in establishing the causal connection element of the prima facie case of retaliation. Clark County School District v. Breeden, 532 U.S. 268, 273-274; Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F. Supp. 318, (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976); Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir. 1986) ("causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge"). See also, Carter v. Ball, 33

F.3d 450, 460 (4th Cir. 1994) (finding a *prima facie* case of retaliation where a demotion occurred less than two years after filing of first complaint and approximately six months after second complaint).

Here, the causal connection between Plaintiff's protected activity and the subsequent retaliatory actions by the Agency is particularly strong and persuasive. Ms. Richardson filed her EEO complaint on June 6, 2006. See EEO Memorandum dated August 31, 2005, attached hereto as Exhibit 5, p.1. Within weeks, on July 11th, she was reassigned and essentially demoted. Am. Complaint at ¶ 22. Highly probative is the fact that Mr. Yamamoto and Mr. Bell had direct knowledge of Plaintiff's oppositional activities before he took the actions at dispute. Am. Complaint at ¶ 19.

Accordingly, the Agency's argument, that Plaintiff fails to demonstrate a nexus between her protected activity and her demotion or detail, is fallacious. Defendant attempts to cover-up its retaliatory motives by claiming that it contemplated the demotion or reassignment before Ms. Richardson made contact with an EEO counselor on June 20th. Def. Mot. Summ. Jud. at 24.

First, Ms. Richardson made initial contact with the EEO counselor in June 6th. See EEO Memorandum dated August 31, 2005, attached hereto as Exhibit 5, p.1.

Secondly, actions speak louder than words. Although the Agency contends that it "thought about" reassigning Ms. Richardson, the fact remains that it did not actually do so until *after* she filed her EEO complaint. Am. Complaint at ¶ 22. Moreover, the Agency provides no documentation that Ms. Richardson's detail was "in the works" before she contacted the EEO in early June. Thus, the timing of the aforementioned events establishes a close temporal proximity between management's knowledge of Ms.

Richardson's protected activity. The decision to detail her and remove her supervisory duties is particularly probative in establishing the causal connection element of the *prima facie* case of retaliation.

Notwithstanding the proximity in time between various protected activities and the ongoing adverse employment actions, circumstantial evidence of supervisory awareness of previous and ongoing protected activity supports an inference that retaliatory motivation played a significant role here. Quite commonly, this awareness is established by circumstantial evidence since employers rarely freely admit damaging information. <u>See</u>, <u>e.g.</u>, <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993) (holding that plaintiff offered sufficient circumstantial evidence to satisfy the causal link requirement of her prima facie case).

Highly illustrative of the importance of circumstantial evidence in the context of a summary judgment motion is <u>Dey v. Colt Construction & Development Co.</u>, 28 F.3d 1446 (7th Cir. 1993). In ruling that the plaintiff did not need to establish by a preponderance of the evidence at the summary judgment stage that one of her supervisors was aware of her sexual harassment complaints, the Court held that all the plaintiff had to do is to "produce evidence that would support an inference that the [supervisor] was so aware." <u>Dey</u>, 28 F.3d at 1458. [4]

Accordingly, because Mr. Yamamoto was aware of Ms. Richardson's complaint before he detailed her, a causal connection exists. Moreover, at a minimum, a legitimate

---

[4] In <u>Dey</u>, the employer discharged the plaintiff shortly after she first complained about sexual harassment by her supervisor. Defendant argued that the decision-maker, the owner of the company, did not have knowledge of the plaintiff's protected activity. Ruling that circumstantial evidence was sufficient to establish knowledge, the court reasoned that because only the owner and the sexual harasser were privy to their own discussions, it must consider their testimony denying knowledge with circumspection and ruled that plaintiff had presented sufficient to establish a sufficient causal connection to establish that the owner may have known of her complaints. <u>Dey</u>, 28 F.3d at 1459 n.12.

dispute of fact exists as to the timing of management's knowledge of Ms. Richardson's complaints and it would therefore be prudent to allow discovery to further determine the correct timeline.[5]

