# PLAINTIFF'S
# EXHIBIT 1

## DECLARATION OF MS. PARTHENIA RICHARDSON

Ms. Parthenia Richardson

v.                                                    Agency Case No. 05-51-00166

U.S. Department of Commerce

I, Parthenia Richardson, pursuant to 28 U.S.C. § 1746, hereby declare.

I understand that this is the claim accepted for investigation:

I, Complainant, formerly the Assistant Director for Counter Espionage, GS-15, Office of Security, Office of the Secretary, Department Of Commerce allege that I have been subjected to a continuous pattern of discrimination and harassment constituting a hostile work environment due to my race (Black) and sex (female). I cite the following:

1. During the period of May to June 2005, Richard Yamamoto did not support me as a supervisor and challenged my employment actions, despite my having obtained guidance from the Office of Human Resources and the Office of General Counsel.

2. In June 2005, Yamamoto took away my ability to make supervisory decisions, including hiring selections.

3. Since June 2005, Yamamoto requires me to meet him on a weekly basis for 30 minutes to discuss supervisory decisions and duties.

4. During the period of May to June 2005, Yamamoto failed to provide me any positive feedback, despite receiving positive feedback from two major clients, and also failed to openly acknowledge my contributions to the organization.

5. During the period of April to June 2005, Yamamoto undermined my authority with staff by allowing them to come directly to him with their concerns and siding with them on controversial matters without first obtaining my rationale for employment decisions and actions.

6. In May 2005, Yamamoto allowed my Caucasian male counterparts and subordinate staff to communicate with me in a disrespectful and condescending manner.

1 of 25

Initials

7. During the period of April to May 2005, Yamamoto treated me with hostility and openly challenged any statements I made in staff meetings and other open forums.

8. On June 1, 2005, Yamamoto told me that he, his colleagues, and his staff did not have confidence in my ability to manage, and added that while he had received outstanding recommendations from previous supervisors and was excited about my coming on board, he now had doubts. At that time, Yamamoto also stated that he had no more "blue chips" available, and that he has used them all up.

I, Complainant also allege retaliation for having engaged in the EEO complaint process when:

9. On July 11, 2005, I was informed by Dave Bell, Acting Deputy Director, Office of Security, that effective July 12, 2005, I was being temporarily reassigned from my position as Assistant Director for the Counter Espionage Division for a period of 120 days. I also learned that Thomas de Seve, a Caucasian male counterpart, was assigned to assume my responsibilities while continuing his current responsibilities.

10. On July 11, 2005, Bell gave me a mid-year counseling that was less than favorable and cited items/issues that were inaccurate.

11. On July 11, 2005, I was informed that I was to move out of my office so that de Seve could occupy my space. I contend that de Seve already had adequate space, which would have allowed him to effectively manage both his pre-existing duties and the duties reassigned to him. I further contend that Linda Guier and Susan Powers, two Caucasian, GS-14 female managers, were reassigned from under my supervision on May 9, 2005, yet were not required to relocate.

12. I was required to move to a workspace where GS-14 employees had better accommodations.

13. The duties given to me on my reassignment are GS-11 and GS-12 duties.

14. On August 17, 2005, I spoke to Bell and requested reasonable accommodation, as recommended by my physician for stress and Bell commented, "You are not under any stress, we just moved you from stress."

15. As a result of the refusal to comply with my request concerning the stress and to escape the hostile work environment, I "submitted an involuntary termination" (i.e., constructive discharge) on September 6, 2005.

For the purpose of this declaration I confirm that my race is Black.

Initials

*Why do you believe Management's treatment since April 2005 was based on discrimination due to your race and sex?*

Response: When I first got there, management seemed to support me and they told me what needed to be changed. They told me some of the things I might encounter. They asked if I thought I could handle it. They gave me a scenario for almost everything I would face. For the first 30–45 days, it appeared as though they backed me. When my employees started to complain because no one had ever made them do what they were supposed to do, management began to feel uncomfortable with all the complaints. The employees knew that by complaining they could get management to move them.