> **b.** **Evidence in this Case Could Lead a Trier of Fact to Conclude that the Defendant's Proffered Reasons for Demoting Ms. Richardson Was Pretext for Retaliation.**

Once plaintiff has demonstrated a prima facie case, the burden shifts to the defendant to articulate with clarity and reasonable specificity a legitimate, nondiscriminatory reason(s) for the action it took. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 253, 256 (1981); Bundy v. Jackson, 641 F.2d 934 (D.C.Cir.1981). To satisfy this "intermediate burden," the defendant is obliged to produce evidence "which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine at 257; St. Peter v. Secretary of the Army, 659 F.2d 1133, 1139 (D.C. Cir.1981 ).

If the defendant is able to articulate a legitimate business reason(s) for its actions, plaintiff must be provided the opportunity to show that defendant's articulations are pretext. In other words, plaintiff must show either that 1) a discriminatory reason more likely motivated defendant or that 2) the defendant's proffered explanation is unworthy of credence and more than likely not the real reasons for the decision(s) at issue. McDonnell Douglas v. Green, 411 U.S. 792, 805, (1973).

---

[5] Discovery will undoubtedly assist in establishing this timeframe. For example, the EEO counselor, Ms. Worthy, is required to report and update her supervisor, Otto Wolf, Chief Financial Officer and Assistant Secretary for Administration and Management, of the discrimination complaints filed in the EEO office. As such, it is highly probable that Mr. Wolf informed Mr. Yamamoto of Ms. Richardson's complaint and establishing when such a conversation may have occurred is critical to her case. Additionally, Ms. Richardson met with Mr. Jamison and Mr. Gunther in late May 2005 to express her concerns about Mr. Yamamoto's discriminatory behavior and discovery is necessary to prove this fact, as well as whether it impacted Mr. Yamamoto's decision-making.

Because of its variety and depth, a plaintiff alleging discrimination may present evidence in support of her case pursuant to the guidelines set out in the D.C. Circuit's *en banc* decision in Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998)(*en* banc). There, the Court categorized data supportive of a plaintiff's claims into three areas: plaintiff's prima facie case, evidence of pretext regarding the employer's proffered reason for its action and other evidence regarding the defendant's behavior that may be relevant to the ultimate determination.

### i.     Temporal Proximity Raises an Inference of Retaliatory Intent.

Here, the Agency seeks to convince the Court that it had supposedly valid reasons for reassigning Ms. Richardson. Specifically, the Agency claims that Ms. Richardson's performance was the reason for Mr. Yamamoto's decision to remove her from her position. Def. Mot. Summ. Jud. at 26-29.

Notwithstanding these assertions, simply put, the facts undeniably show that Mr. Yamamoto took immediate and fairly swift action to reassign or demote Ms. Richardson within weeks of engaging in protected activity. Further, management unreasonably harassed Ms. Richardson when she sought to take leave.

At this stage in the litigation, the same body of evidence adduced to establish the plaintiff's prima facie case applies with equal force in establishing that the defendant's stated business reason is pretext. Kolstad v. American Dental Assoc., 108 F.3d 1431, 1436 (D.C. Cir 1997) vacated on other grounds, 139 F.3d 958 (D.C. Cir. 1998); Shelborne v. Runyon, No. 95-0641, 1997 U.S. Dist. LEXIS 13583 (D.D.C. 1997).

As such, the compelling strength of the evidence which shows a close proximity in time between the protected activity and the adverse action can also be used to raise an

inference of retaliatory motive to rebut defendant's stated reasons for its actions. <u>See</u> <u>DiCarlo v. Potter</u>, 358 F.3d 408 (6th Cir. 2004)(where the proceedings to terminate plaintiff were instituted thirteen days after he had filed an EEO complaint, the court ruled that "the temporal proximity between" the filing of the EEO complaint and the supervisor's initiation of the termination proceedings within a short period of time thereafter, "[was] significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive."); <u>Oliver v. Digital Equip. Corp.</u>, 846 F.2d 103, 110 (1st Cir. 1988) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation").