Mr. Yamamoto had told me to clean up everything. He gave me a promotion to come to do this job. Two months later, he called me in and said people believed I was making them look bad and I needed to make allies not enemies. He'd take the word of anyone over mine. All my GS-15 counterparts are White males. Tom de Seve and Bob Page two of my white male counterparts had supervised or been detailed over the employees in my former division at some point. When they told him anything, Mr. Yamamoto took their word and did not accept what I said, even when I gave him documentation to support it.

*Why do you believe Mr. Yamamoto's actions were based on discrimination due to your race and sex?*

Response: Because I was the only Black female ever in that position and to hold the grade of GS-15 and the obvious disparate treatment between myself and my white male counterparts. He even supported personnel actions of the former

Initials

3

white female Deputy Director (Cheryl Stone); whom left Commerce after 6

months due to frustration with all the personnel issues within the Office of

Security.  Mr. Jay Jamison should be able to attest to this.

*Were you hired in February 2005?*

Response: Yes.

*What was your previous position?*

Response: GS-14 Security Specialist at Homeland Security.

*Was this position announced and did you apply?*

Response: Yes.

*Were you interviewed?*

Response: Yes, I was interviewed in person by Dave Bell and Bob Page, the

Assistant Director for Emergency Operations (or Services). He was detailed to

oversee the division I had before I got there.  Bell was then the Acting Deputy; he

is now the Deputy.  Both are White males.

I was told they would give their recommendation to Mr. Yamamoto and he would

make the final selection.

*Would Mr. Yamamoto have known your race and sex?*

Response: If they told him.  Yes, he should have known because the Special

Agent in Charge in the Office of Security, Sharrieff Nashid, knew me personally

from before.  Bell and Page asked him about me.  Nashid told me they did and

they told me they were interviewing him.  They also got a recommendation from

my then current assistant secretary  and his deputy assistant secretary.

*You said for the first 30-45 days, Mr. Yamamoto supported you.  What*

Initials

*precipitated the problems in April?*

Response: My employees were not doing the work that they were being paid to do.  Mr. Yamamoto met with me during my first days at Commerce for about an hour and a half and laid this out for me.  I was to look into complaints and make employees accountable.  As a new person, my job was to find out what they were doing.  I was told things were not on the right path and I was to guide them. As I started meeting with people from OPM, ISOO and NSA, I asked them what was wrong so I could get us all on the right path.  In my opinion, no one understood what the job entailed and what needed to be done. As a result of these meetings, I learned nothing had been done in two years in the development of and effective Commerce Declassification Program. A report was sent to the President of the United States stated "Commerce is at significant risk of failing" to meet the December 31, 2006 deadline for declassifying documents that were 25 years or older (this report was generated by ISOO). Mr. Yamamoto appeared to  not like me meeting with agencies and told me to not air our dirty laundry.

*Had Ms. Powers and Ms. Guier applied for your GS-15 position?*

Response: That's the rumor I heard. I was told they had hated each other until I came and got the job.  When I came, they banded together to get rid of me.

*Do you think they wanted to get rid of you to get your job?*

Response: They didn't like the fact that I was there, that I told them what to do, and gave them suspenses.  They were two GS-14's making $90,000 or more a piece and I didn't understand why they didn't have the basic tools needed to

Initials

manage people and perform the duties to which they were assigned. They knew
Mr. Yamamoto's style, i.e., if you complain about someone, you get moved or
they get moved.

*Why would Mr. Yamamoto side with them against you when he could have*
*selected them in the first place?*

Response: As I held them accountable, they filed complaints with the IG and sent
letters to the Secretary and he stopped believing in me. He told me if they are
making all these complaints, they have to be true.

I will send you two letters I received from clients thanking me for doing things and
handling the staff.