Given the Agency's immediate and adverse reaction to Ms. Richardson's EEO complaint, a jury could reasonably conclude that a discriminatory reason more likely motivated the Agency than its supposed legitimate reason.

### ii. Defendant's Proffered Reasons are Subject to Significant Questions of Fact and Credibility Determinations.

Plaintiff may also rebut the Agency by showing that its actions lack credence, are unworthy of belief, that disparate and inexplicable treatment occurred after exercising protected rights, or any other method of proof which tends to show that the Agency's explanation is not the real reason for the decision-making. <u>See</u> <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1289 (D.C. Cir. 1998)(<i>en</i> banc). Courts may also look to the evidence as a whole in the light most favorable to the plaintiff. <u>Buggs v. Powell</u>, 293 F.Supp.2d 135, 149 (D.D.C. 2003) ("Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection").

In applying these precepts to a motion for summary judgment, the D.C. Circuit instructed that a plaintiff must present sufficient evidence so that "a reasonable jury could conclude that she was terminated for a discriminatory reason." Waterhouse v. District of Columbia, 298 F.3d 989 (D.C. Cir. 2002) at 992, citing Aka, 156 F.3d at 1290. As the Court pointed out there, the question is:

> [W]hether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of *discriminatory statements or attitudes* on the part of the employer)....

> Id. (Emphasis added) citing Aka at 1289; see Reeves, 530 U.S. at 151.

Accordingly, a plaintiff is not required to produce direct evidence of discrimination and, in most cases, proves discrimination by inference in a Title VII case. See Gates v. Georgia-Pacific Corp., 326 F. Supp. 397, 399 (D.Or. 1970) (direct evidence of discriminatory animus is basically impossible to produce), aff'd, 492 F.2d 292 (9th Cir. 1974); see also United States Postal Serv. Bd. of Governors v. Aikin, 460 U.S. 711, 716 (1983). e.g., (Emphasis added). This standard is applied because statutory retaliation clauses prohibit any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the plaintiff or others from engaging in protected activity. Burlington Northern, 126 S.Ct. 2405 (2006).

Reliance on circumstantial evidence and inference is commonly required because there is seldom "'eyewitness' testimony as to the employer's mental processes." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). See also Hunt v. Cromartie, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence.").

In the case at hand, Defendant contends that performance issues allegedly motivated its decision-making. Def. Mot. Summ. Jud. pp. 26-29. However, this is belied by fact that Mr. Yamamoto prevented Ms. Richardson from carrying out her supervisory responsibilities and subjected her to disparate treatment in comparison to her similarly situated colleagues. Evidence of the treatment of comparators is therefore necessary and this case should not be summarily dismissed.

As a point of fact, at the beginning of Ms. Richardson's tenure at OSY, Mr. Yamamoto met with her and outlined his expectations of her as the new Assistant Director. Richardson Decl. at p. 3, 5. He made it clear that there were difficulties in his department, namely, a number of employees that were not working to their potential. Id. at p. 3, 5. Mr. Yamamoto also presented Ms. Richardson with a number of hypothetical difficult situations and asked how she would handle them. Id. Ms. Richardson was given the impression that Mr. Yamamoto expected her to act autonomously and she had no objection, as she was confident in her ability to manage. Mr. Yamamoto expressed his pleasure at having her on board as the new Assistant Director and, initially, it appeared that he would be supportive. Id.