Mr. Yamamoto had settled two or three EEO complaints out of court, so they
knew how he was. Frank Silver filed a complaint based on age discrimination.
He is a White male. Lee Ballard's is another person who filed a complaint was
settled by letting him work out by Quantico Marine Base, near his house, just to
get him out of the Office of the Security and I believe there was more to the
settlement. He is a white male .

*What employment actions did Mr. Yamamoto challenge and how did he not*
*support you as a supervisor in May to June 2005?*

Response: Basically, in the complaints from others who were not doing their jobs.
He called me in and said, if you told me to do that I'd be upset too. They knew all
they had to do was talk to him and they didn't have to do anything I said.

Initials

*What guidance did you obtain from the Office of Human Resources and the Office of General Counsel and who, specifically, did you speak with in those offices?*

Response: I talked to them about Carla Fisher. That was another thing I just walked in on. Mr. Yamamoto asked me if she was performing adjudications. I asked her supervisor, Linda Guier. She told me, yes. I told Rich. Ms. Fisher had had some legal problems in Baltimore. She told me about the problems herself. As a result, her security clearance had been suspended in October 2004. She said she never saw the letter suspending her clearance. I found that it had been put in her file and no other action taken. She was not restricted from doing adjudication on security clearances.

*Why did Mr. Yamamoto have a problem with your action?*

Response: He had asked me what should have been done. I said she should have been moved out of the office until the court proceedings were concluded. He didn't appear to want to do that but he did, and she filed a complaint against me. Her complaint was based on age and race. She is a Black female, over 40, just like me. Her complaint was dismissed.

This was the first time he mentioned people were upset with me. Bob Page was then Acting Division Director and he was the one who did not take action. HR and General Counsel said a personnel action, separate from the clearance, should have been done.

*You said Mr. Yamamoto prevented you from making supervisory decisions, including hiring selections, in June 2005. Had you made a selection?*

Initials

Response: I had one employee who left and I had received the selection certificate. I talked to Jonathan Perez in HR and asked for information on making a selection. He said the procedures differed based on the grade level of the position. I attempted to get a panel even though this was a lower graded position because I wanted to get input from my employees who had experience in performing the duties the individual would perform and it would be valuable to obtain their input on selecting the right fit. I asked three adjudicators to sit in with me as I interviewed. I received no written guidance. The employees never did sit in with me, so I did it myself. I selected the best qualified. Mr. Yamamoto saw, on the office calendar, that I was having interviews and asked me who was on the panel. I sent an email to Office of Security HR specialist and was told there was no written policy. The latter was told by Mr. Bell that Rich's policy was to have a panel.

When I came to work on the first day, I was just thrown in the office and I started working. There was no book and no policy given to me. I got my hands slapped. *How did you get your hands slapped?*

Response: Mr. Yamamoto was upset with me for not using a panel. He called me in, he was upset, and he said you know I require a panel. He questioned my ability to make the selection. He asked me if I called their references and if I knew the person. I don't know how I'd be a GS-15 if I didn't know that stuff already, nor how I was selected to fill this position if they did not believe I could perform these duties. Also as indicated on my resume I had already taken a two

Initials

week senior leadership and management course while during my initial one year

probationary period as a GS-14 supervisory/managerial employee.

*During what period of time were you prevented from making these decisions?*

Response: There were two other selections from two other lists that he did not let

me do. Mary Isley, a Black female, was on a list for a GS-13 and was selected by

Mr. Yamamoto and Mr. Bell after they reassigned me. I thought she was the

least qualified among the other candidates, especially the 30-point veteran

preference candidates. After I was reassigned, he canceled a list. Mr.

Yamamoto wanted to give the position to Alarie Shyllon, a Black female, who

was responsible for the failed program that I was assigned to complete, because

he didn't want to lose her. I didn't find her the most qualified on an earlier list and

it is apparent she was not prepared for a GS-13 as she could not successfully

fulfill the duties as a GS-12. He canceled one list, which had opened for a

Personnel Security Specialist, and opened another announcement for an

Information Security Specialist, basically so he could select her. Both positions

were in my former division.