Strangely, when Ms. Richardson began exercising her authority at the Assistant Director, Mr. Yamamoto changed his tune. In fact, although he seemed supportive at first, it was not long before Mr. Yamamoto undermined her authority. When Ms. Richardson attempted to hold her subordinates accountable for their work, he failed to support Ms. Richardson in these efforts. Richardson Decl. at 3. In fact, Mr. Yamamoto told Ms. Richardson "you need to make allies, not enemies". Id. When Ms. Richardson uncovered that the department was more than two years behind on a declassification

project, Mr. Yamamoto instructed Ms. Richardson not to "air out our dirty laundry". Id. at p. 5. When Ms. Richardson made the decision to select a new hire without a selection panel, a decision well within Human Resources policy, Mr. Yamamoto admonished her for making the decision and not informing him. Id. at p. 8-9. Time and time again, Ms. Richardson acted with autonomy and each and every time, in response, Mr. Yamamoto attempted to suppress Ms. Richardson from carrying out her supervisory duties. Yet, when Ms. Richardson's Caucasian male counterparts, Thomas DeSeve and Robert Page made similar autonomous decisions, Mr. Yamamoto did not question them. Am. Complaint at ¶ 14-17.

Other employees also support the fact that Ms. Richardson was subject to disparate treatment and discovery is necessary to obtain information from these witness and to expand upon their observations. See Reid Decl. at p. 4, 10; PettyJohn Decl. at 3, 5; Nashid Decl. at 4, 6.

Defendant also asserts in its Motion that management was concerned with its loss of staff during Ms. Richardson's tenure. Def. Mot. Summ. Jud. at 28. What defendant fails to mention is that Ms. Richardson had inherited a division in turmoil (Richardson Decl. at 23) and discovery will allow her to obtain evidence of the high turnover rate that existed prior to her appointment as the Assistant Director. Accordingly, the ability to take discovery regarding the turnover rate at OSY would enable Ms. Richardson to prove that Defendant misappropriates the so-called loss of staff to her management and the contention is fabricated to create a pretext for its retaliatory actions.

Clearly Ms. Richardson has bought to light several points of disputed fact and issues of credibility between Defendant's assertions and her own.  At a minimum, Ms. Richardson should be allowed the opportunity for discovery to prove her claims.

## V.    CONCLUSION

For all the foregoing reasons, this Court should deny Defendant's Motion to Dismiss and for Summary Judgment.


Dated: December 11, 2006                    Respectfully submitted,


                                   _____/s_____
                                   Camilla C.  McKinney, Esq.
                                   Law Offices of Camilla C McKinney, PLLC
                                   1100 Fifteenth Street, N.W., Suite 300
                                   Washington, D.C.  20005
                                   (202) 861-2934/(202) 514-9111 (fax)
                                   Attorney for Plaintiff Parthenia Richardson

### CERTIFICATE OF SERVICE

I hereby certify that on this 11th day  of December, 2006, I caused a true and correct copy of the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment, to be served electronically, to:

Charlotte Abel
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W., Civil Division
Washington, D.C.  20530
Counsel for Defendant

                                   _____s/_____
                                   Camilla C. McKinney

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **PARTHENIA RICHARDSON** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-00517 (ESH) |
| v. | ) | |
| | ) | |
| **CARLOS M. GUTIERREZ,** | ) | |
| **SECRETARY** | ) | |
| **U.S. DEPARTMENT OF COMMERCE** | ) | |
| | ) | |
| Defendant. | ) | |

_____)

### <u>ORDER</u>

Upon consideration of the Defendant's Motion to Dismiss and for Summary Judgment, Plaintiff's Opposition thereto, and the entire record herein, it is hereby ORDERED that the Motion is DENIED.


It is so ORDERED this _____ day of _____, 2006.


_____
U.S. District Court Judge


Copies to:

| | |
|---|---|
| Charlotte Abel | Camilla C. McKinney |
| Assistant United States Attorney | Law Offices of Camilla C McKinney, PLLC |
| Judiciary Center Building | 1100 Fifteenth Street, NW, Suite 300 |
| 555 Fourth Street, N.W., Civil Division | Washington, D.C. 20005 |
| Washington, D.C.  20530 | (202) 861-2934 |
| (202)307-2332 | Counsel for Plaintiff |
| Counsel for Defendant | |