*You stated that since June 2005, Mr. Yamamoto requires you to meet him on a*

*weekly basis for 30 minutes to discuss supervisory decisions and duties. How*

*long did that requirement last?*

Response: I met with him twice, the first time was on June 6 and the second was

June 13. The third time I had to do it, I was preparing for an emergency

preparedness exercise and I had to go to Philadelphia. After that time period he

Initials

received notice of my informal EEO complaint and within the next 2 weeks I was reassigned from my position.

*Was there anything particularly burdensome for you in meeting with him?*

Response: It was burdensome and humiliating because I already attended senior staff meetings once a week with my white male counterparts in which the purpose was to discuss what had occurred since the last meeting and what you were working on within your division. His rationale was that he wanted me to sit with him and explain what I was doing and how I was doing it, so Tom de Seve wouldn't have to tell him what was going on in the division and it wouldn't be a surprise to him. This requirement also was disparate treatment.

*Why would Mr. de Seve be telling him what was going on in your division?*

Response: Tom and Susan Powers were, allegedly, romantically involved and Tom was defensive of any actions I would take involving her. Mr. Yamamoto and Mr. Bell told me of the allegations concerning the two of them. Tom takes personally what is done to her, he's like her guardian angel. She worked for him and had to be removed because of the allegations. Both were married.

*When and how did you learn you received positive feedback from two major clients?*

Response: I received telephone calls from Mike Carroll, Director for Administration at Bureau of Industry and Security and Doris Brown, Director Human Resources at International Trade Administration informing me that they had sent letters to Mr. Yamamoto in the month of June 2005. They asked me if I

Initials

had received their letters when I said no they gave me copies. I can provide copies to you.

*What staff members went directly to Mr. Yamamoto during the period of April to June 2005 and how did this undermine your authority?*

Response: Susan Powers, Linda Guier (white females), Allarie Shyllon, and Geneva Alston, (black females).

There was a controversial issue involving Geneva. Mr. Yamamoto explained to me that she had been out on Worker's Compensation after falling in the building. After speaking to HR, I wanted to see if she needed reasonable accommodation for her injury. She took it as handicap discrimination. Her disability was not documented as such. When she would be angry because of deadlines or requests for her to perform her assigned dutiesshe often obtained a doctor's note and did not come to work for a couple days. She was out of work more than she was in. I suggested we needed to find a solution and that there was work she could do at home since her injury was preventing her from coming in. When she was out one time, she sent in a doctor's note. She was out of sick leave. The note specified that she was disabled for a specific period. She came in on the last day of that period and I told her supervisor Linda Guier that she had to go home since she came in one day early. I checked with HR and I told her I could not take the risk if she were to become injured. Geneva went home and on April 20, sent an e-mail to Mr. Yamamoto and his boss, Otto Wolff.

*Who communicated with you in a disrespectful and condescending manner and how was their manner disrespectful and condescending?*

Initials 

Response: I had e-mails from Tom de Seve's subordinate (Carroll Ward, white male) challenging something I said to him in an earlier e-mail. Ward sent me an email on 31 May 2005 specifically giving me orders and making judgment calls, clearly second guessing the policy that I had outlined per official guidelines with regard to cases. As an example he stated, "We need to know ASAP what your determination is, it should not take more than 3-4 working days to turn around our completed packages to make a determination!" There was a pattern with the way that de Seve ran his division in comparison to mine. My subordinates knew that they could speak with other division heads if they had issues, so long as they were respectful. However, de Seve would not allow me to speak directly to his subordinates on any issue and did not reprimand them for lack of respect. I told Dave Bell and he said, "being challenged is not being attacked or accused of guilt of any kind."

*How did Mr. Yamamoto allow this; was he aware of it?*

Response: He was aware of the problems I had in getting cooperation. He thought it was my fault. I only received cooperation from Harold Washington and Dane Woodard (black males), Richard Duncan and Carroll Ward (white males) refused to cooperate with any of my efforts. They are the 4 field managers assigned to Tom de Seve. He and Mr. Bell said, at first, we thought it was just people not being cooperative but when so many complain, you have to face up to it being your problem and what you are doing is wrong. They said this at the meeting on June 1.

Initials

6    12

*What statements of yours did Mr. Yamamoto challenge in staff meetings and other forums during April to May 2005?*

Response: These were senior staff meetings. That was another reason why I didn't understand why I had to meet with Mr. Yamamoto, since we had these meetings. At these meetings, I would bring up OPM's problem with us not having uploaded any data to the database for over a year. He'd get mad. I don't know why. He mentioned to me before that I didn't need to open a can of worms and didn't need to expose our weaknesses. As I met with them, i.e., officials from different agencies, they would contact me and ask me why something was not done. They knew I would try to fix it.

*You stated on June 1, 2005, Mr. Yamamoto told you that he, his colleagues, and his staff did not have confidence in your ability to manage. Did he say what, specifically, caused him and them to loose confidence in your ability to manage?*

Response: The complaints being made against me. He and Mr. Bell asked me what I thought was the problem. I said, I was doomed to fail. Things were so bad when I got here that they needed to fail so I could fix them. I said, because he was not supporting me, I had to fail. I told him the employees in my division had no formal training. They were only doing what others told them to do. If you reassign someone to a job and they don't know what they are doing, you need to send them to school. The supervisors, Guier and Powers, were not qualified to do what they were doing either.

*You also said that Mr. Yamamoto added that while he had received outstanding recommendations from previous supervisors and was excited about you coming*

Initials

*on board, he now had doubts and that he had no more "blue chips" available, and that he has used them all up. What was he referring to?*

Response: He said, I know you're used to working for powerful people, i.e., generals, and they can back anything you do. Here, I don't have those kind of blue chips. I assumed he meant with Otto Wolff.

*To your knowledge, had any other subordinates of Mr. Yamamoto had their hiring or other employment decisions challenged by employees or had complaints or grievances filed based on actions they had taken?*

Response: I know there were a lot of complaints against Mr. Bell prior to him becoming deputy director. Kari Reid filed a grievance or an EEO complaint. Another guy, James Van Brunt, volunteered to go on active duty to get out of the office. Sharrieff Nashid also had a lot of issues with Mr. Bell as well.

I was told the IG received an anonymous complaint about my personal credit information having been discussed throughout the office. Mr. Yamamoto told me about it. I think he thought I made the complaint, but I was just as shocked as he was. I don't know who called it in. Mr. Yamamoto had me do a credit release for Harold Washington so he could investigate it. Susan and Linda had access to the information from a credit report and released it before I got there. It was discussed by the whole office. I was told this during my interview, so I'd be aware of the kind of people I'd have working for me.

*Do you believe the reason given by Mr. Yamamoto for his actions, i.e., that he was receiving too many complaints about you and that led him to conclude the way you were doing things was the problem, was not valid or was not his true*

Initials

6            12

*reason and that he was really discriminating based on your race and sex because Mr. Bell also had a lot of complaints and he didn't take the same attitude with Mr. Bell?*

Response: Yes I believe that, because of the disparate treatment of the complaints against Mr. Bell, in comparison with those against me, that Mr. Yamamoto's actions were based upon my race and sex.

*Did he select Mr. Bell for promotion?*

Response: Yes.

*You allege reprisal in actions taken by Mr. Bell. Do you believe he was acting at Mr. Yamamoto's direction?*

At first, I felt he was doing what he was told. The actions he tried to take after I left showed me he was involved.

*What were these actions?*

Response: He altered my resignation documents and because I felt this might happen I had provided an advance copy to Jay Jamison, Bonnie Worthy prior to my resignation. I also sent an email the day I resigned to these same individuals which also outlined my reasons for resignation.

*Do you know when and how Mr. Yamamoto and Mr. Bell became aware you alleged discrimination in your treatment by Mr. Yamamoto?*

Response: I believe it was on June 26. The EEO Counselor told me she forwarded my concerns to management.

*Why did Mr. Bell tell you that you were being temporarily reassigned?*

Initials

6        15

Response: Mr. Bell stated it was so I could assist him with some programs/projects that he did not have time to focus on in his role as the Acting Deputy Director, as he then gave me a mid-term counseling and he addressed issues listed in the counseling: loss of key individuals and others stating they were actively seeking other employment, a decline in personnel during the entire period; the working environment in the division was at an all time low with even a temporary employee asking for release; loss of confidence; failure to meet with director on a weekly basis; rude, harsh, and dictatorial communication skills; field office complaints; changing policy without approval; to date that I had not taken responsibility for deficiencies in the division and attributed them to others. The counseling was done on July 11, 2005 exactly one week after I declined an offer of resolution during the informal EEO process. I didn't receive my performance standards until May 17, 2005 although I began working at Commerce on February 20, 2005, some 90 days later.

*Why would Mr. de Seve been reassigned to your division if there were problems in his relationship with Ms. Powers? Are there dates for the meetings?*

Response: On May 9, 2005, Susan Powers and Linda Guier were reassigned from my division by Mr. Yamamoto to develop programs identified by the Commerce Inspector General. . I did not agree with the rationale for their reassignment (to escape my leadership) but did state that I felt I could manage the division better if they were not in the way. Even Mr. Bell said he did not agree and he stated to both of them in various meetings with me present during March and April 2005 they needed to find a way to work with their new supervisor. He

Initials

also explained he did not feel they were being fair to me because they had not given me a chance.

*When they were reassigned, were you directly supervising their subordinates?*
Response: Yes. They were, not functioning in the division as Personnel Security Manager (Guier) and Information Security Manager (Powers), but Guier never moved. Powers moved the sometime between the last week in June 2005 and the first week in July 2005 right before I was reassigned. They were allowed to remain in my workspace and disrupt my work force, and I discussed this with Mr. Bell and Yamamoto several times.

*Where was Mr. de Seve located before he was assigned your workspace?*
Response: In an office in the same building, just down the hall. I asked the reason for the move and was told they wanted him to sit in there. He never actually moved into my office at all. Guier was allowed to run the division from July 12, 2005 until right after I resigned. No one moved into my office until a month ago.

*Who moved in?*
Someone from the DOC Office of Security, a person who works for Tom de Seve. He was told to come up and do the job by Tom because Tom said he didn't have time to do it. He is from an office in Gaithersburg. His name is Dane Woodard. He's a Black male. He is sitting, physically, in the office. He's a GS-14.

*Where was your new workspace located and why was it less favorable than that of GS-14's?*

17 of 25

Initials

Response: The space they gave me was a little hole-in-the-wall near where Dave Bell's people sit. It was a little cubbyhole hidden in the back of the section, across the hall from my old division. There were GS-14's with larger and nicer office space, and right before I departed they were making plans to take the space I was sitting in and knock down a wall to make a full size office for a new GS-15.

*Why do you believe the duties you were assigned were GS-11 and GS-12 level duties?*

Response: They were the duties of the failed Declassification program Alarie Shyllon, a GS-12 Information Security Specialist, and Susan Powers, a GS-14 Information Security Manager, were responsible for. Mr. Yamamoto had a meeting with the director in charge of ISOO and said we would get things done. In this meeting Mr. Yamamoto and Mr. Leonard agreed if Commerce got the program up and running then Mr. Leonard would not report that we were still at significant risk of failing. Rather the current status was reported as not enough information available at this time. They did not have the skills to do it and the agency said we did not have the right format and they had no confidence we know what to do. Mr. Yamamoto got hostile when I brought it up, that we were not meeting the mandate. I was expected to accomplish what Alarie and Susan should have done, I was not doing management and oversight of the program.

*Minutes from an OSY Staff Meeting held on July 12, 2005 indicate the staff was advised you would be focusing "on implementing several high-level departmental initiatives to include the declassification initiative and installation of SIPERNET*

Initials

connectivity. You were also supposed to support COOP, HSPD-12, Census Decennial and other highly priority projects." Were you actually assigned and working on any or all of these other projects?

Response: No and I was never provided any written duty description. I was also removed from email distribution and senior staff meetings that my white male counterparts attended.

When did you advise management that stress was a medical concern?

Response: On August 17, 2005, I spoke to Mr. Bell and requested reasonable accommodations as recommended by my physician and was told "you are not under any stress, we just moved you from stress. If we take this program from you and give it to someone else they will have stress and besides I don't know who would do it." My request for reasonable accommodation was processed through the health unit and the EAP. A copy was also sent to Mr. Bell, HR, GC, and EEO. Previously, when Mr. Bell spoke with me on July 11, 2005 Mr. Bell said he knew I had trouble sleeping and thought the move would alleviate stress.

What accommodation had you requested?

Response: I asked to be moved to another bureau, per my doctor's note dated 8-16-05 "Parthenia Richardson is in medical need of being removed from the current emotionally stressful work environment where she is presently placed."

Would they have had the authority to do that?

Response: After the request goes through the health unit, management has input and agrees to release me. Management would have to work with HR and

19 of 25                                                    Initials

the health unit to find reasonable accommodation and agree to it and offer it to me. If they (management) didn't say yes, it couldn't happen.

*Was the statement you cited Mr. Bell made, i.e., about believing the move had relieved you of stress, his only response?*

Response: When I went to see him on August 17, 2005, he wasn't in and I left the doctors note with is secretary. Later that morning, I asked him if he received it and he said he had, but that he didn't look at it yet. I asked him to do so because it was in my best interest medically to be moved. He said, if I move you it would cause stress to someone else because I don't know who else could do the declassification program.

*Was there anyone else that could do it?*

Response: Within my office, no. In other offices, I don't know. I was not privy to their qualifications. The program was failing for two to three years. Susan and Alarie were both given performance awards/bonuses for work on the program by management prior to my assignment to Commerce. In my opinion, Alarie should have been made to perform the duties to which she was assigned; not be allowed to pass them on to me her previous supervisor to accomplish.

*If the program was failing to meet a mandate, why would they receive kudos?*

Response: Because no one really understood what was involved and no one met with the people I did. Susan Powers and Bob Page (and previously Alan Milne the person I replaced) signed everything that went out and Mr. Yamamoto alleged he was not aware of the issues until I brought them to his attention.

Initials

*Did you discuss you treatment with anyone other than Mr. Bell and Mr. Yamamoto, i.e., HR or a higher level management official?*

Response: I requested to see Mr. Wolff by e-mail, but got no response. I did speak with Fred Schwien, a White male, who I knew from the Army while on active duty. He is the Executive Secretariat for DOC and works directly for the Deputy Director for Commerce. He know my character and work ethic. He said, if it gets to the point where you think you're going to lose, find a new job. He also had issues with Guier and some employees concerning his security paperwork. I had to help him straighten it out during my first weeks at Commerce.

*Why did he not intervene?*

Response: I told him I was coming to him unofficially. I just wanted him to listen and tell me what he thought, personally. I never asked him to intervene.

*Do you believe Mr. Bell and Mr. Yamamoto wanted you to resign?*

Response: Yes. Mr. Yamamoto and Mr. Bell wanted me to meet with them weekly and tell them what was going on, how the action plan was developing in meeting the deadline. I was out for surgery and personal mental health days, on approved sick leave, and while I was out Mr. Bell sent me e-mails asking me the status. Every day I received e-mails and I was told that when I come back I was to have an action plan. How was I to do that if I had to present it on the same day I came back?

*Why was accomplishing this program suddenly so important?*

Response: It finally came on their radar. It was going to the President again, for the second time. The ISOO Presidential deadline was coming up in December

Initials

31, 2006 and there was no program developed to accomplish this goal. There was also a promise made to Mr. Bill Leonard, ISOO by Mr. Yamamoto that Commerce would develop declassification program and an action plan on how the department would meet the deadline. In exchange for this promise the letter to the President did not state for the second year that "Commerce is at significant risk of failing." Instead Mr. Leonard reported there was not enough information to make a determination if Commerce will make the deadline."

*Why do you believe management's actions were due to reprisal and not management's previously expressed dissatisfaction with your actions as a manager?*

Response: I believe it was reprisal because I declined the offer of informal resolution one week before my detail which included the following: a. Detail Counselee to the position of Special Projects Officer, ZA-0080-V/1, for a period of ninety (90) calendar days effective July 10, 2005. Counselee's duty station during her detail will be Bureau of the Census headquarters in Suitland, Maryland. Counselee's first level supervisor will be Harold Washington (a subordinate who worked for Tom de Seve). b. Provide Counselee a statement of work performed for the Office of Security for the period from February 22, 2005 to the effective date of this Agreement. This statement of work will be prepared by Richard Yamamoto or his designee and will be provided to Counselee within twenty-one (21) calendar days of the effective date of this Agreement. c. Inquiries from potential future employers regarding Counselee's employment with the Agency will be directed to the Human Resources Manager or his/her designee,

Initials

6                    2- 7

who will provide the following information only in response to such inquiries: Counselee's title, series, grade, salary, and dates of service. Failure by any Agency employee unfamiliar with the terms of this Agreement to abide by the requirements of this paragraph will not constitute a breach of this Agreement. d. Process Counselee's resignation effective October 10, 2005, unless Counselee leaves the Agency prior to that date.

Coupled with management not presenting me with the letters of appreciation from two major bureaus (dated in May and June 2005) expressing their gratitude for my outstanding support, which also noting they understood the difficult task I had because I inherited a division in turmoil. .

*Who is John Guenther?*

Response: Employment Law Chief, Office of General Counsel.

*Do you believe Mr. Bell and/or Mr. Yamamoto wanted you to resign?*

Response: Yes, I believe they created an environment to make me leave or find a new job.

*Why?*

Response: It was also offered in the offer of resolution during the informal phase, see above offer. Also, I believe because I made things come to light that hadn't been done. I feel they took it personally because I did the job they told me to do and in the process uncovered things that had not been done for years. My white male predecessors and white female subordinates had not accomplished these tasks and assisted Mr. Yamamoto and Mr. Bell in doubting my discoveries, thus making it very difficult for me when addressing these issues.

23 of 25

Initials

6         23

*What are you now seeking as relief?*

Response: 1.  Reinstatement to an equivalent position (GS-15) to duties commensurate to the abilities upon which I was initially hired.

2.  Reinstatement for annual leave and sick leave that was used for stress related absences as documented by my physician; and compensation for lost wages/benefits incurred as a result of my involuntary termination.

3.  Compensatory damages for embarrassment and emotional distress.  This includes demoralization as a result of the unwarranted removal from my position as Assistant Director and the relocation from my office to an area considered beneath that of someone in my position and grade.

4.  Nondiscriminatory placement outside of the Office of Security in an equivalent position (GS-15) that would afford me the same career opportunities as that which I was hired to occupy given my professional background had discrimination not occurred.

5.  Removal of the mid-year counseling from Mr. David Bell, Acting Deputy Director, dated July 11, 2005.

*Do you have a job now?*

Response: No.

*What amount are you requesting for compensatory damages?*

Response: I have not thought of that

*If you have any documentation to support your request you should submit it with your signed declaration.*

24 of 25

Initials

I have read the above statement consisting of 25 pages. I declare under the penalties of perjury that my statement is true, correct and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Parthenia Richardson

Executed on: 11/16/05

6        25